INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
COMMERCIAL ARBITRATION TRIBUNAL
_____x

PBS HOLDING GROUP, INC. (f/k/a NATIONAL PAINTBALL
SUPPLY, INC.),

                                Claimant,

           vs.

                                                Case No.:
                                              50 181 T 00252 05

PROCAPS, L.P. (f/k/a PAINTBALL L.P.),

                              Respondent.
_____x

## FINAL ARBITRATION AWARD

    WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreements entered into by the above-named parties, dated September 20, 2004 and June 12, 2002, as modified on September 20, 2004, and having been duly sworn, and having duly heard the proofs and allegations of the parties do hereby issue the following FINAL ARBITRATION AWARD:

### I
### FACTS

**A. The Industry**

    As chronicled during sixteen days of hearings, this arbitration relates to the paintball industry. Paintball is a competitive game in which players use gas-powered markers (similar to air guns) to launch at each other marble-sized, dye-filled gelatinous capsules known as "paintballs." The purpose of the game is to eliminate (kill) opposing players by striking them with a paintball. Paintball is reportedly a $400 million per year industry, based on sales by manufacturers and distributors to paintball stores and fields.

## B. <u>The Parties</u>

Claimant PBS Holding Group, Inc. is the recent successor to National Paintball Supply, Inc. ("NPS")[1] At all relevant times, NPS was a paintball game supply and distribution company founded by Gino Postorivo which sold various types of paintball equipment, including paintballs, markers, goggles, air systems, loaders, parts and apparel. NPS' core business has been the sale of such products to what is referred to in the industry as the "conventional market"-- paintball fields and stores that operate similarly to golf courses and golf pro-shops. NPS has also sold to customers in the "mass market" such as Wal-Mart and Dick's Sporting Goods.

Since 1998, Procaps Encapsulation, Inc. ("PEI") has been in the business of manufacturing paintballs, and in the same time frame, PEI's sister company, AirTech Industries, Inc. ("AirTech"), has been in the business of manufacturing goggles. In a transaction that closed on March 7, 2005, the assets of PEI and AirTech were sold to a new company--Respondent Procaps, L.P. (f/k/a Paintball L.P.). At that point, Procaps L.P. became engaged in the manufacture of paintballs and goggles which, in turn, were distributed by Procaps L.P.'s subsidiary, Procaps Direct, as well as by NPS and others. Except where necessary to distinguish among them, PEI, AirTech, Procaps L.P. and Procaps Direct are collectively referred to herein as "Procaps."

## C. <u>The Relevant Contracts</u>

On September 20, 2004, NPS and Procaps entered a paintball distribution contract (the "Paintball Contract") which largely superseded an agreement the parties had entered on February 28, 2002. On June 12, 2002, NPS and AirTech entered a goggles distribution

---

[1] Shortly after the hearings, the Panel was advised that NPS had changed its name to PBS Holding Group, Inc. as part of a merger with a paintball manufacturer. These companies are collectively referred to herein as "NPS" without regard to the time period in question.

contract which was amended on September 20, 2004 ("Goggles Contract"). These two contracts are briefly discussed below.

### The Paintball Contract

The Paintball Contract provided that NPS would be the exclusive distributor of DraXxus paintballs, a proprietary line of Procaps, and Procaps would be the exclusive manufacturer of paintballs bearing the name Diablo, which had been covered by a trademark belonging to NPS. Despite these elements of exclusivity, however, Procaps was free to sell private label and its own branded paintballs to third parties (subject to best pricing protection in favor of NPS), and NPS was free to purchase paintballs from other manufacturers provided it met specified minimum purchase requirements for DraXxus and Diablo paintballs (initially 1.7 billion paintballs, with annual increases of 10% per year during the final five years of the Contract).

### The Goggles Contract

The Goggles Contract provided that: (i) NPS had the exclusive right to distribute all masks and goggles manufactured by AirTech, including the VForce line, into the "Conventional Market," as defined in the Agreement; and (ii) absent NPS' written consent, AirTech could not sell VForce masks and goggles into the "Non-Conventional" (mass) market, defined in relevant part as "any retail outlet where less than fifteen percent (15%) of the gross sales of said outlet are derived from paintball and paintball game related products and services."

* * * *

The Paintball Contract and the Goggles Contract (collectively referred to as the "Contracts") had the following common terms, among others:

3

1.  The terms of the Contracts were for seven years, with an automatic renewal for another seven year period unless terminated by either party upon written notice delivered at least six months prior to the end of the initial term.

2.  The Contracts provided for payment within 45 days of shipment, but Procaps/AirTech could not terminate for failure to pay within this 45 day period unless NPS was unable to cure or provide adequate assurances of performance within thirty days of a notice of default.

3.  Neither party could assign its rights or obligations under the Contracts without the express written consent of the other party.

4.  The Contracts were to be "construed and the legal obligations between the parties" were to be determined "according to the substantive laws of the State of New Jersey, USA."

5.  All notices or other communications which were required or permitted to be given by one party to the other under the terms of the Contracts were to be furnished in writing and sent by registered or certified mail.

**D. Success of the Relationship**

In the words of Greg Vance (one of the founders of Procaps), the manufacturing/distribution relationship between Procaps and NPS was a "huge success" right from the start. Thus, for example, NPS' purchases always exceeded the Contracts' requirements, and its annual sales went from $48 million immediately prior to the Contracts to more than $117 million in 2004, which was the last full year of the parties' contractual relationship. Similarly, Procaps annual sales increased from $17 million prior to the Contracts to more than $48 million in 2004.

4

**E. Payment Arrangements**

Soon after execution of the Contracts, the parties agreed to a payment arrangement whereby NPS would not send checks corresponding to specific invoices but would instead send Procaps an overnight package containing five checks in five separate envelopes which were marked with the day of the next week on which they were to be cashed. The practical effect of this payment arrangement was that NPS continually had an overdue balance in relation to the 45 day payment terms of its Contracts with Procaps. Notwithstanding the terms of the Contracts, the parties consistently followed this payment methodology, partly because it typically took Procaps four to six months to credit NPS in situations where NPS gave away products on Procaps' behalf to teams sponsored by Procaps at major tournaments. Although there were many instances where NPS "stretched" its payables to Procaps, NPS did endeavor to keep orders in the pipeline so Procaps could keep its factory in operation and NPS could maintain an appropriate level of inventory. In short, the parties' relationship was unorthodox from an accounting perspective, but workable and profitable for all.

**F. ICC**

Imperial Capital Corporation ("ICC") is a Toronto-based private equity firm. ICC employs an acquisition strategy that attempts to identify a recession-resistant, profitable, low risk industry in which to invest. Once ICC identifies such an industry, it applies stringent investment criteria to select a well-managed, mid-sized acquisition candidate to serve as a platform for growth in the target industry. After identifying a suitable acquisition candidate, ICC seeks majority ownership of that company and then attempts to accomplish further market penetration through a combination of internal growth and

acquisitions, with a view toward ultimately generating an initial public offering, merger, sale, or other attractive liquidity event.

