IN THE AMERICAN ARBITRATION ASSOCIATION

NATIONAL PAINTBALL SUPPLY, INC.,   )
                                   )
            Claimant,              )
                                   )
v.                                 )
                                   )   AAA No. 50 T 181 25205
PAINTBALL L.P.,                    )
                                   )
            Respondent.            )
                                   )
_____

PROCAPS L.P. f/k/a PAINTBALL L.P., )
                                   )
            Counterclaim-Claimant, )
                                   )
v.                                 )
                                   )
NATIONAL PAINTBALL SUPPLY, INC.,   )
                                   )
            Counterclaim-Respondent.)

## PROCAPS L.P.'S RESPONSE TO DEMANDS AND COUNTERCLAIM

Respondent and Counterclaim-Claimant, Procaps L.P (f/k/a Paintball L.P.) (herein "Procaps" or "PLP"), for its response to the Amended Demand for Arbitration filed by Claimant and Counterclaim-Respondent National Paintball Supply, Inc. (herein "NPS") in matter No. 50 T 181 252 05 and the Demand for Arbitration originally filed by NPS in matter No. 50 181 T 00274 05, now consolidated with the instant matter, and for its counterclaim hereby avers:

### INTRODUCTION

1. Procaps and NPS are in the paintball game supplies and equipment manufacture and distribution businesses, respectively. Procaps is a manufacturer of paintball game supplies and equipment, including, of relevance here, paintballs and goggle and mask systems. NPS is a worldwide distributor of paintball game supplies and equipment. Procaps and NPS are parties to two sets of agreements, one relating to the distribution by NPS of paintballs

manufactured by Procaps and the other relating to the distribution by NPS of goggle and mask systems manufactured by Procaps.

2. As set forth below in further detail, on June 24, 2005, Procaps terminated both sets of agreements because of NPS's failure to cure its breach under the agreements, specifically its failure to pay amounts due under the agreements or to provide "adequate assurances of performance," prior to the end of the cure period. NPS contends that, if any breach had occurred, it was cured. NPS further contends that Procaps breached the agreements relating to paintball distribution in a number of respects. Procaps denies each and every one of these allegations of breach. To the contrary, Procaps contends that it is NPS who has committed additional breaches of the parties' agreements and, further, that NPS has engaged in a campaign of false and disparaging statements about Procaps and its products in the marketplace, as well as other anticompetitive conduct. Procaps has been damaged by NPS' breaches and actions in an amount to be determined, but which Procaps estimates presently to be no less than $10 million (including amounts due and unpaid for product purchases), and expressly reserves its right to amend its demand should it determine that its damages exceed that figure (of course, paying a higher filing fee if necessary).[1]

3. Although it is NPS who commenced these actions, Procaps is very anxious to have these matters heard and resolved by the Panel as quickly as possible. Accordingly, it requests not only certain final relief, as set forth below, but also that a hearing be held as soon as possible so that this matter can be brought to an expeditious resolution.

---

[1] All dollar amounts herein are in United States dollars.

## THE PARTIES

4. On information and belief, NPS is a distributor of paintball game supplies and equipment located in Sewell, New Jersey. Relevant to this matter, NPS has operations in the United States and Europe. NPS is the owner of the "DIABLO" brand of paintballs, and, under the agreements at issue here, was for a time the exclusive licensee and distributor of the "DRAXXUS" brand of paintballs owned and manufactured by Procaps. NPS also sells other paintball game supplies and equipment, including goggle and mask systems and markers (paintball guns), under various brands.

5. Procaps is a limited partnership located in Ville St. Laurent, Quebec, that manufactures paintball game supplies and equipment. Procaps is the owner and manufacturer of, among other things, the "DRAXXUS" and "X-BALL" brands of paintballs, as well as the "V-FORCE" and "CONQUEST" brands of goggle and mask systems. (Procaps was formerly known as Paintball L.P.; it changed its name on March 11, 2005.) Procaps acquired the business of Procaps Encapsulation, Inc. and Airtech Industries Inc. on March 7, 2005, and with its acquisition of the businesses took over those entities' contracts with NPS, described below, for the distribution by NPS of paintballs and goggle and mask systems manufactured by Procaps Encapsulation, Inc. and Airtech Industries Inc., respectively.[2]

## BACKGROUND AND THE AGREEMENTS AT ISSUE

6. The initial relationship between Procaps and NPS arose in 2002, after a dispute arose between the parties over the use of the "DIABLO" trademark in the United States.

