**IN THE AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| NATIONAL PAINTBALL SUPPLY, INC., )<br>)<br>Claimant, )<br>)<br>v. )<br>)<br>PROCAPS, L.P. (f/k/a PAINTBALL L.P.), )<br>)<br>Respondent. )<br>_____ ) | AAA No. 50 181 T 00252 05 |

**NATIONAL PAINTBALL SUPPLY, INC.'S OPENING POST-HEARING BRIEF**

        **DUANE MORRIS LLP**
        Patrick J. Loftus, Esquire
        Robert E. Kelly, Esquire
        Lawrence H. Pockers, Esquire
        Michael S. Zullo, Esquire
        30 South 17th Street
        Philadelphia, PA 19103-4196
        (215) 979-1000

        *Attorneys for Claimant*
        *National Paintball Supply, Inc.*

## *I.    INTRODUCTION*

**BY MR. LOFTUS:**

**Q.**     At the meeting on the 28th or at any other time did PLP protest the amount that was sent 2.6 million?
**A.**     Sir, we did not rescind our termination after June –
**MR. WILKINSON**: That is not the question. The question is did you protest, did you say that is not enough money.
**THE WITNESS**: When, sir?
**BY MR. LOFTUS**:
**Q.**     At the meeting on the 28th or any other time?
**A.**     We had an agreement that they would provide us checks for 700 for shipments of 500. The contract was terminated. They were to continue that on and work off the balance of the past due. We are still owed a lot of money. Then the second set of checks received late, and they were no longer the 700 that we agreed to. 700 checks, 500 product would go out, 200,000 reduction to the payable.
**Q.**     I apologize. My question obviously was not very clear. Let me try again. When the letter of June 16th was sent by e-mail and by fax indicating that NPS was making a payment in the amount of 2.6 did PLP ever take the position that that was an inadequate amount to cure?
**A.**     We believe we could have terminated earlier than June 24th. We terminated June 24th.
**Q.**     Okay. Let me take another run at it. We know the notice of default didn't specify an amount, right?
**A.**     Sir, I'll go back to the –
**MR. EVANS**: Try to answer the question.
**THE WITNESS**: I understand it did not have an amount. I've seen it.
**BY MR. LOFTUS**:
**Q.**     Didn't NPS try to reconcile its accounts, and didn't they represent that they were cursing, not just May 7th, but as of June 16th, when they sent the $2.6 million, correct?
**A.**     Can you repeat that, sir?

**Q.**     After getting the Notice of Default didn't NPS attempt to reconcile its accounts, try to determine what was due and owing, and didn't NPS then send a check in the amount of 2.6 to cover what it believed to be outstanding as of the date of the letter, June 16th?
**A.**     Sir, I know that both accounting groups of both companies worked on a reconciliation. I was not involved with that, and they sent some registered letters on June the 16th and I eventually received $2.6 million of checks on June the 28th.
**Q.**     Okay. And the basis for terminating had nothing to do with the actual amount that NPS had sent via registered mail, correct?
**A.**     Sir, I told you when we terminated this contract.
**MR. WILKINSON**: Did you ever hear anybody say that $2.6 million was insufficient to terminate, either as of May 16th or June 16th -- June 24th?
**MR. EVANS**: Insufficient to satisfy the balance you mean?
**MR. WILKINSON**: Inadequate to cure it? It wasn't enough money, did you ever hear that?
**THE WITNESS**: Did I ever hear that it was not enough money? Maybe you can explain it? Say that again, sir.
**MR. WILKINSON**: They sent a check on --
**THE WITNESS**: 2.6 million.
**MR. WILKINSON**: 2.6 million. They say that was adequate to cure as of the time when the check was sent, as of June 24th, I believe. Just a minute. Let me finish. Did you ever say, no, that is not adequate to cure, that is not enough money, it should have been 3.5? Did you ever hear that said?
**THE WITNESS**: Well, when we terminated, sir, on June the 28th we still were owed $5 million and had a way to get it paid down.
**MR. WILKINSON**: I'm talking about amounts in arrears curing.
**THE WITNESS**: They reconciled towards the amounts in arrears. Two groups agreed we were in the ballpark of the amounts in arrears.
**MR. WILKINSON**: With the 2.6.
**THE WITNESS**: Yes, tied to this May 17th.

The testifying witness is Robert Molyneux, a Principal of Imperial Capital Corporation ("ICC") which, in March 2005, acquired the assets of Procaps Encapsulation, Inc. and created Procaps L.P., the respondent in this action. Beginning in November 2004, Mr. Molyneux led ICC's efforts to acquire

1

Procaps Encapsulation, Inc. and, following the acquisition and while retaining his position at ICC, served on the board of Procaps L.P. ("Procaps").[1]

The above excerpt -- less than five pages of a 4,000 page transcript containing testimony from 16 days of evidentiary hearings -- distills all of the relevant facts that this Panel need consider in deciding the central issue in this action.

