the Paintball Contract superseded the February 2002 Agreement and the May 2004 Agreement entered into between NPS and Procaps.  Ex. NPS-3.[7]

The Paintball Contract essentially maintained the relationship that had previously been in place between the parties.  NPS would still be the exclusive distributor of DraXxus paintballs and Procaps would remain the exclusive manufacturer of Diablo paintballs.  However, the exclusivity terms that had previously been in place were relaxed to permit Procaps to sell private label and its own branded paintballs to third parties and for NPS to source paintballs from other manufacturers provided it met its minimum purchase obligations of DraXxus and Diablo paintballs.  Tr. 3/22 at 37 (J. Postorivo); Ex. NPS-3.  The other key terms of the Paintball Contract were as follows:

- Procaps could manufacture and sell so-called private label, or "OEM Paintballs," to third party purchasers, but Procaps was not permitted to actively participate in the promotion or advancement of any OEM Paintball and NPS was entitled to best pricing with respect to comparable paintballs, per the prices set forth in Schedule A to the Paintball Contract.  Ex. NPS-3 at ¶¶ 1.01(vii) and 3.03, and at Schedule A.

- Procaps could manufacture and sell so-called "QIP Paintballs" – defined as paintballs manufactured by Procaps under trademarks owned by Procaps – to third parties, provided that NPS would at all times be afforded best pricing with respect to such paintballs, per the prices set forth in Schedule A to the Paintball Contract, and further provided that NPS had the right to purchase QIP Paintballs from Procaps.  Ex. NPS-3 at ¶¶ 1.01(v) and 3.04, and at Schedule A.

- NPS was required to purchase all of its requirements of Diablo Paintballs from Procaps and Procaps was to be the exclusive supplier of Diablo Paintballs to NPS, subject to limited exceptions.  Ex. NPS-3 at ¶ 3.01.  Similarly, NPS was obligated to purchase all of its requirements of DraXxus Paintballs from Procaps and Procaps was to be the exclusive supplier of DraXxus Paintballs to NPS.  Ex. NPS-3 at ¶ 3.02.

- NPS was obligated to purchase a minimum of 1.7 billion paintballs, comprised of Diablo and DraXxus paintballs, from Procaps.  Ex. NPS-3 at ¶3.06.  Over the final five purchase years of the initial term under the Paintball Contract, that 1.7 billion minimum figure was to increase by 10% each year.  Ex. NPS-3 at ¶ 3.08.

---

[7] On September 20, 2004, NPS and Procaps entered into a separate  XBall Paintball Rebate Agreement (the "XBall Rebate Agreement") that provided NPS with a $1 rebate per case for each case of XBall NPS purchased from Procaps over and above a purchase volume of 300 million paintballs.  Ex. NPS-4 at ¶2; Tr. 3/22 at 38-39 (J. Postorivo).

- In the event NPS acquired an ownership interest in a paintball manufacturing concern, Procaps had the option to be released from its obligation to charge NPS best pricing on OEM Paintballs and QIP Paintballs provided, however, that if Procaps should opt to be released from this obligation, Procaps would no longer have the exclusive right to manufacture NPS' Diablo Paintballs.  Ex. NPS-3 at ¶ 15.02.

### 3. *Key Terms Present In Each Of The Contracts*

The following key terms were present in both the Paintball Contract and the Goggles Contract:

- The term of each of the Contracts was for a period of seven years, with an automatic renewal for another term of seven years unless terminated by either party upon written notice delivered at least six (6) months prior to the end of the initial term or any renewal thereof.  Exs. NPS-3 at ¶ 8.01; NPS-5 at ¶ 8.01; Tr. 3/20 at 229-230 (G. Postorivo).

- The payment term of each of the Contracts provided that NPS was to pay within 45 days from the date products were shipped from Procaps'/AirTech's manufacturing facilities, but Procaps/AirTech could not terminate for failure by NPS to pay within this 45 day time frame unless: (1) "such default and/or failure continues for a period of thirty (30) days after notice and NPS before the expiration of said thirty (30) day period is unable to cure"; or (2) "NPS otherwise fails to provide [Procaps/AirTech] with adequate assurances of performance."  Exs. NPS-3 at ¶¶ 5.02 and 8.03; NPS-5 at ¶¶ 4.01 and 8.02.

- Neither party could assign its rights or obligations under the Contracts without the express written consent of the other party, and the Contracts would be binding upon any successors or permitted assigns.  Ex. NPS-3 at ¶¶ 16.03, 16.04; NPS-5 at ¶¶ 13.03, 13.04.

- The Contracts were to be "construed and the legal obligations between the parties hereunder shall be determined according to the substantive laws of the State of New Jersey, USA."  Exs. NPS-3 at ¶16.05; NPS-5 at ¶ 13.05.

- All notices, requests, orders, demands, or other communications under the terms of the Contracts required or permitted to be given by one party to the other were to be given in writing, and to be sent by registered or certified mail.  Exs. NPS-3 at ¶ 16.06; NPS-5 at ¶ 13.06.

### 4. *Assignment Of The Contracts To Procaps, L.P.*

Effective February 25, 2005, all rights, title and interest in the Contracts were assigned from PEI and AirTech, respectively, to Procaps, L.P..  Ex. NPS-2218.  NPS consented to the assignment pursuant to the terms set forth in paragraphs 16.03 of the Paintball Contract and 13.03 of the Goggles Contract and, in so doing, executed various documents relating to that consent.  Exs. NPS-2219 through NPS-2226.  The effect of the assignment was that, going forward, Procaps, L.P. now stood in the shoes of PEI

and AirTech with respect to the subject matter of the Contracts.  Exs. NPS-2218; NPS-3 at ¶ 16.04; NPS-5 at ¶ 13.04.

