Ex. NPS-1550. In this same email, Miller also explained to his colleagues the other benefits of terminating the Contracts with NPS.

> The evolving situation with National Paintball brings the strong hope of doing business with NPS on a non-exclusive, non-contractual basis, and thus eliminating many contractual branding restrictions which hindered our growth in the past. The elimination of the National contract could enable us to take the Crosman "GameFace" joint venture to new heights through some traditional/non traditional market cross promotion and branding, potentially including special DraXxuS and XBall sub-brands or SKU sizes made specifically for Sporting Goods/Mass Retail markets. Currently GameFace only offers Dusk and Scorch brands, while Brass Eagle delivers a confusing plethora to the shelves. This new development could hopefully enable GameFace to achieve additional shelf space through more listings during the Autumn line reviews.
>
> Obviously, many things hinge on our ability to move out of the current contractual restrictions, to do business with NPS on a non-exclusive basis, and to sell additional Procaps brands directly. In a post-contractual scenario, if we were to launch another Procaps brand (already prepared) that is specifically NEVER accessible to NPS, we believe that many Customers would literally come out of the woodwork with desires of buying direct.

Id. The sum total of Procaps' sales projections – in the time period *before* the termination of the Contracts – was as follows:

```
   630-840 million  (30%-40% of 2.1 billion, Miller's projection of NPS' drop ship sales)
 + 350 million      (Richmond's European sales projection)
 + 200-300 million  (Miller's projection for American Paintball Supply)
 + 500 million      (Miller's projection for Cousins/Pev's)
 + 15 million       (Miller's projection for Exotic Sportz)
 + 30-50 million    (Miller's projection for Hollywood Sports Park)
```

= **1.725 billion – 2.055 billion**

This figure does not take into account the customers who Miller indicated would "literally come out of the woodwork with desires of buying direct" from Procaps (Ex. NPS-1550); the "millions" of customers who Richmond Italia testified did not want to do business with NPS (Tr. 9/7 at 129 (Richmond Italia)); *or* the business that Procaps hoped to still do with NPS on a non-exclusive basis (Ex. NPS-1550). Tr. 9/27 at 195-196 (Miller). In short, the evidence demonstrates that Molyneux's testimony that there was no "Plan B" is plainly another example of Procaps' continuing bad faith, in light of the overwhelming evidence that Procaps had, prior to the termination, already determined how Procaps would replace its sales to NPS.

Thus, when Gino Postorivo telephoned Molyneux on June 16th, announcing that NPS was set to deliver checks totaling more than $2.6 million to Procaps (an amount sufficient to bring the account current not only up through the date of the default notices, but up through *June 17th*) and inquiring how Procaps wanted the money, Procaps was caught completely off guard.  Indeed, on the morning of the 16th, prior to Gino's call to Molyneux, Tafler had already emailed NPS advising that Richmond Italia considered the Contracts to be terminated.  Ex. NPS-564.  Because Procaps had already conceived its business plan for after the Contracts were terminated, one that would permit Procaps to do business with NPS on a non-exclusive basis as its management "always wanted" and would also allow Procaps to grow in a way that would make ICC's investors happy, Molyneux was at a complete loss to answer Gino's simple question.  Tr. 3/24 at 73-75 (Molyneux).  Instead, he offered a lame excuse about having to check with his own *subordinates* – precisely because NPS, by paying the $2.6 million, had thrown an unexpected wrinkle into Procaps' and ICC's grand plans.  Id.  What was Procaps' answer to this dilemma?  Procaps' and ICC's management decided that, even though NPS had obviously cured the "incurable" default, they would simply then terminate the Contracts at the "next available opportunity."  Eight days later, without having issued a new set of default notices and without any warning, Procaps did just that.

In the intervening period between June 16th and June 24th, when Procaps terminated the Contracts, the evidence reveals that Procaps' bad faith continued unabated.  On June 23rd, Richmond Italia circulated an email among the principals of the NPS, Procaps and ICC in which he purported to summarize a conversation he had just had with Gino Postorivo.  Ex. NPS-64.  Richmond's email states that Gino "made a commitment to send his complete balance in full tomorrow, via wire transfer, or hand-delivered certified checks or bank drafts."  Ex. NPS-64.  It goes on to say that Richmond "made it clear to Gino that our prior arrangement is over, but we would like to find common ground for a new deal, and he agreed."  Id.  Richmond testified that the conversation he is recounting in this email was a one-on-one conversation between Richmond and Gino.  Tr. 9/7 at 230-231 (Richmond Italia).

