Failing such a designation by the parties, the tribunal shall apply such law(s) or rules of law as it determines to be appropriate."

Here, the parties have designated New Jersey law as the law applicable to the construction and interpretation of the Contracts. Exs. NPS-5 at ¶13.05, NPS-3 at ¶16.05. Each of the claims made by NPS and Procaps arises under the Contracts. As such, New Jersey law applies to each of the claims in the arbitration.

The Uniform Commercial Code ("UCC") provides the framework for analyzing whether Procaps improperly terminated and otherwise breached various provisions of the Contracts. New Jersey has adopted the UCC, including Article 2 of the UCC which applies to contracts for the sale of goods. See Ford Motor Credit Co. v. Arce, 791 A.2d 1041, 1042 (N.J. Super. Ct. 2002). Although the New Jersey Supreme Court has never ruled on the question, both the U.S. District Court for the District of New Jersey and the New Jersey Superior Court have predicted that the New Jersey Supreme Court would apply the UCC in the context of an exclusive distributorship relationship. See Jo-Ann, Inc. v. Alfin Fragrances, Inc., 731 F.Supp. 149, 154 (D. N.J. 1989); Custom Communications Eng'g v. E.F. Johnson Co., 636 A.2d 80, 84 (N.J. Super. Ct. 1993); see also Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660, 668 (N.J. 1985) (observing that "the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain").

### B.   *Procaps Improperly Terminated the Contracts (Counts I and II)*

It is widely recognized that a contract constitutes a "promise or a set of promises for the breach of which the law gives remedy, or the performance of which the law in some way recognizes as a duty." Restatement Second of Contracts § 1. "Were this not the law, no one . . . would be able to enter into any long-term contract." Chambers Dev. Co. v. Passaic County Utils. Auth., 62 F.3d 582, 589 (3d Cir. 1995). As such, "[t]he sanctity of a contract is a fundamental concept of our entire legal structure." Id. "It is a fundamental principle of contract law, therefore, that, wise or not, a deal is a deal." Id. (citing Morta v. Korea Ins. Corp., 840 F.2d 1452, 1460 (9th Cir. 1988)).

As set forth at length, <u>supra</u>, Section III.E., the evidence is overwhelming that the termination of the Contracts was in bad faith and that the reason Procaps gave for the default and termination – NPS' overdue account balance – was merely a pretext to terminate the Contracts. Under New Jersey law, the fact that Procaps acted in bad faith and dealt unfairly with NPS renders its termination of the Contracts improper, regardless of whether Procaps followed the express language of the termination clauses in the Contracts. However, even if Procaps' (and ICC's) motives had been pristine, <u>i.e.</u>, even if, as Tafler testified, "no one" among Procaps' or ICC's management wanted to see the Contracts terminated, the fact remains that the termination of the Contracts was legally and factually improper in every respect.

### *1. Procaps' Termination Of The Contracts Violated The Covenant Of Good Faith And Fair Dealing Implied In Every Contract*

Section 1-203 of the New Jersey UCC contains the general good faith requirement for every contract governed by the UCC: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." N.J. Stat. Ann. § 12A:1-203. Good faith is defined as "honesty in fact in the conduct or transaction concerned." N.J. Stat. Ann. § 12A:1-201(19). In addition, a covenant of good faith and fair dealing is implied in every contract in New Jersey. <u>See</u> <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 690 A.2d 575 (N.J. 1997). This covenant requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Wilson v. Amerada Hess Corp.</u>, 773 A.2d 1121, 1126-27 (N.J. 2001) (<u>quoting</u> <u>Palisades Properties, Inc. v. Brunetti</u>, 207 A.2d 522 (N.J. 1965)); <u>see also</u> 5 Williston on Contracts § 670, at 159-60 (3d ed.1961). The duty of good faith and fair dealing exists independently from express duties set forth in the contract. <u>See</u> <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 690 A.2d 575, 588 (N.J. 1997). Thus, "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations *even when it exercises an express and unconditional right to terminate*." <u>Id</u>. (emphasis added).

