c.    ***NPS Unquestionably Cured The Default And, At A Minimum, Provided Adequate Assurances That It Could Perform, When It Paid Procaps $3,050,014.35 Between May 17th and June 10th***

As Tafler admitted, the course of conduct between the parties was, generally speaking, to apply any payments made by NPS to the oldest outstanding invoices. Tr. 11/3 at 125-126 (Tafler). Thus, any payments by NPS after the issuance of the default notices should have been applied, in the normal course of business between the parties, to the invoices that made up NPS' $3,041,083 overdue account balance as of May 17th, according to Procaps' post-litigation analysis.

The evidence demonstrates that between May 17th and June 10th, NPS mailed checks and/or made wire payments totaling $3,050,014.35. Exs. NPS-2233, NPS-2239. More specifically, on May 17th NPS mailed checks totaling $700,000; on May 24th NPS mailed checks totaling $700,000; on June 1st NPS mailed checks totaling $700,000 and wired $300,014.35; on June 8th NPS mailed checks totaling $600,000; and on June 10th NPS wired $50,000. Id. Applying these payments by NPS against the oldest outstanding invoices – the ones that made up the amount in "default" as of May 17th – based on the parties' course of conduct, NPS unquestionably cured the defaults noticed on May 17th because, by June 10th, it had paid an amount greater than the amount in default ($3,050,014.35 in payments versus $3,041,083 in default according to Tafler's post-litigation analysis). The approximately $3.05 million in payments made by NPS between May 17th and June 10th, referenced above, does not even take into account NPS' payment of $700,000 on June 15th *or* its payment of more than $2.6 million on June 16th.

4.    ***Even Assuming, Arguendo, The May 17th Default Notices Required NPS To Pay Its Past Due Account Balance As Of The Date Of Payment, NPS Did So Through Its Payment Of More Than $2.6 Million On June 16th***

Procaps apparently takes the position that NPS' obligation upon receipt of the default notices was to pay, by no later than June 16th, the amount necessary to bring NPS' account balance current *through the date it made payment*. Tr. 11/3 at 120 (Tafler); Tr. 9/6 at 260-61 (Truant). As set forth above, this analysis of NPS' obligations is simply wrong. However, even if Procaps were somehow correct in framing NPS' obligations, NPS *still* cured when it sent checks totaling $2,621,189.19 by

65

registered mail to Procaps on June 16th, along with an account reconciliation showing this to be the amount NPS believed was necessary to pay its account balance current through June 17th. Ex. NPS-9.

Significantly, Procaps never once complained that the amount NPS sent by registered mail on June 16th was insufficient to cure the default, even under Procaps' tortured interpretation of NPS' obligation vis-à-vis the default notices. Tr. 9/5 at 155-157 (Molyneux); Tr. 9/5 at 272-273 (Truant) (**Q:** And after you received the June 16th letter from NPS . . . no response was ever sent by you or anyone else to NPS challenging the amount that was purportedly put into that letter, the 2.6? **A:** By myself or Mr. Molyneux? **Q:** Right. **A:** *No.*) (emphasis added). Indeed, after trying desperately to avoid answering the question on this critical point, Molyneux finally admitted that the amount NPS paid was, in his words, "in the ballpark of the amount in arrears." Tr. 3/24 at 105.[28]

---

[28] As the sequence below demonstrates, Molyneux only agreed that the $2.6 was "in the ballpark" after two members of the Panel admonished Molyneux for not answering the question:

> **Q:** At the meeting on the 28th or at any other time did PLP protest the amount that was sent 2.6 million?
> **A:** Sir, we did not rescind our termination after June --
> **MR. WILKINSON:** *That is not the question. The question is did you protest, did you say that is not enough money.*
> **THE WITNESS:** When, sir?
> **Q:** At the meeting on the 28th or any other time?
> **A:** We had an agreement that they would provide us checks for 700 for shipments of 500. The contract was terminated. They were to continue that on and work off the balance of the past due. We are still owed a lot of money. Then the second set of checks received late, and they were no longer the 700 that we agreed to. 700 checks, 500 product would go out, 200,000 reduction to the payable.
> **Q:** I apologize. My question obviously was not very clear. Let me try again. When the letter of June 16th was sent by e-mail and by fax indicating that NPS was making a payment in the amount of 2.6 did PLP ever take the position that that was an inadequate amount to cure?
> **A:** We believe we could have terminated earlier than June 24th. We terminated June 24th.
> **Q:** Okay. Let me take another run at it. We know the notice of default didn't specify an amount, right?
> **A:** Sir, I'll go back to the --
> **MR. EVANS:** *Try to answer the question.*
> **THE WITNESS:** I understand it did not have an amount. I've seen it.
> **Q:** Didn't NPS try to reconcile its accounts, and didn't they represent that they were cursing [sic], not just May 7th, but as of June 16th, when they sent the $2.6 million, correct?
> **A:** Can you repeat that, sir?
> **Q:** After getting the Notice of Default didn't NPS attempt to reconcile its accounts, try to determine what was due and owing, and didn't NPS then send a check in the amount of 2.6 to cover what it believed to be outstanding as of the date of the letter, June 16th?
> **A:** Sir, I know that both accounting groups of both companies worked on a reconciliation. I was not involved with that, and they sent some registered letters on June the 16th and I eventually received $2.6 million of checks on June

(Continued…)

Even under the incorrect view of NPS' obligations that Procaps now espouses, Procaps' own records reveal that NPS cured. The post-litigation analysis done by Tafler indicates that NPS' overdue account balance as of June 16th was $3,072,779. Ex. PLP-817. However, this amount did not credit NPS for two different sets of checks that NPS had mailed on or before June 16th: (1) checks totaling $560,000, which were received by Procaps on June 16th but which Procaps did not yet count against the overdue account balance because Procaps had yet to cash the checks; *and* (2) the checks totaling $2,621,189.19 that NPS sent by registered mail on June 16th, which Procaps was aware of on the 16th by virtue of the letter John Campo emailed and faxed to Procaps' principals on the 16th. Tr. 11/3 at 175-178 (Tafler). Adding these two amounts together results in a figure of $3,181,189.19, which was an amount *greater* than the overdue account balance as of June 16th, even according to Procaps' post-litigation analysis ($3,181,189.19 in payments versus an overdue balance of $3,072,779 according to Procaps' post-litigation analysis). For the reasons set forth below, there is absolutely no proper legal basis for Procaps' refusal to consider these amounts as having been paid on June 16th.

---

(Continued…)

> the 28th.
> **Q:** Okay. And the basis for terminating had nothing to do with the actual amount that NPS had sent via registered mail, correct?
> **A:** Sir, I told you when we terminated this contract.
> **MR. WILKINSON:** Did you ever hear anybody say that $2.6 million was insufficient to terminate, either as of May 16th or June 16th -- June 24th?
> **MR. EVANS:** Insufficient to satisfy the balance you mean?
> **MR. WILKINSON:** Inadequate to cure it? It wasn't enough money, did you ever hear that?
> **THE WITNESS:** Did I ever hear that it was not enough money? Maybe you can explain it? Say that again, sir.
> **MR. WILKINSON:** They sent a check on --
> **THE WITNESS:** 2.6 million.
> **MR. WILKINSON:** 2.6 million. They say that was adequate to cure as of the time when the check was sent, as of June 24th, I believe. Just a minute. Let me finish. Did you ever say, no, that is not adequate to cure, that is not enough money, it should have been 3.5? Did you ever hear that said?
> **THE WITNESS:** Well, when we terminated, sir, on June the 28th we still were owed $5 million and had a way to get it paid down.
> **MR. WILKINSON:** I'm talking about amounts in arrears curing.
> **THE WITNESS:** They reconciled towards the amounts in arrears. *Two groups agreed we were in the ballpark of the amounts in arrears*.
> **MR. WILKINSON:** With the 2.6.
> **THE WITNESS:** *Yes*, tied to this May 17th.

Tr. 3/24 at 100-105 (Molyneux) (emphasis added)

In Okosa v. Hall, 718 A.2d 1223 (N.J. Sup. Ct. 1998), the New Jersey Superior Court considered the same issue as the one presented here, i.e., whether a payment mailed *prior to*, but received and posted *after*, the deadline for payment set forth in a default notice constituted effective "payment" such that termination of the contract based on the failure to pay was improper.  In Okosa, the insurance company defendant notified its insured of the default through the mail and advised the insured that if payment was not made by March 16, 1994, the policy would be cancelled.  Id. at 1223.  The insured mailed payment to the insurance company on March 15, 1994, but the check was not posted by the insurance company until March 22, 1994.  Id.  The insurance company cancelled the policy on the basis that the payment had not been made on time.  Id.