## G. ICC Identifies Procaps

In or about September 2004, ICC learned that Procaps was receptive to selling its business. Ed Truant, Rob Molyneux and Steven Lister (all high ranking members of ICC) flew to Montreal to meet with Procaps management. The negotiations progressed quickly and on October 19, 2004, the parties signed a letter of intent under which ICC (or its nominee) would acquire the assets of Procaps and AirTech, among other assets, for $100 million (a portion of which was deferred and subject to "earn-out" provisions based on financial results after the transaction).

## H. ICC's Interest in Diversifying Procaps' Customer Base

As part of its due diligence, ICC prepared a Confidential Information Memorandum ("CIM") seeking expressions of interest from potential lenders who might finance the transaction. The CIM acknowledged that NPS accounted for "roughly 75% of Procaps' revenue." ICC emphasized, however, that Procaps' "growth strategy" was to achieve customer diversification and to develop new sales channels, with the goal of ensuring that "no one customer represents more than 30% of its revenue."

At this time, ICC privately recognized that the customer concentration problem could be resolved by eliminating the exclusive rights NPS had to distribute DraXxus paintballs and VForce goggles, as well as the "best price" protection NPS enjoyed under the Contracts. Thus, for example, in mid-November 2004, Ed Truant prepared an internal report (titled "Project Splat Status") wherein he stated under the heading "Operational and Industry Observations:"

National relationship is untenable as it currently stands. Need to change the agreement to either (i) more closely align the 2 companies or (ii) go into direct competition with National.

## I. ICC Offers to Buy NPS

Apparently encouraged by their analysis of the paintball industry, Steven Lister, Rob Molyneux and Ed Truant of ICC met with Gino Postorivo and other NPS representatives on November 4, 2004 to discuss a possible acquisition of NPS by ICC. In the course of the meeting, the ICC representatives made a rough calculation, using a multiple of NPS' EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) to arrive at a proposed price for the acquisition of approximately $77 million. This offer was codified in a follow-up email which concluded: "Gino, let us know this afternoon if we have a deal or not." Gino Postorivo declined the offer.

## J. NPS' Consent to ICC's Acquisition of Procaps

Based on the provisions in the Contracts requiring consent to assignment, ICC recognized that it needed NPS' permission before it could proceed with an acquisition of Procaps. When seeking this consent, ICC said nothing about the parties' payment methodology or the well known fact that NPS regularly maintained an overdue balance in relation to the 45 day payment terms of its Contracts with Procaps.[2] To the contrary, ICC told NPS at the time that it was pleased with the feedback it had received from its potential financing sources regarding NPS' financial condition and that the parties' relationship was in good standing under the Contracts. Thus, for example, Ed Truant

---

[2] A "Project Splat Financial Due Diligence Report" prepared for ICC by Ernst & Young acknowledged that, although payment terms were 45 days, "these terms can extend to 55 days due to processing times and general flexibility. Terms may be extended even further during peak selling seasons."

(ICC) emailed Gino Postorivo and Norm Gunn (NPS' CFO) on January 13, 2005 as

follows:

> Gino & Norm,
>
> Just wanted to say thanks for all of your assistance with the lenders yesterday. We received very good feedback from them and it looks like we are in good shape to close our deal with Richmond, Richard and Greg.
>
> We look forward to our conversations early next week.
>
> Thanks again.

* * * *

NPS eventually consented to the assignment of the Contracts and ICC's acquisition

of Procaps. On March 7, 2005, ICC successfully closed its purchase of Procaps for $100

million. As part of the closing documentation, Procaps and NPS each executed a standard

estoppel certificate confirming that both parties were in "good standing" under the

Contracts in all material respects.

## K. Events Immediately
### Following the Acquisition

On the same day ICC closed on its acquisition of Procaps, Rob Molyneux advised his

boss, Steven Lister, of Molyneux's interest in tackling Procaps' customer concentration

problem:

> I want to deal with the customer concentration risk head on. While I believe we should dual track[3] with NPS I believe that road, no matter how we tru [sic], will be frustrating and may lead no where [sic].

---

[3] The "dual track" is presumably a reference to both a possible acquisition of NPS and an enhancement of the Procaps/NPS relationship through a renegotiation of the Contracts and/or a correction of the overdue amount.

The principals of ICC, Procaps and NPS attended an April 12, 2005 dinner in Philadelphia to celebrate ICC's successful acquisition of Procaps. At this dinner Mr. Molyneux for the first time raised the subject of NPS' account balance and stated that he wanted the companies' accounting groups to craft a plan whereby NPS would get its account balance current by the "end of this summer." ICC reiterated its wish that NPS rectify its overdue account "by the end of the summer" on numerous occasions.

The April 12, 2005 dinner was followed by an April 25, 2005 email wherein Ed Truant remarked to Rob Molyneux and Steven Lister that Procaps was in a position to put the "squeeze" on NPS:

> Strategically, we are in a great position to squeeze Gino because he is very exposed to exclusivity related to Procaps' paint and masks. If Procaps were to decide to go direct, there goes his business for a few years. We will tactfully have to make him aware of this fact.

On May 4, 2005, ICC offered to purchase NPS' distribution business (i.e., the vast majority of NPS) for $45 million. This offer was roughly $33 million less than what ICC had suggested in December 2004 (albeit for all of NPS' business), prior to NPS' consent to assignment of the Contracts. Gino Postorivo rejected this offer.

**L. The May 17, 2005 Default Notices**

Despite ICC's stated ambition for NPS to bring its account current by "the end of the summer," on May 17, 2005, Procaps dispatched by registered mail (as required by the Contracts' notice provisions) two identically worded default notices (one for each Contract) to NPS, stating in full:

> Please treat this letter as notice of your default under the Agreement, for failure to pay amounts due and owing to Procaps within the time period during which such payment

9

> is to be made, and for which you have thirty (30) days from
> the date hereof to cure such default.
>
> As provided in invoices sent to you, interest accrues on the
> amounts due and owing at the rate of 18% per annum and
> shall continue at such rate until payment has been received.

The notices did not state the amount that was "due and owing" by NPS; there were

no account reconciliations supplied with them; and they did not expressly request or

demand "adequate assurances of performance" by NPS under the Contracts.

## M. The Circumstances Surround-
##    ing the Default Notices

While certain of the ICC and Procaps witnesses testified that they wanted NPS to

cure its default in a timely fashion, its business records suggest that a renegotiation of the

Contracts to eliminate exclusivity (thereby solving the "customer concentration

problem") was the driving force behind the default notices. For example, Craig Miller

(Procaps' Vice President, Sales) wrote an internal email on May 31, 2005 concerning an

upcoming phone call to NPS:

> Lastly, a question regarding our timing for this call:
> Regarding Procaps' very strained relations with NPS at this
> time (millions of dollars in overdue balances, and still no
> REPLY to our registered letter, which put them on official
> notice of contractual breach, with only 2 weeks left to
> respond) . . . So, do you think it would possibly be better to
> wait a couple of weeks, based on the idea that, if NPS does
> not remedy their huge balances due in that time, then our
> supply contracts are null and void, **enabling us to start
> fresh on a non-exclusive basis, which is what we've
> always wanted**. (Emphasis added.)