---

[2] For the sake of convenience, references herein to "Procaps" or "PLP" will include Procaps L.P., Paintball L.P., Procaps Encapsulation, Inc. and Airtech Industries Inc., without regard to the exact name of the corporate entity involved at any particular time.

At the time, Procaps had been utilizing the DIABLO mark for paintballs in the United States, Canada and Europe, among other locations. At the same time, NPS had been utilizing the DIABLO mark on markers (*i.e.*, paintball guns) in, at least, the United States. Although Procaps believed it had rights to the DIABLO mark, it decided to reach an amicable resolution of the matter with NPS, resulting in the first agreement between the parties – *i.e.*, the Wholesale Product Supply & Distribution Agreement dated February 28, 2002 (the "2002 Paintball Agreement").[3] This agreement provides, among other things, that, first, NPS would purchase Procaps' United States distribution arm (Diablo Direct International, LLC) for $2 million, second, that NPS would become the sole owner of the DIABLO mark in the United States, and, third, that NPS would become Procaps' exclusive distributor for paintballs in the United States.

7. More specifically, under the 2002 Paintball Agreement, effective April 29, 2002, among other things, Procaps became the exclusive supplier of all of NPS' wholesale requirements for paintballs and NPS became the exclusive distributor for Procaps' paintballs in the United States within the "Conventional" market. As defined in the 2002 Paintball Agreement, the "Conventional" market was "any wholesale and/or retail outlet where more than fifteen percent (15%) of the gross sales of said outlet are derived from Paintball and paintball game related products and services; including, but not necessarily limited to paintball field and game sites, tournaments and special events." (The "Non-Conventional" market is any other retail outlet.) In addition, among other things, Procaps gave NPS an exclusive license to use Procaps' DRAXXUS brand for paintballs within the United States. (Procaps retained its rights over that brand elsewhere in the world, including Canada and Europe.)

---

[3] For Procaps, the exact legal entity that entered into this and all subsequent agreements relating to paintballs was Procaps Encapsulation Inc.

8. Thereafter, on June 12, 2002, Procaps and NPS entered into an agreement whereby, among other things, NPS became Procaps' exclusive distributor of the V-FORCE brand of goggle and mask systems in the United States Conventional market[4] (herein the "2002 Goggles and Masks Agreement").[5] It was further agreed, among other things, that V-FORCE was to be Procaps' primary goggle and mask system brand in the Conventional market, while CONQUEST was to be Procaps' primary goggle and mask system brand in the Non-Conventional market.

9. By Spring of 2004, the Procaps and NPS relationship began to experience difficulties. In an effort to resolve the situation, the parties entered into an "Amendment of Contract Terms" to the 2002 Paintball Agreement (herein, the "May 2004 Paintball Agreement"), whereby Procaps sold its European distribution business (Diablo Direct Euro Limited) to NPS in exchange for a cash payment of $815,000 and higher minimum purchase levels of paintballs by NPS. In addition, the parties agreed, among other things, that NPS's exclusive license to the DRAXXUS brand for paintballs would extend into Europe.

10. Notwithstanding the May 2004 Paintball Agreement, by the Fall of 2004 things had still not improved. Accordingly, in September, 2004, the parties entered into three more agreements in an effort to resolve matters. First, on September 16, 2004, the parties entered into a "Product Supply Agreement" which replaced the prior paintball agreements, along with the related "XBall Rebate Program" Agreement (herein the "XBall Agreement".) (The

---

[4] The Conventional market is defined the same in the 2002 Goggles and Masks Agreement as it is in the 2002 Paintball Agreement. The definition of Non-Conventional market is also the same.

[5] For Procaps, the exact legal entity that entered into this and the subsequent agreement relating to goggle and mask systems was Airtech Industries Inc.

XBall Agreement, together with the Product Supply Agreement are referred to herein as the "September 2004 Paintball Agreement".) The September 2004 Paintball Agreement is one of the two operative agreements at issue in this dispute.

11. The parties also entered into an agreement on September 16, 2004, called the "Confirmation of Contract Terms," confirming the terms of the 2002 Goggles and Masks Agreement and extending the territory covered by that agreement to Europe, given NPS's acquisition of Procaps' European distribution business in May of 2004. The 2002 Goggles and Masks Agreement, together with the Confirmation of Contract Terms, shall be referred to herein as the "Goggles and Masks Agreement," which is the second operative agreement at issue in this dispute.