The facts are simple. Pursuant to two letters dated May 17, 2005, Procaps advised National Paintball Supply, Inc. ("NPS") that NPS had failed to pay unspecified "amounts due and owing" within 45 days and that such failure constituted a default under the payment provisions of two exclusive supply agreements between the parties (the "Contracts"). On June 16, 2005, via the same method utilized by Procaps in transmitting the default notices, NPS sent Procaps checks totaling more than $2.6 million -- an amount which NPS had determined *not only* satisfied any past due balance that may have existed as of the date of the default notices but that also brought NPS' account balance with Procaps current (i.e., all invoices 45 days, or older, paid up to and including June 17, 2005). Both the fact of the amount sent and NPS' position as to its current payment status were communicated to Procaps in separate written correspondence faxed and emailed to Procaps that same day. Procaps never once complained that the amount NPS paid was insufficient to cure the alleged default.

Notwithstanding the fact that Procaps identified one *and only one* event of default in its notices -- failure to pay amounts remaining unpaid for 45 days or more as of May 17, 2005 -- and the fact that NPS made payments sufficient to cure any such alleged "default" *and then some* within 30 days, Procaps terminated the agreements on June 24, 2005.

Unfortunately, and as demonstrated in the above excerpt, these simple facts had to be gleaned from the muddle of evasion, obfuscation and distracting side issues that constituted Procaps' defense at the hearings in this matter. After months of insisting that this action was nothing more than a garden-

---

[1] References to "Procaps" herein refer to both the pre-acquisition and post-acquisition entity unless otherwise indicated.

2

variety creditor collection case against a deadbeat customer that would take no more than a day or two to try in full, Procaps showed up for the evidentiary hearings in this matter with the means and intention of detonating a cluster bomb of malarkey that would disperse misinformation indiscriminately over a wide area. Procaps hoped that NPS would be struck by one or more stray fragments or, at the very least, end up buried in the rubble of confusion. In other words, Procaps, knowing that it had improperly terminated the agreements, decided its best option was to put as much distance as possible between itself and its two biggest obstacles in this matter: the facts and the law.

That Procaps chose this tact is not surprising as the evidence establishes that the termination was improper in every way. Having decided from the outset of the due diligence process that if NPS could not be purchased the Contracts must be terminated, ICC, once it became the majority shareholder in Procaps, sought to concoct the "incurable default." When NPS cured despite Procaps' best efforts to obfuscate, Procaps did not let that small detail interfere with the plan ICC set in motion. Procaps terminated anyway.

Procaps' termination of the Contracts was clearly improper as a matter of law. First, the overwhelming evidence of ICC's and Procaps' bad faith renders the termination improper even had Procaps followed the express language of the Contracts in terminating, which Procaps did not. Moreover, Procaps waived the payment terms of the Contracts on which any claimed default and subsequent termination were based, rendering the termination improper. In addition, even if Procaps could rely on the payment terms in the Contracts, NPS indisputably cured, even under the interpretation of NPS' obligations that is most favorable to Procaps. As a result of Procaps' improper termination of the Contracts and its other contractual violations, NPS has suffered damages totaling between $39.8 million and $43.3 million.

    A.    ICC's "Project SPLAT!"

ICC set out to conquer the paintball industry. But when ICC began its due diligence on its first acquisition target, Procaps Encapsulation, Inc., ICC's principals regarded the exclusive supply contracts

3

between Procaps and its largest customer, NPS, as "untenable." If ICC, in keeping with its business model, were to acquire Procaps as the platform for its conquest of the paintball industry (a conquest that would allow ICC to take the company "public" or sell it off within 3 to 5 years at a handsome profit), it needed to resolve Procaps' "customer concentration problem." The terms of the Contracts dictated that, but for a few exceptions, Procaps could only sell its products in the traditional paintball market to NPS. Because of this, approximately 70-80% of Procaps' total sales were to NPS. As long as such a large percentage of Procaps' sales were "concentrated" in NPS, Procaps' fortunes were effectively tied to those of NPS. The management of ICC and Procaps believed that this large concentration of Procaps' sales to NPS was a "problem" because Procaps would make more money if it were free to sell all of its products to whomever it chose. However, the Contracts stood in the way.

Therefore, ICC came up with a two-part plan to address the customer concentration "problem." ICC's own internal report reflects its "game plan." "Plan A" was that ICC would seek to acquire NPS, which would make the Contracts moot and would result in a combined entity that could sell to whomever it chose. "Plan B" was that ICC would engineer the termination of the Contracts so that Procaps could sell to NPS on a non-exclusive basis while Procaps built a distribution network and prepared to directly compete with NPS.

NPS rejected ICC's initial purchase offer of $77.5 million in December 2004. However, ICC could not yet resort to "Plan B" and terminate the Contracts because it first needed NPS' consent to the assignment of the Contracts in order to complete its acquisition of Procaps. Instead, ICC placated NPS by assuring NPS that nothing would change after NPS' consent to the assignment, other than that NPS would *benefit* by dealing with a more professional management team.