### D.   Significant Characteristics Of The NPS-Procaps Contractual Relationship

#### 1.   Growth Of The Businesses/Building Of The Brands

The evidence demonstrates that the marriage of NPS' distribution network and Procaps' manufacturing capabilities generated phenomenal sales results for both companies.  Greg Vance, one of the partners who owned Procaps, acknowledged as much when he testified that the contractual relationship was a "huge success."  Dep. Tr. Vance at 87-88.  In the first year after the February 2002 Agreement was signed, NPS purchased approximately 1.65 to 1.7 billion paintballs, far exceeding its minimum purchase requirements of 1 billion paintballs per year under the February 2002 Agreement.  Tr. 3/22 at 24 (J. Postorivo).  In the first year after the Goggles Contract was signed, it took NPS just four or five months to exceed its annual minimums.  Tr. 3/22 at 26 (J. Postorivo).  For that first year, NPS nearly doubled its minimums under the Goggles Contract and tripled the number of goggles sales made by Diablo Direct prior to the time when NPS became the exclusive distributor of VForce goggles.  Tr. 3/22 at 26 (J. Postorivo).  During the entire period of time when NPS and Procaps (including AirTech) were contractual partners, NPS always exceeded its minimum purchase obligations under the contract that was in effect at the time.  Tr. 3/20 at 246 (G. Postorivo); Tr. 3/21/06 at 265 (J. Postorivo).

NPS' sales went from $48 million, prior to entering into the February 2002 Agreement, to more than $117 million in the last full year that the parties were contractual partners.  Tr. 3/21 at 265 (J. Postorivo).  Similarly, Procaps' sales went from $17 million in 2001, the last full year prior to the February 2002 Agreement, to more than $48 million in 2004, the last full year that the parties were contractual partners.  Ex. NPS-31 at p. 10.  During this period of time, Procaps introduced its DraXxus brand, which quickly developed a reputation as "one of the most recognized brand names in the paintball industry."  Ex. NPS-31 at p. 12.  Within a period of time of less than three years, sales of DraXxus paintballs from Procaps to NPS, Procaps' exclusive supplier, increased from zero to more than

$15 million. Ex. NPS-2214 at pp. 12-13.  During this period of time, NPS favored the DraXxus brand over its own Diablo brand because DraXxus came to dominate the paintball market and, from NPS' perspective, NPS had the exclusive right to distribute DraXxus paintballs for the seven-year term of the February 2002 Agreement and then for an additional seven-year term following the execution of the Paintball Contract.  Tr. 3/20 at 229, 233-235 (G. Postorivo).[8]

### 2.  *Payment Arrangements*

From early in the contractual relationship, NPS and Procaps agreed to a payment arrangement where, instead of NPS sending checks which corresponded to specific invoices, NPS would send an overnight package each week to Procaps with five checks, one corresponding to each day of the following week.  Tr. 3/20 at 258-265 (G. Postorivo); Tr. 3/21 at 266 (J. Postorivo).  One of the reasons for this payment arrangement was that NPS would be due credits for products that it gave away, on behalf of Procaps, at major tournaments to teams that Procaps sponsored.  Tr. 3/21 at 267 (J. Postorivo).  It often took Procaps four to six months to issue credits to NPS for paintballs and other products that NPS had distributed, for free, to Procaps-sponsored teams at industry events.  Tr. 3/22 at 6-10 (J. Postorivo); Ex. NPS-16.

The checks that NPS sent on a weekly basis were not post-dated.  Id.  Rather, they were sent in envelopes marked "Monday," "Tuesday," "Wednesday," "Thursday" and "Friday" to denote the day that each check was to be deposited.  Id.  Along with the package containing the checks for the next week, NPS would denote which invoices the payments should be applied against.  Tr. 11/3 at 77 – 78 (Tafler).  Generally, the course of dealing between the parties was to apply payments to the oldest outstanding invoices.  Tr. 11/3 at 31 (Tafler).

---

[8] Richmond Italia testified that NPS had "nothing to do" with building the DraXxus brand.  Tr. 9/7/06 at 94-98 (Richmond Italia).  This testimony is one of many instances in which Procaps' witnesses were simply not credible.  Clearly, since NPS was the exclusive distributor of DraXxus paintballs to the Conventional Market from DraXxus' infancy through June 2005, NPS must have had something to do with DraXxus becoming the dominant paintball brand on the market.  Moreover, Mr. Italia's partner, Greg Vance, specifically contradicted Mr. Italia on this point.  Dep. Tr. Vance at 87 – 88.

23

With the exception of the May 2004 Agreement, each of the contracts between the parties, including the Paintball Contract and the Goggles Contract, contained the same 45-day payment terms. Exs. NPS-1 at ¶ 5.01, NPS-3 at ¶ 5.02, NPS-5 at ¶ 4.01. However, at all relevant times NPS was permitted to pay beyond the terms set forth in the contract in force at the time. Tr. 11/3 at 81-82 (Tafler).[9] The effect of this payment arrangement was that NPS always had an overdue balance when compared to the 45-day payment term written in the contract that was in effect at the time. Tr. 11/3 at 73-75 (Tafler). Significantly, Procaps never advised NPS that this was unacceptable or, in Procaps' view, put NPS in breach of the Contracts. Id.

> **E.      ICC Enters The Picture And, From The Very Beginning, Plots A Course That Ultimately Leads To The Wrongful Termination Of The Contracts**
>
> **1.      ICC And Its Business Model**

ICC is a Toronto-based "merchant bank" – another term for a private equity firm. Ex. NPS-30. Formed in 1989 by partners Steven Lister and Jeffrey Rosenthal, ICC employs an acquisition strategy that attempts to identify a recession-resistant, profitable, low-risk industry in which to invest. Id. Once such an industry is located, ICC "applies stringent investment criteria to select a well-managed, mid-sized acquisition candidate to serve as a platform for growth in the target industry." Id. Once a suitable acquisition candidate is identified, ICC seeks majority ownership of that company and then seeks further industry penetration through a combination of internal growth and acquisitions, with a view toward generating an "initial public offering, merger or other attractive liquidity event." Id.