47

Of course, the "conversation" Richmond describes in his email never took place. In the first instance, the notion that Gino would have committed to pay NPS' "complete balance in full" by the very next day is preposterous, as NPS was under no obligation to pay any invoices that were still current. Moreover, the notion that Gino agreed that the "prior arrangement is over" makes absolutely no sense in light of how NPS had bent over backwards to ensure that the Contracts were not terminated. However, the proof that Richmond Italia's self-serving email was based not on a real conversation but was instead merely an effort to "create a paper trail" to make it look like NPS was not honoring its obligations comes, once again, from Procaps' own documents. More specifically, a side-by-side comparison of Richmond's email, sent on the evening of the 23rd, with an email that Craig Miller sent to Richmond earlier that same evening, demonstrates that it was Miller who "invented" this conversation, and Richmond who simply forwarded a virtually identical version of the fictional conversation on to the larger group:

```
-------- Original Message --------
From: "richmond" <richmond@procaps.com>
Date: Thu, 23 Jun 2005 22:14:48
To:"Rob Molyneux" <rjm@imperialcap.com>;"Ed Truant" <etruant@imperialcap.com> Cc:"Gino Postorivo" <Gino@NationalPaintball.com>;"John Campo" <jcampo@NationalPaintball.com>;"Johnny Postorivo" <johnny@NationalPaintball.com>;"Steve Lister" <sdl@rogers.blackberry.net>;"Richard Italia" <richard@procaps.com>
Subject: Gino

Partners,

I just spoke to Gino Postorivo. He called from his cell phone. After a very long conversation, I am convinced that in Gino's heart, he truly wants to settle his balances, and to continue to do business with us in some way.

During the call, Gino made a commitment to send his complete balance in full tomorrow, vi wire transfer, or hand-delivered certified checks or bank drafts. He gave me his word, saying, "I will not let you down". In my personal opinion, I believe Gino's payment delay tactics are not malicious. They seem to be a direct result of National's financial struggles.

I realize that my decision against sending our Lawyer's official response goes against your instructions, but I made it clear to Gino that our prior arrangement is over, but we would like to find common ground for a new deal, and he agreed.

If this 24 hour delay causes harm to Procaps, L.P., I take full responsibility, and I can recommend some good names for my replacement!
:-)

Richmond
```

```
From: Craig Miller
Sent: Thursday, June 23, 2005 6:11 PM
To: richmonditalia@rogers.blackberry.net
Subject: Letter re NPS conversation

Partners,

I just spoke to Gino Postorivo. He called from his cell phone. After a very long conversation, I am convinced that in Gino' heart, he truly wants to settle his balances, and to continue to do business with us in some way.

During the call, Gino made a commitment to send his complete balance in full tomorrow, via wire transfer, or hand-delivered certified checks or bank drafts. He gave me his word, saying, "I will not let you down". In my personal opinion, I believe Gino's payment delay tactics are not malicious. They seem to be a direct result of National's financial struggles.

I realize that my decision against sending our Lawyer's official response goes against your instructions, but I made it clea to Gino that our prior arrangement is over, but we would like to find common ground for a new deal, and he agreed.

If this 24 hour delay causes harm to Procaps, L.P., I take full responsibility, and I can recommend some good names for my replacement! ☺

Richmond
```

48

Cf. Ex. NPS-64 and Ex. NPS-1420.[23]

Another clear example of Procaps' bad faith in this June 16th to June 24th time frame involves an email exchange that occurred on June 24th. When Molyneux was unable to provide an answer to the simple question, "How do you want the money?", which Gino asked him in their conversation on the 16th, NPS sent the $2.6 million in checks via registered mail in compliance with the notice provisions in the Contracts. On the 24th, when the checks had not arrived according to Procaps, Norm Gunn sent an email to Truant advising that NPS would be more than happy to stop payment on the checks and issue new checks to be sent via overnight mail. Ex. NPS-15. Gunn even included the text of the email Truant should send if Procaps wanted NPS to take these steps. Id. Of course, no email was forthcoming. Instead, later that same afternoon, NPS received two versions of the following termination letter:

**VIA REGISTERED MAIL, EMAIL and FAX**

June 24, 2005

National Paintball Supply, Inc.
570 Mantua Blvd.
Sewell, N.J. 08080

Attention: Eugenio Postorivo

Dear Mr. Postorivo:

Re:   Products Supply Agreement entered into by Procaps Encapsulation Inc. and National Paintball Supply, Inc., as assigned to Procaps, L.P. (the "Agreement")

We have previously notified you of a default by letter dated May 17, 2005 and allowed you a thirty (30) day cure period to remedy the default, which default remains unremedied at this time.