The implied covenant of good faith and fair dealing is relevant to this case in two different ways. First, it is relevant as its own stand-alone claim. In this regard, the fact that NPS may not have pleaded an independent count in its Consolidated Arbitration Demand alleging a breach of the implied covenant of good faith and fair dealing is not significant. The New Jersey Rules of Civil Procedure mandate that "[w]hen issues not raised by the pleadings and pretrial order are tried by consent or without the objection of the parties, they shall be treated in all respects as if they had been raised in the pleadings and pretrial order." See N.J. Rule: 4:9-2. The Comment to that Rule demonstrates that amendment under these circumstances is not a matter of discretion; the pleadings *must* be amended. "Where evidence relating to issues beyond those framed prior to trial is adduced without objection, the rule requires amendment of the pleadings to conform to that evidence or, in the absence of actual amendment, *deems* the pleadings to have been so amended." See N.J. Rule: 4:9-2 Comment (emphasis added). The AAA's ICDR Procedures do not in any way contradict the New Jersey rule. "During the arbitral proceedings, any party may amend or supplement its claim, counterclaim or defense, unless the tribunal considers it inappropriate to allow such amendment or supplement because of the party's delay in making it, prejudice to the other parties or any other circumstances." Id. at Art. 4.

Here, Procaps never once objected to the evidence presented by NPS during the hearings which demonstrated Procaps' (and ICC's) bad faith in terminating the Contracts. Under these circumstances, New Jersey law mandates – and the ICDR Procedures allow – conforming of the pleadings to reflect a claim for breach of the implied covenant of good faith and fair dealing, based on the evidence presented during the hearings that was accepted by the Panel without objection by Procaps.

Second, the implied covenant of good faith and fair dealing is unquestionably relevant to the Panel's consideration of whether Procaps' breached, by improperly terminating, the Contracts. In Bak-A-Lum Corp. v. ALCOA Building Products, Inc., 351 A.2d 349 (N.J. 1976), the New Jersey Supreme Court considered the effect of the implied covenant of good faith and fair dealing in the context of the allegedly improper termination of an exclusive distribution contract. In Bak-A-Lum, the plaintiff, BAL,

54

an aluminum siding distributor, brought a breach of contract claim against defendant, ALCOA, the manufacturer of aluminum siding based on the allegedly improper termination of the parties' oral exclusive distribution agreement. Id. at 350. The trial court held that ALCOA improperly terminated the contract, and the court awarded damages based on its finding that ALCOA should have provided BAL with a minimum of seven months' notice before terminating the contract – notwithstanding the fact that, because there was no written contract, there was no agreement that either side provide any notice that it was going to terminate the contract. Id. at 350-51. On appeal, the New Jersey Supreme Court considered the issue of how much notice was appropriate within the framework of the implied covenant of good faith and fair dealing and held as follows:

> While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing similarly persisted between them. In such circumstances defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith of which we have spoken. *As such, it must be given substantial weight in determining the reasonableness of a period of notice of termination of the distributorship*.

Id. at 352 (citations omitted) (emphasis added); see also, supra, Sons of Thunder, 690 A.2d at 588 (holding that "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations *even when it exercises an express and unconditional right to terminate*.") (emphasis added).

Thus, before the Panel even considers whether Procaps' actions in this case violated the express provisions of the Contracts which address the circumstances under which the Contracts could be terminated (and, as set forth, infra, consideration of these circumstances leads to the inexorable conclusion that Procaps improperly terminated the Contracts), the Panel *must* consider and attach significant weight to Procaps' and ICC's *motives* in reaching a determination of whether the Contracts were improperly terminated.