In reversing the trial court's grant of summary judgment for the insurance company, and remanding the matter with instructions that the trial court was to enter judgment in favor of the insured, the court explained that the so-called "Mailbox Rule" controlled the outcome of the case.  "Generally speaking, the Mailbox Rule sanctions the formation or completion of a contractual undertaking upon the act of mailing where the use of the mail is authorized by the other party as the medium for response."  Id. at 1224.  The court observed that "[w]here the parties are at a distance from one another, and an offer is sent by mail, it is universally held in this country that the reply accepting the offer may be sent through the same medium, and, if it is so sent, the contract will be complete when the acceptance is mailed."  Id. (citing Dickey v. Hurd, 33 F.2d 415, 417 (1st Cir. 1929), cert. denied, 280 U.S. 601 (1929)).  The court noted that the insurance company had authorized the insured to send its payment via the mails.  Id.  The court held that by sending the checks by certified mail the day before the deadline, the insured had made timely payment even though the payment may not have been received or posted until after the deadline and, as such, the insurance company improperly terminated the policy.  Id.[29]

---

[29] See also Russock v. AAA Mid-Atlantic Ins. Co., 2006 PA Super. LEXIS 72 (Pa. Super. Ct. 2006) (under the mailbox rule, payment is deemed received on its mailing date);  Huizar v. Carey, 273 F.3d 1220, 1223 n. 3 (9th Cir. 2001) (same); Barry v. Videojet Sys. Int'l, Inc., U.S. Dist. LEXIS 13421 (N.D. Ill. Sept. 12, 1995) ("By operation of the mailbox rule, Barry's

(Continued…)

As the holding in <u>Okosa</u> makes clear, "payment" is not synonymous with "deposit." <u>Okosa</u>, 718 A.2d at 1224. Procaps' contention that NPS had somehow not "paid" the $560,000 in checks when Procaps actually had those checks in hand is simply without merit. Similarly, Procaps' contention that NPS had not "paid" the $2,621,189.19 that was sent by registered mail by NPS on June 16th is also simply without merit. As the holding in <u>Okosa</u> makes clear, where the payer transmits the payment by a means authorized by the other party, payment is effective *at the time it was sent*. <u>Okosa</u>, 718 A.2d at 1224. Here, NPS transmitted the payment by registered mail – the same means that the default notices were sent, and the means required for any notices under the Contracts. Exs. NPS-3 at ¶ 16.06, NPS-5 at ¶ 13.06. In addition, Procaps cannot be heard to argue that NPS' payment of $2,621,189.19 – the amount necessary to bring the account current through *June 17th* – was somehow insufficient (because Procaps did not *receive* the payment until later) when NPS specifically offered to send the payment to Procaps in whatever manner Procaps wished (including by wire or overnight mail). Tr. 3/23 at 73-74 (Molyneux) (acknowledging that when asked on June 16th how Procaps would like to be paid, Molyneux indicated to Gino Postorivo that he would have to get back to him); Tr. 3/21 at 98-100 (G. Postorivo) (advising that, when Molyneux did not answer, NPS sent checks by registered mail).

The absurdity of Procaps' position is captured in the conflicting testimony of Truant and Tafler on what Procaps believes is the critical issue in the case – whether NPS paid its overdue account balance current as of June 16th, the date Procaps maintains was the last day NPS could "cure" the default. The testimony reveals that even Procaps cannot agree on what NPS actually had to do to cure the default. Thus, Tafler testified as follows:

---

(Continued…)

acceptance of Videojet's offer was valid when he *mailed* the premium checks in November and December") (emphasis added); <u>Staten Island Supply Co. v. Lumbermens Mut. Cas. Co.</u>, 2005 U.S. Dist. LEXIS 4921, 3-4 (S.D.N.Y. 2005) (insurance company retracted cancellation of policy because premium payment was constructively received when insured mailed the check).

**Q:**    Assume that Mr. Molyneux had told Gino wire the money and the wire was sent of $2.6 million?

**A:**    Correct.

**Q:**    You would agree with me that that would have brought NPS current *as of June 16th*?

**A:**    No, it would not.

**Q:**    And the reason you say it would not is *because you have in hand these checks of June 15th but you have not yet deposited them all*?

**A:**    *Correct.*

Tr. 11/3 at 178 (Tafler) (emphasis added).  In contrast, Truant testified as follows in response to the same question:

**Q:**    So nobody ever challenges from the 16th until the 24th the actual amount of the checks that were sent for the purpose of curing the default?

**A:**    *No.  Because if I received them that day, it would have cured. . .*

Tr. 9/6 at 275 (Truant) (emphasis added).  Whereas Tafler and Truant gave conflicting answers in response to what Procaps believes is the critical issue in the case, Molyneux *did not even know the answer*, even *after* he had six months between hearing sessions to reflect on his testimony:

**Q:**    When the 2.6 came in and was applied to the outstanding invoices, did it bring Procaps [sic] current through June 16th?

**A:**    *I wouldn't know that.*

Tr. 9/5 at 157 (Molyneux) (emphasis added).  When Procaps' own principal witnesses on the issue of the default, cure and termination of the Contracts could not agree on and/or did not know what NPS had to do to "cure" the default – more than one year after the fact and in the context of an arbitration centered on these issues – the evidence demonstrates that Procaps plainly concocted the notion of NPS' "incurable default" and that, in Procaps' view, no matter what NPS did to cure, termination of the Contracts was the preordained result.

**5.    At A Bare Minimum, NPS' Actions Indisputably Provided Procaps With Adequate Assurances That NPS Could Perform Under The Contracts And, Therefore, Procaps' Termination Was Improper Pursuant To The Plain Language Of The Termination Clauses Of The Contracts**

As set forth, <u>supra</u>, the Contracts unambiguously provided that Procaps could only terminate if the "default" at issue "continue[d] for a period of thirty (30) days after notice, and NPS, before the expiration of said thirty (30) day period" was "unable to cure" *or* "otherwise fail[ed] to provide [Procaps] with adequate assurances of performance."  Exs. NPS-3 at ¶ 8.03, NPS-5 at ¶ 8.02.  Procaps has chosen to ignore the fact that all NPS had to do if it wanted to avoid triggering Procaps' right to terminate the Contracts was to provide, within 30 days of a notice of default, adequate assurances that NPS could perform under the Contracts.  <u>Id</u>.  Here, NPS not only cured, but its payment to Procaps of more than $6.5 million between May 17th and June 16th, if nothing else, provided adequate assurances that NPS could perform under the Contracts.  Therefore, even under these uncontested facts, there is no question that Procaps improperly terminated the Contracts.

**6.    None Of The Other Issues Raised By Procaps Have Any Bearing On The Analysis Of Whether The Termination Was Improper**

The May 17th default notices were based on NPS' alleged "failure to pay amounts due and owing."  Exs. NPS-7, NPS-8.  The sole basis for Procaps' termination of the Contracts was NPS' claimed failure to cure the May 17th default notices.  Exs. NPS-13, NPS-14.[30]  Yet, Procaps' defense

---

[30]  Although the termination letters plainly indicated that Procaps was terminating the Contracts based on NPS' alleged failure "to remedy" the defaults noticed on May 17th, the following exchange with the Chairman of the Panel very plainly illustrates that Molyneux was of the opinion that Procaps could terminate for reasons that *were never even communicated to NPS:*

> THE CHAIRMAN:  Well, the Notice of Default covered the $2.6 million that was -- approximately due and owing that was past due as of the time of the Notice of Default?
> THE WITNESS:  Right.
> THE CHAIRMAN:  Did you terminate because they didn't make good on that 2.6 million?
> THE WITNESS:  And we did not have the prior payment for the prior week.  They were supposed to provide us payments of -- check of $700,000 for the next week.  Those did not occur.
> THE CHAIRMAN:  But the failure to do that postdated the Notice of Default?
> THE WITNESS:  That happened the week -- we sent the termination on the 24th.  The checks did not arrive prior to that when they normally would have on June 23rd and 22nd, sir.
> THE CHAIRMAN:  But the Notice of Default was limited to the failure to pay the 2.6 that was past due as of the time of the Notice of Default?