On June 3, 2005, Mr. Miller sent an email to Rob Molyneux and others wherein he

somewhat more colorfully stated:

> PLEASE let us remain strong and let us deliver
> MAXIMUM pressure to cause our supply contract with

> them to become null and void, so that we can conduct
> business with NPS on a non exclusive basis, on terms
> dictated by US instead of Campo [NPS' General Counsel]!
>
> May the Force be with us!!!!!!

And on June 15, 2005, Mr. Miller sent an email to Howard Tafler (Procaps CFO)

with a copy to Richmond Italia (Procaps' President), stating:

> The evolving situation with National Paintball brings the
> strong hope of doing business with NPS on a non-
> exclusive, non-contractual basis, and thus eliminating many
> contractual branding restrictions which hindered our
> growth in the past. . . .
>
> Obviously, many things hinge on our ability to move out of
> the current contractual restrictions, to do business with NPS
> on a non-exclusive basis, and to sell additional Procaps
> brands directly. In a post-contractual scenario, if we were
> to launch another Procaps brand (already prepared) that is
> specifically NEVER accessible to NPS, we believe that
> many Customers would literally come out of the woodwork
> with desires of buying direct.

* * * *

Significantly, almost from the moment it issued the default notices, Procaps

accelerated its planning for the expansion and diversification of its sales network. In this

regard, Procaps hired a temporary worker to enter NPS' drop ship customer list into

Procaps' data base, visited potential distributors in Europe and convened various strategy

sessions to vet how Procaps might replace any lost sales volume resulting from its

termination of the Contracts.

**N. Events Following
   the Default Notices**

In the weeks following the default notices, the parties' accounting departments

exchanged spreadsheets in an attempt to reconcile the NPS account, an effort made more

11

complicated by the large number of invoices, the payment program in place and the strain on the relationship caused by the notices. With no agreement in place on the precise amount owed by NPS, on June 16, 2005, Gino Postorivo telephoned Rob Molyneux announcing that NPS was set to deliver checks totaling more than $2.6 million to Procaps, an amount NPS believed was sufficient to bring the account current not only through the date of the default notices, but through June 17th, and inquiring how Procaps wanted the money to be transmitted. Molyneux responded that he would check with others at ICC. Having not heard from Mr. Molyneux, in the late afternoon of June 16, 2005, NPS sent checks totaling $2,621,189.19 ("$2.6 million") by registered mail to Procaps in Canada, along with an account reconciliation showing this to be the amount NPS believed was necessary to bring its account balance current through June 17.[4]

NPS sent the checks via registered mail because: (i) it had not heard back from Mr. Molyneux as to whether ICC preferred the checks to be sent via overnight mail or some other means; (ii) the notice provisions of the Contracts required the use of registered or certified mail; and (iii) ICC had sent the May 17, 2005 default notices via registered mail. Also, on June 16, 2005, NPS emailed Procaps a PDF of the covering transmission materials, and it faxed to Procaps copies of the checks comprising the $2.6 million.

By June 24, 2005, Procaps had not received the packages containing the checks. On that day, Procaps sent NPS two versions of the following termination letter (one for the Paintball Contract and one for the Goggles Contract):

> We have previously notified you of a default by letter dated
> May 17, 2005 and allowed you a thirty (30) day cure period

---

[4] There was extensive, conflicting documentation and testimony at the hearings as to the precise amount in arrears (i.e., over 45 days) as of various points in time. There was general agreement, however, that the amount in arrears as of the date of the default notices was, as Mr. Molyneux testified, "in the ballpark" of $2.6 million, or the amount NPS sent to Procaps on June 16, 2005.

to remedy the default, which default remains unremedied at this time.

Please treat this letter as notice of termination of the Agreement effective immediately, in accordance with its terms. We will be in touch with you to discuss arrangements arising from such termination to ensure that there is an orderly transition.

In addition, we will be discussing with you the payment of your indebtedness to us and the provision of security therefor.

## II
## ISSUES RE NPS' ATTEMPTS TO CURE

Set forth below is a discussion of the relevant facts and issues related to NPS' efforts to cure the payment alleged in the May 17, 2005 default notices.

### A. NPS' Payments from May 17, 2005, through June 10, 2005

Howard Tafler (Procaps' CFO) testified that, generally speaking, the course of conduct between the parties was to apply payments made by NPS to the oldest outstanding invoices. Thus, any payments by NPS after the issuance of the default notices should have been applied, in the normal course of business between the parties, to the invoices constituting NPS' claimed overdue account balance of $3,041,083 as of May 17, 2005.[5]

Between May 17 and June 10, 2005, NPS mailed checks and/or made wire payments (the standard method of payment for European sales) to Procaps totaling $3,050,014.35. More particularly, on May 17, NPS mailed Procaps checks totaling $700,000; on May 24, it mailed Procaps checks totaling $700,000; on June 1, it mailed Procaps checks totaling $700,000 and, in addition, it wired Procaps $300,014.35; on June 8, it mailed Procaps

---

[5] This amount was not advanced by Procaps during the spring of 2005, but rather represents Procaps' analysis of the overdue balance as presented at the hearings.

checks totaling $600,000; and on June 10, NPS wired Procaps $50,000. Applying these

payments against the oldest outstanding invoices, NPS cured the defaults noticed on May

17 because by June 10, it had paid an amount greater than the amount in alleged default

on May 17 ($3,050,014.35 in payments versus $3,041,083 of arrearages as of the May 17,

2005 default notices).

## B. Additional Checks

NPS argues that separate and apart from the above-described payments, it cured the

default because:

> 1. On June 15, 2005, NPS sent Procaps four checks totaling $560,000, under the
>
> same methodology the parties had traditionally followed. These checks were
>
> received by Procaps on June 16.
>
> 2. As described above, on June 16, 2005, NPS sent Procaps checks totaling $2.6
>
> million.
>
> 3. The above checks totaled roughly $3.18 million which was more than the
>
> $3,041,083 of alleged arrearages on May 17, 2005 (the date of the default notices)
>
> and more than the $3,072,779.67 of alleged arrearages on June 16, 2005.

Procaps makes a number of arguments as to why these checks did not effectively

cure NPS' default. Each of these contentions is separately discussed below.