12. On March 7, 2005, Procaps L.P. (then known as Paintball L.P.),[6] acquired Procaps Encapsulation Inc. and Airtech Industries Inc. and, along with those businesses, their rights and interests in and obligations under the September 2004 Paintball Agreement and the Goggles and Masks Agreement. NPS agreed to the assignment of these agreements on February 25, 2005 and reconfirmed that agreement on March 4, 2005. In exchange for NPS' agreement to these assignments, Procaps agreed to forgive the balance of $265,000 remaining on the $815,000 owed by NPS for the purchase of Procaps' European distribution business.

## ORIGINS AND NATURE OF THE INSTANT DISPUTE

13. By May, 2005, NPS had failed to pay its bills to Procaps in a timely fashion, and had accrued a substantial past due amount on its purchases of both paintballs and goggle and

---

[6] As noted above, on March 11, 2005, Paintball L.P. changed its name to Procaps L.P.

mask systems. (As of May 17, 2005, NPS owed Procaps $8,150,802.47, with $3,041,803.20 past due.) Thus, on May 17, 2005, Procaps sent notices of default and breach to NPS under both the September 2004 Paintball Agreement and the Goggles and Masks Agreement. In accordance with the agreements, the notice provided for a 30-day cure period, which would end on June 16, 2005.

14. On information and belief, on June 16, 2005, NPS sent out checks totaling $2,621,189.19, purportedly to cover at least the past due amounts under both agreements to Procaps, via United States registered mail.[7] On this date (as well as on other occasions during the period between May 17, 2005 and June 16, 2005), Procaps personnel spoke with NPS personnel regarding the need for immediate payment or adequate assurances of performance, but none was forthcoming. On June 17, 2005, NPS faxed copies of the letters forwarding the checks to Procaps, and also sent out a photocopy of the letters and checks to Procaps via another United States mail method.

15. On June 21, 2005, NPS filed the instant demand for arbitration, serving a copy on Procaps with a lengthy demand letter, raising a number of alleged breaches of the September 2004 Paintball Agreement that are now the subject of this arbitration.[8] This letter was not received by Procaps until June 28, 2005, after Procaps had already sent out its notices of termination, discussed below. Although Procaps has not formally replied in writing to this

---

[7] As noted, the checks were not received until June 28, 2005, at which point the amount due had increased to $8,358,132.97, with the past due amount at $4,206,343.38. Also, although the cover letters with the checks purported to include a total of $3,155,438.86 in checks, only $2,621,189.19 in checks was, in fact, included.

[8] NPS's letter forwarding the June 21 demand for arbitration is dated June 20, 2005; however, since it attaches the demand not filed until June 21, it is obvious that the letter must not have been sent until June 21, at the earliest.

demand letter, as discussed below, Procaps personnel have orally responded to NPS personnel on a number of key points, including agreeing to allow an external auditor to review Procaps books on certain topics. NPS has not followed up on this matter.

16. On June 23, 2005, still having not received payment from NPS, Procaps' Richmond Italia spoke with NPS's President, Eugenio ("Gino") Postorivo, regarding the nonpayment. Postorivo assured Italia that he would forward the full balance due via wire transfer or hand delivered certified checks or bank drafts the next day. Other Procaps' personnel also communicated with other NPS personnel at this time, in an effort to obtain payment or at least adequate assurances of performance, but none was forthcoming.

17. The next day, June 24, 2005, still having not received payment in any form or adequate assurances of performance from NPS, Procaps sent out notices of termination to NPS of both the September 2004 Paintball Agreement and the Goggles and Masks Agreement, due to NPS's failure to cure the prior notices of default. Importantly, not only had payment not been received by June 16, 2005, the last day to cure the default, NPS had also failed to provide "adequate assurances of performance" as provided for under each agreement. Indeed, to the contrary, Procaps had serious and well-founded concerns regarding the financial health of NPS and was and is of the belief that NPS would not be able to pay the amounts due. This belief was due, at least in part, to statements made by personnel of NPS, including NPS's Chief Financial Officer, to Procaps personnel, regarding NPS's financial health and inability to pay, as well as NPS' failure to provide any adequate assurances of performance at any time during this period, despite repeated requests for same.