However, once NPS consented to the assignment of the Contracts, and ICC then acquired Procaps, there were no longer any obstacles preventing Procaps, which was now controlled by ICC, from implementing its "game plan." The evidence demonstrates that on the very day that ICC acquired Procaps, Rob Molyneux, one of the two principals of ICC who were now running Procaps, vowed to

4

address the customer concentration problem "head on." During this same time frame, the other principal of ICC who was now running Procaps, Ed Truant, bragged to his bosses that ICC was "in a great position to squeeze" Gino Postorivo, the President of NPS, meaning that ICC could offer a lower price to acquire NPS based on the threat that, if NPS rejected the purchase offer, Procaps would simply terminate the Contracts and distribute its own products. Richmond Italia, the President of Procaps, stood to gain $20 million in the form of an earn-out from ICC's acquisition of Procaps if Procaps acquired NPS or if Procaps' sales exceeded a certain amount, which Richmond believed they would if the Contracts were terminated and Procaps was free to sell to whomever it chose. Craig Miller, Procaps' Vice President of Sales, repeatedly lobbied his bosses to "apply maximum pressure" so that the Contracts with NPS would become "null and void." Once again, ICC offered to purchase NPS. This time, the offer was $45 million for NPS' distribution business. When NPS rejected this second, and much lower, purchase offer, Procaps invoked "Plan B." Just two months after ICC had acquired a majority stake in Procaps, it issued default notices, the precursor to its eventual purported termination of the Contracts.

### B. *Procaps' Bad Faith And Unfair Dealing*

Inherent in every contract under New Jersey law (the law the parties agreed would govern any disputes between them), is an implied covenant of good faith and fair dealing. This covenant ensures that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." The New Jersey Supreme Court has held that the implied covenant of good faith and fair dealing may be breached even when, unlike this case, a party *properly* terminates a contract based on the express terms of a termination clause.

Thus, even before the mechanics of the default, NPS' cure and Procaps' subsequent termination of the Contracts are considered, the Panel must assess the evidence and testimony to determine whether the principals of ICC and Procaps were acting so as to destroy NPS' right to receive the benefits of the Contracts when, for example:

5

- ICC concluded early on in the due diligence process that the Contracts were "untenable" and that ICC would either need to acquire NPS or have Procaps go into direct competition with NPS, which Procaps could not do so long as the Contracts were in force;

- on the day ICC acquired Procaps, Molyneux declared in an email to his boss, Steven Lister, his intention to "deal with the customer concentration risk head on";

- a little more than one month after the acquisition, Truant emailed Molyneux and Lister that Procaps was "in a great position to squeeze Gino because he is very exposed to exclusivity related to Procaps' paint and masks" and that "[i]f Procaps were to decide to go direct, there goes his business for a few years," and further offered that "we will tactfully have to make him aware of this fact";

- Procaps issued default notices on May 17th[2] only six days after Truant reaffirmed that Procaps' CFO, Howard Tafler, would speak to NPS' CFO, Norm Gunn, about working out a payment plan under which NPS would bring its overdue balance current *by the end of the summer*;

- Procaps did not even include the actual amount that it considered to be overdue in its default notices;

- Procaps did not e-mail, fax or otherwise advise NPS that the default notices had been sent by registered mail on May 17th, thus resulting in what Procaps had hoped would be a drastically shortened response time;

- Procaps never sent a single correspondence between May 17th to June 16th which specified the actual amount Procaps believed NPS had to pay to cure the defaults;

- only days after the default notices were issued, Zbid Migos, one of only two Vice Presidents of Procaps, authorized the hiring of a temporary employee to enter NPS' customers into Procaps' mailing list – a mailing list which would have been necessary only if Procaps was intent on terminating the Contracts, given that Procaps had a grand total of about 15 customers by virtue of the exclusivity terms in its Contracts with NPS and in its contracts with its mass market distributor;

- Miller, the other Vice President of Procaps, wrote numerous emails to Procaps' principals in which he openly and repeatedly advocated for the cancellation of the Contracts;

- Richmond Italia repeatedly threatened Gino Postorivo and John Campo, NPS' General Counsel, that the Contracts would be terminated no matter what NPS did;

---

[2] Unless otherwise indicated, all references to dates are to dates in 2005.

6

- on June 16th, Gino Postorivo informed Molyneux that NPS had $2.6 million in checks ready to deliver to Procaps, but when asked the simple question "How do you want the money," Molyneux was unable (or unwilling) to answer;

- Procaps knew as of June 16th that the $2.6 million in checks had been sent on that date by NPS via registered mail, yet Procaps terminated the Contracts eight days later when it had not received the checks, even though the checks were only sent by registered mail in the first instance because Molyneux was unable to answer Gino Postorivo's simple question;

- Procaps never disputed the account reconciliation that NPS emailed and faxed along with the checks showing that NPS had paid the amount it believed it had to pay to bring its account current through June 17th, yet Procaps terminated the Contracts on June 24th anyway;

- on June 24th, when Procaps had yet to receive the $2.6 million in checks sent by registered mail on June 16th, NPS provided Procaps with the text of an email to send to NPS if Procaps wanted NPS to cancel the checks and overnight new checks, yet Procaps refused to simply send the email, instead opting to terminate the Contracts that same day;

- on June 28th, when Procaps received from NPS more than $2.6 million in certified funds and another $700,000 in checks, Procaps still refused to rescind its purported termination; and

- before, during and after the pendency of the default notices, Procaps and ICC made offers to purchase NPS.

Plainly, the evidence demonstrates that the actions of ICC's and Procaps' principals were *not* taken in the interest of "preserving" the Contracts. Rather, they were the by-product of the decision ICC had made from the outset that, if it could not acquire NPS, it would instead simply terminate the Contracts. No amount of revisionist history – i.e., surely not Tafler's *incredible* testimony that, despite the overwhelming evidence to the contrary, "no one at Procaps" wanted to see the Contracts terminated – can change this fact. By contrast, the evidence shows that NPS' actions during this time frame – including its efforts to reconcile its overdue account balance in the absence of any statement by Procaps of the amount it believed NPS had to pay, its payment of an amount sufficient to bring its balance current up through the day after its payment (as opposed to simply paying the amount overdue as of the date of the default notices), and its payment on only the 23rd day after it had received the notices of

7

default to ensure that it paid its account current within 30 days from when Procaps *mailed* the default notices – were all taken in an effort to preserve the Contracts.