---

[9] Tafler's testimony in this regard was as follows:

> **Q:** Now, had you testified yesterday that when you got to Pro Caps there was a amount that was beyond the 45 days, right?
> **A:** Correct.
> **Q:** And in fact if you went back to the beginning of the relationship there was always an amount under this payment plan that was beyond 45 days, right?
> **A:** Correct.

24

### *2.  ICC's Bad Faith In The Pre-Acquisition Period*

In or around September 2004, ICC became aware that Procaps was entertaining suitors interested in potentially acquiring the business. Tr. 9/6 at 150-151 (Truant). On the day that ICC learned about Procaps' interest in a potential sale, Truant, Molyneux and Lister flew to Montreal to meet with the principals of Procaps. Tr. 9/6 at 154 (Truant). On October 19, 2004, ICC signed a letter of intent to acquire the assets of Procaps and AirTech, among other assets, for $100 million. Ex. NPS-31 at PRO203020-029. Shortly thereafter, ICC began its due diligence process. Tr. 9/6 at 161-162 (Truant). Thus began "Project SPLAT!," the code name ICC came up with for its entry into the paintball industry. Tr. 3/23 at 168 (Molyneux).

Molyneux and Truant were the co-leaders of ICC's efforts to acquire Procaps. Id. Shortly after the due diligence process began, ICC prepared a Confidential Information Memorandum ("CIM") seeking expressions of interest from potential lenders who would finance the transaction. Tr. 3/23 at 175 (Molyneux); Ex. NPS-31. The CIM acknowledged that NPS accounted for 76% of all of Procaps' paintball sales and anywhere from 70%-75% of Procaps' overall business. Ex. NPS-31 at p. 45; Tr. 3/23 at 175 (Molyneux). The CIM also laid out the following "growth strategy" for Procaps:

> The vision for Procaps is to achieve significant sales growth over the next 5-years, through a combination of internal growth and select acquisitions. The main thrust of its expansion activities is focused on *customer diversification* and the *development of new sales channels*.

Ex. NPS-31 at p. 8 (emphasis added). The goal of "customer diversification" was to ensure that "no one customer represents more than 30% of [Procaps'] revenue." Id. at p. 28.

ICC's goal of diversifying such that no one customer represented more than 30% of Procaps' revenue could not be achieved when Procaps was locked into exclusive distribution agreements with NPS that included only a narrow window (and one for which NPS had best pricing protection) for Procaps to sell directly to third parties in the Conventional Market. Of course, in the CIM that went to potential lenders, ICC would not and could not announce that ICC's plan was to either acquire NPS or

25

terminate the Contracts, because no lender would agree to provide more than $40 million in financing, see Tr. 9/5 at 30-31 (Molyneux), if there was a good chance that the very first act taken by the borrower would be to terminate the customer representing 70%-80% of its sales. So, instead, ICC represented to potential lenders the diversification goal would be achieved through direct-to-field sales through its X-Ball Direct sales business,[10] new retail customers, OEM (private label) sales, "product segmentation" and international distribution beginning in 2006 without cutting into sales to NPS. Id. at pp. 28, 29-30 (advising that Procaps would be marketing X-Ball in a way designed not to "cannibalize its own sales through NPS"). In essence, the CIM painted a picture for the potential lenders of dramatically increasing sales through these other channels – as opposed to acquiring NPS or terminating the Contracts.

However, ICC privately acknowledged that the customer concentration problem could only be resolved by eliminating the exclusive rights NPS had to distribute DraXxus paintballs and VForce goggles, and the best pricing protection NPS had with respect to its purchase of "QIP" Paintballs, under the Contracts. This is very clearly spelled out in an internal ICC report prepared by Ed Truant in mid-November 2004. Tr. 9/6 at 180 (Truant); Ex. NPS-32. In a section of the report entitled "Operational and Industry Observations," Truant laid out the problem *and* the only possible solution:

**Project SPLAT!**
**STATUS**

Operational and Industry Observations

| Issue | Status | Due Date |
|---|---|---|
| National relationship is untenable as it currently stands. Need to change the agreement to either (i) more closely align the 2 companies or (ii) go into direct competition with National. The bipolar | | |

---

[10] X-Ball Direct was a semi-direct sales force Procaps established for its X-Ball product. Ex. NPS-31 at p. 29. The sales force was directed by Paul Sattler, one of the former partners in the Diablo Direct distribution network that Procaps sold to NPS as part of the February 2002 Agreement. Id.; see also Ex NPS-1.

26

Ex. NPS-32 at p. 2.[11]

On November 4, 2004, Lister, Molyneux and Truant visited NPS' headquarters in Sewell, New Jersey. Tr. 3/21 at 37-38 (G. Postorivo); Ex. NPS-33. The stated purpose of the meeting was to get to know NPS, the largest customer of ICC's acquisition target, Procaps. Tr. 3/21 at 38 (G. Postorivo); Tr. 3/23/06 at 195-196 (Molyneux). However, during the meeting it became evident that what ICC really wished to discuss was a way to "more closely align" Procaps and NPS through the purchase of NPS. ICC's representatives used a dry erase board to show NPS how, based on a calculation that involved using a multiple of NPS' EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization), ICC came up with a purchase price for NPS of approximately $77 million. Tr. 3/21 at 45-46 (G. Postorivo). In a follow-up email sent on December 2, 2004, Lister reduced ICC's offer to purchase NPS to writing:

```
-----Original Message-----
From: Stephen Lister [mailto:sdl@rogers.blackberry.net]
Sent: Thursday, December 02, 2004 12:30 PM
To: Gino Postorivo
Subject: Deal - amended

The terms of our offer as we discussed are as follows:

* $77.5 million dollar purchase price, comprised of $70 million cash,
  and a $7.5 million note (increased from $5 million).
* $5 million re-investment of above proceeds in equity.
* Note is 4 years (reduced from 5), interest rate of 5.5 %
* Note repayment of $1 million per year is based on meeting annual
  earnings before interest and taxes depreciation and amortization
  (EBITDA) of $10 million per year and $40 million cumulatively and pro
  rata per year).
* Early repayment of note, and not subject to performance hurdles, if
  company is taken public, merged with a public company or sold during the
  term of the note.
* Employment agreement specifying base salary of $500,000 and bonus of
  100% of base salary (bonus subject to achieving budgeted EBITDA as
  mutually determined - note: bonus percentage increases and deceases with
  performance of EBITDA against budget (minimum of 2 year term - at your
  option can be extended to 5 years)

Gino, let us know this afternoon if we have a deal or not.
```