Please treat this letter as notice of termination of the Agreement effective immediately, in accordance with its terms. We will be in touch with you to discuss arrangements arising from such termination to ensure that there is an orderly transition.

In addition, we will be discussing with you the payment of your indebtedness to us and the provision of security therefor.

Yours very truly,
PROCAPS, L.P.

Per:
   Edward Truant
   Director

---

[23] Richmond's and Miller's testimony that Richmond "dictated" this email to Miller, and that Miller, one of only two *Vice Presidents* at Procaps, then transcribed it for Richmond, is another example of testimony given by Procaps' principals that simply defies all reasonable belief.

49

Ex. NPS-13; see also Ex. NPS-14 (termination letter for Goggles Contract).

The 24th was a Friday. The parties scheduled meetings in Philadelphia for the following Monday night, the 27th, which spilled into the 28th. On the 28th, Procaps asserts that it "finally" received the $2.6 million in checks that NPS had sent on the 16th by registered mail only because Molyneux had not given an answer to the simple question "How do you want the money?". Richard Italia flew down to New Jersey and Procaps received certified funds. Tr. 3/24 at 73-74 (Molyneux); Tr. 9/28 at 110-111 (Campo). In addition, NPS handed Procaps additional checks that day totaling $700,000. Tr. 3/24 at 97 (Molyneux). Yet, even with the money in hand, Procaps, the party who claims that it did not want to see the Contracts terminated, inexplicably refused to withdraw its termination letters. Tr. 9/28 at 133-35 (Campo); Ex. NPS-66.

The evidence demonstrates that Procaps, even after terminating the Contracts, looked to capitalize on NPS' now vulnerable position to purchase NPS at a vastly reduced cost, i.e., that Procaps still sought to execute ICC's "Plan A". On July 5th, Richmond Italia visited NPS' headquarters and sought to broker a deal:

```
From:    richmond
Sent:    Tuesday, July 5, 2005 05:44:31 PM
To:      Rob Molyneux, Ed Truant
Subject: Nps

Just to make sure, it would be 51% of 20 mil goodwill= 10 mil plus assets
Need to know if I should continue down this line or drop it, at this point I
think we can get 51% for under 25 mil
```

Ex. NPS-69. Richmond's emails to Molyneux and Truant that day reflect that, as Truant prophesied, Procaps had indeed placed the "squeeze" on Gino and NPS – from a high of $77.5 million in December 2004, Procaps' purchase offers for NPS decreased to $45 million in May 2005 (after NPS had been bamboozled into consenting to the assignment of the Contracts) and, to less than $25 million (after Procaps had terminated the Contracts).

50

Procaps' bad faith during this entire period is captured in an email sent by Lister, one of the two men who run ICC, on the 27th to Truant and Molyneux, who were about to depart for the meetings with NPS in Philadelphia. The words Lister used in his email betray an arrogance that characterizes ICC's and Procaps' bad faith conduct, and their cavalier attitude about the sanctity of the Contracts and the threat of litigation relating to their termination:

> From: Stephen Lister
> Sent: Monday, June 27, 2005 02:38:42 PM
> To: Edward Truant, Robert Molyneux
> Subject: Fw: Recent Campo Missive
>
> Here is my response to Gino. I hope you can keep Gino and Campo focussed on the issues alone without the emotions, history, and invective (I know you guys are going to be diplomatic). I know he has earned the right to both barrels, but we can at least pull the trigger with a smile on our face, and have him thanking us for doing it after.
>
> Have fun. I am here if you want to plug me in at some point.
>
> I think it is in the interests of all that this thing does not spiral into litigation, etc. But I know we are prepared to go down that path if necessary.
>
> Steve

Ex. NPS-65. Of course, Procaps did pull the trigger and, as Lister prophesied, the result is this arbitration. The fact that ICC and Procaps knew that their actions in terminating the Contracts would likely result in litigation is a testament to the arrogance and bad faith exhibited by their principals. As Lister noted, ICC and Procaps were "prepared to go down that path" because of ICC's strategy, developed at the outset of the due diligence process, that it would terminate the Contracts at any cost, and whether or not it had proper grounds to do so. Clearly, here no such proper grounds for termination existed.

## IV.   ARGUMENT

### A.   *New Jersey Law Applies to Each of the Claims in the Arbitration*

Article 28 of the ICDR International Dispute Resolution Procedures provides that "[t]he tribunal shall apply the substantive law(s) or rules of law designated by the parties as applicable to the dispute.

51