55

In most cases, a party must cobble together circumstantial evidence in order to demonstrate that the party that terminated the contract had an improper motive for doing so. As set forth, supra, Section III.E., here the evidence of Procaps' (and ICC's) bad faith and ill-motives in terminating the Contracts is direct and overwhelming. As such, New Jersey law mandates that Procaps be found to have improperly terminated based on its (and ICC's) bad faith and unfair dealing, *regardless* of whether Procaps abided by, or violated, the express termination provisions of the Contracts. See, supra, Sons of Thunder, 690 A.2d at 589.

> 2. *Procaps Waived The 45-Day Payment Terms In The Contracts And, Therefore, Could Not Have Properly Defaulted NPS On That Basis On May 17th*

Beginning with the February 2002 Agreement, each of the contracts governing the relationship between NPS and Procaps, with the exception of the May 2004 Agreement, contained a 45-day payment term. Exs. NPS-1 at ¶ 5.01; NPS-3 at ¶ 5.02; NPS-5 at ¶ 4.01. Notwithstanding what was written in each of these contracts, the evidence unequivocally establishes that throughout the parties' three year relationship, NPS consistently made – and Procaps consistently accepted – payment beyond 45 days. Tr. 9/26 at 15 (Gunn); Tr. 11/2 at 235 (Tafler). The parties' course of performance in this regard, i.e., NPS' payment and Procaps' acceptance of payment beyond the 45-day payment terms set forth in the operative contracts, continued after the Paintball Contract was signed and the Goggles Contract was amended on September 20, 2004. Id. It also continued after ICC acquired Procaps. Id.

Under New Jersey law, where, as here, the course of performance between two parties has consistently differed from the terms of the parties' written agreement, the terms of the written agreement are waived and the course of performance between the parties controls for purposes of construing the parties' obligations with respect to the specific subject matter at issue. See N.J. Stat. Ann. §§ 12A:2-

56

208(3) and 12A:2-209; Cassidy Podell Lynch, Inc. v. Snyder General Corp., 944 F.2d 1131, 1147 (3d Cir. 1991).[24]

In Cassidy, plaintiff had been the distributor of defendant manufacturer's industrial air conditioning systems for approximately two years. 944 F.2d at 1134, 1136. After the manufacturer terminated the agreement between the parties, the distributor brought suit and prevailed on its claim that the termination was improper, and the manufacturer appealed. The distributor cross-appealed seeking a new trial on its additional claim that it was entitled to damages based on the manufacturer's failure to supply the distributor with all the air conditioning equipment needed to fulfill a contract the distributor had entered into with New Jersey Bell Telephone Company. Id. at 1134. The manufacturer argued that it was entitled to halt delivery of the equipment because the distributor had materially breached the contract by failing to pay for previously delivered goods within 30 days of their shipment. Id. at 1147. Each purchase order as well as the manufacturer's various sales manuals set forth a payment term of "net 30 days." Id. In finding that the manufacturer had waived this 30-day payment term, the Third Circuit reasoned as follows:

> The course of performance between the parties . . . reveals payments were consistently made approximately ninety days after shipment. The record reveals only one month during the contract period when Cassidy paid its account before the expiration of ninety days. When Snyder refused to deliver the equipment, the Cassidy account covering the New Jersey Bell contract was not yet ninety days past due. Section 2-208(3) of the N.J. U.C.C. states that "such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."
>
> *Snyder's acquiescence in this course of performance amounted to a waiver of the thirty-day payment term.*

Id. at 1147 (citations omitted) (emphasis added).[25]

---

[24] Under the N.J. UCC, a provision in a contract prohibiting waiver except by a signed writing has no effect. See N.J. Stat. Ann. § 12A:2-209(4); see id., New Jersey Study Comment Four. Thus, the provisions in the Contracts prohibiting modification except by written agreement, see Exs. NPS-3 at ¶ 16.02, NPS-5 at ¶ 13.02 , would not prevent a waiver by course of performance in this case. See Cassidy, 944 F.2d at 1147, n.11 (noting that contractual provision prohibiting waiver except by written agreement did not prevent waiver through course of performance pursuant to UCC § 2-208).