(Continued…)

DM1\738254.1

"strategy" in this case was primarily built around three issues that admittedly had nothing whatsoever to do with the actual reason for the termination of the Contracts. More specifically, the "red herrings" Procaps focused its defense on were: (1) NPS' alleged failure to provide "adequate assurances" under the UCC, despite the fact that Procaps never made a request for adequate assurances under the UCC; (2) Gino Postorivo's ownership interest in the Blue Arc manufacturing facility, which Procaps knew of from and after the Fall of 2004 and which, in any event, was permissible under the Paintball Contract; and (3) NPS' discussions in 2005 about a possible acquisition of a competitor, PMI, discussions Procaps did not even know about until after the Contracts had already been terminated and which, in any event, were permissible under the Contracts and did not result in a transaction.

a.    *Procaps Never Made A Proper Request For Adequate Assurances And, In Any Event, The Termination Was Not Based On A Failure By NPS To Provide Adequate Assurances*

Procaps' "adequate assurances" argument is illustrative of its strategy to divert the Panel's attention from the real issues in the case. This argument was laid out by Procaps' counsel in her opening statement when she argued that even if Procaps' "main argument [that NPS failed to adequately cure under the Contracts] is wrong, that perhaps [Procaps was] jumping the gun . . . there is no question that [Procaps] behaved properly and terminated the [Contracts] in July at the very latest" under a theory that

---

(Continued…)

THE WITNESS: Yes, sir.
THE CHAIRMAN: Okay. Did you terminate because they didn't pay the $2.6 million?
THE WITNESS: Yes, sir, they had not paid that on a timely basis.
THE CHAIRMAN: I understand they had not paid on a timely basis as of the time you sent the Notice of Default. Is it your contention they didn't cure that either?
THE WITNESS: Yes, sir.
THE CHAIRMAN: Why do you say that?
THE WITNESS: We had advice of counsel and went through the various issues that happened up to the 24th, and it's not only just not payment. We were sending a continued product and getting even more past due.
THE CHAIRMAN: Those things were not the subject of a subsequent Notice of Default?
THE WITNESS: There was only one Notice of Default on May the 17th.
THE CHAIRMAN: So, I want to get it straight, that *you terminated for a lot of different reasons, at least most of which were never expressed in a formal Notice of Default*?
THE WITNESS: *Yes, sir.*

Tr. 9/5 at 202-04 (Molyneux) (emphasis added).

NPS had not provided "adequate assurances" in response to a June 4th email request seeking adequate assurances within the meaning of the UCC. Tr. 3/20/06 at 87-90.  There are myriad factual flaws with this argument.  In the first instance, the termination of the Contracts was based not on a failure by NPS to provide adequate assurances of performance under the UCC but, rather, on NPS' alleged failure to remedy the defaults noticed on May 17th.  Exs. NPS-13, NPS-14.  Moreover, the June 4th email to which Ms. Galli refers does not even approach what is required under the UCC in order to properly make a request for adequate assurances.

New Jersey law requires that any demand for adequate assurances be in writing.  N.J. Stat. § 12A:2-609(1); see also Tr. 3/20 at 88 (N. Galli) ("Mr. Loftus is correct, it has to be in writing . . .") After receipt of "a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."  Id. at 2-609(4).

Courts require specificity in any communication requesting adequate assurances.  The demand must "clearly convey[] the insecure party's intent to *suspend performance* in the absence of adequate assurances."  Cumberland County Improvement Authority v. GSP Recycling Co., Inc., 818 A.2d 431, 440 (N.J. Super. 2003) (emphasis added); AMF, Inc. v. McDonalds Corp., 536 F.2d 1167 (7th Cir. 1976).  In Puget Sound Energy, Inc. v. Pacific Gas and Electric Co., 2002 U.S. Dist. LEXIS 1350 (N.D. Cal. Jan. 4, 2002), the U.S. District Court for the Northern District of California analyzed whether a writing that purported to be a demand for adequate assurances under California's and Washington's formulations of section 2-609 of the UCC – which are nearly identical to New Jersey's formulation – satisfied the specificity requirement.  In that case, the writing provided, in pertinent part, as follows:

> PG&E's repeated failures to deliver energy as scheduled by Puget were never contemplated by the parties and have deprived Puget of material and substantial benefits under the Agreement.
>
> Puget hereby demands that PG&E comply with the Agreement.

> Particularly in view of the downgrading of PG&E's debt rating to below investment grade and PG&E's financial position as disclosed in its 8-K filed last week, Puget also hereby demands that PG&E promptly provide Puget with reasonable and adequate assurance of PG&E's ability to perform the Agreement.

Id. at *9-10.  In concluding that the above-cited letter did not constitute a proper demand for adequate assurances under section 2-609 of the UCC, the Court reasoned as follows:

> The U.C.C. "requires a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance." It is far from clear that a person reading the letter from Puget would have understood that the U.C.C. was being implicated. First of all, there was room for debate as to whether the U.C.C. even applied to the Agreement. Second, Barrington, who prepared PG&E's response, is not an attorney, though he did consult one in preparing PG&E's response.  There is no evidence that Barrington understood the letter to be implicating the U.C.C. The letter did not quote from the U.C.C., cite it, or otherwise call attention to it.  Puget chose not to use the form letter available from West McKinney's Forms, Matthew Bender, Lexis, or other similar format.  There is no evidence the U.C.C. arose frequently in the dealings between these companies. Nor is there evidence that Barrington understood that if PG&E failed to respond to the letter that Puget would terminate the contract. The letter did not include any statement regarding the consequences of a failure to respond or provide a deadline by which to do so. Given the totality of these circumstances, the court finds that Puget's demand was not sufficiently clear.

Id. at *36-37.

Here, Procaps argues that the following email was its "demand for adequate assurances":

| | |
|---|---|
| **From:** | howard |
| **Sent:** | Saturday, June 4, 2005 04:14:33 PM |
| **To:** | Norm Gunn |
| **CC:** | Ed Truant, Deirdre D. Gagnon |
| **Subject:** | Re: Can we talk this afternoon? |

```
Gail will send an updated ar listing to kim on monday. Please keep in mind that
when you send us the 700K per week, I believe you remove it from the AR
immediately, but we have to cash it over 7 days (we don't cash on the weekend)
so your books look more up to date than in reality.

Also, gino said we could get details on your new financing and what your margin
position so we can get some comfort. He also indicated we could be able to speak
to your bk mgr. We need to get the info to give us and especially our bank some
comfort given your AR position.
I will be out of town until thursday, but you can speak to Ed Truant at ICC 416
362 3658 about providing the financing and info and speak to Deirdre and Gail
about the AR balance

Regards
Howard
```

Ex. NPS-506.  Like the purported "demand for adequate assurances" in Puget Sound, Tafler's email does not refer, cite to or otherwise call attention to the UCC.  Indeed, Tafler admitted that his email was

*not* an attempt to demand adequate assurances under the UCC. Tr. 11/3 at 153-154 (Tafler). There is no indication in the email of the consequences to NPS were NPS to fail to respond or of a deadline for a response. Nor is there any indication that Procaps was going to suspend performance until NPS did respond. See Cumberland County, 818 A.2d at 440 (holding that New Jersey UCC requires that demand "clearly convey the insecure party's intent to *suspend performance* in the absence of adequate assurances") Accordingly, even if Procaps *had* intended to terminate on the basis of a failure by NPS to provide adequate assurances (which it did not), Tafler's June 4th email would not have come anywhere close to satisfying the requirements of a proper demand for adequate assurances pursuant to section 2-609 of the UCC. And even if the June 4th email somehow constituted a proper request for adequate assurances, Procaps' June 24th termination was premature and improper.

In light of this, Procaps' focus on NPS' alleged "failure" to provide adequate assurances under the UCC is irrelevant. Indeed, even Procaps' own expert acknowledged as much when he testified that his analysis was based on a "hypothetical" conversation between NPS and Procaps "that I gather never really took place" *after* the Contracts had already been terminated. Tr. 11/2 at 99 (Epstein). Epstein further admitted that he understood that his analysis, focusing on a period of time *after* the termination took place, was undertaken as a *justification* for why Procaps terminated the Contracts. Tr. 11/2 at 104 (Epstein). In any event, Epstein's analysis of what this "hypothetical conversation" might have consisted of (had it actually taken place) is fundamentally flawed for many reasons.

First, Epstein based his opinion on inaccurate data provided by Procaps regarding the amount of NPS' overdue account balance. In determining whether NPS had the financial wherewithal to meet its obligations, Epstein considered the status of NPS' overdue account balance as of certain dates. Exs. PLP-453 at ¶¶ 7-8, PLP-454 at ¶¶ 5-8. Epstein acknowledged that he did no independent analysis of what NPS' overdue account balance was, opting instead to rely on Procaps for that information. Tr. 11/2 at 89-93 (Epstein). More specifically, Epstein relied on an exhibit which was prepared by Procaps

75

and set forth NPS' current and past due account balances from March through September 2005. Tr. 11/2 at 95-96 (Epstein); Ex. PLP-327. However, the current and past due account balances contained in the exhibit, and relied on by Epstein, were *different* from those presented by Procaps in its post-litigation analysis. Cf. PLP-327 and PLP-809.