### (i) The Effective Date of Payment

Procaps argues that NPS' tender of the checks totaling $2.6 million took effect on

June 28, 2005 when the checks were received[6] by Procaps, and not on June 16, 2005

when the checks were sent. This has special significance here, because as Mr. Truant

---

[6] The checks arrived at Procaps' factory in Canada on June 28, 2005, and Procaps representatives brought
them to New Jersey, where they were replaced with a certified check.

testified, if Procaps had received the $2.6 million on June 16, "it would have cured." The Panel finds that the $2.6 million of checks contributed to NPS cure of the purported default as of the date they were mailed, for the following reasons:

**FIRST**, in Okasa v. Hall, 718 A.2d 1223 (N.J. Sup. Ct. 1998), the New Jersey Superior Court considered the same issue as the one presented here, i.e., whether a payment mailed **prior to**, but received and posted **after**, the deadline for payment set forth in a default notice constituted effective "payment" such that termination of the contract based on the failure to pay was improper. Relying on the venerable "Mailbox Rule," the court held that the payment had been effective as of the time of mailing, stating: "Generally speaking, the Mailbox Rule sanctions the formation or completion of a contractual undertaking upon the act of mailing where the use of the mail is authorized by the other party as the medium for response."

Under Okasa and similar authorities considered by the Panel, NPS' attempt to cure the default was effective on June 16, 2005 when the $2.6 million was sent, not on June 28, 2005 when the checks were received. If the Mailbox Rule were not applied in a case such as this, a party, even though following the notice provisions of the contract, would be subject to the vagaries of the mail and there would be no certainty as to whether an important act could be or had been accomplished within the time frame set forth in the contract.

**SECOND**, on June 16, 2005, Gino Postorivo called Rob Molyneux to advise him that NPS was sending $2.6 million in checks and to ask how Mr. Molyneux wanted the checks to be transmitted. Mr. Molyneux, however, never responded. It would be inequitable and in contravention of the implied covenant of good faith and fair dealing for

Procaps to decline (or at least not expressly authorize the use of) overnight mail and, then, to contend that the $2.6 million payment was untimely because it had not been sent by overnight mail. Indeed, it would have been perilous in this charged atmosphere for NPS to have used a transmittal method (overnight mail) at variance with the Contracts and the manner used by Procaps when it issued the default notices.[7]

**THIRD**, the Contracts provided NPS with 30 days from a notice of default **either** to cure the default **or** to provide "adequate assurances of performance." On the same day that NPS sent Procaps the checks totaling $2.6 million, it emailed Procaps a copy of the transmission materials and faxed to Procaps copies of the checks that had been sent. Thus, even if the Mailbox Rule were not applied and NPS' mailing of the $2.6 million of checks had been not been effective because the checks were not received until June 28, it would still be the case that: (i) Procaps received the aforementioned email and fax on or about June 16, which was timely under any definition of the cure period; and (ii) the fax and email clearly constituted the contractual "adequate assurances" that any claimed overdue balance had been or would be paid.

* * * *

For the reasons stated, the Panel holds that: (i) NPS' payment of the $2.6 million was effective on June 16, 2005—the day the checks were sent: and (ii) even if the payment of the $2.6 million had not been effective until June 28, 2005, the fax and email which Procaps received on or about June 16 constituted "adequate assurances of performance" sufficient to cure any purported payment default covered by the May 17 notices.

---

[7] Notably, it took a week for Procaps' default notices to reach NPS, yet Procaps maintains that the notices were effective when sent.

**(ii) The $560,000 in Checks**

Procaps makes the following argument concerning the checks totaling $560,000 which Procaps received from NPS on June 16, 2005:

1. The $560,000 was comprised of four checks, each for $140,000.

2. Of the four checks, one was to be cashed on June 17; one was to be cashed on June 20; another was to be cashed on June 21; and the last was to be cashed on June 22. The four checks could not have contributed to a cure since they were not to be cashed until after the end of the cure period which Procaps calculates as June 16, 2005.

\* \* \* \*

The primary issue raised by the foregoing argument is whether the cure period ended on June 16 (30 days from the date the default notices were sent) or on June 23 (30 days from the date the default notices were received). If the period ended on June 23, then the $560,000 of checks were properly a part of the cure. For the reasons set forth below, the Panel finds that the cure period ended on June 23, 2005 and that the $560,000 of checks were properly part of the cure tendered by NPS:

**FIRST**, the Contracts expressly afforded a party 30 days to cure a default identified in a notice of default. Clearly, this 30 day cure period does not commence until the defaulting party receives the notice of default and learns what needs to be cured since, otherwise, the defaulting party would not have had the 30 days to cure, as contemplated by the Contracts.

**SECOND**, under the New Jersey UCC "a person has 'notice' of a fact when: (a) The person has actual knowledge of it; or (b) The person has **received** a notice or notification

17

of it; or (c) From all the facts and circumstances known to the person at the time in question the person has reason to know that it exists." (Emphasis added.) N.J. Stat. Ann., Sec. 12A:1-201(25). Here, it is undisputed that NPS did not receive or know about the notices of default until May 24, 2005, as Procaps sent the notices by registered mail and (unlike NPS) did not send conforming copies by email or fax (which could have provided earlier "notice"). Under the UCC, the 30 day cure period began to run when the notices were received by NPS on May 24, and the period expired on June 23, and

**THIRD**, even if the $560,000 of checks were deemed not to have been payments made during the cure period, Procaps had possession of the checks on June 16, 2005, which was within the cure period, and Procaps knew that the checks could be cashed just a few days later (in accordance with the parties' course of dealings). In the Panel's view, this constituted "adequate assurances" that NPS would perform its payment obligations under the Contracts.

### (iii) Procaps' Acquiescence in the Amount

While Procaps now contends that the amounts of NPS' payments were insufficient to cure as of either May 17, 2005 or June 16, 2005, this position runs directly contrary to Procaps' position at the time of the payments. The facts in this regard are as follows:

1. The May 17, 2005 default notices specified no particular amounts which were claimed to be "due and owing".

2. On June 15, 2005, Norm Gunn (NPS' CFO) sent Howard Tafler (Procaps' CFO) a spreadsheet created by NPS reflecting what NPS believed it had to pay to bring its account balance current.

3. On June 16, 2005, John Campo (NPS' General Counsel) sent Procaps the checks totaling $2.6 million and faxed and emailed to Procaps a reconciliation showing how NPS had arrived at $2.6 million as the amount which NPS believed it had to pay to bring its account balance current.

4. Procaps never complained at the time that the $2.6 million was insufficient to cure. In fact, it was not until the midst of this arbitration that Howard Tafler (Procaps' CFO) first came up with an analysis purporting to demonstrate that the $2.6 million had not been sufficient after all.

5. Even in the context of this arbitration, Procaps' witnesses other than Tafler testified that the $2.6 million (if timely received) would have been sufficient to cure. Thus, for example, Ed Truant testified that: "if I received [the $2.6 million] that day, it would have cured . . ." And Rob Molyneux testified that as to the $2.6 million of checks: "They reconciled towards the amounts in arrears. Two groups agreed we were in the ballpark of the amounts in arrears".

* * * *

For the reasons stated, the Panel holds that NPS timely and effectively cured the defaults, covered by the May 17, 2005 default notices.