18. On June 27, 2005, Procaps received the photocopies of the June 16, 2005 letters and checks. On June 28, 2005, Procaps finally received the original June 16, 2005 letters and the checks. Thereafter, Procaps cashed the checks, since NPS owed the money, but in doing so did not waive NPS's failure to cure the breach. Indeed, on June 27 and 28, Procaps personnel met with NPS personnel in a further attempt to resolve this matter amicably, and reached what Procaps thought would be an agreement to move forward. Under the agreement reached on June 28, it was understood that the agreements would still be terminated, but NPS would be permitted to buy supplies and equipment from Procaps so long as a payment plan that had been worked out for current, future and past amounts due was met. However, within two weeks of this meeting NPS ceased to forward any payments under the agreement reached on June 28, and Procaps is thus no longer supplying NPS under any terms or conditions.[9] To date, NPS still owes Procaps $5,075,828.24 for past purchases, plus interest.

19. On July 7, 2005, NPS amended its demand for arbitration to include the detailed claims asserted in NPS's June 21, 2005 letter to Procaps, and also filed the second arbitration, which has since been consolidated with the first, relating to the Goggles and Masks Agreement.

### RESPONSE TO NPS'S CLAIMS OF BREACH BY PROCAPS

20. In NPS' Amended Demand for Arbitration and its Demand for Arbitration in the second matter, NPS details a number of purported breaches of the agreements by Procaps. Procaps sets forth here each alleged breach and its response.

---

[9] Procaps remains willing to supply NPS, however, on 45-day terms and without any exclusivity, provided past due amounts are paid off and a line of credit is in place to cover future purchases.

21. First, as to both agreements, NPS claims that Procaps wrongfully terminated each agreement. As set forth above, Procaps termination of both agreements was wholly proper. Pursuant to Section 8.03 of the September 2004 Paintball Agreement and Section 8.02 of the Goggles and Masks Agreement, Procaps is entitled to terminate each agreement for nonpayment by NPS (after notice and a 30-day cure period). As noted above, by May 17, 2005, NPS owed Procaps $8,150,405.79, with $3,041,803.20 past due. Accordingly, Procaps sent notices of default to NPS and, as detailed above, NPS not only failed to make payment, but also failed to provide "adequate assurances of performance," by June 16, 2005, as required to cure the breach under each agreement. Thus, under Section 8.03 of the September 2004 Paintball Agreement and Section 8.02 of the Goggles and Masks Agreement, Procaps was entitled to terminate each agreement, which it did on June 24, 2005, notably only after giving NPS additional opportunities to cure, receiving promise of same and having that promise again fall through.

22. NPS has also alleged that Procaps never intended to honor the agreements and the termination of the agreements was a result not of NPS' own breaches of the agreements, but rather some nefarious scheme by Procaps to defraud and terminate NPS as a distributor, in retaliation for NPS' purported refusal to be acquired by Procaps (or its investors). Procaps flatly denies all of these allegations. Procaps intended to and has honored all of the terms of both agreements. Indeed, as detailed above, even in the face of NPS's blatant breach of said agreements, Procaps has given NPS several opportunities to cure and has remained willing to continue with NPS as a distributor, under certain circumstances, even after the termination. Moreover, the termination of NPS has nothing to do with any acquisition discussions, which occurred in November and December of 2004. Those discussions were of a preliminary nature, arose because of natural synergies seen during Procaps' acquisition of the two predecessor

companies and terminated because the parties could not reach an agreement on valuation of the NPS business.

23. Second, NPS claims a number of purported breaches by Procaps of the September 2004 Paintball Agreement:

    a. Breach of Sections 4.03 and 4.04 of the September 2004 Paintball Agreement for failing to ship paintballs in accordance with NPS' orders: Procaps flatly denies this allegation and states that, to the contrary, each and every shipment of paintballs was specifically approved by NPS prior to shipment;

    b. Breach of Sections 3.03, 3.04 and 5.06 of the September 2004 Paintball Agreement by charging NPS greater than the lowest price charged others and charging others lower prices than permitted in the agreement: Procaps flatly denies this allegation and has agreed to an audit by an external auditor as provided for in the agreement to verify that this allegation is false; however, NPS has failed to pursue this audit;

    c. Breach of Section 2.04 of the September 2004 Paintball Agreement and Section 3(ii) of the May 2004 Paintball Agreement (which survives by incorporation in the September 2004 Paintball Agreement) by soliciting business in Europe in contravention of NPS' exclusivity in Europe: Procaps again flatly denies this allegation and states that, to the contrary, all actions by Procaps are permitted by and in accordance with the agreements;

    d. Breach of Section 7.01 of the September 2004 Paintball Agreement by selling paintballs under the DRAXXUS mark in breach of NPS' exclusivity under that mark:

Procaps again flatly denies this allegation and states that at all times it has complied with the requirements of the agreement with regard to the DRAXXUS mark; and

e. Breach of Section 5.03 of the September 2004 Paintball Agreement by charging NPS prices that are not competitive with comparable products from other manufacturers: Procaps again flatly denies this allegation and states, on information and belief, that, to its knowledge, at all times Procaps' prices to NPS were competitive with those of other manufacturers. Further, the parties had, in fact, amended prices at NPS' request (due to competitive concerns) in connection with the negotiation of the September 2004 Paintball Agreement.

24. NPS also generally asserts a host of other legal theories and causes of action in their demands, without supporting facts or arguments from which Procaps can determine the exact nature of these allegations. These include claims of fraud, negligent misrepresentation, equitable fraud, disparagement under New Jersey's Unfair Competition Statute, N.J. Stat. 56:4-1 et seq., trade libel, tortious interference with NPS' existing and potential business relationships and other claims under common law. Procaps hereby expressly reserves the right to supplement its answer to these claims to the extent such allegations are later elucidated. To the extent any claim can be understood from what is pled, however, and to the extent not already denied herein, Procaps hereby expressly denies each and every such claim.

25. NPS also asserts a claim for punitive damages; however, awards of punitive damages are not permitted under the American Arbitration Association's International Rules, which govern this dispute. Thus, NPS' claim for punitive damages must be dismissed.

## NPS' BREACHES OF BOTH AGREEMENTS AND RESULTING DAMAGES

26. NPS' last payment to Procaps was made on July 19, 2005. To date, NPS owes Procaps $5,075,828.24. NPS has not disputed that this amount is due, yet it has not paid it either.

27. As a result of the termination of each agreement caused by NPS' nonpayment and failure to cure, Procaps has also suffered additional injuries and damages in an amount to be determined. Investigation is continuing and Procaps specifically reserves its right to amend its counterclaim to add a plea for a specific amount of damages flowing from these breaches.

28. In addition to its failure to pay under both agreements, which resulted in the termination of the agreements by Procaps, NPS has also breached the September 2004 Paintball Agreement and the Goggles and Masks Agreement in at least the following ways. As this matter and investigation is on going, Procaps expressly reserves its right to amend its counterclaim to add additional breaches of the September 2004 Paintball Agreement and/or the Goggles and Masks Agreement, should they be identified.

29. First, on information and belief, during the term of the agreement, NPS sourced DIABLO brand paintballs from a manufacturer or manufacturers other than Procaps, in direct violation of paragraph 3.01 of the September 2004 Paintball Agreement.

30. In the alternative, on information and belief, during the term of the agreement, NPS repackaged the DIABLO brand paintballs, in direct violation of paragraph 3.01 of the September 2004 Paintball Agreement.

31. In addition, NPS failed to submit purchase orders for paintballs in a timely fashion, in direct violation of Section 4 of the September 2004 Paintball Agreement.

32. Also, on information and belief, in violation of both the September 2004 Paintball Agreement and the Goggles and Masks Agreement, after acquiring Procaps' European distribution business in May 2004, NPS has failed to honor its obligations under the agreements to act as Procaps' European distributor. After NPS took over as Procaps' European distributor, sales of Procaps' products in Europe have dropped off dramatically. For example, during the period of January through June, 2005, sales of DRAXXUS paintballs in Europe had dropped by 50% over sales for the same period in 2004. In addition, on information and belief, NPS' deficiencies in Europe are intentional and NPS is actively switching prior Procaps customers from Procaps products to other products sold by NPS. In addition, on information and belief, NPS is intentionally alienating prior Procaps' customers and unreasonably failing to follow up on viable new leads provided by Procaps. These actions specifically violate, at least, Section 11.05 of the September 2004 Paintball Agreement and Section 2.02 of the Goggles and Masks Agreements, both of which provide that NPS must "vigorously, diligently and faithfully promote the sale of" Procaps' products.