### C. By Any Standard Procaps Improperly Terminated The Contracts

Even apart from Procaps' bad faith and ill motives, the evidence demonstrates that Procaps' termination of the Contracts was plainly improper.

First, the claim of a "default" was improper. New Jersey law is clear that where, as here, one party to a contract permits the other party to consistently pay beyond the term set forth in the contract, the payment term set forth in the contract is considered to have been waived by the acquiescing party. Although such a waiver may later be retracted, it may only be retracted if it is reasonable to do so under the circumstances and, in all events, such a retraction of the waiver can only apply to *future* obligations. Here, where Procaps acquiesced for more than three years to a payment arrangement whereby NPS consistently paid beyond the stated contractual terms, Procaps waived the 45-day payment term in the Contracts as a matter of law. Moreover, having caused NPS to consent to the assignment based on the promise that *nothing would change* in the parties' relationship, it would have been unreasonable for Procaps, only two months later, to have retracted its waiver after NPS relied on this promise. Furthermore, even if Procaps could have reasonably retracted its waiver of the 45-day payment terms, the *earliest* it could have done so was on May 24th, the date NPS received the default notices, and the waiver would have only applied to invoices *issued* that day or thereafter. In other words, NPS could not have been in "default" until July 8th – 45 days after May 24th.

Second, Procaps improperly terminated the Contracts because NPS indisputably cured the bogus "default." The applicable "termination" clauses of the Contracts unambiguously provided that Procaps could only terminate if a "default and/or failure continue[d] for a period of thirty (30) days after notice, and NPS, before the expiration of said thirty (30) day period" was "unable to cure" <u>or</u> "otherwise fail[ed] to provide [Procaps] with adequate assurances of performance." Thus, the plain language of the termination clauses makes clear that NPS *either* had to cure *or* provide Procaps with adequate

8

assurances of performance within 30 days from the time that NPS *received notice* of the default. But NPS did not need to do both.

Actually, the fact that NPS had the option to either cure or provide adequate assurances of performance is entirely academic because the evidence established that NPS actually *cured* the default well within 30 days of receiving notice. In this regard, the law is clear that NPS' sole obligation, once it received notice of the default on May 24th, was to pay, within 30 days, the amount that was overdue as of the date of the default notices – *May 17th*. Therefore, even assuming, *arguendo*, that the overdue amount as of May 17th was $3,041,083 – the amount owed on that date according to the post-litigation analysis done by Tafler – the evidence is undisputed that Procaps actually received from NPS checks and wires totaling *more* than *$3,050,000* during the time period from May 17th to June 10th. And that $3,050,000 does not even include the checks totaling more than $2.6 million that NPS sent to Procaps by registered mail on June 16th.

Third, even under Procaps' tortured interpretation of the default notices, where NPS had to bring its account current as of the date of payment (rather than the date of the notices), NPS would have *still* cured the default when it sent, by registered mail, checks totaling more than $2.6 million to Procaps on June 16th. Indeed, Procaps never once challenged the amount paid by NPS or that the payment brought NPS current through June 17th. The fact that Procaps may not have *received* the checks until June 28th is of no moment. New Jersey law recognizes the "mailbox rule," under which payment is deemed to be "received" on the date it is *sent*, under circumstances such as those present in this case. In any event, NPS actually had an additional seven days within which to mail out the payment because June 16th marked only the 23rd day after NPS had received notice of the alleged defaults. Furthermore, the only reason that Procaps had not received the checks was because Molyneux refused to answer NPS' simple question, "How would you like the money?"

The evidence unequivocally demonstrates that any claimed "default" noticed on May 17th was cured as of June 16th at the very latest, even assuming, as Procaps argues, that NPS' obligation was to

9

bring its account current as of the date of its payment.  Finally, NPS' payment of more than *$6.5 million* between May 17th and June 16th, at the very least, provided adequate assurances of NPS' ability to perform under the Contracts.  Therefore, NPS both cured *and* provided adequate assurances of performance within 30 days of having received the notices of default.  Accordingly, when Procaps terminated the Contracts on June 24th based on a claimed "failure to cure" the alleged defaults that had been noticed on May 17th – without having ever sent out an additional set of default notices *after* May 17th and, therefore, without having provided NPS with its contractually guaranteed notice period within which to cure a default or provide adequate assurances that it could perform – Procaps did so in violation of the plain language of the Contracts.