---

[11] Interestingly, Truant also noted in this same document that the viability of a key element of the customer diversification plan that ICC had presented to the potential lenders, X-Ball Direct, was very much in question due to NPS' opposition to that plan. Id. Significantly, the CIM noted no such opposition or impediment to this key element of Procaps' customer diversification strategy, further evidence that the diversification "plan" presented to the potential lenders was a sham. Ex. NPS-31. Ultimately, Procaps shut down the X-Ball Direct sales network in or around January 2005, based on NPS' opposition to the existence of that network on the grounds that it violated the terms of the Contracts. Tr. 3/23 at 53-55, 68 (J. Postorivo); Tr. 9/8 at 44-45 (Richmond Italia).

27

Ex. NPS-34.[12]  NPS rejected ICC's purchase offer.  Tr. 9/27 at 294-295 (Campo).

Just as ICC made misrepresentations to its potential lenders in order to get financing for its acquisition of Procaps, ICC made misrepresentations to NPS about the effect ICC's acquisition of Procaps would have on the NPS-Procaps relationship.  Significantly, Molyneux admitted that ICC needed NPS to consent to the assignment of the Contracts from the old Procaps entities to the post-acquisition entity.  Tr. 3/23 at 224 (Molyneux).  Without that consent, ICC could have never obtained the financing to complete its acquisition of Procaps, because no bank would provide the majority of the financing on a $100 million transaction if it knew that the contract between the borrower and the customer representing 70%-80% of the borrower's sales would not be assigned as part of the transaction.  Therefore, ICC never said a word to NPS about its conclusion that it either needed to purchase NPS, i.e., "more closely align the 2 companies," or go into direct competition with NPS.  Rather, ICC's representatives painted a rosy picture of a future in which, following the acquisition, NPS would continue to be Procaps' most important customer and benefit from no longer having to deal with Richmond Italia as its main point of contact, and be dealing with a more professional management team.  Tr. 9/27 at 281-282 (J. Campo); Tr. 3/21 at 39-40 (G. Postorivo).

---

[12] Among the many instances in which his testimony was simply not credible, Molyneux testified that this email in which Lister, on behalf of ICC, set forth the "terms of our offer," and advised Gino to "let us know this afternoon if we have a deal or not," was not really an "offer":

> **Q:** And at the bottom of the E-mail, it says – this is Mr. Lister's E-mail – "Gino, let us know this afternoon if we have a deal or not."  Do you see that?
> **A:** Yes, sir.
> **Q:** It sounds pretty firm to me.
> **A:** This is not firm.  This was based upon looking at very limited financial information that we didn't get a copy of and some general discussions with Gino, it was a number that we talked about.
> **MR. CHAIRMAN:** Well, once you throw a number like this out, is as a practical matter – and you are certainly in the business and I'm not – you will not get it for less?
> **A:** Well, sir, we hadn't received the budget, so we didn't know what we thought their business would be doing the next year.  We weren't sure exactly – we had to look at the inventory, the receivables in detail.  So the only thing that we had looked at were some un – were the draft September statements.  It was very general.  It was – it's not to say a deal would happen at this price, no, sir.  I can't, not at that stage.

Tr. 3/23 at 199-200 (Molyneux).

28

In her opening statement, Procaps' counsel stated that NPS was aware, prior to ICC's acquisition of Procaps, that following the acquisition a "new world order" would take hold, one in which NPS would no longer be permitted to carry an overdue account balance. Tr. 3/20 at 63-64. Significantly, over the course of 16 hearing days, Procaps did not introduce a single document or a shred of credible testimony suggesting that anyone from ICC or Procaps, in the pre-acquisition period, or at any other time, ever mentioned anything to anyone at NPS regarding a need for NPS to bring its account balance with Procaps down in order for the transaction to move forward or for the post-acquisition entity to continue to do business with NPS.[13] Indeed, ICC was well aware, prior to its acquisition of Procaps, that NPS received extended terms with regard to its account balance. ICC had asked Ernst & Young ("E&Y") to prepare a Financial Due Diligence Report for "Project Splat". Tr. 9/6 at 163 (Truant). The Report prepared by E&Y in November 2004 advised that Procaps gave extended terms to its three largest customers, including NPS, such that these customers, each of whom had 45-day payment terms, paid on average within *78 days*. Ex. NPS-35 at ICC00003791.

Despite the fact that ICC was plainly aware of the alleged "problem" regarding NPS' overdue account balance, ICC never communicated any ultimatums, warnings or, for that matter, the slightest concern to NPS about this "issue" during the pre-acquisition period. Indeed, the evidence establishes just the opposite – that ICC communicated to NPS that ICC was pleased with the feedback that it had received regarding NPS' financial condition, and that NPS was in good standing under the Contracts.

---

[13] Truant testified that he verbally communicated a concern about NPS' overdue balance to NPS prior to the acquisition because it would have been "inappropriate" to have put such a concern in writing. Tr. 9/6 at 204 (Truant). As with nearly all of the testimony of Procaps' principals on the key issues in the case, Truant's testimony in this regard is simply not credible. If ICC were truly concerned about the status of NPS' account balance and/or its ability to pay that balance, it would have demanded written assurances from NPS that it could meet its payment obligations and, if it did not receive those assurances, it would have never gone through with a transaction in which it was spending millions of dollars of its investors' money. Truant's attempt to draw a distinction between a written communication (which he acknowledged ICC never made because, in his view of the universe, it would have somehow been "inappropriate" to have done so) and a verbal communication (which, for some reason, was "appropriate") is an obviously disingenuous attempt to cover up for the fact that no such communication ever occurred.