57

Once a party waives a provision of a contract through course of performance, as Procaps did here, the UCC permits the party to retract that waiver. Section 2-209(5) of the New Jersey UCC provides:

> A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

N.J. Stat. Ann. § 12A:2-209(5). In Cassidy, the Third Circuit considered the effect that a retraction of the manufacturer's waiver would have had on the parties' obligations:

> [A]lthough Snyder could have retracted its waiver with respect to future shipments, it could *not* demand compliance with respect to past shipments. Thus, Snyder could *not* declare that Cassidy breached the contract by failing to pay for the past shipments on thirty-day terms and Snyder was *not* entitled to withhold future shipments on this basis.

Cassidy, 944 F.2d at 1147 (emphasis added). The Court also noted that, had Snyder retracted its waiver, a jury could yet have found that such a retraction was unjust under the circumstances. Id.; see also Double-E Sportswear Corp. v. Girard Trust Bank, 488 F.2d 292, 298 (3d Cir. 1973) (finding that issue of whether waiving party gave reasonable notice of retraction of that waiver a question of fact for jury).

In the instant case, Procaps unquestionably waived reliance on the 45-day payment terms in the Contracts by continuing to accept, both before and, significantly, after its acquisition by ICC, payment from NPS well beyond 45 days after products were shipped. See Cassidy, 944 F.2d at 1147. The

---

(Continued…)

[25] See also Exxon Corp. v. Crosby-Mississippi Resources, Ltd., 40 F.3d 1474, 1490-92 (5th Cir. 1995) (applying sections 2-208 and 2-209 of Mississippi UCC, holding that seller of natural gas had waived, through course of performance, its right to demand that purchaser pay minimum price set forth in contract, where seller had acquiesced for more than four years in permitting purchaser to pay less than minimum price); J.W. Goodliffe & Son v. Odzer, 423 A.2d 1032, 1034-35 (Pa. Super. Ct. 1980) (applying sections 2-208 and 2-209 of Pennsylvania UCC, holding that purchaser of industrial gas had waived right to assert that it was not liable for rental charges for industrial gas cylinders, reasoning that although parties' written agreement deleted requirement that purchaser pay rental charges for cylinders, parties had thereafter orally agreed to reinstate rental charges and purchaser had paid rental charges to seller over period of more than three years); Margolin v. Franklin, 270 N.E.2d 140, 142-43 (Ill. Ct. App.) (where seller accepted late payments for seven consecutive months but then insisted that default had occurred when buyer thereafter submitted late payments, seller's course of performance in repeatedly accepting late payments waived strict time provisions of contract).

evidence was uncontradicted that from the start of the parties' relationship in 2002, NPS made payments beyond the 45-day payment terms. Tr. 11/3 at 81-82 (Tafler). Thus, the only issues are: (1) whether Procaps could have fairly retracted its waiver of the 45-day payment terms or, alternatively, whether retraction of that waiver would be unjust "in view of a material change of position [by NPS] in reliance on the waiver"; (2) assuming, *arguendo*, that Procaps could retract its waiver, whether it actually did; and (3) assuming, *arguendo*, that Procaps could and did reasonably retract its waiver, when such a waiver became effective.

As to this first issue, under the circumstances here it would have been manifestly unjust for Procaps to retract its waiver of the 45-day payment terms in the Contract. ICC was well aware that historically Procaps had extended payment terms beyond 45 days to its largest customers, including NPS. Ex. NPS-35 at ICC00003791 (E&Y Financial Due Diligence Report, indicating average terms of 78 days for largest customers); Tr. 3/22 at 226 (Molyneux) (testifying that he understood this report meant that "Procaps' relationship with National was such that payment terms were extended," beyond 45-days and "extended even further" during the peak season). Yet, prior to persuading NPS to consent to the assignment of the Contracts, ICC *never* informed NPS that it would, thereafter, insist on NPS adhering to the 45-day payment terms. On the contrary, ICC's representatives told NPS that, following the assignment, nothing would change Tr. 3/21 at 64-68 (G. Postorivo). The consent documents NPS signed confirmed NPS' good standing under the Contracts. Exs. NPS-2219, NPS-2220. In reasonable reliance on these representations, NPS "materially altered its position" by consenting to the assignment of the Contracts. As Gino Postorivo testified, he would not have consented to the assignment had he known that ICC planned to terminate the Contracts a little more than three months after the assignment. Tr. 3/21 at 97.