Second, in looking at NPS' overdue account balance and NPS' cash position on June 30th, Epstein admittedly failed to consider $700,000 from NPS that had been received by Procaps on June 28th but had simply not yet been deposited. Tr. 11/2 at 115-117 (Epstein).[31] This "vanishing" $700,000 is critical because it undermines Epstein's conclusion that "NPS did not have sufficient liquidity to pay the overdue amounts due to Procaps" as of June 30th. Ex. PLP-453 at ¶ 5. More specifically, Epstein admitted that his conclusion was based on his determination that in order to pay the overdue balance, NPS would have to "tap" its line of credit, which it could not do without violating one or more of its bank covenants. Tr. 11/2 at 117-118 (Epstein). Epstein made this determination by considering the amount of NPS' overdue account balance on June 30th ($1.358 million) in comparison to NPS' cash on hand as of that date ($775,000). Tr. 11/2 at 115-117 (Epstein). However, when correcting for the "vanishing" $700,00, NPS, even under Epstein's wholly irrelevant analysis, certainly had sufficient "liquidity" to pay the overdue account balance.

Third, Epstein failed to consider other sources of cash NPS could have made use of in order to pay its overdue account balance, including a $1 million equipment revolver, an outstanding loan owed to

---

[31] Epstein's testimony was as follows:

> **Q:** Okay. So let's just make sure we compare apples to apples. The 1.358 doesn't include the 700,000, right? So -- is that right?
> **A:** Listen, the 1.358 in my report was a number I relied on from Procaps based on whatever information they had about the amounts owed reduced by the amounts paid. And exactly what checks were cashed and not cashed, I don't know.
> **Q:** You don't know if the 1.358 includes or not the 700,000?
> **A:** The 1.358 when I wrote the report was my understanding of the amount that was owed and not paid. *And I don't consider holding an uncashed check payment.*

Tr. 11/2 at 116-117 (Epstein) (emphasis added).

NPS for which NPS could have demanded accelerated payment, and an infusion of capital by NPS' sole shareholder, Gino Postorivo.  Tr. 11/2 at 132 (Epstein).        Accordingly, even if there were any relevance to Epstein's "hypothetical" analysis of what a conversation between NPS and Procaps that did not occur might have consisted of, Epstein's opinion would *still* be completely unreliable and useless because he ignored the actual evidence of what NPS owed, what it had paid, and what other sources of funds NPS could have used to pay its account balance to Procaps.

> **b.      *Gino Postorivo's Ownership Interest In Blue Arc Was Permitted Under The Paintball Contract, Was Known About By Procaps And ICC, And By Procaps' Witnesses Own Admissions Had Nothing To Do With The Termination***

There is no question that the terms of the Paintball Contract permitted NPS or its designee, Gino Postorivo, to acquire an ownership interest in a paintball manufacturing facility.  Ex. NPS-3 at ¶ 15.02. Procaps' witnesses admitted as much.  Tr. 3/24 at 46-47 (Molyneux) ("My understanding is he could own a paint plant, and then there are various things that could happen.  He may lose at that point, if we wished, his preferred pricing, whatever that was in the contract"); Tr. 9/27 at 130-131 (Miller); Tr. 9/6 at 243-245 (Truant); Ex. NPS-51 (Miller email acknowledging NPS was permitted to acquire ownership interest in Blue Arc).  Furthermore, there is no question that Gino's ownership interest did not form any legal basis for the default notices or the termination letters.  Exs. NPS-7, NPS-8, NPS-13, NPS-14. Nevertheless, Procaps focused a significant portion of its case on the issue of Blue Arc.  Procaps apparently attached great significance to the issue of whether the principals of Procaps and ICC knew about Gino's ownership interest in Blue Arc prior to May 2005.  It is unclear why this would even matter in light of the fact that Procaps acknowledges that Gino was permitted to own an interest in a paintball manufacturing plant.[32]  In any event, every Procaps witness mimicked the "party line" that no one at Procaps or ICC knew about Gino's ownership interest in Blue Arc until May 2005 at the earliest.

---

[32] Procaps' theory in this regard appears to be that when it "discovered" Gino's ownership interest in Blue Arc in May 2005, it precipitated the issuance of the default notices because Procaps did not wish to "finance" NPS' ability to finance Blue Arc

(Continued…)

The problem with this "party line" is that it is directly contradicted by the evidence, which demonstrates that Procaps clearly knew, in *November 2004*, about NPS' option to acquire an ownership interest in Blue Arc because the owners of Procaps were discussing a possible acquisition by Procaps of the so-called "Blue Arc option" *from NPS*:

```
From:    greg
Sent:    Friday, November 19, 2004 07:24:00 PM
To:      Richard Italia
CC:      Richmond Italia, Craig Miller
Subject: market plan does not change; risks reduced, rewards enhanced

NPS/Procaps secretly joint venture in XBall Direct.

Going after a list of 3,000 PMI customers that are going to be spoon fed to us,
and attacked with Nationals blessing and assistance. They will supply the
network with novel IP hard goods (other than paint and mask) and make it a win
win. Imagine we will appear to compete with NPS and not piss off our biggest
customer. NPS will allow us to sell our mask (conquest version) to PMI
conventional market, work a deal for launching Diablo to mass markets when we
can release from Crosman (we pitch Walmart/Kmart that it is manufacturer direct,
NPS has EDI and acts as fulfillment agent, we control the receivables, NPS
provides goods other than paint/mask). They are open to the Blue Arc option
assigned to us. All of this discussed with Craig last week and he likes the
idea. There are many faux pas in structuring this for effect and success, but
everyone (Gino, John, Richard, Craig, Greg and last but most importantly
Richmond) agrees that this concept, yet to be crafted in concrete form, has
merit, and I believe, genuinely wants to step in this direction.
```

Ex. NPS-279.  Moreover, the evidence plainly demonstrates that *ICC* also knew about the Blue Arc option in November 2004.  In the same memorandum in which ICC, in November 2004, declared the Contracts to be "untenable," Truant also noted that "National has secured an option to buy Blue Arc." Ex. NPS-32.  The answers given by Procaps' and ICC's witnesses when confronted with the very clear evidence that Procaps and ICC knew, in November 2004, about Gino's ownership interest in Blue Arc demonstrate the extent to which these witnesses would say *anything* in support of Procaps' position in the arbitration.  For example, Miller attempted to explain, when confronted with Vance's November 19,

---

(Continued…)

by permitting NPS to continue to pay beyond the 45 day payment terms set forth in the Contracts.  Tr. 3/24 at 15 (Molyneux); Tr. 9/6 at 243-245 (Truant).  However, this "theory" ignores the overwhelming evidence that ICC intended to terminate the Contracts all along if NPS refused to sell.  See, e.g., Ex. NPS-32 (declaring Contracts to be "untenable" and further stating that options were to either "more closely align" NPS and Procaps through a purchase of NPS or to "go into direct competition" with NPS).

2004 email, that even though the sentence "They are open to the Blue Arc option assigned to us"

appears under the heading "NPS/Procaps Secretly Joint Venture in XBall Direct," and despite the fact

that the next sentence indicates that Vance actually discussed this with Miller, it was yet somehow

"unclear" what Vance was referring to in his email.  Tr. 9/27 at 53-55 (Miller).[33]  Richard Italia testified,

when confronted with this same email, that he believed the "Blue Arc option" referred to a "loan" that

NPS would assign to Procaps, even though that makes no sense given that NPS and Procaps are

paintball companies, not banks.  Tr. 9/29 at 199 (Richard Italia).  When confronted with the excerpt

from the "Project SPLAT!" memorandum cited above, which he himself wrote, Truant testified that

NPS' option to purchase Blue Arc was just a "rumor" at this point – despite the fact that the

memorandum says nothing about this option being a rumor and, in fact, could not have been more

unequivocal.  Tr. 9/6 at 181 (Truant).  Perhaps the best example of Procaps' *incredible* testimony on this

point was delivered by Molyneux, who testified that the first time that Procaps/ICC confirmed Gino's

ownership of the "Blue Arc option" was in mid-May 2005, when Procaps received a letter from NPS

discussing the option.  Tr. 3/24 at 42-43 (Molyneux).  Apparently Molyneux overlooked the fact that, on

May 4th, Procaps made a $45 million purchase offer that included the purchase of the Blue Arc

---

[33] Miller testified as follows:

> **Q:** They are open to the Blue Arc option assigned to us.  Did I read that correctly?
> **A:** That's what the sentence says that is here.
> **Q:** And by that you understood Mr. Vance to mean National was open to assigning the Blue Arc option that it had to Procaps?
> **A:** I don't know if I would agree with that.  This is very vaguely worded in its entirety.  It never even definitively indicates that he is talking about National here.  It could be assumed.  I guess you've assumed he is talking about it.  I don't think it definitively says the Blue Arc option is theirs to assign.
> **Q:** I see.  So, your testimony is you can't really tell if this is referring to National?
> **A:** *Well, it's clearly very poorly written.*
> **Q:** I see.  Well, isn't it under an initial sentence that says, NPS/Procaps secretly joint venture in Procaps Direct?
> **A:** *That is a pretty bizarre sentence in and of itself.*
> **Q:** Sir, is that the first sentence of the e-mail?
> **A:** Yes.
> **Q:** And under that is that paragraph I just read you a sentence from?
> **A:** Yes.
> **Q:** Okay.  You are saying I'm not sure what Greg Vance was really saying here, right?
> **A:** *Right.*

Tr. 9/27 at 53-55 (Miller) (emphasis added).

manufacturing facility!  Ex. NPS-46.  Simply put, the testimony by Procaps' and ICC's witnesses with regard to the "Blue Arc option" is not credible, and in any event the issue is irrelevant because it had nothing to do with the termination of the Contracts because it was concededly never a proper legal basis for any such termination.