### III
### <u>SUBSEQUENT ARREARAGES</u>

Procaps argues that even if NPS cured the overdue balance as of the date of the default notices, it was still justified in sending the June 24, 2005 termination letters because NPS did not transmit its regular weekly checks on June 23, thereby creating new arrearages. The principal problems with this argument are that (i) Procaps never sent a default notice regarding these new arrearages, and (ii) the Contracts clearly provided that

Procaps could not terminate for late payment without sending a notice of default and affording a 30 day period to cure. In other words, the Contracts do not condone a "perpetual" notice of default.

While Procaps argues that its May 17, 2005 default notice created an open ended right for Procaps to terminate the Contracts if NPS ever went into arrears again (even for $1 for one day in the distant future), the Panel declines to read the ambiguous notices in the fashion now being urged. The notices are too vague to put NPS on notice that they were intended as a "perpetual" notice of default. Moreover, the default notices did not clearly state or even intimate any such thing, and a contrary reading would frustrate a party's opportunity to cure.

Procaps' argument also is contrary to common sense since, by definition, the concept of a "default" is backward looking or, stated somewhat differently, one obviously cannot effectively send a notice of default with respect to a default that has not yet occurred. Howard Tafler recognized this basic principle in the following testimony:

> Q. When you are talking about someone being in default by definition it is a retrospective analysis, right?
>
> A. I'm not a lawyer but I guess so.
>
> Q. I mean you can't say you are in default about some future obligation because it has not occurred, right?
>
> A. Correct.

* * * *

For the reasons stated, the Panel holds that Procaps had no right to terminate the Contracts as a result of any arrearages that may have arisen on or after June 23, 2005.

## IV
## WAIVER OF PAYMENT TERMS

As previously discussed, NPS would each week pay Procaps a lump sum in the form of five checks to be cashed on successive days of the following week. The practical effect of this was that NPS was always in arrears in relation to the Contracts' requirement that invoices be paid within 45 days. While the parties fully understood this, they continued to do business in this fashion until the time of the May 17, 2005 default notices.

Under New Jersey law, where the course of performance between the parties has consistently differed from the terms of the parties' written agreement, the terms of the written agreement are waived and the course of performance between the parties controls for purposes of construing the parties' contractual obligations. See N.J. Stat. Ann., Secs. 12A:2-208(3) and 12A:2-209. As the court stated in Cassidy Podell Lynch, Inc. v. Snyder General Corp., 944 F.2d 1131, 1147 (3rd Cir. 1991):

> The course of performance between the parties . . . reveals payments were consistently made approximately ninety days after shipment. The record reveals only one month during the contract period when Cassidy paid its account before the expiration of ninety days. . . . Section 2-208(3) of the N.J. U.C.C. states that "such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."
>
> Snyder's acquiescence in this course of performance amounted to a waiver of the thirty-five day payment term.

Clearly, there was a waiver here of the 45 day payment provision in the Contracts. Procaps argues, however, that this waiver was retracted pursuant to Section 2-209(5) of the New Jersey UCC which permits a party to retract a waiver "by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust . . . ." This right of retraction, however, must be

forward looking and cannot be retroactively applied to events prior to the retraction.

Cassidy, 944 F.2d at 1147.

There was no retraction prior to the May 17, 2005 default notices. Certainly, there was no "reasonable notification received by the other party that strict performance will be required of any term waived" within the meaning of Section 2-209(5) of the UCC. And while there were communications between the parties in the spring of 2005 concerning NPS' arrearages, the expressed goal of ICC/Procaps was for NPS to bring its account current "by the end of the summer." In the meantime, Procaps continued to accept checks and the accumulation of new arrearages pursuant to the payment methodology described.

* * * *

For the reasons stated, the Panel finds that there was a waiver of the 45 day payment provision of the Contracts up to the time of the May 17, 2005 default notices. That being so, there was no payment default as of the date of those notices and, accordingly, the notices provided no basis for Procaps' purported termination of the Contracts.

V
ALLEGED DEMAND FOR ASSURANCES
UNDER THE NEW JERSEY UCC

The New Jersey UCC provides that: (i) a party to a contract who has reasonable grounds for insecurity about the other's performance may serve a demand for assurances; and (ii) a "failure to provide within a reasonable time not exceeding thirty days such assurances of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." N.J. Stat., Sec. 12A:2-609(1).

Here, Procaps argues that the following portion of a June 4, 2005 email from Howard

Tafler to Norm Gunn (NPS' CFO) constituted a demand for assurances under the UCC to

which NPS did not adequately respond:

> Also, gino said we could get details on your new financing and what your margin position [is] so we can get some confort [sic]. He also indicated we could be able to speak to your bk mgr. We need to get the info to give us and especially our bank some confort [sic] given your AR position.[8]

There are a number of flaws in the argument that the June 4, 2005 email was an

effective demand for assurances under the UCC:

**FIRST**, the email does not state that Procaps intended to suspend performance of the

Contracts if it did not receive adequate assurances. See Cumberland County Improvement

Authority v. GSP Recycling Co., Inc., 818 A.2d 431, 440 (N.J. Super. 2003) (court

recited the need for specificity in any communication requesting adequate assurances,

noting that the demand must clearly convey "the insecure party's intent to suspend

performance in the absence of adequate assurances."

**SECOND**, the email does not mention the UCC. See Puget Sound Energy, Inc. v.

Pacific Gas and Electric Co., 2002 U.S. Dist. LEXIS 1350 (N.D. Cal. Jan. 4, 2002) (in

holding that a letter did not constitute an adequate demand for assurances under the UCC,

the court stated that: "The letter did not quote from the U.C.C., cite it, or otherwise call

attention to it.")

---

[8] Procaps contended during the hearing that Mr. Tafler's June 4, 2005 email constituted Procaps' demand for assurances under the UCC. Without waiving that argument, Procaps contends in its Post-Hearing Opening Brief that the May 17, 2005 notices of default also constituted a demand for assurances to which NPS did not adequately respond. The Panel has held, however, that those notices could only cover amounts allegedly in arrears as of May 17, 2005. As previously discussed, NPS timely cured these alleged arrearages or, at the least, provided adequate assurances of performance of its payment obligations.

**THIRD**, the email does not mention the 30 day statutory deadline within which to respond. See Puget Sound Energy Inc., supra ("The letter did not include any statement regarding the consequences of a failure to respond or provide a deadline by which to do so.").

**FOURTH**, Mr. Tafler conceded that his email was not an attempt to demand adequate assurances within 30 days pursuant to the UCC. This admission is consistent with the fact that prior to the 30 day deadline for providing any such assurances, Procaps served its June 24, 2005 notices of termination.

\* \* \* \*

For the reasons stated, the Panel holds that the notices of default and Mr. Tafler's email do not constitute demands for assurances and that Procaps never served NPS with an effective demand for assurances within the meaning of the UCC or the Contracts.