33. On information and belief, breach of Section 15.02 of the September 2004 Paintball Agreement by failing to disclose in a timely fashion interests held by NPS (or its principals, partners or affiliates) in Blue Arc Holdings, a paintball manufacturer, despite repeated requests from Procaps personnel for confirmation of the same. On information and belief, these interests were acquired in the Fall of 2004, but were not disclosed at all until May 17, 2005, and, even then, the exact nature of such interests were not disclosed (and are still unknown); and

34. On information and belief, breach of NPS' obligations under both the September 2004 Paintball Agreement and the Goggles and Masks Agreements to act on behalf of Procaps' interests as its exclusive distributor, by secretly discussing a merger with Pursuit

Marketing Inc. ("PMI"), one of Procaps' most significant competitors, and, further, actively working against Procaps' interests because of this prospective merger to shut Procaps out of the marketplace, at least for a period of time.

35. Each of these breaches has caused Procaps damages in an amount yet to be determined. Investigation is continuing and Procaps expressly reserves the right to amend its counterclaim to add a plea for a specific amount of damages flowing from these breaches.

### NPS' OTHER ILLEGAL CONDUCT

36. Since the termination of the agreements at issue, NPS has engaged in other illegal conduct. Specifically, on information and belief, high ranking officers of NPS have been soliciting a group boycott of Procaps and its products and advising the marketplace, among other things, that NPS will no longer be selling DRAXXUS paintballs at the European events due to quality concerns with Procaps' manufacturing of the paintballs. This statement is simply untrue, as, first, it was Procaps and not NPS that terminated the agreements, and, second, at no time has NPS complained about the quality of Procaps' products. On information and belief, this was not a one or two time occurrence but a well-orchestrated attempt to achieve a boycott and maliciously to injure and attempt to destroy the business of Procaps.

37. In addition, on information and belief, NPS' actions with regard to the acquisition of an interest in Blue Arc Holdings and its potential merger with PMI, and other activities related thereto, have been with the purpose and intent of driving Procaps from the market place for at least a period of time and hampering Procaps' ability to compete effectively in the marketplace in the future. On information and belief, these actions are anticompetitive and have caused Procaps significant injury.

38. NPS' actions have caused Procaps damages in an amount yet to be determined. Investigation is continuing and Procaps expressly reserves the right to amend its counterclaim to add a plea for a specific amount of damages flowing from these breaches.

WHEREFORE, Procaps respectfully requests that the Panel find in its favor and against NPS and enter a reasoned opinion, as follows:

    a. Declaring that the September 2004 Paintball Agreement and the Goggles and Masks Agreement were properly terminated by Procaps on June 24, 2005;

    b. Enjoining NPS and its personnel from making any further negative statements about Procaps and the quality of its products and from any future solicitations of a group boycott of Procaps' products in Europe or anywhere in the world;

    c. Requiring NPS to pay Procaps $5,075,828.24 plus interest for amounts due for prior purchases under the agreements at issue;

    d. Requiring NPS to pay Procaps additional damages in an amount to be determined incurred as a result of NPS's breaches of the September 2004 Paintball Agreement and the Goggles and Masks Agreement, including due to the early termination of the agreements because of nonpayment and the other breaches set forth above and as yet to be identified;

    e. Requiring NPS to pay Procaps additional damages in an amount to be determined incurred as a result of NPS' other illegal conduct;

    f. Requiring NPS to pay Procaps all costs, including arbitrators' fees and all costs of arbitration, and attorneys' fees incurred in this arbitration; and

      g. Providing for any other relief as deemed just and proper by the Panel.

Procaps also respectfully requests that the Panel convene the parties as quickly as possible to set a schedule for an expedited hearing in this matter, preferably in the early Fall of this year. Given NPS' behavior in the market place, particularly, this matter is of extreme urgency and Procaps would like immediate and complete relief on all claims, so that it may put this matter behind it and focus on rebuilding its distribution networks in the United States and Europe.

Dated: August 11, 2005

                              Respectfully submitted,

                              */s/ Nicole D. Galli*
                              Jon A. Baughman, Esquire
                              Nicole D. Galli, Esquire
                              PEPPER HAMILTON LLP
                              3000 Two Logan Square
                              Eighteenth & Arch Streets
                              Philadelphia, PA  19103-2799
                              (215) 981-4000

                              Attorneys for Respondent and Counterclaim-Claimant, Procaps L.P.