      D.    *Procaps' "Smoke And Mirrors" Defense*

Any way one analyzes the evidence under New Jersey law, Procaps improperly terminated the Contracts.  In recognition of this fact, Procaps predictably employed a "smoke and mirrors" approach during the hearings to distract the Panel from the real issues in the case.  For example, Procaps presented so-called "expert" testimony from a witness who, rather than addressing the central issue of whether NPS had cured the alleged default, instead offered an admittedly "hypothetical" opinion about whether NPS would have been able to provide Procaps with "adequate assurances" that it could perform under the Contracts *on June 30th*, a date *after* Procaps had already terminated the Contracts.  That Procaps never actually made a request for adequate assurances that would come anywhere close to satisfying the requirements under the U.C.C., and that Procaps' termination of the Contracts was clearly based on NPS' alleged failure to pay amounts due and owing, rather than for failing to provide "adequate assurances," appears not to have mattered to Epstein or, for that matter, to Procaps.  Similarly, Procaps focused a substantial portion of its case on two issues – Gino Postorivo's ownership interest in Blue Arc and NPS' discussions regarding a possible acquisition of PMI – which the evidence plainly demonstrates did not even form the basis for Procaps' default and termination of the Contracts.

10

To the extent that Procaps' principals ever did address the actual issue in this case, they were not burdened by any of the evidence regarding the actual amounts that were owed or paid. For example, Molyneux and Truant – the two men running Procaps – had no idea what the overdue balance was on the date that Procaps sent out its default notices; no idea how that balance compared to what it had been at the same time the previous year; no idea what NPS paid in the 30 days after Procaps sent out the default notices; and no idea where NPS' payments brought the overdue balance as of June 16th or June 24th. The common refrain from each of Procaps' principals who testified – Molyneux, Truant, Richmond Italia and Craig Miller – was that these were merely "accounting" issues. In the absence of any expert testimony, Howard Tafler was the only Procaps witness who even attempted to address the key issue in the case. However, Tafler based his analysis on reports that he ran a few weeks prior to testifying – *more than one year after the actual events in question*. These reports demonstrate that NPS cured even under Procaps' tortured interpretation of the default notices. In any event, Tafler finally conceded that no one from Procaps ever disputed the account reconciliations forwarded by Norm Gunn on June 15th and John Campo on June 16th which formed the basis for the amount NPS paid to Procaps on the 16th. Tafler also advanced the "never-ending" default theory which Procaps now appears to be trumpeting, to the effect that even if NPS had cured the May 17th default notices, when its account later became overdue again and no payments were received by Procaps on one day (June 23rd), Procaps was then entitled to terminate the very next day, and without providing any *additional* notice of default and the required cure period.

Incredibly, it was not until right before the last day of testimony that NPS even *received* Procaps' final analysis of what Procaps believed was owed and paid by NPS. This was *after* countless hours were spent examining Procaps' witnesses about what the overdue account balance was on some of the key dates in the case and what payments were made by NPS to offset that amount. Even Procaps' expert, Roy Epstein, refused to address this issue. Thus, not only did Procaps make it nearly impossible for NPS to determine what NPS had to do to "cure" the default during the relevant time periods in the case,

11

but Procaps made it equally difficult for NPS and the Panel to determine the status of NPS' account balance in Procaps' view because the numbers kept changing. This is a perfect example of why a default notice should properly set forth the amount that is owed, which Procaps' notices did not do.

Procaps' defense strategy extended far beyond mere misdirection. The following Table compares certain of the representations made by Procaps' counsel in her opening statement (left side of the Table) with what the evidence presented over the course of 16 days of hearings actually demonstrated (right side of the Table):

| REPRESENTATION MADE DURING OPENING STATEMENT | REALITY |
|---|---|
| NPS was aware prior to ICC's acquisition of Procaps that, although Procaps had previously permitted NPS to carry an overdue balance, under the "new world order" this would no longer be the case. Tr. 3/20 at 63-64.[3] | Not a single document during the pre-acquisition period reflects that ICC or Procaps communicated to NPS any ultimatum or even the slightest concern about NPS' overdue balance on its roughly $35 million in purchases per year from Procaps, nor was there any mention of the overdue balance in any of the numerous consent documents that ICC had NPS sign when it consented to the assignment of the Contracts to the post-acquisition Procaps entity. |
| The lender that financed ICC's acquisition of Procaps, National Bank of Canada, was looking "very, very closely [at] what was going on with [Procaps'] vendors" in the time period following ICC's acquisition of Procaps. Tr. 3/20 at 64-65. Procaps' bank was not going to tolerate it. Tr. 3/20 at 67. | Not a single document reflects that the bank was concerned or even aware of what NPS' overdue balance was *at any time* prior to termination of the Contracts. To the contrary, the evidence demonstrates that the bank was not even informed in writing about the termination until months after the fact because Procaps was aware that the bank would have never approved of Procaps' unilateral decision to terminate its largest customer a little more than three months after the bank had lent more than $40 million to finance ICC's acquisition of Procaps. |
| At a dinner in Philadelphia on April 12th, the CFOs of NPS and Procaps were instructed to get together and work on a payment plan whereby NPS' account would be brought current and "kept current on a going forward time frame by around the mid-June time frame . . . | The documents uniformly demonstrate, and Procaps' own witnesses repeatedly admitted, that what was discussed was a payment plan whereby NPS would bring its account current by *the end of the summer*, not by "the mid-June time frame." |

---

[3] Citations to the hearing transcripts herein are by hearing date (all dates are in 2006), page number and, where applicable, witness. Thus, for example, a citation to pages 102 and 103 of the March 20, 2006 transcript would be "Tr. 3/20 at 102-103 (G. Postorivo)."