Thus, for example, after Gino Postorivo and Norm Gunn, at ICC's request, spoke to ICC's lenders in January 2006 about NPS' financial condition, Truant wrote the following email:

> From: Edward Truant [mailto:etruant@imperialcap.com]
> Sent: Thursday, January 13, 2005 2:48 PM
> To: Gino Postorivo; Norm Gunn
> Subject: Banks
>
> Gino & Norm,
>
> Just wanted to say thanks for all of your assistance with the lenders yesterday. We received very good feedback from them and it looks like we are in good shape to close our deal with Richmond, Richard and Greg.
>
> We look forward to our conversations early next week.
>
> Thanks again.

Ex. NPS-48. Similarly, ICC placed no conditions regarding NPS' account balance with Procaps in the numerous documents ICC had NPS sign as part of NPS' consent to the assignment of the Contracts from QIP and ATI to Procaps. In fact, Procaps specifically confirmed in these consent documents that NPS was in good standing under the Contracts:

> 2. National and Procaps each confirm that, to the best of their knowledge, both parties are in good standing under the Distribution Agreement in all material respects, except as stated on Exhibit A.

Ex. NPS-2219; Ex. NPS-2220 (providing same language with respect to ATI).[14]

### 3. ICC's/Procaps' Bad Faith In The Period Between The Acquisition And The Issuance Of The Notices Of Default

ICC acquired Procaps on March 7, 2005, for $100 million. Ex. PLP-212. By the time ICC acquired Procaps, ICC's "Plan A" with respect to the customer concentration "problem," i.e., "more closely align" NPS and Procaps through a purchase of NPS, had not panned out. NPS had rejected ICC's $77.5 million purchase offer that was made in December 2004. Ex. NPS-34; Tr. 3/21 at 52-53 (G. Postorivo); Tr. 9/27 at 294-295 (Campo). On the same day ICC closed on its acquisition of Procaps, Molyneux advised his boss, Lister, of Molyneux's plans to address the customer concentration problem:

---

[14] There was no "Exhibit A" as referenced in the document. Tr. 3/23 at 235-236 (stipulation of counsel).

```
-----Original Message-----
From: "Robert Molyneux"
Date: Mon, 7 Mar 2005 14:16:10
To: "Steven Lister"
Subject: PMI

Steve know that your not as keen as I am on PMI. If all goes well today, as I
believe it will I plan to call Jeff and David on Wens. ( I'll speak to Richmond
tonight)) tell them closed and plan meeting.
I want to deal with the customer concentration risk head on.
While I believe we should dual track with NPS I believe that road, no matter how
we tru, will be frustrating and may lead no where
```

Ex. NPS-39.

ICC wasted little time following through on Molyneux's promise to address the customer concentration problem "head on." The principals of ICC, Procaps and NPS attended a dinner in Philadelphia on April 12, 2005, to celebrate NPS' role in ICC's successful acquisition of Procaps one month earlier. Tr. 3/21 at 198-200 (G. Postorivo); Tr. 11/2 at 270 (Tafler); Tr. 3/23 at 233-234 (Molyneux). At the dinner, the parties again discussed the prospects for an acquisition of NPS, this time by Procaps, which was now owned by ICC. Tr. 3/23 at 246-247 (Molyneux). ICC also raised, for the very first time, the issue of NPS' account balance. Tr. 3/23 at 233-234 (Molyneux) (**Q:** But the earliest specific meeting that you can recall discussing payment terms with National was the April 12th meeting, correct? **A:** Yes.); Tr. 11/2 at 270-271 (Tafler). More specifically, Molyneux told Gino that Molyneux would like to get Procaps' and NPS' CFOs (Tafler and Gunn) together to discuss a payment plan whereby NPS would bring its account balance current *by the end of the summer*. Tr. 3/23 at 230-31 (Molyneux). Significantly, Molyneux admitted that not only was the plan was for NPS to bring its account balance current *by the end of the summer*, but that Molyneux indicated to Gino that this plan *was acceptable to Procaps*. Id.[15] Tafler also conceded that the plan was for NPS to get current by the

---

[15] Molyneux's testimony was as follows:

> **MR. CHAIRMAN:** Let me just pick up on something. Gino during this conversation, I gather he said to you, my new banking arrangements or whatever it might be, I think I can get myself by the end of the summer in position to comply with the 45 days?
> **A:** The concern in this industry –
> **MR. CHAIRMAN:** No. I am just asking what he said.
> **A:** Yes, sir.
> **MR. CHAIRMAN:** Is that what he said?

(Continued…)

end of the summer. Tr. 11/3 at 93 (Tafler) (**Q:** And do you recall that the conversation was that the CFOs would get together and work on a schedule that would get NPS current through the end of the summer, do you recall that? **A:** Yes, I do.).[16] Not surprisingly, Molyneux never mentioned to Gino or anyone at NPS that, in reality, if NPS did not bring its account balance current within the *next two months*, Procaps intended to terminate. Tr. 3/23 at 230 (Molyneux).