Even assuming, *arguendo*, that Procaps was entitled to retract its waiver, Procaps never actually did so in this case. Certainly, Procaps *never* delivered a formal written notice to NPS advising NPS that Procaps was now insisting on compliance with the 45-day payment terms as written in the Contracts.

59

Indeed, the evidence establishes that, prior to NPS' receipt of the default notices on May 24th, Procaps' representatives communicated that NPS would have until *the end of the summer* to bring its account balance current. Tr. 11/3 at 93 (Tafler); Tr. 3/23 at 229-231 (Molyneux). The very earliest that Procaps could be said to have retracted its waiver was on May 24th, the day that NPS received the default notices. Tr. 3/21 at 71-73 (G. Postorivo). Assuming the receipt of those default notices constituted adequate notice that Procaps would no longer honor the parties' course of performance, the Third Circuit's opinion in Cassidy makes clear that the retraction of the waiver could have only applied to *future* invoices, not invoices which had previously issued. Cassidy, 944 F.2d at 1147 ("although Snyder could have retracted its waiver with respect to future shipments, it could *not* demand compliance with respect to past shipments") (emphasis added). Thus, under New Jersey law, Procaps could have only *properly* insisted on compliance with the 45-day payment terms on *July 8th* – 45 days from May 24th, when any invoices that were issued on May 24th would have become due. At that point, if NPS had not paid any overdue amounts on invoices that *issued* on May 24th or thereafter, Procaps would perhaps have been within its rights to default NPS and trigger the 30-day notice period called for in the Contracts. Here, of course, Procaps defaulted NPS on *May 17th*, but only based on a payment term that Procaps had waived through its three-year course of performance, and without having previously retracted that waiver.

        3.      ***NPS Indisputably Cured The Defaults And, At A Minimum, Provided Adequate Assurances Of Performance, Within 30 Days Of Having Received Notice Of The Defaults***

Procaps would have the Panel believe that its May 17th default notices created a never-ending obligation on the part of NPS to get current and remain current such that, even if NPS cured, Procaps could *still* terminate the Contracts if, at any point thereafter, NPS was even a day late in making payments to Procaps. Tr. 9/7 at 25-26 (Truant); Tr. 11/3 at 191-192 (Tafler).[26] Even apart from the

---

[26] Truant testified in this regard as follows:

    **Q:**    Now, if at any point National -- on any given day during this period National had paid you

(Continued…)

parties' three-year course of performance and Procaps' waiver of the 45-day payment terms in the Contracts, as a matter of good faith, fairness and logic, Procaps' position is simply unsupportable. It is also incorrect under the plain language of the Contracts and under New Jersey law. Procaps' "never-ending default notice" theory fails as a matter of law because, at the most fundamental level, the theory completely ignores the concept of what a "default" means; completely ignores what NPS' obligations were upon receiving the default; and completely ignores the undisputed evidence that NPS satisfied its obligations.

### a. The Amount In "Default" As Of May 17 Was, At Most, $3,041,083

By definition, the concept of a "default" is backward-looking. See, e.g., Peak Partners, L.P. v. Republic Bank, U.S. App. LEXIS 20232, at *12 (3d Cir. August 7, 2006) (noting that "normal usage of the word 'default'" referred to the "failure to perform a task or fulfill an obligation"). This seemingly self-evident principle, that a "default" is by definition retrospective, was acknowledged by Tafler during his testimony:

> **Q:** When you are talking about someone being in default by definition it is a retrospective analysis, right?