        **c.**       ***Procaps' Repeated Focus On NPS' Discussions With PMI About A Potential Acquisition Are Irrelevant Because Procaps Did Not Even Know About These Discussions Until After It Had Already Terminated The Contracts, And In Any Event, The Acquisition Never Happened***

Similarly, Procaps' focus on the "PMI issue" is another red herring for many reasons.  First, Procaps' own witnesses admitted that Procaps did not learn that NPS and PMI were discussing a possible transaction until *after* Procaps had already terminated the Contracts.  Tr. 9/6 at 108 (Molyneux); Tr. 9/7 at 15 (Truant); Tr. 9/8 at 198 (R. Italia).  Accordingly, these discussions could not have had any bearing on Procaps' *prior* decision to terminate the Contracts.  Second, even if Procaps' decision to terminate had been based on the negotiations between NPS and PMI, which it was not, this would have been an improper basis on which to terminate the Contracts because the Paintball Contract permitted NPS to acquire PMI.  Ex. NPS-3 at ¶ 15.02.  Third, Procaps never issued a notice of default in respect of the "PMI issue" and, therefore, NPS did not receive an opportunity to cure as mandated by the Contracts.  Finally, Procaps' focus on the "PMI issue" is hypocritical in light of the fact that ICC and Procaps were also pursuing a potential acquisition of PMI.  Tr. 9/6 at 149-151 (Truant).  Ironically, Truant admitted that whereas NPS was permitted to acquire an ownership interest in PMI under the Contracts, Procaps and/or ICC were *not* permitted acquire PMI under the Contracts.  Tr. 9/6 at 223-24 (Truant).

Procaps appears to be advancing an "anticipatory repudiation" type of argument, i.e., that Procaps' decision to terminate "did not matter" because NPS planned to acquire PMI anyway and, if this occurred, the Contracts would have been cancelled in any event.  This argument is without merit.  First, the acquisition did not occur.  Second, the documents make clear that NPS' intention was to *maintain*

80

the Contracts if the PMI acquisition had gone through.  Ex. PLP-384.  In any event, the theory of

anticipatory repudiation requires Procaps to have had "reasonable grounds for insecurity" with respect to

the PMI issue and thereafter to have demanded adequate assurances of performance by NPS in light of

Procaps' insecurity about the PMI issue.  N.J. Stat. § 12A:2-609.  Here, Procaps could not have had

"reasonable grounds for insecurity" about NPS' discussions with PMI because Procaps did not even

know about these discussions until *after* it terminated the Contracts.

### C.    *Procaps Breached The Best Pricing Provision Of The Paintball Contract (Count III)*

As set forth above, NPS was entitled under the Paintball Contract to best pricing with regard to

Procaps' sale of so-called "QIP" and "OEM" paintballs to third parties.  Ex. NPS-3 at ¶¶ 3.03, 3.04.  A

"QIP" Paintball was defined as a paintball manufactured by Procaps under trademarks owned by

Procaps.  Ex. NPS-3 at ¶¶ 1.01(v).  An "OEM" paintball was defined as a paintball that was customized,

i.e., privately labeled, for one specific customer, usually a paintball field or store.  Ex. NPS-3 at ¶

1.01(vii); Tr. 9/27 at 72-73 (Miller).

Schedule A to the Paintball Contract sets forth the mechanics of how the best pricing protection

afforded to NPS was supposed to work.  Ex. NPS-3 at Sched. A.  The price charged to third parties for

"QIP" or "OEM" paintballs was, in all events, supposed to be higher than what NPS was paying for the

same, or equivalent, brand of paintballs.  Id.; Tr. 9/27 at 71-82 (Miller).  The amount of the price

protection provided to NPS varied depending on the volume of paintballs purchased by a given third

party on an annual basis.  Ex. NPS-3 at Sched. A.; Tr. 9/27 at 71-82 (Miller).

The evidence demonstrates that Procaps ignored the best pricing protection by charging third

parties much less for "QIP" and "OEM" paintballs than what these third parties should have been

charged based on the pricing structure set forth in the Paintball Contract and, therefore, charging NPS

*more* than it should have paid for the same or equivalent paintballs.  Tr. 9/27 at 83-114 (Miller).  The

evidence demonstrates that Procaps' violations of the best pricing protection took two forms.  First,

Procaps charged third parties less than it should have for Procaps' "QIP" paintballs by pretending that

81

those paintballs actually corresponded to a lower pricing structure on Schedule A to the Paintball

Contract than that to which the parties had agreed.  Second, Procaps made no effort whatsoever to

forecast how much third parties intended to purchase on an annual basis and, therefore, did not adhere to

the volume-based pricing structure set forth in Schedule A to the Paintball Contract.

With respect to this first category of violations, the evidence demonstrates that the only brand of

paintballs Procaps ever sold which qualified as "QIP" paintballs under the Paintball Contract was the

XBall brand of paintballs.  Tr. 9/27 at 72 (Miller).  Procaps manufactured three different levels of XBall

– Gold, Silver and Bronze.  Tr. 9/27 at 75 (Miller).  In terms of the categories set forth in Schedule A to

the Paintball Contract, the XBall Silver was one step up from the XBall Bronze, and the XBall Gold was

one step up from the XBall Silver.  Id.  Miller admitted that the XBall Bronze level paintball was a

metallic, two-toned paintball.  Tr. 9/27 at 75 (Miller).  The definitions in Schedule A to the Paintball

Contract provide that a metallic, two-toned paintball (like XBall Bronze) was the equivalent of a "Mid

Level" paintball.  Ex. NPS-3 at Sched. A (noting that a Mid Level paintball could be metallic or non-

metallic, whereas the next level below that, Low Level, could only be non-metallic).  Thus, the XBall

Silver was the equivalent of the "High Level" paintball on Schedule A, and the XBall Gold was the

equivalent of the "Tournament" level paintball on Schedule A.  Ex. NPS-3 at Sched. A.[34]

This notwithstanding, Procaps' own invoices make clear that it pretended that the XBall Gold,

Silver and Bronze level paintballs were actually one level down from that to which they corresponded

by the parties' express agreement.  The per case amounts Procaps charged the third parties to which it

sold XBall Gold, Silver and Bronze were $30, $28 and $26, respectively.  See, e.g., Exs. NPS-2199 at

---

[34] After admitting that the XBall Bronze was a metallic ball – and, therefore, could only be the equivalent of a "Mid Level" paintball or above based on the characteristics set forth in the Paintball Contract – Miller later tried to change his story when confronted with the evidence that Procaps had intentionally mis-priced the various XBall brands.  He claimed that, although he had previously testified that XBall Bronze was a metallic, two-toned paintball, see Tr. 9/27 at 75 (Miller), XBall Bronze had a "metallicky look to it" but that it was not actually metallic.  Tr. 9/27 at 106-107 (Miller).  Miller's flip-flop on this point is representative of the numerous instances where he offered testimony that was simply not credible.  In any event, Procaps' own documents demonstrate that the XBall Bronze was a metallic paintball – and therefore should have been subject to the "Mid Level" pricing as set forth in Schedule A to the Paintball Contract.  Ex. NPS-2216 at p. 4.