## VI
## NPS' BEST PRICING CLAIM

Under the Paintball Contract, NPS was entitled to best pricing with regard to Procaps' sales of so-called "QIP" and "OEM" paintballs to third parties. A "QIP" Paintball was defined as a paintball manufactured by Procaps under trademarks owned by Procaps, and an "OEM" paintball was defined as a paintball that was customized, i.e., privately labeled for one specific customer, usually a paintball field or store. NPS claims that Procaps' violation of this best pricing protection took two forms which are separately discussed below.

**A. Categorization of QIP Paintballs**

NPS claims that Procaps charged third parties less than it should have for "QIP" paintballs by pretending that those paintballs actually corresponded to a lower pricing

24

structure on Schedule A to the Paintball Contract than that to which the parties had agreed. More particularly, NPS argues that: (i) the definitions in Schedule A to the Paintball Contract provided that a metallic, two-toned paintball (like X-Ball Bronze) was the equivalent of a Mid Level paintball which was to be sold at Mid Level prices; and (ii) Procaps in fact sold X-Ball Bronze to third parties as a Low Level paintball at Low Level prices.[9]

This argument is based on the supposition that any metallic, two-toned paintball (such as X-Ball Bronze) must be a Mid Level, not a Low Level paintball. Craig Miller (Procaps' Vice President, Sales), however, testified that, in fact, "X-Ball Bronze is a . . . Midnight [or Low Level] equivalent" because:

1. "X-Ball Bronze is made from recycled ribbon, [ribbon that has] already been used."

2. In manufacturing X-Ball Bronze paintballs, Procaps does not "add any metallic content into the product, but the ribbon contains it. [X-Ball Bronze] has sort of a metallic look, but it is not an ingredient. It is not a cost factor."

3. Thus, while X-Ball Bronze paintballs may have a metallic appearance (which is the basis for NPS' allegation that they were misclassified), metal is not added to nor is it figured into the manufacturing cost of these paintballs.

* * * *

---

[9] Procaps manufactured three levels of X-Ball, mimicking the Olympic medal structure, with X-Ball Silver being one step up from X-Ball Bronze and X-Ball Gold being one step up from the X-Ball Silver. NPS also argues that if X-Ball Bronze should have been moved from Low Level to Mid Level then, by definition, X-Ball Silver should have been moved from Mid Level to High Level, and X-Ball Gold should have been moved from High Level to Tournament.

Mr. Miller's testimony about X-Ball Bronze was not effectively rebutted by NPS and is accepted by the Panel. Accordingly, NPS' claim related to the pricing of X-Ball paintballs is denied.

**B. Forecasts of Purchases**

Pursuant to Sections 3.03 and 3.04 of the Paintball Contract, Procaps was permitted to sell X-Ball (QIP) and private label (OEM) paintballs to third parties. The prices for these paintballs were "predicated on the purchase volumes of said third-party purchasers as set forth in Schedule A attached hereto . . . ." To determine which pricing a customer would receive for X-Ball and private label paintballs, Procaps had to forecast the future purchase volumes of these two categories of paintballs for each third party customer for a one year period.

NPS contends that the appropriate way to measure Procaps' good faith in arriving at these one year forecasts is: (i) to calculate the volume amount each third party customer purchased during the nine month period from September 20, 2004 when the Paintball Contract was executed through June 24, 2005 when the Contract was terminated; (ii) to annualize that nine month number to arrive at a full year of purchases; and (iii) to compare this annualized number to the Procaps forecast. On this basis, NPS argues that the Procaps forecasts bear very little resemblance to reality. This argument, however, has the following shortcomings, among others:

**FIRST**, NPS contends that the year to be utilized to determine if a third party was entitled to the price it received was **NPS'** Purchase Year, as defined by the Paintball Contract, i.e., "successive period of twelve (12) full months following the Agreement Date ('Purchase Year')." There is no basis for this assumption, however, and it is far

more likely that the appropriate year would be the **third party's** purchase year or, in the alternative, the calendar year. The Contract is silent on this, and NPS did not present sufficient evidence to establish the proper year for use in the analysis.

**SECOND**, even assuming the Purchase Year as defined in the Contract should be used, there were at least three months remaining in the Purchase Year after the June 24, 2005 termination date, and there is no basis for presuming that annualizing a third party's purchases is an appropriate forecasting measure.

**THIRD**, NPS ignores third parties' purchases of generic paintballs which were permissible under the Contract and would count towards the requisite volumes.

**FOURTH**, several of the purchasers NPS identifies are related parties (e.g., X-Ball Direct, Generation E and Cousins), and thus their purchase volumes should be considered collectively.

**FIFTH**, NPS' calculations do not take into account that after agreements had been reached with third parties on forecasting and pricing, the sales of X-Ball to third parties were cut off in order to accommodate NPS' desire to be the sole supplier of X-Ball.

**SIXTH**, after all is said and done, it appears that NPS did receive the best price or, at the least, NPS has not established to the contrary.

\* \* \* \*

For the reasons stated, the Panel denies NPS' best pricing claim based on Procaps' forecasts of purchases.

## VII
## BLUE ARC AND PMI

At the hearing, much time was devoted to: (i) Gino Postorivo's purchase option or ownership interest in Blue Arc, a manufacturer of paintballs, and a secured loan he had

made to Blue Arc; and (ii) NPS' negotiations to acquire or merge with PMI, which was another manufacturer of paintballs. In the final analysis, however, these two subjects are completely irrelevant to whether Procaps' termination of the Contracts was proper because:

1. Gino Postorivo's interests in Blue Arc were either known to Procaps and ICC or were a matter of public record and, more importantly, these relationships were permitted under the Paintball Contract. Further, Procaps' own witnesses conceded that Gino Postorivo's interest in Blue Arc was not a default under the Paintball Contract that caused the termination of NPS.[10]

2. As to PMI, the facts are that: (i) the Paintball Contract permitted NPS to acquire or merge with PMI (provided it continued to meet its minimum purchase requirements); and (ii) NPS' negotiations with PMI had nothing to do with Procaps' termination of the Contracts; indeed, Procaps did not even know about NPS' negotiations with PMI when it terminated NPS.

3. Neither the notices of default nor the notices of termination say anything about Blue Arc or PMI.

## VIII
## PROCAPS' COUNTERCLAIM
## FOR ACCOUNT BALANCE

NPS clearly owes Procaps in the vicinity of $5 million for product it purchased and

_____

[10] Procaps did contend that it did not want to finance NPS' investment in Blue Arc but it does not appear that Blue Arc was producing paintballs that were competitive with Procaps' products.

received but for which it never paid.[11] According to Procaps' records, the amount is $5,016,386 and according to NPS' records, the amount is $4,910,681. For purposes of the Counterclaim, the Panel finds Procaps' number to be more reliable and, accordingly, it awards Procaps $5,016,386 on its Counterclaim for the account balance due to it.

## IX
## NPS' DAMAGES

NPS claims an array of damages caused by Procaps' wrongful termination of the Contracts.