12

| | |
|---|---|
| There was . . . clear statements to National that come the middle of June this past due . . . for more than 45 days was coming to an end . . . and [Procaps] was giving [NPS] two months to clean things up and move forward on a new basis." Tr. 3/20 at 66-68. | |
| That Exhibit PLP-327 was a document "created by [Procaps'] expert" showing the overdue receivable from NPS on a weekly basis during the relevant time period. Tr. 3/20 at 68-70. | PLP-327 was created by Tafler, not by Procaps' expert, Epstein. Epstein simply accepted whatever amount Procaps said was overdue on various dates in his admittedly hypothetical "adequate assurances" analysis. In any event, the amounts listed on PLP-327 do not match the amounts reflected on later exhibits presented by Procaps. |
| That even if Procaps' "main argument [that NPS failed to adequately cure under the Contracts] is wrong, that perhaps [Procaps was] jumping the gun . . . there is no question that [Procaps] behaved properly and terminated the [Contracts] in July at the very latest" under a theory that NPS had not provided "adequate assurances" in response to a June 4th email for adequate assurances under the UCC. Tr. 3/20 at 87-90. | The June 4th email was admittedly not designed to be, nor was it an effective, demand for adequate assurances under the UCC. In any event, all of Procaps' witnesses admit that the termination, of course, occurred on June 24th (not sometime in July) and that the sole basis for the termination was the default notices sent out on May 17th (which referenced only the past due balance), not a failure by NPS to respond to any request by Procaps for "adequate assurances" of performance. |

*   *   *   *   *   *   *   *   *   *   *   *

NPS also has proven its claim that Procaps breached the "best pricing" provisions of the Paintball Contract. Craig Miller acknowledged Procaps' wholesale violation of these provisions during the time period when the Paintball Contract was in force.

Procaps is not entitled to relief on its counterclaims. Where a party so clearly acts in bad faith, as Procaps has in this case, principles of equity dictate that it ought not be able to profit from its wrongdoing. Forfeiture of the value of the product shipped to NPS for which NPS did not pay is appropriate under New Jersey law. Procaps did not put on any evidence regarding and/or did not prove its other counterclaims and thus cannot prevail on these claims. Furthermore, since Procaps, not NPS, breached and terminated the Contracts, Procaps is obviously not entitled to collect "lost profits" resulting from its wrongful termination of the Contracts.

13

For its part, NPS is entitled to damages for Procaps' improper termination and other violations of the Contracts. As discussed below, these damages total between $39.8 million and $43.3 million. Moreover, NPS is entitled to recover its attorneys' fees and costs and will provide, together with its Reply Brief, a summary of the fees and costs NPS has incurred in this matter.

## II.     PROCEDURAL BACKGROUND

This arbitration was originally commenced by NPS on June 21, 2005, through the filing of a Demand for Arbitration with the International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"). On July 8, 2005, NPS filed an Amended Demand for Arbitration. That same day, NPS also commenced a separate arbitration through the filing of a Demand for Arbitration with the ICDR. The separate arbitration was assigned case number 50 181 T 00274 05. Case number 50 181 T 00274 05 was later consolidated with this matter.

On August 11, 2005, Procaps filed its Response and Counterclaim to the Demands for Arbitration made by NPS. On October 3, 2005, NPS filed a General Denial and Affirmative Defenses to Procaps' Counterclaim. On November 23, 2005, NPS filed an Amended Consolidated Demand for Arbitration and Supplemental Statement of Claims ("Consolidated Arbitration Demand"). On December 5, 2005, Procaps filed its Response to NPS' Consolidated Arbitration Demand and Counterclaim.

## III.    FACTUAL BACKGROUND

### A.    The Parties

At all relevant times, NPS was a paintball game supply and distribution company headquartered in Sewell, New Jersey, which dealt in various types of paintball equipment, including numerous brands of markers and paintballs as well as goggles, air systems, loaders, parts, and clothing. Tr. 3/20 at 103-104 (G. Postorivo). NPS was founded in 1989 by Gino Postorivo when he opened a paintball retail store

14

out of his father's pizza shop after meeting some paintball players who came into the pizza shop for lunch. Id. at 153-155 (G. Postorivo). The company began operations as South Jersey Paintball Supply and later changed its name to NPS in 1992. Id. at 96 (G. Postorivo). Including its main headquarters located in Sewell, New Jersey, at all relevant times NPS had seven locations around the world, strategically placed in one or two-day shipping points. Id. at 108-109 (G. Postorivo).

Procaps Encapsulation, Inc. ("PEI") was formed in or around 1998 by three partners: Richmond Italia; Richard Italia; and Greg Vance. Tr. 9/7 at 66; Tr. 9/8 at 140-42 (Richmond Italia). PEI was engaged in the business of manufacturing paintballs. Dep. Tr. Vance at 27-28.[4] PEI's sister company, AirTech Industries, Inc. ("AirTech"), was involved in the business of manufacturing goggles. Dep. Tr. Vance at 49-50. In a transaction that closed on March 7, 2005, the assets of PEI and AirTech were sold to a new company, Procaps, L.P. (f/k/a Paintball, L.P.). Ex. PLP-212. ICC is the majority shareholder of Procaps, L.P. Id. Procaps, L.P. is engaged in the business of manufacturing paintballs and goggles and its subsidiary, Procaps Direct, is engaged in the business of distributing those products. Tr. 9/27 at 12 (Miller).