Significantly, this concept – that the parties would work on a payment plan whereby NPS would bring its account balance current *by the end of the summer* – was what Procaps consistently communicated to NPS up through the time, roughly one month later, when Procaps issued its default notices. For example, on May 11th, Truant circulated an email summarizing two days of meetings among Procaps' principals which resulted in the following action item regarding the issue of a payment schedule with NPS:

```
From:         Edward Truant
Sent:         Wednesday, May 11, 2005 04:08:43 PM
To:           Howard Tafler, Richmond Italia, Richard Italia
CC:           Rob Molyneux, Stephen Lister
Subject:      Follow-Up from Meetings
Attachments:  ICC Equity analysis.xls (19.3 KB)

Gents,

Follow-up items from Monday/Tuesday's meeting:

J) Howard to follow-up with Norm Gunn to get him to agree to a payment
schedule which meets our objectives (weekly payments from Europe). The
short-term goal is to get all NPS receivables in line with their 45 day
credit terms, as per their agreement, by the end of the summer. With our
```

---

(Continued…)

    **A:** In general terms, yes.
    **MR. CHAIRMAN:** I'm curious. And you said, that's good, that sounds good?
    **A:** *Yeah, it's fine*.

Id. (emphasis added).

[16] In yet another example of a representation made by Procaps' counsel in her opening statement that is contrary to what her own witnesses repeatedly testified to, Procaps' counsel was adamant that there were "clear statements to National that come the middle of June this past due . . . for more than 45 days was coming to an end . . . and [Procaps] was giving [NPS] two months to clean things up and move forward on a new basis." Tr. 3/20 at 66-68.

Ex. NPS-47; Tr. 11/3 at 93-94 (Tafler) (admitting he thereafter followed-up with Gunn to discuss payment schedule where NPS would bring its account balance current *by the end of the summer*).

From mid-April through mid-May 2005, while Procaps was communicating to NPS that it had until the *end of the summer* to bring its account balance current, privately, the principals of ICC and Procaps were engaging in the same deceit that characterized all of ICC's dealings with NPS, both before and after ICC's acquisition of Procaps. During this time frame, ICC's and Procaps' management were plotting the best way to implement their plan to either "more closely align" NPS and Procaps through the acquisition of NPS (Plan A), or to go into direct competition with NPS (Plan B). Ex. NPS-32. With respect to Plan A, Truant perfectly summarized, in two separate emails he sent to Molyneux and copied to his bosses at the end of April, ICC's newfound leverage in the wake of having persuaded NPS to consent to the assignment of the Contracts:

```
From:    Ed Truant
Sent:    Thursday, April 21, 2005 06:27:52 PM
To:      Molyneux, Rob
CC:      Lister, Stephen D., Rosenthal, Jeffrey L.
Subject: NPS

I think they're in a bad position, we should take full advantage.
```

```
From:    Ed Truant
Sent:    Monday, April 25, 2005 05:39:22 PM
To:      Molyneux, Rob
CC:      Lister, Stephen D.
Subject: Valuation and other stuff

Strategically, we are in a great position to squeeze Gino because he is very
exposed to exclusivity related to Procaps' paint and masks. If Procaps were to
decide to go direct, there goes his business for a few years. We will tactfully
have to make him aware of this fact.
```

Exs. NPS-42, NPS-44.[17]

---

[17] Consistent with his approach whenever he was confronted during his testimony with a document demonstrating Procaps' and/or ICC's bad faith, Molyneux simply would not provide a responsive answer when asked what his understanding was of Truant's April 25th email:

  **Q:** And, am I correct in understanding that paragraph to mean that if PLP terminates the

(Continued…)

Meanwhile, Procaps was also preparing to implement Plan B, in case it was unsuccessful in its efforts to acquire NPS:

> From: Rob Molyneux
> Sent: Friday, April 22, 2005 03:21:35 PM
> To: Howard Tafler
> CC: Ed Truant, Steven Lister, Richmond Italia
> Subject: NPS
>
> Richmond has a meeting Campo next week. Can you give us an update where we stand with the NPS acct's rec and the schedule of payments. Please update your model to reflect the payments and shipments inorder that we can see where we end up in June

---

(Continued…)

> contract Gino is going to have a major problem?
> **A:** No, sir. You would have to speak to Ed about that. I mean, it's best to speak to him about this.
> **Q:** Really. You had a different understanding than what I just said?
> **A:** Sir, when I received this e-mail I didn't spend much time with it. If I remember, Ed was on vacation and my only question to him was, I thought you were on vacation. It is a long memo. It deals with other issues. I didn't spend a lot of time on this.
> **Q:** Wasn't this an issue that was of paramount importance to you in this timeframe?
> **A:** Sir, I receive a lot of e-mails in the day. What I'm telling you, and you could look at this, My response was, I thought you were on vacation.
> **Q:** I receive a lot of e-mails in a day as well, but I recognize when one is more important than others. It seems to me this issue goes right back to the customer concentration issue, correct?
> **A:** Sir, there are at least three or four topics on this e-mail. And, again, if you want to deal with that specific paragraph it did not -- don't reflect it -- I don't understand it from the point of view of -- again, my response to this e-mail was, I thought you were on vacation.
> **Q:** What was your understanding of the first sentence when he says, we are in a great position to squeeze Gino?
> **A:** Sir, as I said, my response to this e-mail was, I thought you were on vacation. I did not spend a lot of time on this.
> **Q:** You would rather not tell us about your understanding of this paragraph, is that what you are telling us?
> **A:** I'm telling you exactly how I responded.
> **Q:** I'm not asking you --
> **A:** I thought you were on vacation.
> **Q:** I'm asking you your understanding of this paragraph, sir.
> **A:** I didn't write the paragraph, sir.
> **Q:** Okay. Do you understand what I'm asking you? What was your understanding? You are a recipient of this e-mail. Tell me what you understood this paragraph to mean?
> **A:** I don't recall my understanding. My only response to this e-mail was, I thought you were on vacation.
>     *     *     *     *     *     *
> **Q:** You don't have any recollection of your understanding of this paragraph?
> **A:** Sir, I think I answered the question.

Tr. 3/24 at 7-9 (Molyneux).

34

Ex. NPS-43. Molyneux's email makes plain that, contrary to what Procaps was telling NPS, Procaps' management actually had no intention of waiting until "the end of the summer" to cancel the Contracts with NPS if NPS resisted Procaps' acquisition attempts. Rather, Procaps' plan, if it could not quickly acquire NPS, was to terminate the Contracts in June.