---

(Continued…)

> the full amount past due would you have terminated them on that day?
> **A:** If they paid us the full amount, no.
> **Q:** What if they went into default again the very next day?
> **A:** *Absolutely.*
> **Q:** Why?
> **A:** Because that is what the default letter called for.
> **Q:** Would you have needed to send them another Default Notice?
> **A:** *Not as far as we are concerned.*

Tr. 9/7 at 25-26 (Truant) (emphasis added). Similarly, Tafler testified as follows:

> **Q:** Help me understand this Mr. Tafler. In your view of the world or Pro Caps view of the world these Default Notices once issued they are of an indefinite duration, right?
> **A:** This particular notice, yes.
> **Q:** So, under your view of the world NPS could have cured, been current for a couple months, paid Pro Caps millions of dollars but if it was a day late on a payment it is your view that under that May 17th Notice of Default Pro Caps can drop the hammer and terminate NPS? . . .
> **A:** *That is my understanding, yes.*

Tr. 11/3 at 191-192 (Tafler) (emphasis added).

61

    **A:**    I'm not a lawyer but I guess so.

    **Q:**    I mean you can't say you are in default about some future obligation because it has not occurred, right?

    **A:**    Correct.

Tr. 11/3 at 124-125 (Tafler).

The concept that a "default" refers to a failure to fulfill an obligation that has *already* accrued is reflected in the Contracts themselves. When interpreting the terms of an agreement under New Jersey law, "the terms of the contract must be given their 'plain and ordinary meaning'." Kaufman v. Provident Life and Casualty Insurance Co., 828 F. Supp. 275, 283 (D. N.J. 1992) (citing Armco Inc. v. Glenfed Financial Corp., 746 F. Supp. 1249, 1252 (D. N.J. 1990)). Specific terms "should be analyzed with regard to the meaning of the contract as a whole." Kaufman, 828 F. Supp. at 283. Moreover, "[t]he construction of a written instrument 'to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical [people] to accomplish an honest and straightforward end.'" Armco, 746 F. Supp. at 1253 (quoting Krosnowski v. Krosnowski, 126 A.2d 182 (N.J. 1956)).

Here, the plain language of the Contracts unambiguously provided that a "default" consisted of a failure by NPS to make payments *when such payments became due and payable*. Exs. NPS-3 at ¶ 8.03, NPS-5 at ¶ 8.02. Payments became "due and payable" from NPS to Procaps within 45 days from the date Procaps' shipped the invoiced products to NPS. Exs. NPS-3 at ¶ 5.02, NPS-5 at ¶ 4.01. Thus, on May 17th, the date the default notices were mailed to NPS, the specific "default" at issue (assuming, *arguendo*, that Procaps was entitled to rely on the 45 day payment terms) was NPS' failure to pay invoices that had become "due and payable" as of that date, i.e., the "default" was NPS' failure to pay invoices aged more than 45 days *as of May 17th*. NPS was not – nor could it be – in "default" on May 17th with respect to invoices that had *yet to become* "due and payable." According to the post-litigation rationalization performed by Tafler and incorporated in Exhibit PLP-817, and for the moment accepting

62

Procaps' position regarding the amount "overdue" just for purposes of this argument, the amount "overdue" and therefore in "default" as of May 17th was $3,041,083.[27]

      b. *NPS' Sole Obligation Upon Receipt Of The Default Notices Was To, Within 30 Days, "Cure" The Default Or Provide Adequate Assurances That It Could Perform Under The Contracts*