PLP011768, NPS-2200 at COUSINS000001, NPS-2202 at GE00003, NPS-2203 at Hollywood Sports

Park-000058, NPS-2204 at PLP013546, NPS-2205 at PLP011345, NPS-2206 at PLP011048.  However,

as Schedule A to the Paintball Contract makes clear, the *lowest* prices – the 30 truck prices – that

Procaps should have been charging third parties for each case of the three levels of XBall brand

paintballs were $32, $30 and $28.  Ex. NPS-3 at Sched. A.  Accordingly, the evidence plainly

demonstrates that Procaps violated the best pricing component of the Paintball Contract in this regard.

See id.; see also Tr. 9/27/06 at 114 (Miller) (**Q:** Paintball Central did not pay that price that it should

have paid under the contract for Xball Bronze, did it? **A:**  It does not look like it is right.).

      The evidence also demonstrates that Procaps made no effort whatsoever to charge third parties

for XBall or private label paintballs based on the expected yearly volume of sales to the customer, as

mandated by the best pricing structure to which the parties agreed.  The prices to be charged to third

parties for XBall or private label paintballs depended on the volume the customers were expected to

purchase on an annual basis.  Ex. NPS-3 at Sched. A; Tr. 9/27 at 81-82 (Miller).  The volume cut-offs in

Schedule A were 30 trucks of paintballs (the equivalent of $2 million or more); 12 trucks (the equivalent

of $700,000 or more); 84 skids (the equivalent of $240,000-$280,000); and an "ad hoc" price if a

customer purchased less than 84 skids of XBall.  Ex. NPS-3 at Sched. A; Tr. 9/27 at 79-81, 110 (Miller).

Accordingly, with regard to "QIP" paintballs, a third party was to pay either $2 more per case (12 truck

price), $4 more per case (84 skid price), or $6 more per case (ad hoc price) than what NPS paid

depending on how much the customer bought on an annualized basis.  Id.  With regard to "OEM"

paintballs, a third party was to pay either $1 more per case (30 truck price), $2 more per case (12 truck

price), or $3 more per case (84 skid price) than what NPS paid depending on how much the customer

bought on an annualized basis.  Id.

      The evidence demonstrates that *none* of Procaps' customers, with the exception of XBall Direct,

should have qualified for the 12 truck price for either XBall or private label paintballs and, therefore, the

*least* these customers should have paid for XBall or private label paintballs is $4 per case more than

NPS (XBall) or $2 per case more than NPS (private label).  Once again, the evidence comes from Procaps' own documents.  As set forth above, 12 truckloads of paint was the equivalent of $700,000 or more in purchases.  Ex. NPS-3 at Sched. A; Tr. 9/27 at 79-81 (Miller).  Procaps tracked its sales to all customers during the period of time from June 25, 2004 through June 24, 2005 – a period of time longer than, but inclusive of the period during which the Paintball Contract was in force.  Ex. NPS-2214.  In looking at the actual purchases made by Procaps' XBall and private label customers over the roughly nine month period during which the Paintball Contract was in effect (September 20, 2004 through June 24, 2005), *none* of Procaps' private label or XBall customers (with the exception of XBall Direct) were on track to do anywhere close to $700,000 in sales on an annual basis.  See, e.g., **American Paintball Supply**, id. at p. 3 (a total of less than $200,000 in sales of the "American" brand private label paintballs, and less than $200,000 in sales of XBall); **Exotic Sports**, id. at p. 8 (less than $100,000 in sales of "Fireball" private label brand); **Generation E Sports**, id. at p. 9 (less than $85,000 of "Blaze" equivalent private label sales and less than $200,000 of XBall sales); **HSP Sports (Hollywood Sports Park)**, id. at p. 9 (less than $41,000 of "HSP" branded private label sales and less than $45,000 of XBall sales); **NVP**, id. at p. 14 (less than $145,000 of XBall sales); **Paintball Central**, id. at p. 14 (less than $17,000 of "Blitz" equivalent private label sales and less than $34,000 of XBall sales); **Paintball Sports, Inc./Cousins**, id. at p. 15 (less than $200,000 of Blaze, Midnight and Rec Sport equivalent private label sales and less than $26,000 of XBall sales); **PEVS Paintball**, id. at p. 16 (less than $16,000 of Blitz equivalent private label sales and less than $265,000 of XBall sales); **Smart Parts**, id. at p. 19 (less than $21,000 of "Printed" private label sales).

Despite the fact that these customers were plainly *not* entitled to the best third party pricing ($2 more per case for XBall, $1 more per case for private label), the evidence demonstrates that *all* received the best pricing from Procaps without regard to likely purchase volumes.  The *least* amount Procaps should have been charging its customers per case of XBall paintballs should have been the 84 skid price –$30, $32 and $34, respectively.  In some instances, where the customer's purchases were on track to be

84

less than $240,000 for the year, the customer should have only been eligible for the "Ad Hoc" price -- $32, $34 and $36, respectively. Ex. NPS-3 at Sched. A. As set forth, <u>supra</u>, Procaps actually charged third parties $26, $28 and $30, respectively, for these different grades of paintballs, <u>i.e.</u>, the best third party pricing. Thus, the evidence demonstrates that Procaps charged third parties $4-$6 less per case than what Procaps should have charged these customers. Put another way, NPS was overcharged by $4-$6 per case.

Similarly, Procaps vastly undercharged its private label customers by virtue of the fact that it ignored the volume requirements inherent in the best pricing component of the Paintball Contract. Thus, for example, Generation E Sports was charged $26 per case for its "Blaze" equivalent private label paintball. Ex. NPS-2202 at PLP012497. "Blaze" was defined as a "Mid Level" paintball under Schedule A to the Paintball Contract. As set forth above, Generation E Sports' nine month total of purchases of "Blaze" equivalent private label paintballs was less than $85,000. Ex. NPS-2214 at p. 9. Thus, Generation E Sports should have been paying $29 per case of Blaze according to Schedule A, <u>i.e.</u>, $3 more than what it actually paid. Ex. NPS-3 at Sched. A; <u>see also</u> NPS-2200 at COUSINS000005 (demonstrating that Paintball Sports, Inc./Cousins, another of Procaps' private label customers, was also paying $26 per case for Blaze equivalent paintballs).

In light of this uncontraverted evidence, Miller's testimony in response to a question by one of the members of the Panel is remarkable:

> **MR. ZUCKER**: With any of your customers did you make the pricing that you were giving them dependent upon how much they purchased from you?
>
> **THE WITNESS**: Certainly.

Tr. 9/27 at 97 (Miller). Clearly, Miller treated the oath he took prior to giving his testimony with the same lack of seriousness that Procaps took its promise to abide by the pricing protections for NPS built into the Paintball Contract.

### D.    NPS' Damages

#### 1.    NPS Is Entitled To Recover Between $37.6-$40.9 Million In Damages As A Result Of Procaps' Improper Termination Of The Contracts

NPS has demonstrated that it is entitled to recover between $37.6 and $40.9 million in damages as a result of Procaps' improper termination of the Contracts.

The remedies provided for in the UCC "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." N.J. Stat. Ann. § 12A:1-106. An improper termination of a contract is a breach of contract, and Section 2-711 of the UCC provides a buyer with several alternative remedies for a seller's breach of contract. N.J. Stat. Ann. § 12A:2-711. The buyer can "'cover' by making in good faith and without unreasonable delay any reasonable purchase of . . . goods in substitution for those due from the seller." N.J. Stat. Ann. § 12A:2-712(1). In that case, the buyer "may recover from the seller as damages the difference between the cost of cover and the contract price . . . ." N.J. Stat. Ann. § 12A:2-712(2). If the buyer is unable to cover or chooses not to cover, the measure of damages is the difference between the market price and the contract price. See N.J. Stat. Ann. § 12A:2-713. Under either alternative, the buyer may *also* recover incidental and consequential damages. See N.J. Stat. Ann. §§ 12A:2-712, 2-713 (noting that buyer may recover cover/market damages "*together with* any incidental or consequential damages") (emphasis added); see also Seaman v. United States Steel Corp., 400 A.2d 90, 93 (N.J. Super. Ct. 1979) (stating that damages for lost profits and additional expenses "come within the category of consequential damages")

Where the seller knows, or has reason to know, that the buyer is in the business of reselling the goods, lost profits resulting from the seller's breach are recoverable. See James J. White, Robert S. Summers, Uniform Commercial Code at 324 (4th ed. 1995) (referencing section 2-715 of the UCC); N.J. Stat. Ann. §12A:2-715 Comment 6 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know").

Here, there is no question that Procaps knew that NPS was reselling the paintballs and goggles Procaps was selling to NPS. Therefore, Procaps is liable to NPS for NPS' cover/market damages *and* for NPS' lost profits resulting from Procaps' improper termination of the Contracts.