<u>First</u>, NPS seeks lost profits (including margin erosion) resulting from its inability to sell the products covered by the Contracts, as well as its inability to make projected lost "convoyed sales" of other products, pursuant to Sections 2-712 and 2-713 of the UCC (allowing a buyer of goods to recover incidental and consequential damages).

<u>Second</u>, NPS seeks "cover" damages, representing the difference between the prices actually paid for replacement products and the prices specified in the Contracts. *See* UCC § 2-712.

<u>Third</u>, NPS seeks "market" damages, representing the difference between the Contract prices and the market prices for products for which it was unable or unwilling to cover. *See* UCC § 2-713.

<u>Fourth</u>, NPS seeks damages for Procaps' alleged violations of the best pricing provision of the Paintball Contract.[12]

---

[11] NPS claims that Procaps has "forfeited" its right to collect the account balance because it acted with "unclean hands" in terminating the Contracts. This argument is without merit. Unclean hands is an equitable doctrine and is not a defense to a claim at law for money damages. While the Panel has determined that Procaps wrongfully terminated the Contracts, there is no legal or equitable basis to find that it has forfeited its entitlement to the monies unquestionably due to it.

[12] As the Panel has found for Procaps on NPS' claim for violation of the best pricing provision of the Paintball Contract, these damages are not considered herein.

29

Fifth, NPS seeks costs and attorneys' fees pursuant to Article 31 of the International Dispute Resolution Procedures of the International Centre for Dispute Resolution ("ICDR Arbitration Rules").[13]

## A. Lost Profits

NPS argues that Procaps' wrongful termination of the Contracts caused it to sustain lost profits on the sales of paintballs, goggles and other products, and that the damages are projected to continue through the stated term of the Contracts.  NPS' damages analysis was presented primarily through Glenn Newman, an accountant with the firm of Parente Randolph, LLC.  Mr. Newman calculated the decline in product sales subsequent to Procaps' purported termination of the Contracts in June 2005. He then projected the profit on such sales and deducted any incremental costs that would have been incurred by NPS to achieve those sales.

### (i) Paintballs

As to paintballs, Mr. Newman estimated that NPS would have sold 823,552 cases of paintballs from September 2005[14] through May 2006, whereas its actual sales volume was 447,342, a difference of 376,210 cases.  Mr. Newman then calculated the average incremental profit per case based on NPS' financial results for the fiscal years 2004 and 2005, arriving at a figure of $4.45 per case.  Mr. Newman multiplied that figure by the

---

[13] Article 31 of the ICDR Arbitration Rules provides, in pertinent part, that the tribunal may assess and apportion costs of arbitration, including "the reasonable costs for legal representation of a successful party."

[14] Mr. Newman used September 2005 as a starting point for the damages analysis based on his opinion that NPS had sufficient paintball inventory to mitigate any lost sales between the date of termination and September 2005.  NPS' fiscal year ends September 30th. Procaps contended at various times during the arbitration that NPS could have continued to purchase from Procaps on a nonexclusive basis and that indeed the parties had put such an arrangement in place. While this testimony was disputed by NPS, there is no dispute in the record that on July 11, 2005, Procaps ordered all shipments to NPS to cease.

lost sales volume and concluded that NPS' lost profit on paintballs was $1,674,135 for the period September 2005 through May 2006.

In order to project paintball losses through the duration of the Paintball Contract, Mr. Newman assumed that NPS' shortfall in paintball sales would continue, but that NPS would be able to mitigate its damages and that the shortfall would accordingly improve from 46% (which it experienced during the nine months following termination) to 40%. Mr. Newman used the same profit margin ($4.45/case) for this analysis.

The final step in the paintball lost profits calculation was to apply a discount rate to the projected profit stream to reflect the risks inherent in the business and the time value of money.  As is typical, Mr. Newman built a discount rate by starting with the risk free rate of return (t-bills) to which he added percentages attributable to various risk premiums based on industry and company-specific factors.  Mr. Newman concluded that a 25% discount rate was appropriate.[15]  Applying this discount rate to the projected lost profit stream, Mr. Newman opined that NPS' cumulative lost profits on paintball sales through the duration of the Paintball Contract were $7,737,766 (in present dollars).

### (a) Price Erosion

In addition to the decreased paintball sales volume and associated lost profits, NPS seeks damages for "price erosion" on the sales it has achieved and is projected to achieve during the term of the Paintball Contract.  During the nine month period from September 2005 through May 2006, NPS' average margin on paintballs decreased by $1.84 per case as a result of Procaps' wrongful termination of the Paintball Contract.  To quantify the damages associated with this price erosion, Mr. Newman multiplied the

---

[15] Procaps' expert used a discount rate of 15% in his analysis of Procaps' damages, which, if applied to NPS' claim, would produce a higher measure of damages.

margin decline by the actual and projected sales quantities, arriving at cumulative price erosion damages of $4,583,924 through the duration of the Paintball Contract.

### (ii) Goggles

Mr. Newman performed a similar analysis for the goggles product line. Historically, the V-Force product line manufactured by Procaps accounted for more than 80% of NPS' goggle sales. After termination, NPS introduced a new line of proprietary goggles, Vents and Empire. While the introduction of this line has served to partially mitigate the lack of the V-Force branded products, NPS' overall sales of goggles during the post termination nine month period ending May 2006 were approximately 35 percent of sales in the identical prior nine month period. Mr. Newman assumed that this new line of goggles would enable NPS to restore its sales of goggles to 40% of its prior levels by the end of the term of the Goggles Contract in June 2009. He then used an average gross profit margin for lost goggles sales of 20%, and projected NPS' goggle damages to be $1,888,914 for the duration of the Goggles Contract.

### (iii) Other Products

Finally, NPS seeks damages for lost sales of "other products," specifically, accessories, barrels, markers/guns and air systems.[16] Using the same methodology explained above, Mr. Newman calculated these damages to be $7,989,974 through September 2011.

---

[16] As might be expected, NPS' inability to offer Procaps-manufactured paintballs (and goggles) adversely affected its sales of other products, because customers prefer to purchase all necessary paintball related products from one distributor. Also, NPS' witnesss testified, and the Panel finds, that the ability to sell quality paintballs (such as DraXxus) to customers was a significant contributing factor to NPS' sales of other products.

### (iv) Procaps' Defenses

Procaps argues that NPS' lost profits claim is inflated and that Mr. Newman's opinion should be excluded because he failed to verify the accuracy of the data. The Panel rejects Procaps arguments as to the methodology used by Mr. Newman. His reports and testimony were highly professional and he relied on appropriate techniques for expert testimony respecting business damages.[17] The Panel does find, however, that NPS lost profits and margin erosion damages should be reduced to reflect a more realistic assessment of NPS' business prospects (its ability to mitigate) and the effect of an industry slowdown (as well as other circumstances unrelated to Procaps' termination of the Contracts). Specifically, the Panel finds that NPS' damages should be limited to a period of approximately 2 ½ years from a date shortly after the unlawful termination (September 1, 2005) through September 30, 2008 after which time, we believe, NPS will be able to fully mitigate the effect of the termination on its business.