### B. The Paintball Business

"Paintball" is a competitive game in which players use gas-powered markers (similar to air guns) to launch at each other marble-sized dye-filled gelatinous capsules (also known as "paintballs"). The purpose of the game is to eliminate players on the opposing team by striking them with a "paintball." Tr. 3/20 at 99-100 (G. Postorivo); Ex. NPS-31. Paintball is reportedly a $400 million per year industry, based on sales by manufacturers or distributors to paintball stores and fields. Tr. 3/20 at 135-138 (G. Postorivo).

---

[4] Citations to the transcripts of depositions are to the name of the deponent and the page number for the cite. Thus, a citation to pages 27-28 of Greg Vance's deposition is "Dep. Tr. Vance at 27-28."

15

Among the various categories of paintball supplies, paintballs are the most important for a distributor. Tr. 3/20 at 104 (G. Postorivo); Tr. 3/24 at 202-203 (Molyneux). Unlike most sports, in paintball the ball "disappears," i.e., the paintballs explode on contact and, therefore, players must continuously buy replacement paintballs to play the game. Tr. 3/20 at 104-105 (G. Postorivo). "[I]f you control the paint you control the customer," because, when shipping paintballs, a distributor like NPS could add goggles, accessories and apparel and, in effect, ship these additional products for free. Tr. 3/20 at 122 (G. Postorivo); Dep. Tr. Vance at 60-61. However, if a distributor loses its ability to supply its customers with paintballs, it "lose[s] twice" because the customers will also stop buying from it other paintball-related items. Tr. 3/20 at 247 (G. Postorivo); Tr. 3/21/06 at 261-262 (J. Postorivo).[5]

Paintballs are typically sold in cases made up of four bags of 500 paintballs, for a total of 2000 paintballs per case. When shipping paintballs, approximately 100 cases fit on a "skid" – a 48 foot by 48 foot pallet. Tr. 3/20 at 109-110 (G. Postorivo); Tr. 9/27 at 79 (Miller). The paintball itself is comprised of an outer skin made up of pig skin gelatin called the "shell." The inside of the paintball contains polyethylene glycol and is called the "fill." The shell and the fill can be different colors and can be metallic and/or two-toned. Tr. 3/20 at 110-111 (G. Postorivo).

There are six different levels, or "grades," of paintballs. The grades are based on the quality of the shell and the fill and the performance of the paintball. In terms of performance, the paintball cannot be too soft or fragile, or it will break during shipping or break in the paintball gun. Conversely, the paintball cannot be too hard, or it will cause injury. Tr. 3/20 at 111-116 (G. Postorivo); Tr. 3/22 at 13-14 (J. Postorivo). At the low end of the six grades of paintballs are "white box," which are so named because they are not branded and are usually sold in a plain white box (although the shells and fills can

---

[5] Procaps' expert, Epstein, took umbrage with the notion that the sale of paintballs drives the sale of other paintball-related products. Ex. PLP-454 at pp. 5, 7. Like most of the rest of his opinions, however, Epstein's opinion on this point should be discounted because Epstein simply ignored the testimony of even Procaps' own witnesses which established that sales of paintballs drive sales of other products. Dep. Tr. Vance at 60-61 (agreeing that once customer bought skid of paintballs, the "logistics" were "really good" for shipping other paintball-related products at minimal cost); Tr. 3/24 at 202-03 (Molyneux) (testifying that a distributor "need[s] the paintballs").

be any color). At the top end are professional or tournament level paintballs, used by professional paintball players. Tr. 3/20 at 116-118 (G. Postorivo).

A paintball gun, or "marker," consists of the marker itself, a loader to load the paintballs, a barrel, and an air tank which enables the marker to fire paintballs rapidly. Tr. 3/20 at 123-125 (G. Postorivo). Goggles or masks also consist of a variety of component parts including the lens and visor. Tr. 3/20 at 127-128 (G. Postorivo). The other types of products distributed by NPS are known as "soft goods" and include products such as jerseys, pants, gloves, neck protectors and other padding. Tr. 3/20 at 129-130 (G. Postorivo).

NPS' core group of customers have traditionally been paintball fields and stores that operate similarly to golf courses and golf pro-shops, and paintball products make up the vast majority of the business done by these customers. NPS also sells to customers in the "mass market," i.e., Wal-Mart, Dick's Sporting Goods, etc. Tr. 3/20 at 105-106 (G. Postorivo).

### C.  *Evolution Of The Contracts Between NPS And Procaps*

In 1993 or 1994, NPS began marketing a paintball gun called "Diablo." Tr. 3/20/06 at 180-181 (G. Postorivo Test.); Ex. NPS-2168 at p. 11. At an industry event in or around January 2000, Richmond Italia informed Gino Postorivo that Richmond was opening a paint manufacturing plant and would be using the name "Diablo." Tr. 3/20 at 182-183, 187-188 (G. Postorivo). Thereafter, Procaps sought to register the trademark "Diablo" with the United States Patent and Trademark Office ("USPTO"). Ex. NPS-2168. NPS filed an opposition to Procaps' registration of the "Diablo" trademark. Id.

During the time period when NPS' opposition to Procaps' registration of the "Diablo" trademark was pending, NPS and Procaps began discussing a possible resolution of the dispute. The parties met in New York in late 2001 and, at that meeting, Gino and Richmond began to discuss an arrangement where NPS would distribute products manufactured by Procaps. Tr. 3/20 at 198-200 (G. Postorivo). Negotiations continued through late 2001 and into early 2002. Tr. 3/20 at 209-210 (G. Postorivo). On

17

February 27, 2002, the USPTO granted NPS' motion for summary judgment regarding its opposition to Procaps' registration of the "Diablo" trademark. Ex. NPS-2168.