On May 4th, Procaps offered to purchase NPS' distribution business – which represented the vast majority of NPS' business – for $45 million. Ex. NPS-46. Procaps' reduced offer – approximately $33 million less than it had offered in December 2004, prior to NPS' consent to the assignment of the Contracts – reflected the "great position" Procaps believed it was now in to "squeeze Gino" as NPS had consented to the assignment. Ex. NPS-44. NPS rejected this offer. Tr. 3/24 at 31-33 (Molyneux).

        *4.*    *ICC's/Procaps' Bad Faith In Contriving Excuses To Mask The Real Reason Why The Default Notices Were Issued*

The evidence demonstrates that NPS' rejection of Procaps' May 4th purchase offer was the precipitating event that led to the issuance of the default notices by Procaps on May 17th. The issuance of the default notices, and the subsequent termination of the Contracts based on those default notices, was merely an extension of the "solution" mapped out by ICC in its Project SPLAT! Status Report from November 2004 to "change the agreement to either (i) more closely align the two companies or (ii) go into direct competition with National." Ex. NPS-32. Having failed to acquire NPS, ICC naturally proceeded to Plan B and engineered, albeit without cause, the termination of the Contracts so that Procaps could then directly compete with NPS.

Procaps' assertion that a claimed overdue account balance was the reason for the default notices (and later, the termination of the Contracts) is the artifice it came up with to mask the real reason why the default notices were issued, as a claim of "default" and the termination of the Contracts was ICC's Plan B all along if it could not convince NPS to sell. Once again, ICC's and Procaps' own documents demonstrate that the supposed "issue" regarding NPS' overdue account balance was clearly just a pretense to cancel the Contracts.

35

As ICC well understood prior to its acquisition of Procaps, NPS always ran an overdue account balance with Procaps when measured against the 45-day payment terms embodied in the Contracts and in the agreements that preceded the Contracts. Tr. 11/3 at 81 (Tafler). The notion that the overdue account balance had somehow grown appreciably worse in the period between ICC's acquisition of Procaps and the date the notices of default were issued is belied by Procaps' own documents, which show that NPS' overdue account balance had only increased by approximately $200,000 between mid-March and mid-May, a negligible amount. Ex. PLP-327. More striking is Procaps' own analysis comparing NPS' account balance in June 2005 to what it had been the previous year, in June 2004:

```
From:         Ed Truant
Sent:         Sunday, June 26, 2005 01:23:16 PM
To:           Molyneux, Rob
Subject:      Fw: National US and UK JUNE 30, 2004
Attachments:  National US and UK June 24, 2005.xls (45.7 KB)
```

Comparable numbers for 2004

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | AS of June 23, 2005 | | | | | | |
| 2 | | | | | | | |
| 3 | NPS | Total | Current | Overdue | 1 to 30 | 31 to 60 | 61+ |
| 4 | | | | | | | |
| 5 | USA | 6,273,304.15 | 4,046,995.12 | 2,226,309.03 | 1,990,080.42 | 356,175.07 | (119,946.46) |
| 6 | Europe | 1,390,414.92 | 681,094.44 | 709,320.48 | 491,052.22 | 60,000.00 | 158,268.26 |
| 7 | | | | | | | |
| 8 | Old Procaps | 731,105.47 | 0.00 | 731,105.47 | 0.00 | 0.00 | 731,105.47 |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | TOTAL | 8,394,824.54 | 4,728,089.56 | 3,666,734.98 | 2,481,132.64 | 416,175.07 | 769,427.27 |

|   | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Procaps | | | | | | | |
| 2 | Customer Aged Summary As at 06-30-2004 | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | Total | Current | Overdue | 31 to 60 | 61 to 90 | 91+ |
| 5 | | | | | | | | |
| 6 | USD-National Paintball Inc (USA) | USD | 5,901,536.41 | 2,669,962.62 | 3,231,573.79 | 2,582,689.20 | 340,388.57 | 308,496.02 |
| 7 | USD-National Paintball Europe | USD | 1,272,980.01 | 1,039,194.01 | 233,786.00 | 233,786.00 | 0.00 | 0.00 |
| 8 | | | | | | | | |
| 9 | Total outstanding in: | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | United States Dollars | | 7,174,516.42 | 3,709,156.63 | 3,465,359.79 | 2,816,475.20 | 340,388.57 | 308,496.02 |

36

DM1\738254.1

Ex. NPS-49. As evidenced by Procaps' own analysis, NPS' overdue account balance had grown by only a negligible amount ($3,465,359.79 in June 2004 as compared to $3,666,734.98 in June 2005) and the overdue amount actually constituted a *lower* percentage of the overall account balance as compared to the previous year.[18] What is most significant is that the 2005 numbers cited in Procaps' report do not even take into account NPS' payment of more than $2.6 million on June 16, 2005.

The evidence concerning NPS' overdue account balance in the time period following ICC's acquisition of Procaps demonstrates that the balance was consistent with what it had previously been. Moreover, upon being alerted by Procaps at the April 12th dinner to the alleged "problem" regarding NPS' overdue account balance, NPS thereafter immediately *increased* its weekly payments. Ex. NPS-2239. Indeed, just weeks before the default notices were issued, Tafler acknowledged that, by virtue of increased weekly payments by NPS, the balance was moving "in the right direction." Ex. PLP-511. Simply put, the evidence contradicts the notion that NPS' overdue account balance had somehow reached a "critical mass" by mid-May such that it would have legitimately triggered the issuance of the default notices.[19]

The evidence establishes that Procaps plainly understood that the accounts receivable issue was just an excuse for issuing the default notices and, recognizing that the default notices needed more

---

[18] Molyneux testified that this ratio – the overdue amount as a percentage of the overall amount – was supposedly an important measure for Procaps in assessing the state of the NPS receivable. Tr. 3/23 at 232 (Molyneux).