Having only recently established what Procaps (by virtue of its post-litigation analysis) now believes was the amount in "default" as of May 17th, the analysis shifts to what NPS' obligations were with respect to this "default" if NPS wished to avoid triggering Procaps' right to terminate the Contracts. In this regard, the plain language of the Contracts again controls. More specifically, the Contracts unambiguously provided that Procaps could only terminate if the "default" at issue "continue[d] for a period of thirty (30) days after notice, and NPS, before the expiration of said thirty (30) day period" was "unable to cure" *or* "otherwise fail[ed] to provide [Procaps] with adequate assurances of performance." Exs. NPS-3 at ¶ 8.03, NPS-5 at ¶ 8.02. NPS' obligation, therefore, was to pay $3,041,083 (the amount Procaps maintains in its post-litigation analysis was overdue as of May 17th) *or* to provide Procaps with adequate assurances that it could perform under the Contracts – *it plainly did not have to do both*.

However, regardless of which option it chose, NPS had until June 23rd – 30 days from the date NPS *received* the default notices – to do one or the other if it wished to foreclose Procaps' ability to terminate. In their documents during the relevant time period and throughout the proceedings in this matter, the principals of Procaps erroneously maintained that June 16th was the "deadline" for NPS to respond to the default notices. However, under the New Jersey UCC "a person has 'notice' of a fact when: (a) The person has actual knowledge of it; or (b) The person has received a notice or notification

---

[27] In analyzing the circumstances surrounding the notices of default, the Panel should not lose sight of the fact that Procaps did not include in its default notices an amount due or any reconciliation whatsoever. Exs. NPS-7, NPS-8. Nor did Procaps advise NPS during the cure period of the amount it believed was owed to cure the default. In fact, only after weeks of arbitration hearings did Procaps commit to its "final numbers" as reflected by Tafler's post-litigation analysis. Procaps' conduct demonstrates why a default notice should properly include the amount in default so that the defaulting party can receive proper notice as to its payment obligation. Of course, the evidence demonstrates that Procaps did not want NPS to know what it had to do to cure, which explains the absence of any figure in the default notices.

of it; or (c) From all the facts and circumstances known to the person at the time in question the person has reason to know that it exists." N.J. Stat. Ann. § 12A:1-201(25). Here, there is no dispute that NPS did not receive or know about the default notices until May 24th. Tr. 3/24 at 59 (Procaps' counsel stipulating that notices were received by NPS on May 24, 2005). Accordingly, NPS' obligation upon receipt of the default notices on May 24th was to pay $3,041,083 (the amount Procaps maintains in its post-litigation analysis was overdue as of May 17th) *or* to provide Procaps with adequate assurances that it could perform under the Contracts by *June 23rd*.

Procaps has asserted that NPS' obligation in respect of the May 17th default notices was to pay its past due account balance current *by June 16th*, and to thereafter keep its balance current. Tr. 11/3 at 191-192 (Tafler). However, Procaps' interpretation of NPS' obligations simply does not comport with the plain meaning or intent of the Contracts, nor is it "in accord with justice and common sense." Armco, 746 F. Supp. at 1253. The flaw in Procaps' position is that it lumps *all* invoices together as creating one payment obligation on NPS' part, when the plain language of the Contracts dictates that *each separate* invoice, or set of invoices issued on the same day, creates a *separate* payment obligation. Stated otherwise, Procaps' position reflects its incorrect argument that, once Procaps gave notice of a non-specific default for "failure to pay amounts due and owing," then that notice of default applied for all time and that even if NPS brought its account balance current within 30 days, if it *ever* fell even one day behind thereafter, Procaps was entitled to terminate. Indeed, the evidence demonstrates that this is *precisely* what Procaps did in this case. On June 16th, NPS paid its account balance current through June 17th. Procaps never challenged the amount that NPS paid as being insufficient to "cure" the default, nor did it ever give NPS any indication that it had to do anything else with respect to the May 17th default notices. Yet, just eight days later, and without having provided NPS with any further default notices or any other notice, Procaps attempted to terminate the Contracts at the very first opportunity, when the weekly checks it had expected the previous day had not arrived.

64