Glenn Newman was NPS' damages expert. Procaps stipulated to Newman's qualifications to give an opinion regarding NPS' damages. Tr. 9/25 at 187-88 (advising of stipulation). Newman gave credible testimony regarding the damages NPS has suffered as a result of Procaps' improper termination of the Contracts. With respect to his lost profits analysis, Newman performed a traditional "but for" analysis, measuring damages over the life of the Contracts based on what NPS' profits would have been but for Procaps' termination of the Contracts. Tr. 9/25 at 191 (Newman). Indeed, the methodology utilized by Newman to calculate NPS' lost profits is the *same* methodology utilized by Epstein in calculating Procaps' alleged damages. More specifically, Newman considered NPS' historical sales and profit margins; considered what NPS' profits would have been over the life of the Contracts; compared NPS' "but for" profits with NPS' actual profits during the post-termination period; deducted mitigating sales; and applied a discount rate, in order to arrive at his lost profits calculation. Tr. 9/25 at 191-92 (Newman); Cf. Ex. PLP-453 at ¶¶ 25-49. Indeed, a comparison of the respective experts' lost profits calculations reveals that Newman was actually *more conservative* in calculating NPS' lost profits than Epstein was in calculating Procaps' lost profits. Both experts assumed that there would not have been any growth in the respective companies' sales of paintballs over the life of the Contracts. Cf. Ex. NPS-837 at p. 22; Ex. PLP-453 at ¶ 29. However, Newman applied a 25% discount rate to account for the risks in achieving the projected profits over time. Ex. NPS-837 at p. 24. In contrast, the discount rate Epstein applied to Procaps' damages was 15%. Ex. PLP-453 at ¶ 37. Applying a lower discount rate results in a *higher* damages calculation. Tr. 11/2 at 180 (Epstein). NPS' lost profits are set forth in Table 18 of the Newman Expert Report:

Table 18: Total Damages ($000s) for the Duration of the Agreements

| Damage Classification | Through 5/31/06 | 9/30/06 | 9/30/07 | 09/30/08 | 9/30/09 | 09/30/10 | 09/30/11 | Total |
|---|---|---|---|---|---|---|---|---|
| Paint | $2,497 | 1,000 | 2,641 | 2,113 | 1,678 | 1,336 | 1,057 | $12,322 |
| Goggles | 413 | 242 | 609 | 423 | 202 | | | 1,889 |
| Other Sales | 1,325 | 683 | 1,791 | 1,433 | 1,138 | 905 | 715 | 7,990 |
| Total Losses | $4,235 | $1,925 | 5,041 | 3,969 | 3,018 | 2,241 | 1,772 | $22,201 |

Ex. NPS-837 at p. 37.  The $22.2 million in NPS' lost profits calculated by Newman increases to $25.5

million if applying Epstein's less conservative 15% discount rate.  Ex. NPS-839 at p. 13.

Newman simply applied the formula spelled out in the express language of the UCC to calculate

NPS' cover and market damages to be $653,021 and $14,801,953, respectively.  Ex. NPS-839 at p. 20.

Therefore, the total amount of NPS' damages (cover/market plus lost profits) is $37,655,974, applying

the 25% discount rate utilized in Newman's report, or $40,955,974, applying the 15% discount rate

utilized in Epstein's report in the context of his calculation of Procaps' alleged damages.  Id.

> **2.     NPS Is Also Entitled To Damages In The Amount Of Approximately $2.2-$2.4
> Million For Procaps' Violations Of The Best Pricing Provisions Of The
> Contracts**

As set forth above, Procaps violated the best pricing provisions in the Paintball Contract by

charging third parties much less for "QIP" and "OEM" paintballs than what these third parties should

have been charged based on the pricing structure set forth in the Paintball Contract and, therefore,

charging NPS *more* than it should have paid for the same or equivalent paintballs.   The appropriate

measure of damages based on Procaps' aforementioned violations is the difference between what NPS

actually paid for products as to which it was supposed to receive pricing protection and what it should

have paid based on Procaps' wrongful conduct.  See The Fund of Funds, Ltd. v. Arthur Anderson & Co.,

545 F. Supp. 1314 (S.D.N.Y. 1982); Epic Systems Co. v. Allcare Health Management System, Inc.,

2002 U.S. Dist. LEXIS 17110 (N.D. Tex. Sept. 11, 2002).

In The Fund of Funds, the plaintiff had entered into an investment agreement with the defendant

whereby the defendant agreed that the investment vehicles were to be sold to plaintiffs "at prices no less

favorable . . . than the prices charged by [defendant] to its 200-odd industrial or other purchasers."  Id. at

1329. At trial, the evidence showed that the plaintiff paid markedly more for certain investment vehicles than other third party investors. The jury used the prices paid by the other investors as a measuring stick for the fair market value of the investments and awarded the plaintiff the difference between what it had paid and what it should have paid under the "most favored nation clause." <u>Id</u>. at 1375. The court determined that this was a reasonable assessment of damages and upheld the award, holding that the "difference between what [plaintiff] paid and what [plaintiff] should have paid" was the proper measure of damages. <u>Id</u>.

Similarly, in <u>Epic Systems</u>, the United States District Court for the Northern District of Texas awarded a plaintiff the difference between what it had paid under a license agreement and what it should have paid had the "most favored nation" clause been honored. <u>Id</u>., 2002 U.S. Dist. LEXIS at * 19. There, the parties had entered into a license agreement which provided that the plaintiff would make continuing royalty payments to the defendant. The license agreement also contained a "most favored nation clause" that entitled plaintiffs to substitute the financial terms of any license that defendant granted to another party thereafter if those terms were more favorable than its own. <u>Id</u>. at * 2. Subsequently, the defendant granted the same license to third parties with more favorable terms requiring one time up front payment for the license rather than requiring continuing royalty payments. <u>Id</u>. Upon receiving this information, the plaintiffs requested that the defendant substitute the terms of these license agreements with its own. The defendants refused to do so. <u>Id</u>. at * 3. After determining that this refusal constituted a breach of the "most favored nation clause" and thus a breach of contract, the court stated that the plaintiff was entitled to substitute the terms of the later licenses, requiring a one time fee, with its own. <u>Id</u>. at *19. Further, the court held that the plaintiff was entitled to recover any funds it had paid under the license agreement that exceeded the lump sum fee under the reconstituted agreement. <u>Id</u>. at *19; <u>see also</u> N.J. Stat. Ann. § 12A:1-106 (providing that damages remedies provided for in UCC "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed").

89

Here, as in the cases cited above, the appropriate measure of damages for Procaps' various violations of the best pricing protection in the Paintball Contract is the difference between what NPS actually paid and what NPS should have paid had the best pricing protection been honored. The calculation is a relatively simple one. As set forth, <u>supra</u>, section IV.C., the evidence demonstrates that NPS actually charged third parties between $4 and $6 less per case than it should have for XBall, and $3 less per case than it should have for private label paintballs. Thus, NPS is entitled to a rebate in the amount of between $4 and $6 per case for every case of XBall it purchased during the period of time when the Paintball Contract was in force. <u>See</u> <u>The Fund of Funds</u>, 545 F. Supp. at 1375; <u>Epic Systems</u>, 2002 U.S. Dist. LEXIS 17110 at *19. Furthermore, because the private label paintballs Procaps sold were the equivalent of other paintballs sold to NPS, NPS is entitled to a rebate in the amount of $3 per case for every case of paintballs it purchased during the period of time when the Paintball Contract was in force, with the exception of XBall. <u>Id</u>.

The number of cases of XBall purchased by NPS during the relevant period is derived by looking at Procaps' own sales records. Ex. NPS-2214. The evidence demonstrates that NPS purchased 104,158,000 "units," <u>i.e.</u>, individual paintballs, of XBall during the period of time when the Contracts were in force. <u>Id</u>. at pp. 12, 13 (composite of XBall units purchased by NPS).[35] Dividing by 2000, which is the number of paintballs in a "case," yields the total number of cases of XBall sold to NPS – 52,079 cases. The calculation of NPS' damages for Procaps' breach of the best pricing provision in the Paintball Contract relating to "QIP" paintballs is, therefore, in the range of $208,316 to $312,474 (52,079 multiplied by $4 and $6, the range of the "overcharge" to NPS based on Procaps' violations of the best pricing provisions.

---

[35] Although the report includes a time period prior to when the Paintball Contract was in force, the testimony revealed that XBall was not sold to NPS until *after* the Paintball Contract was signed. Tr. 9/25 at 47-48, 75-78, 169 (J. Postorivo). Thus, all of the sales of XBall to NPS reflected on the exhibit are within the relevant time frame.