This analysis yields the following damages:

| | |
|---|---|
| Paintballs | $5,225,000 |
| Goggles | $1,687,218 |
| Other Products | $5,231,427 |
| Margin Erosion | $3,025,444 |
| **TOTAL** | **$15,169,089** |

---

[17] In Capital Funding,VI, LP v. Chase Manhattan Bank USA, N.A., the Court found that Mr. Newman had relied too heavily on purportedly inaccurate information supplied by his client. Procaps argues that the same circumstances occurred here. Without expressing any view on the Court's analysis, the Panel does not believe that the Capital Funding case has any relevance to this matter, as Mr. Newman's opinions are based primarily on reliable business records generated and maintained by NPS in the ordinary course of its business, and his professional judgment as to other factors typically considered by damages experts.

**B. <u>NPS' Cover/Market Damages</u>**

NPS also asserts a claim for cover and market damages under provisions of the

UCC which address a buyer's damages for non-delivery or repudiation. More

particularly, NPS seeks damages under the following sections of the UCC, as adopted in

New Jersey:

> **<u>Section 12A:2-712</u>**, which provides that a buyer may recover from the
>
> seller, as damages, the difference between the cost of "cover"—the cost
>
> of making a reasonable purchase of substitute goods—and the contract
>
> price, and
>
> **<u>Section 12A:2-713</u>**, which provides that, alternatively, the buyer may
>
> recover the difference between the "market price"—which is to be
>
> determined as of the date the buyer learns of the breach—and the contract
>
> price.[18]

Procaps attacks NPS' cover and market damages on a number of grounds, but

most persuasive is its contention that to allow NPS to recover both lost profits and cover

or market damages would result in double recovery.  The Panel agrees.  As a matter of

logic, NPS' lost profit claim already includes the differences between the Contract prices

and the cover prices or market prices that existed at the time.

**C. <u>Costs and Attorneys' Fees</u>**

The Panel may award attorneys' fees under Article 31 of the ICDR Arbitration

Rules. The Panel declines to exercise that discretion here.  Although the Panel believes

that the fees sought are reasonable and that Procaps unquestionably breached the

---

[18] An aggrieved buyer may recover cover damages and at the same time, may also recover market damages
to account for situations where the buyer could only partially cover its damages caused by the seller's
breach.

Contracts, it does not believe that the circumstances of the case are so extreme as to warrant a departure from the American rule under which each party is responsible for the costs of its counsel.

## X
## CONCLUSION

By way of summary and conclusion, the undersigned Arbitrators hereby award as follows:

1. On its claim for wrongful termination, Claimant is awarded Fifteen Million, One Hundred Sixty Nine Thousand, Eighty Nine Dollars and Zero Cents ($15,169,089.00 USD), plus 9% simple annual interest on $4,235,688.00 of that amount from June 1, 2006 to May 1, 2007 in the amount of Three Hundred Forty Nine Thousand, Four Hundred Forty Four Dollars and Twenty Six Cents ($349,444.26 USD), for a total of Fifteen Million, Five Hundred Eighteen Thousand, Five Hundred Thirty Three Dollars and Twenty Six Cents ($15,518,533.26 USD). Such award is intended to cover all of Claimant's damages arising from the termination of the Contracts.

2. On its counterclaim for the account balance due, Respondent is awarded Five Million, Sixteen Thousand, Three Hundred Eighty Six Dollars and Zero Cents ($5,016,386.00 USD), plus 9% simple annual interest on that amount from July 1, 2005 to May 1, 2007 in the amount of Eight Hundred Twenty Seven Thousand, Seven Hundred Three Dollars and Eighty Cents ($827,703.80), for a total of Five Million, Eight Hundred Forty Four Thousand, Eighty Nine Dollars and Eighty Cents ($5,844,089.80 USD).

3. The amounts awarded in paragraphs 1 and 2 above are to be netted into a single payment from Respondent to Claimant. Accordingly, Respondent is to immediately pay Claimant Nine Million, Six Hundred Seventy Four Thousand, Four Hundred Forty Three Dollars and Forty Six Cents ($9,674,443.46 USD), plus simple annual interest at the rate of 9% on any unpaid portion of that amount from June 1, 2007 until paid in full.

4. All claims for costs and attorneys' fees are denied.

5. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling THIRTY FIVE THOUSAND TWO HUNDRED NINETY DOLLARS AND ZERO CENTS ($35,290.00) shall be borne as incurred by the Parties.

6. The compensation and expenses of the Arbitrators totaling THREE HUNDRED TWENTY ONE THOUSAND NINE HUNDRED SIXTY-SIX DOLLARS AND TEN CENTS ($321,966.10) shall be borne equally by the Parties.

7. This Award is in full settlement of all claims and counterclaims submitted to this arbitration. To the extent any such claim or counterclaim is not specifically mentioned herein, it is denied.

8. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

* * * *

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the recognition and enforcement of Foreign Arbitral Awards, this Final Arbitration Award was made in New York, New York.

_David L. Evans_     _4/26/07_
David L. Evans        Dated

_____
John Wilkinson        Dated

_____
William A. Zucker        Dated

STATE OF MASSACHUSETTS )
                           ) ss.:
COUNTY OF SUFFOLK        )

I, David L. Evans, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

_David L. Evans_     _4/26/07_
David L. Evans        Dated

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

I, John Wilkinson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

_____
John Wilkinson        Dated

37

\* \* \* \*

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the recognition and enforcement of Foreign Arbitral Awards, this Final Arbitration Award was made in New York, New York.

_____     _____
David L. Evans                       Dated

_John Wilkinson_    4/26/07
_____     _____
John Wilkinson                       Dated

_____     _____
William A. Zucker                    Dated

STATE OF MASSACHUSETTS )
                       ) ss.:
COUNTY OF SUFFOLK      )

I, David L. Evans, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

_____     _____
David L. Evans                       Dated

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )

I, John Wilkinson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

_John Wilkinson_    4/26/07
_____     _____
John Wilkinson                       Dated

37

\* \* \* \*

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the recognition and enforcement of Foreign Arbitral Awards, this Final Arbitration Award was made in New York, New York.

| | |
|---|---|
| David L. Evans | Dated |

| | |
|---|---|
| John Wilkinson | Dated |

*William A Zucker*     4/24/07

| | |
|---|---|
| William A. Zucker | Dated |

STATE OF MASSACHUSETTS )
                           ) ss.:
COUNTY OF SUFFOLK      )

I, David L. Evans, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

| | |
|---|---|
| David L. Evans | Dated |

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK )

I, John Wilkinson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

| | |
|---|---|
| John Wilkinson | Dated |

STATE OF MASSACHUSETTS )
                       ) ss.:
COUNTY OF SUFFOLK      )

I, William A. Zucker, do hereby affirm upon my oath as Arbitrator that I am the
individual described in and who executed this instrument, which is my Final Arbitration
Award.

_____  4/26/07
William A. Zucker          Dated