On February 28, 2002, the day after the USPTO granted NPS' motion for summary judgment regarding its opposition to Procaps' registration of the "Diablo" trademark, NPS and Procaps entered into a Wholesale Product Supply & Distribution Transfer Agreement (the "February 2002 Agreement"), the first in what would become a series of contracts between the parties. Tr. 3/20 at 219-220 (G. Postorivo); Ex. NPS-1. The February 2002 Agreement set forth the framework for the subsequent contracts that later amended and/or superseded it. The February 2002 Agreement:

- affirmed that the "Diablo" name belonged to NPS and provided that NPS would acquire Diablo Direct, Procaps' U.S. distribution arm, for $2 million and assume responsibility for certain of Diablo Direct's warehouses Ex. NPS-1 at ¶¶ 5.01, 7.03, 17.01 and 10.06; Tr. 3/20 at 228-229 (G. Postorivo); Tr. 3/21 at 263-64 (J. Postorivo); Tr. 9/27 at 22-23 (Miller).

- provided that NPS would be the exclusive distributor of Procaps' new "DraXxus" branded paintballs to the "Conventional Market," defined in relevant part as "any wholesale and/or retail outlet where more than fifteen percent (15%) of the gross sales of said outlet are derived from Paintball and paintball game related products and services," within the United States and its territories, and, in turn, provided for Procaps to be the exclusive manufacturer and supplier of paintballs, including Diablo branded paintballs, to NPS. Ex. NPS-1 at ¶¶ 2.04, 2.07, 3.01 and 3.02; Tr. 3/20 at 227 (G. Postorivo); Tr. 3/21 at 253-254 (J. Postorivo); Tr. 9/27 at 24 (Miller).

- provided for purchase minimums. Ex. NPS-1 at ¶¶ 3.10 and 3.11;

- extended for a seven year term. Ex. NPS-1 at ¶ 8.01; Tr. 3/20 at 229 (G. Postorivo); and

- gave NPS the option to purchase Procaps' Canadian and European distribution arms. Ex. NPS-1 at ¶ 18.01; Tr. 3/20 at 228 (G. Postorivo); Tr. 9/27 at 23 (Miller).[6]

The contracts which form the basis for NPS' claims in this case are the June 12, 2002 Exclusive Distributor Agreement between NPS and AirTech, as modified by the September 20, 2004 Confirmation

---

[6] NPS ultimately commenced its own operations in Europe and eventually purchased Procaps' European distribution arm, paying $815,000 in May 2004 and agreeing to an "Amendment of Contract Terms" (the "May 2004 Agreement") which provided NPS with the exclusive right to distribute all paintballs manufactured by Procaps, including "QIP Paintballs," in the European Territory, without distinction as between the Conventional and Non-Conventional Markets. Ex. NPS-2 at ¶3(i) and (ii); Tr. 3/20 at 222 (G. Postorivo); Tr. 3/22 at 31 (J. Postorivo).

18

DM1\738254.1

of Contract Terms between the same parties which expanded the territory within which NPS was the exclusive distributor of AirTech goggles and masks to include the European territory (referred to collectively herein as the "Goggles Contract"), see Exs. NPS-5 and NPS-6, and the September 20, 2004 Product Supply Agreement between NPS and Procaps (the "Paintball Contract"). Ex. NPS-3.

### 1. *The Goggles Contract*

The Goggles Contract gave NPS the exclusive rights to distribute all masks and goggles manufactured by AirTech, including the VForce line, to the "Conventional Market" (defined in the same way it had been in the February 2002 Agreement). Ex. NPS-5 at ¶¶ 1.03 and 2.01. AirTech could not sell VForce masks and goggles into the Non-Conventional Market, defined in relevant part as "any retail outlet where less than fifteen percent (15%) of the gross sales of said outlet are derived from Paintball and paintball game related products and services," without NPS' written consent. Ex. NPS-5 at ¶ 2.04(i). The Goggles Contract also obligated NPS to make minimum purchases of 75,000 VForce branded products during the first year, then 83,000, 91,000, 99,000, 107,000 and 115,000 over years 2-6, respectively, of the Goggles Contract. Ex. NPS-5 at ¶ 2.09.

### 2. *The Paintball Contract*

In the months leading up to September 2004, Procaps had actively sought out companies who might be interested in acquiring Procaps. Dep. Tr. Vance at 141-144; Tr. 9/7 at 116-118 (Richmond Italia). NPS and Procaps began discussing making changes to their contractual relationship. Tr. 3/23 at 37 (J. Postorivo). One of the changes Procaps desired was to gain additional sales pipelines for its products. Tr. 9/27 at 71 (Miller). At this point, prior to September 2004, Procaps essentially had only three customers: NPS; a Canadian distributor; and Procaps' mass market distributor. Tr. 3/22 at 37 (J. Postorivo).

On September 20, 2004, NPS and Procaps entered into the Paintball Contract. Tr. 3/20 at 222-223 (G. Postorivo); Ex. NPS-3. With the exception of certain discrete terms incorporated by reference,

19