[19] In her opening statement, Procaps' counsel offered up yet another reason why the default notices were sent when she represented that National Bank of Canada, the bank that provided the financing for ICC's acquisition of Procaps, was looking "very, very closely [at] what was going on with [Procaps'] vendors" in the time period following ICC's acquisition of Procaps. Tr. 3/20 at 64-65. Here again is an example of an excuse that appears to have been made up out of whole cloth. Procaps did not introduce a single document during 16 days of hearings in this matter which would indicate that National Bank of Canada was concerned or *even aware* of what NPS' account balance was *at any time* prior to the termination of the Contracts by Procaps. To the contrary, the evidence demonstrates that ICC did not even formally notify the bank of Procaps' unilateral decision to terminate its largest customer until at least *November*, nearly six months after the termination. See, e.g., Ex. NPS-636 (June 29, 2005 email from Truant to Laurent Genest at National Bank, advising of NPS' payment of approximately $2.6 million which "went a long way to getting our accounts receivable current with them" but not mentioning that Procaps had terminated Contracts); Tr. 9/6 at 287-289 (Truant) (**Q:** And you never sent a formal notice of termination of the contract until November, correct? **A:** Well, again, we had phone conversations. We had met with the bank, we had met with the bank regarding a distribution plan, and then the formal notice was sent in November. . .).

37

"teeth," Procaps' management desperately sought out additional grounds on which to default NPS on the very day the default notices were issued. Craig Miller, Procaps' Vice President of Sales, was the member of Procaps' management team tasked with finding some other basis to default NPS.[20] Miller wrote a series of emails to his superiors at Procaps on the afternoon of May 17th that were clearly designed to provide an additional purported "rationale" for the default notices that were to issue later that day. At 1:23 p.m., it was NPS' advertisement of Diablo paintballs in 500 and 1000 count boxes. Ex. NPS-464. At 3:31 p.m., it was NPS' ownership interest in Blue Arc. Ex. NPS-51. At 3:46 p.m., it was NPS' rumored merger with PMI. Ex. NPS-465. Miller's first email contains the imagery of a shark going in for the kill – a perfect analogy for what Procaps was about to set in motion that very afternoon:

```
From:    Craig Miller
Sent:    Tuesday, May 17, 2005 01:23:13 PM
To:      Richard Italia, Richmond Italia, Rob Molyneux (E-mail), Edward Truant
Subject: NPS Contract Violation? NPS advertising Diablo in 500 & 1000 ct es - which we don't make. No
         such PO. Nice people, eh?

Gents –

We have a packaging order for ~10,000 Diablo boxes (2000-count), and it needs a
go-ahead.

However, I have a glossy ad in my hands, torn from NPS' current "Paintball
2Xtremes" magazine, including a photo and offer of the contractually Procaps-
manufactured "Diablo" brand, being sold as "Now available in 500 and 1000 count
boxes…" for which we've never received P.O.s, and which we've never made.

In light of this, and smelling blood in the water, purchasing wishes to know, Do
we proceed with the 2000-count packaging purchase, or are there plans to cut
them off,
```

Ex. NPS-464. The fact that Procaps did not include *any* of the grounds suggested by Miller in its default notices confirms that none of what Miller was citing came anywhere close to constituting a violation of the Contracts, and further illustrates Procaps' bad faith in seeking to terminate in the first place.

### 5. ICC's/Procaps' Bad Faith In Attempting To Concoct The "Incurable" Default

---

[20] Miller denied that he had been so tasked. Tr. 9/27 at 119-120 (Miller). However, his denial is not to be believed in light of the impossible coincidence that he happened to send his bosses three emails relating to potential violations of the Contracts by NPS on the very afternoon the default notices were issued. After all, this is the same witness who denied that he wanted to see the Contracts with NPS terminated despite the numerous emails he wrote during the relevant period in which he openly and repeatedly advocated for the termination of the Contracts.

Perhaps the best way to assess the true motives of Procaps in issuing the May 17th default notices is to assume, for a moment, that what Procaps truly wanted – as each of its principals who testified swore – was simply for NPS to bring its account current, and that, as Tafler testified, no one at Procaps wanted to see the Contracts terminated. Tr. 11/2 at 307, 11/3 at 23, 59 (Tafler). If, in fact, this were the case, what would reasonable businessmen have done under the circumstances to ensure that NPS was given every opportunity to "cure" the defaults so that Procaps would not be "forced" to terminate the Contracts – and its largest customer?

Certainly a party that did not wish to see the Contracts be terminated would very clearly state in its default notices – or at a minimum would attach a report showing – the amount that NPS would have to pay to bring its account current. After all, as Tafler acknowledged, it would have been very easy for Procaps to run a report showing all of the invoices that were overdue as of May 17th, the date the default notices were issued. Tr. 11/3 at 123-124 (Tafler) (**MR. EVANS:** You could generate a report as of any day you want. **THE WITNESS:** Correct.). Similarly, if Procaps truly wished to make it clear – assuming, *arguendo*, it could properly do so under the Contracts – that it wanted NPS to actually bring its account current not only through May 17th, but also through June 16th (i.e., 30 days from the date the default notices were issued), it certainly would very clearly state as much in its default notices. Furthermore, if Procaps was "rooting" for NPS to bring its account current to avoid being "forced" to terminate the Contracts (which, according to Tafler, no one at Procaps wanted), it certainly would have told NPS in its default notices – or at a minimum would attach a report showing – the amount that NPS had to pay on the 30th day to bring its account current, based on a tally of all of the invoices that would be more than 45 days overdue on the 30th day after the default notices were sent, assuming no payments by NPS in the interim. Tafler acknowledged that this report could, of course, be run by Procaps. Tr. 11/3 at 123-124 (Tafler). Finally, if Procaps truly wished to see the Contracts continue in full force and effect, it surely would have emailed or faxed the default notices to NPS in addition to sending them via registered mail so that NPS, based on Procaps' (erroneous) assertion that the 30 day "cure" period ran

39