The calculation of NPS' damages for Procaps' violations of the best pricing provisions relating to private label paintballs is computed in similar fashion. Exhibit 2.1 to the expert report submitted by Glenn Newman reflects the monthly sales of paintballs by NPS over the historical period. Ex. NPS-837 at exhibit 2.1. As set forth therein, the total number of "boxes" (cases) of paintballs sold by NPS during the period of time when the Paintball Contract was in force – starting with October 2004 and ending in June 2005 – was 833,467. Id. Johnny Postorivo testified that paintballs manufactured by Procaps comprised approximately 85%-90% of NPS' total paintball sales. Tr. 9/26 at 56-57 (J. Postorivo) (indicating that sales of Procaps manufactured paintballs represented approximately 2.1 billion of the 2.4 billion in annual paintball sales by NPS). Discounting the total number of cases sold by NPS to reflect this percentage of "other" sales results in a range of between 708,447-750,120 cases of Procaps manufactured paintballs sold by NPS during the relevant period (833,467 multiplied by 85%-90%). Discounting from that figure sales of XBall (to avoid double counting) results in a final tally of between 656,368 to 698,041 cases of non-XBall branded paintballs sold by Procaps to NPS during the relevant time frame. When multiplied by $3, the amount of the "overcharge" to NPS as a result of Procaps' violations of the best pricing provision relating to private label paintballs, the resulting figure is in the range of $1,969,104 to $2,094,123.

### 3.    *NPS Is Entitled To Recover Its Attorneys' Fees And Costs*

Article 31 of the ICDR International Dispute Resolution Procedures provides that the tribunal may apportion costs among the parties and that such costs may include "the reasonable costs for legal representation of a successful party." The parties also agreed that the arbitrators "shall have the right to award and include in their award any relief that they deem proper in the circumstances, including without limitation . . . attorney's fees and costs." Exs. NPS-3 at ¶ 16.09, NPS-5 at ¶ 13.09.

The Panel should exercise its discretion and award attorneys' fees and costs to NPS in this matter. The evidence demonstrates that Procaps' termination of the Contracts was in bad faith. See, supra, Section III.E. Clearly, Procaps' majority shareholder, ICC, charted a course from the outset of

the due diligence process that could have only ended with an acquisition of NPS or the termination of the Contracts, regardless of what steps NPS properly took to prevent the Contracts from being terminated.  Id.  Lister's June 27th email to Molyneux and Truant betrays the arrogance of the principals of an organization that simply did not care whether its termination was proper and who were ready to litigate if NPS objected.  Ex. NPS-65 ("I think it is in the interests of all that this thing does not spiral into litigation, etc.  But I know we are prepared to go down that path if necessary")  As such, Procaps alone is responsible for the fact that it left NPS with no choice but to pursue litigation to remedy Procaps' unilateral and patently improper termination of the Contracts.  NPS should not have to pay the price – in the form of its own attorneys' fees and costs – just to achieve what it was entitled to as a matter of law had Procaps not improperly terminated the Contracts.  Moreover, as indicated in Lister's email, Procaps was prepared from the outset to "go down [this] path".  Equity therefore dictates that Procaps, as the lone actor here, should bear the costs associated with this route, i.e. NPS' attorneys' fees.

NPS will provide a detailed summary of its attorneys' fees and costs and will attach that summary to its reply brief.

### E.    In Contrast, Procaps Is Not Entitled To Damages On Its Counterclaims

#### 1.    Procaps Has Forfeited Any Right It Had To Collect On Its Counterclaim For Nonpayment By NPS

It is well-settled that the equitable doctrine of unclean hands applies "when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue." Saudi Basic Industries Corp. v. ExxonMobil Corp., 401 F. Supp. 2d 383, 392 (D. N.J. 2005) (citing Paramount Aviation Corp. v. Augusta, 178 F.3d 132, 147 n.12 (3d Cir. 1999)).  The doctrine of unclean hands operates to prevent a party that would otherwise be entitled to prevail on the merits of its claim from prevailing when that party has engaged in conduct "which rightfully can be said to transgress equitable standards of conduct."  Saudi Basic Industries Corp., 401 F. Supp. 2d at 393 (quoting Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, 598 (3d Cir. 1972)).  "The doctrine [of unclean

92

hands] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.  It has *nothing to do with the rights or liabilities of the parties. . .*"  See Gaudiosi v. Mellon, 269 F.2d 873, 882 (3d Cir. 1959) (quoting Art Metal Works v. Abraham & Straus, 70 F. 2d 641, 646 (2d Cir. 1934) (Hand, J., dissenting), cert. denied, 293 U.S. 596).

Here, Procaps unquestionably acted in bad faith when it improperly terminated the Contracts, without any proper legal basis, and based on the decision ICC made in the fall of 2004 to do so if ICC were unsuccessful in its attempts to acquire NPS.  See, supra, Section III.E.  Procaps' conduct in this regard – including in terminating the Contracts notwithstanding the undisputed evidence demonstrating that NPS cured the "incurable default" – transgresses equitable standards of conduct.  See Saudi Basic Industries Corp., 401 F. Supp. 2d at 393.  Accordingly, even if Procaps were entitled to recover the outstanding receivable, Procaps has forfeited its right to recover these amounts based on the doctrine of unclean hands.

### 2.    *Procaps Is Not Entitled To Prejudgment Interest*

Even if Procaps' hands were "clean" and it were entitled to recover on its counterclaim for the balance of payments allegedly owed by NPS, which is not the case, New Jersey law is clear that Procaps would not be entitled to collect pre-judgment interest under the circumstances.  Where, as here, it is clear that the party seeking pre-judgment interest has engaged in numerous acts of bad faith, that party is not entitled to pre-judgment interest.  See Bak-A-Lum Corporation of America v. Alcoa Building Products, Inc., 351 A.2d 349, 353 (N.J. 1976) (concluding that prejudgment interest should not have been awarded to defendant on its counterclaim because "[i]nterest does not run on liquidated claims as a matter of course, but 'in accordance with principles of equity'" and that where defendant had improperly terminated exclusive distribution contract, "the equities preclude allowance of interest to the defendant.").

Accordingly, in all events, Procaps' claim for pre-judgment interest must be denied.

93

**3.      *Procaps Cannot Recover On Any Of Its Other Counterclaims***

Procaps has also asserted a number of other counterclaims in this action.  See Procaps' Response to Demands and Counterclaim ("Procaps' Response") at ¶¶ 27-34.  Procaps is not entitled to damages on account of any of these counterclaims because it either did not present any evidence to support its claims, or because the evidence presented actually contradicts Procaps' claims.

First, Procaps is plainly not entitled to recover on its claim that NPS is liable for Procaps' damages resulting from the termination of the Contracts.  The fact that Procaps seeks these damages when *Procaps*, not NPS, improperly terminated the Contracts is simply absurd.  It is axiomatic that a party may only recover on a counterclaim for breach of contract where it demonstrates that the *other* party actually breached.  Coyle v. Englander's, 199 N.J. Super. 212, 223 (N.J. App. Div. 1985).  Here, the evidence demonstrates that Procaps itself, and not NPS, breached the Contracts and, therefore, Procaps cannot recover damages from NPS.  See, supra, Section IV.B.

Moreover, Procaps presented no evidence that NPS improperly sourced or repackaged Diablo brand paintballs in violation of paragraph 3.01 of the Paintball Contracts.  See Procaps' Response at ¶¶ 30-31.  Similarly, Procaps presented no evidence to support its claim that the alleged drop off in European sales was a result of any "breach" of the Contracts by NPS.  Id. at ¶32.  Finally, Procaps' claims that NPS breached the Paintball Contract by failing to "timely" disclose its interests in Blue Arc, see id. at ¶ 33, and breached the Contracts by secretly discussing a merger with PMI, see id. at ¶ 34, are belied by the evidence demonstrating that Procaps unquestionably knew about NPS' interests in Blue Arc, and are further belied by Procaps' admissions that NPS' conduct with respect to Blue Arc and PMI did *not* violate the Contracts.  Tr. 3/24 at 46-47, 172 (Molyneux); Tr. 9/6 at 243-244 (Truant).

**V.      *CONCLUSION***

For the reasons set forth herein, NPS has proven it claims for breach of contract relating to Procaps' improper termination of the Contracts and Procaps' violations of NPS' best pricing protection in the Paintball Contract.  NPS has also demonstrated that it is entitled to damages in the amount of

between $39.8 million and $43.3 million, as well as a yet-to-be determined award of attorneys' fees and costs. By contrast, Procaps is not entitled to prevail on any of its counterclaims and is entitled to no damages.

Respectfully submitted,

_____/S/_____
Patrick J. Loftus, Esq.
Robert E. Kelly, Esq.
Lawrence H. Pockers, Esq.
Michael A. Zullo, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 979-1000

95