IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| NATIONAL PAINTBALL SUPPLY, INC., ) <br> ) <br> Claimant, ) <br> ) <br> v. ) <br> ) <br> PAINTBALL L.P., ) <br> ) <br> Respondent. ) <br> ) | AAA No. 50 T 181 25205 |

_____

| | |
|---|---|
| PROCAPS L.P. f/k/a PAINTBALL L.P., ) <br> ) <br> Counterclaim-Claimant, ) <br> ) <br> v. ) <br> ) <br> NATIONAL PAINTBALL SUPPLY, INC., ) <br> ) <br> Counterclaim-Respondent. ) <br> ) | **CONTAINS CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION** |

**PROCAPS L.P.'S**
**POST-HEARING OPENING BRIEF**

Respondent and Counterclaim-Claimant Procaps L.P. ("Procaps"), by and through

its undersigned counsel, hereby submits this Post-Hearing Opening Brief.

## I.    INTRODUCTION

The key issue in this matter is:  Was Procaps' termination of its agreements with

National Paintball Supply, Inc. ("NPS") on June 24, 2005 proper?  After reviewing all of the

evidence, as well as the applicable law, Procaps respectfully submits that the only answer to this

question is an unqualified "yes."  Procaps put NPS on notice no later than April 12, 2005, that

NPS needed to bring its account current, and that it would not be able to continue to pay on a

past due basis going forward.  On May 17, 2005, after a month of discussions between the

companies' most senior managers yielded no tangible steps towards that goal, Procaps sent NPS

formal breach notices under the two relevant agreements, advising NPS that, *inter alia*, it had thirty (30) days in which to bring its past due account current and keep it current. Notwithstanding these notices of default, which NPS admits receiving on May 24, 2005, NPS did not remedy the situation. Specifically, on no date between May 17 and June 24, 2005 (or even any date thereafter) did NPS ever become current, let alone remain current. Accordingly, on June 24, 2005 – more than thirty (30) days after NPS received the notices of default – Procaps terminated both agreements. At the time of termination, NPS owed Procaps $5,016,586 for product purchased and received. NPS never paid that amount, and Procaps seeks to recover that amount herein, with interest. Procaps also suffered significant impact on its business as a result of the termination and thus it seeks to recover the lost profits that Procaps reasonably could have expected to earn had the contracts continued to the end of their expected terms.

NPS contends that Procaps' termination of the agreements was improper because: (1) the parties' course of performance precluded Procaps from requiring NPS to pay within 45-days; (2) Procaps' breach notices were defective, because they failed to specify the amount owed and/or the specific invoices past due; (3) NPS came current on June 16, 2005, such that termination thereafter was not proper; and (4) the termination was really a pretext to acquire NPS "on the cheap" or destroy it. As will be discussed below, each of these arguments is without merit.

Instead, as will be discussed below, the evidence has shown that, *inter alia*, (1) even if there was a course of performance, allowing NPS to pay in longer than 45-days, Procaps notified NPS no later than April 12, 2005 that such practices were no longer acceptable and that NPS must adhere to the terms of the contract; (2) the breach notices were proper and provided all the necessary detail to notify NPS of its obligations to cure (as evidenced by NPS'

own interpretation of the notices); (3) NPS never became current on any day, including not on June 16 (and even under its own account reconciliation); and (4) the termination was for entirely proper and valid reasons, and neither Procaps nor its investor, ICC, had any ulterior motives.

Indeed, the evidence demonstrated that the only party with ulterior motives was NPS. During the fifteen (15) months prior to the termination of the agreements, NPS had taken numerous, active steps to establish alternatives to Procaps as its paintball supplier. First, NPS had acquired another paintball manufacturing facility, Blue Arc, after having had, for a time, deep involvement in the day-to-day management of the business, in direct contravention of its agreements with Procaps' predecessor entities. Second, NPS decreased its dependence on Procaps as its source of paintballs in Europe by buying extensively from another, European manufacturer, Hovid, resulting in not only a decrease in the amount of paintballs purchased from Procaps, but a further slow down in NPS' ability to pay its bills to Procaps. Third, during the seven (7) months preceding and then even beyond the time of contract termination, NPS was in serious merger negotiation discussions with Pursuit Marketing Inc. ("PMI"), Procaps' largest competitor. As independent evidence from NPS' own bank, PNC, demonstrated, had that deal gone through while the NPS contracts with Procaps were in effect, NPS would not have honored its obligations to Procaps under the agreements, to Procaps' substantial detriment. Of course, NPS never advised Procaps of any of its plans or intentions.

Given all this, it comes with particular ill-grace for NPS to argue now that it was Procaps, rather than NPS, who was the bad actor and that NPS is the injured party. In the simplest terms, the facts are these: NPS was extremely slow in paying its bills and was not taking Procaps' requests to get current at all seriously; yet when Procaps sent a notice of default under the agreements in an attempt to prod NPS into responding, NPS still did not act to meet its

obligations. Instead, it strung Procaps along for several more weeks with repeated empty promises, finally sending an inadequate amount to Procaps by registered mail, the slowest fashion possible and a method never before used by the parties. Moreover, it appears NPS still had no intention of becoming fully current or remaining that way, because it then compounded the problem by not sending Procaps its usually weekly checks, thus immediately *increasing* the past due amount by another $700,000. At the same time, behind the scenes, NPS was setting itself up to be able to significantly decrease, if not ultimately eliminate, its dependence on Procaps for paintballs. While Procaps did not know most of the facts relevant to NPS' activities in this regard, the record shows that by the time Procaps sent the breach notices and ultimately the termination notices, it certainly was hearing various rumors and collecting some evidence that indicated this might be occurring.

Accordingly, faced with an $8 million receivable, a significant portion of which was past due, and an uncooperative business partner, who, from all appearances, was – at best – playing games or – at worst – setting them up, Procaps did the only thing that a reasonable business person could to save its business: it decided to exercise its right to terminate its contracts with NPS. Procaps suffered significantly as a result and should not be made to suffer further. Instead, the Panel should award Procaps not only the amount of the outstanding receivable, plus interest, but also an additional amount, as set forth below, to make Procaps whole.

## II.    STATEMENT OF FACTS[1]

### A.  Procaps/NPS relationship before March 7, 2005 ICC Acquisition

Procaps, through its predecessor entity, Procaps Encapsulation, Inc. ("Procaps Encapsulation") and NPS first began to do business together under a formal agreement in late February, 2002, when the parties entered into their first paintball supply and distribution agreement.  NPS-1.  The relationship expanded that June, when a Procaps Encapsulation related entity, Airtech Industries, Inc. ("Airtech"), also entered into a supply and distribution agreement with NPS, for Airtech's proprietary goggle and mask systems.[2]  NPS-2.

From the beginning, NPS began to pay Procaps not on an invoice by invoice basis, but rather in five weekly checks for certain amounts, agreed to by the parties.  More specifically, on a certain day each week, NPS would forward a set of five checks, each for a certain amount, to be deposited one a day over the next five business days.[3]  H. Tafler, 11/2/06 Tr. at 240-243.  It is undisputed that these checks were always sent by some form of overnight courier, such as UPS or Federal Express.  G. Postorivo, 3/21/06 Tr. at 184-185; H. Tafler, 11/2/06 Tr. at 241.  With each set of checks, NPS would provide instructions to Procaps as to which outstanding invoices to credit the payments, generally with the oldest invoices being paid off first.  H. Tafler, 11/2/06 Tr. at 246; H. Tafler, 11/3/06 Tr. at 31-32; 125-128.  Once NPS acquired Procaps' European distribution rights in May, 2004, it also began to wire payments to

---

[1] To assist the Panel in its review of the facts in this matter, Procaps' counsel has prepared a detailed chronology of events, which it attaches as Exhibit A hereto.  The Statement of Facts herein should be read in conjunction with that chronology.

[2] As it has been throughout the case, for convenience, "Procaps" will be used to refer to both Procaps Encapsulation and Airtech, as well as to Procaps L.P., depending upon time period and context.

[3] During the period in which Procaps consisted of two companies, NPS actually sent a total of ten (10) checks each week, five (5) per company.  Thereafter, when the companies became a single entity, NPS sent five (5) checks only.  H. Tafler, 11/2/06 Tr. at 240-241.

Procaps from Europe. N. Gunn, 9/26/06 Tr. at 63-64. These payments were not made on any regular schedule, although Procaps had requested regular payments. H. Tafler, 11/3/06 Tr. at 209.

Also from the beginning, NPS began to run past due. Indeed, as early as December, 2002, NPS already was past due and proposed purchasing less in order to, *inter alia*, bring its account current. PLP-483; PLP-582; C. Miller, 9/27/06 Tr. at 30-34; N. Gunn, 9/26/06 Tr. at 137-140. Procaps did not object to this, under the circumstances.[4] Tafler, 11/2/06 Tr. at 282-283. In addition, thereafter, from time to time, Procaps requested that NPS increase the amounts of its weekly checks to bring the account more current. G. Postorivo, 3/22/06 Tr. at 4-6; G. Postorivo, 3/21/06 Tr. at 184. PLP-483; N. Gunn, 9/26/06 Tr. at 147-149; C. Miller, 9/27/06 Tr. at 35-38; PLP-582; PLP-67. In general, until the summer of 2004, NPS responded and brought down the past due balances considerably (although not to zero). However, starting in the summer of 2004, past due balances continued to increase, particularly those from Europe, and NPS' responsiveness to Procaps' requests to bring the balances in line decreased. PLP-586; PLP-588; PLP-668; PLP-696; PLP-760; PLP-782; R. Italia, 9/8/06 Tr. at 151-152;[5] H. Tafler, 11/2/06 Tr. at 255-256; H. Tafler, 11/3/06 Tr. at 81-83. Indeed, during this period, the parties also had significant issues with regard to pricing, as well as other disputes, and it is clear from the record evidence that the parties' deal almost fell apart completely that summer. *Id.*; PLP-570; R. Italia, 9/8/06 Tr. at 150-152. However, the parties managed to patch together their

---

[4] Indeed, as Procaps' CFO, Howard Tafler, explained, even as recently as 2005 Procaps was willing to have NPS order less product in order to stay more current, although at no time did NPS offer this as a potential solution. H. Tafler, 11/2/06 Tr. at 252-253.; H. Tafler, 11/3/06 at 289-294. Instead, NPS placed one of its largest orders ever just a week after receiving the default notices.

[5] All references herein to "R. Italia" testimony shall be to the testimony of Richmond Italia. To the extent *Richard* Italia's testimony is cited, that will be explicitly noted.

differences, and entered into a set of new agreements on September 20, 2004. NPS-3; NPS-4; NPS-6; C. Miller, 9/27/06 Tr. at 70-73; H. Tafler, 11/3/06 Tr. at 83.

After entering into those agreements, the past due accounts receivable balance remained higher than that which Procaps was comfortable, and had risen to the level where Procaps' Richmond Italia raised the issue with NPS. R. Italia, 9/8/06 Tr. at 164-166; H. Tafler, 11/2/06 Tr. at 266-267. For example, even on the eve of closing, Richmond Italia requested specific assistance by NPS to bring the European accounts receivable, in particular, more current in time for closing, but even that did not occur despite Gino Postorivo's representation to Mr. Italia that it would. PLP-537; R. Italia, 9/8/06 Tr. at 164-166; PLP-537.

It also was recognized during the due diligence period by both Procaps personnel and ICC personnel that remedying the past due balance situation would need to be a priority once the deal closed. Indeed, during the fall of 2004, ICC received advice from its financial due diligence consultants, Ernst & Young, emphasizing the need to bring *all* significantly past due accounts, not just NPS' account, into line after closing, and the potential resulting benefits to Procaps of doing so.[6] NPS-35; H. Tafler, 11/2/06 Tr. at 257-259. R. Molyneux, 3/23/06 Tr. at 231-233; R. Molyneux, 3/24/06 Tr. at 130-132,158-160; E. Truant, 9/6/06 Tr. at 308-310. In addition, Robert Molyneux of ICC also explained that he had a conversation with Gino Postorivo prior to closing in which he advised Mr. Postorivo that, with the additional debt after the acquisition, Procaps was concerned about the NPS past due accounts receivable, and

---

[6] "If the Company adhered to their standard terms of sale of 45 days, an average of $3,120[,000] of savings in working capital investment would have been achieved over the historical period." NPS-35 at ICC 3791; R. Molyneux, 3/23/06 Tr. at 205-206; R. Molyneux, 9/5/06 Tr. at 33-35; E. Truant, 9/6/06 Tr. at 195-197.

Mr. Postorivo assured him that, with his new financing, he could get the accounts current by the end of the summer. R. Molyneux, 3/23/06 Tr. at 228-229.[7]

### B. Events leading up to issuance of notices of default on May 17, 2005

After the closing on March 7, 2005, the accounts receivable issue became even more of a priority for Procaps and ICC in light of newly developing factors in the market place generally and some specific issues arising relating to NPS. Notably, as Procaps and ICC personnel have explained, the need to bring Procaps' accounts receivables in line was not limited to NPS. R. Molyneux, 9/5/06 Tr. at 22-25; R. Italia, 9/7/06 Tr. at 85; H. Tafler, 11/2/06 Tr. at 257-259; *see also* NPS-35. For example, Procaps also had significant accounts receivable issues with Game Face, its joint venture with Crosman, which sold to the mass market and was Procaps' other major customer. R. Italia, 9/7/06 Tr. at 85. Indeed, as Messrs. Tafler and Molyneux explained, after the closing, ICC directed Procaps' CFO, Howard Tafler, to work with Crosman to get that account in line as well, which he did, successfully. R. Molyneux, 9/5/06 Tr. at 22-23; H. Tafler, 11/2/06 Tr. at 261-263.

As Procaps personnel explained, the reasons for needing to bring all accounts, and particularly the NPS account, in line were numerous. First, just as a matter of best business practices (and also because now the accounts receivable assets were supporting large bank financing, much more sizable than before), Procaps needed to work to bring all accounts receivables in line and current after the closing. R. Molyneux, 3/23/06 Tr. at 231-233; R. Molyneux, 3/24/06 Tr. at 130-132, 158-160; E. Truant, 9/6/06 Tr. at 308-310; R. Italia, 9/8/06 Tr. at 164-167; H. Tafler 11/2/06 Tr. at 258-259; 279-283. Second, the United States paintball

---

[7] Mr. Molyneux also had a conversation with Mr. Gunn during the due diligence process where Mr. Gunn told him that NPS was required to bring its past due accounts with its marker supplier, Tippman, in line after Tippman was acquired by a private equity fund. R. Molyneux, 9/24/06 Tr. at 154-155.

market had changed significantly by Fall of 2004, another factor applicable to all accounts. As Mr. Tafler explained:

> This was an industry that was used to double digit growth over a ten-year period. And in the fall of 2004, business really took a bit of a dive. Sales were down. Sales to NPS were down, sales to our other customers were down. People in the industry were telling us, you know, sales were down across the board.

H. Tafler 11/2/06 Tr. at 259-260. In short "this is not the same industry that it was even six months ago that's used to double digit growth." *Id.* Conditions had changed. R. Molyneux, 3/24/06 Tr. at 149-152.

In addition, the Procaps team explained there were several factors unique to NPS that necessitated a change in past practices with regard to the NPS' account. First, as Mr. Tafler and others with Procaps explained, Europe became an issue, in particular:

> [NPS was] having problems in Europe. Europe was not experiencing the same thing [as in the US] from people that we knew, that sales in Europe were continuing to show strong growth. But our sales to Europe were down, and they were having a hard time paying their balances. So we knew they were struggling to finance and pay for their European operations.

H. Tafler 11/2/06 Tr. at 260-261. Second, Procaps was learning that the nature of NPS' business was changing to include manufacturing of various products, which would impact their ability to pay suppliers:

> We also knew that they were becoming more of a manufacturer and less of a distributor, which means you have to invest more in manufacturing facilities. They were buying a lot, we heard, from companies overseas, which means when you buy product you have to pay for it by LC, perhaps. Which means you have to pay for it effectively up front.
>
> So in the past when you are a distributor, you rely a lot on your suppliers to provide certain terms to you so you can pay – finance your inventory. When you are a manufacturer, you effectively have to pay up front.

H. Tafler 11/2/06 Tr. at 261.  Finally, Procaps had "heard Gino was making investments outside the company in real estate, so he might be taking funds out." *Id.* at 262.  As Mr. Tafler explained "all those things put a lot of pressure on that business." *Id.* at 262

In addition, Procaps had observed that, overall, NPS' purchases from Procaps were down over the prior year, most significantly in Europe.  H. Tafler Tr. 11/2/06 at 263-265. Yet, during this period, the portion of NPS' accounts receivable for the United States that was overdue had doubled as compared to the prior year in terms of both dollar amount and as a percentage of the total receivable.  R. Molyneux, 9/5/06 Tr. at 149-150; E. Truant, 9/6/06 Tr. at 309-310; H. Tafler 11/2/06 Tr. at 266-270.  In addition, the past due account receivable from Europe was large and continuing to grow.  H. Tafler 11/2/06 Tr. at 266-270.

As a result of all of these factors, Procaps was no longer willing (or able) to allow the NPS account to remain past due:

> *It was a very big impact on how we allowed things to occur in the past and currently.  It's a completely different situation.*  The market has changed.  And we had to be much more concerned about their accounts receivable, their ability to pay, given that we had no information on their financial situation.  But just given from our view, a soft market, financing in Europe, financing investment overseas, financing personal investments, it made it very difficult that, you know, there might be a problem with the receivable, so we better keep a better eye on it.  It's not the same market as it was in the past to support the receivable.

H. Tafler 11/2/06 Tr. at 262-263 (emphasis added). In summary, both market and company specific conditions had changed (for both Procaps and NPS) and the only prudent course was for the parties to handle the NPS account in a different way.

Accordingly, it is undisputed that, on April 12, 2005, in the first meeting among the parties after the closing, the Procaps team, specifically Mr. Molyneux, advised Gino Postorivo that NPS' account would need to be brought current by the end of the summer, kept

current thereafter and, also, Procaps (or at least its bank) would need to be provided with certain information about NPS' financial condition and, particularly, its new financing.  R. Molyneux, 3/23/06 Tr. at 231-233; R. Molyneux, 3/24/06 Tr. at 130-132; 158-160; E. Truant, 9/6/06 Tr. at 224-226; 311-314; H. Tafler, 11/2/06 Tr. at 283-286; H. Tafler, 11/3/06 Tr. at 91-98.  It was agreed that Mr. Tafler would get together with NPS' CFO, Norman Gunn, to work on these matters, including coming up with a specific payment plan to get the account current.  NPS-389; R. Molyneux, 9/5/06 Tr. at 72-75; E. Truant, 9/6/06 Tr. at 225-226; N. Gunn, 9/26/06 Tr. at 31-34; H. Tafler, 11/2/06 Tr. at 270-279; H. Tafler, 11/3/06 Tr. at 94-98; 201-202.  After the meeting, Mr. Postorivo advised Mr. Gunn of the discussion and instructed him to work with Mr. Tafler.  N. Gunn, 9/26/06 Tr. at 33-41.

On April 13, the day after the meeting, Mr. Tafler contacted Mr. Gunn to follow up on the discussion at the April 12 meeting.  He provided Mr. Gunn with a schedule showing trending on the account, and making some specific suggestions for a payment plan that would bring the account current in a timely fashion.  PLP-448; NPS-389; N. Gunn, 9/20/06 Tr. at 205; H. Tafler, 11/2/06 Tr. at 270-279.  Thereafter, for the next month, Messrs. Tafler and Gunn discussed the matter by email and phone, but at no time did NPS proffer a payment plan (or agree to any of Procaps' suggestions) or provide any of the requested financial information. PLP-328; PLP-405; NPS-389; R. Molyneux, 9/6/06 Tr. at 247-250; E. Truant, 9/7/06 Tr. at 4-6; H. Tafler, 11/2/06 Tr. at 272-277; H. Tafler, 11/3/06 Tr. at 94-98, 201-202;.  Indeed, from Procaps' perspective, although Mr. Gunn kept promising a plan and saying they were working on it, little substantive progress was being made.  *Id.*

By early May, Procaps requested that a UCC search be performed to determine if NPS had an interest of any sort in Blue Arc.  R. Molyneux, 9/5/06 Tr. at 68-69; E. Truant, 9/6/06

Tr. at 181-184; E. Truant, 9/7/06 Tr. at 6-8; R. Italia, 9/18/06 Tr. at 187-190; H. Tafler, 11/2/06

Tr. at 283-285.  Prior to this time, although Procaps (and ICC) personnel had asked NPS

management on numerous occasions whether NPS (or Gino Postorivo) had such an interest, it

was repeatedly denied.  E. Truant, 9/6/06 Tr. at 183-184; R. Italia, 9/8/06 Tr. at 188.

R. Molyneux, 9/5/06 Tr. at 53; Richard Italia, 9/29/06 Tr. at 199-200; H. Tafler, 11/2/06 Tr. at 8-

14; 214-215; H. Tafler, 11/3/06 Tr. at 221-222; see also, J. Rosenthal, 11/2/06 Tr. at 8-10.  On

May 13, Procaps received the results of that search, which demonstrated that NPS was a secured

creditor of Blue Arc, which indicated to the Procaps folks that NPS did, indeed, have some type

of ownership interest in Blue Arc.[8]  NPS-50; E. Truant, 9/6/06 Tr. at 244.  This caused Procaps

grave concerns on top of all their previous concerns in March and April.  In addition to NPS'

lack of substantial progress since April 12 in getting its account current (or even getting a plan

for doing so or providing financial information), Procaps was now concerned that NPS was, in

essence, using Procaps' funds to finance another paintball operation.  *Id.*; R. Molyneux, 3/24/06

Tr. at 14-15; 41-43; 162-165; H. Tafler, 11/2/06 Tr. at 284.  While the Procaps team understood

that, under the September 2004 agreements, NPS was entitled to acquire an interest in a paintball

manufacturer "[i]t doesn't mean we have to finance it."  R. Molyneux, 3/24/06 Tr. at 164-165;

R. Molyneux, 9/5/06 Tr. at 71-72; E. Truant, 9/6/06 Tr. at 243-244; Richmond Italia, 9/8/06 Tr.

at 187-188; H. Tafler, 11/2/06 Tr. at 283-284.

---

[8] NPS finally confirmed this interest on May 17, 2005.  Prior to sending out the default notices, out of courtesy, Richmond Italia contacted NPS' John Campo to advise him that the notices were coming and to request, again, that NPS take serious steps to bring the accounts in line and avoid termination.  R. Italia, 9/8/06 Tr. at 168-169; G. Postorivo, 3/21/06 Tr. at 75-76; J. Campo, 9/27/06 Tr. at 310-311.  In response, Mr. Campo sent a letter on May 17 by email to various Procaps personnel, in which, *inter alia*, NPS admitted that it had an ownership interest in Blue Arc (through Gino Postorivo).  PLP-167; NPS-463; J. Campo 9/27/06 Tr. at 315-319.  This was the first time anyone from NPS had ever confirmed this rumor to anyone from Procaps or ICC.  R. Molyneux, 3/23/06 Tr. at 231-232; E. Truant, 9/6/06 Tr. at 252-253; R. Italia, 9/8/06 Tr. at 188; Richard Italia, 9/29/06 Tr. at 199-200; H. Tafler, 11/2/06 Tr. at 285; J. Rosenthal, 11/2/06 Tr. at 14.

In addition, this combination of factors and concerns caused the Procaps team to no longer be willing to wait until the end of the summer for NPS to get current. Having seen no substantial progress towards that end by mid-May, and having no further information about NPS' financial condition, while learning that NPS now had an interest in a competing paintball manufacturer, the Procaps team decided that the situation needed to be remedied much more quickly, if it was going to be remedied at all by NPS. R. Molyneux, 3/23/06 Tr. at 231-233; 274-276; R. Molyneux, 3/24/06 Tr. at 14-17; 22-25; 42-43; 162-165; R. Molyneux, 9/5/06 Tr. at 193-202; R. Molyneux, 9/6/06 Tr. at 75-76; E. Truant, 9/7/06 Tr. at 4-7; R. Italia, 9/8/06 Tr. at 167-172; H. Tafler, 11/2/06 Tr. at 279-285. Accordingly, in conjunction with their counsel, the Procaps team prepared notices of default under both contracts, which were sent out on May 17, 2005, by registered mail (as required by the agreements). R. Molyneux, 3/24/06 Tr. at 48-57; E. Truant, 9/6/06 Tr. at 244-247; H. Tafler, 11/2/06 Tr. at 280-282.

The May 17 default notices provided that NPS was in default:

> For failure to pay amounts due and owing to Procaps within the time period during which such payment is to be made, and for which you have thirty (30) days from the date hereof to cure such default.

NPS-7; *see also* NPS-8. The notices also demand the payment of interest. *Id.* NPS admits receiving the notices of default on May 24, 2005. N. Gunn, 9/26/06 Tr. at 54; J. Campo, 9/28/06 Tr. at 4-5. Under Section 8.03 of the Paintball Agreement and 8.02 of the Goggles Agreement, NPS had thirty (30) days in which to cure the default, which means that the default had to be cured by June 23, 2005.[9] NPS-3; NPS-5.

---

[9] The Procaps team has testified that they were under the impression that NPS had to cure by June 16, 2005, thirty (30) days after the date the breach notices were sent, and that, thus, they could have terminated the agreement on June 16 or any date thereafter. Nonetheless, for a number of reasons they did not terminate until June 24, more than thirty (30) days after the notices were received. R. Molyneux, 3/24/06 Tr. at 82-84.

### C. Events from May 17 to June 16, 2005

Even after sending out the default notices on May 17, Procaps continued to try to work with NPS to cure the default – specifically to get the past due amount current, to obtain enough information about NPS' financial condition to be comfortable continuing to extend them credit terms and, generally, to agree upon a plan going forward for keeping the NPS account current. R. Molyneux, 3/24/06 Tr. at 32-33; 165-168; H. Tafler, 11/2/06 Tr. at 279-285. As Procaps personnel have explained, Procaps had no "Plan B:" they simply did not have an alternative distribution network, knew that it would take significant time to establish one, and wanted to avoid that outcome if at all possible. R. Molyneux, 3/24/06 Tr. at 150-151; E. Truant, 9/6/06 Tr. at 184-186; R. Italia, 9/8/06 Tr. at 120-125; R. Italia, 9/8/06 Tr. at 215-218. . Accordingly, even after sending out the breach notices, the Procaps folks continued to carry on serious conversations with NPS personnel in an effort to get NPS to cure the breach and avoid termination.[10] R. Molyneux, 3/24/06 Tr. at 198-203; E. Truant, 9/6/06 Tr. at 185-186; R. Italia, 9/8/06 Tr. at 218-220; H. Tafler, 11/2/06 Tr. at 21-28.

Once again, however, these efforts were to no avail. NPS' senior management (including Gino Postorivo and Mr. Gunn) promised that the parties would speak about NPS' financial condition on several occasions, yet this conversation never materialized. H. Tafler, 11/2/06 Tr. at 304-314. R. Molyneux, 3/24/06 Tr. at 33-34; 165-173; E. Truant, 9/7/06 Tr. at 7-9. Mr. Postorivo also promised on several occasions that documentary financial information

---

[10] Of course, after sending out the termination notices, personnel at Procaps and ICC realized they needed at least to start thinking about various options for alternative distribution should NPS not cure and the contracts were terminated. However, as the evidence has demonstrated, no serious planning commenced until after July 11, 2005, when Procaps and ICC realized that there were no possibilities of any kind for a distribution system that included NPS. *See* PLP-219; PLP-501; R. Italia, 9/8/06 Tr. at 215-218; R. Molyneux, 9/5/06 Tr. at 120-125; E. Truant, 9/6/06 Tr. at 185-186. Indeed, Procaps did not have a complete distribution plan until August 23, PLP-227, and did not launch its own distribution network until the Fall of 2005, which was not fully operational until well into 2006; Richmond Italia, 9/8/06 Tr. at 218-220; R. Molyneux, 3/24/06 Tr. at 195-203.

would be shared, but this did not occur. R. Molyneux, 3/24/06 Tr. at 165-166. R. Molyneux, 9/5/06 Tr. at 74-78; E. Truant, 9/7/06 Tr at. 13-14; H. Tafler, 11/3/06 Tr. at 11-12. Indeed, further raising Procaps' and ICC's concerns about NPS' ability to pay, in a conversation between Mr. Molyneux and Mr. Postorivo on June 3, Mr. Postorivo asked for extended, 90-day terms. R. Molyneux, 3/24/06 Tr. at 167-169. Thereafter, in the one brief conversation that Mr. Gunn and Mr. Tafler had about NPS' financial condition on June 14, 2005, Mr. Gunn made statements that left Mr. Tafler with the impression that NPS was not getting current because they *could not* get current. H. Tafler, 11/2/06 Tr. at 302-304; PLP-187. In the words of Mr. Truant, to whom Mr. Tafler had reported this conversation, this information was "Further evidence that Gino doesn't have the money to make up for the overdue receivables . . . ." PLP-187; R. Molyneux, 9/5/06 Tr. at 103-105; E. Truant, 9/7/06 Tr. at 9-11; H. Tafler, 11/3/06 Tr. at 5-13.

During the period between receiving the breach notices on May 24 and up until June 16, 2005, there were also numerous exchanges between the parties' accounting departments, working to reconcile the account. NPS-481; PLP-182; PLP-183; NPS-493; NPS-494; PLP-184; NPS-506; NPS-517; PLP-189; PLP-572; NPS-555; NPS-560; H. Tafler, 11/2/06 Tr. at 196-304; H. Tafler, 11/3/06 Tr. at 150-157; 211-214. Interestingly, notwithstanding this activity, Mr. Gunn has admitted that on no day during this time period did he ever ask Mr. Tafler or anyone else from Procaps or ICC specifically what it would take to satisfy the breach notices and, in particular, what amount Procaps would find satisfactory. N. Gunn, 9/26/06 Tr. at 226-227. Also, at no point until June 16 did anyone from NPS ask anyone from Procaps or ICC the method by which payment should be made. G. Postorivo, 3/21/06 Tr. at 94-100; R. Molyneux, 3/24/06 Tr. at 73-75; H. Tafler, 11/3/06 Tr. at 193-195.

By June 16, having received no indications from NPS that any progress towards cure was being made, Procaps was frustrated, and believed that termination was becoming inevitable. Accordingly, at Richmond Italia's direction, Mr. Tafler sent an email to Norm Gunn indicating that Procaps believed NPS was not curing the default and including a proposal for a new agreement. NPS-564. H. Tafler, 11/2/06 Tr. at 310-313. Richmond Italia then emailed Gino Postorivo personally about this in more detail later that afternoon. PLP-542. Finally, having received these emails, NPS surfaced. Gino Postorivo and Mr. Campo called Mr. Molyneux that afternoon, around 5 p.m., to advise him that they planned to make payment that day and ask how he would like the checks sent.[11] R. Molyneux, 3/24/06 Tr. at 73-76. Mr. Molyneux said he assumed by the usual method (overnight courier) but he would check. R. Molyneux, 3/24/06 Tr. at 74. By the time Mr. Molyneux was able to get back to Mr. Postorivo with instructions, Mr. Molyneux was told it was too late, and that NPS had unilaterally decided to send the checks by registered mail – the first time ever that such method of transmittal was used for payments. R. Molyneux, 3/24/06 Tr. at 73-76.

### D. Events from June 16 to the termination on June 24, 2005

Procaps did not learn the details of what checks were sent on June 16 until June 17, when a copy of the $2.6 million checks, the account reconciliation statement and the letters explaining that the $2.6 million checks were faxed to Mr. Tafler by Mr. Gunn.[12] NPS-2208; N. Gunn, 9/26/06 Tr. at 86-88. J. Campo, 9/28/06 Tr. at 54-58; J. Campo, 9/29/06

---

[11] Interestingly, the Post Office records appear to indicate it was submitted to the Post Office just before 4:00 p.m. that day – an hour before Mr. Postorivo placed his call to Mr. Molyneux. NPS-2227.

[12] On June 16, Mr. Campo apparently just mailed the checks and the account reconciliation by registered mail, and then prepared and emailed letters only to Procaps that evening memorializing that fact. The letters themselves were not mailed out until June 17 (along with copies of the checks). PLP-593; J. Campo, 9/28/06 Tr. at 54-58.

Tr. at 97-29. Mr. Tafler shared this schedule with his team to begin to work on determining if the amount was sufficient to bring NPS' account current, at least as of June 16. H. Tafler, 11/2/06 Tr. at 313-314. Regardless, the Procaps team was encouraged by NPS sending checks for a large amount of the past due, as they felt that it was, finally, progress in the right direction, even if not cure. R. Italia, 9/7/06 Tr. at 212-214; H. Tafler, 11/3/06 Tr. at 11-12; H. Tafler, 11/3/06 Tr. at 178-179.

Critically, a close examination of NPS' schedule, which accompanied the $2.6 million in checks (NPS-9), demonstrates that, even using NPS' account reconciliation figures, the $2.6 million was *insufficient* to cure the amount past due on that day. NPS-9; E. Truant, 9/7/06 at 19-21; H. Tafler, 11/3/06 Tr. at 19-21. If one looks at the NPS June 16 schedule, it shows that NPS had determined that, as of June 17, $3,489,689.19 would be past due. *Id.* at NPS-033437; H. Tafler, 11/3/06 Tr. at 42-43. Removing the two invoices becoming past due on June 17 (Invoices 1263 and 1264, totaling $138,651.30), the past due amount at the beginning of the day on June 16, per the NPS schedule, is $3,351,037.80. H. Tafler, 11/3/06 Tr. at 43-44. Giving NPS credit for the two payments received and deposited that day – a wire transfer from NPS Europe in the amount of $168,500.00 and a check payment from NPS US in the amount of $140,000, brings the past due amount at the end of that day to $3,042,537.89.[13] H. Tafler, 11/3/06 Tr. at 44-45. Yet, instead of sending Procaps a check for that amount, it sent a check for $2,621,189.19 (*see, e.g.*, NPS-9), $421,348.70 less than even NPS knew was past due that day. H. Tafler, 11/2/06 Tr. at 21-23. The reason for this is that, as the schedule accompanying NPS-9 demonstrates and has been conceded by NPS at the hearings, NPS gave itself credit for $560,000 in checks it had sent to Procaps on June 15, but which Procaps was

---

[13] These calculations are also set forth in PLP-809.

unable, under the parties' agreement, to cash and thus did not cash until June 17, 20, 21 and 22. H. Tafler, 11/3/06 at 172-174; S. Scherf, 9/29/06 at 191-194; E. Truant, 9/7/06 at 19-24. On each of these days, of course, additional invoices became past due, such that NPS never became current on any of those days either, even under their own June 16 schedule, as demonstrated by PLP-809 (and even if one gave NPS credit for the $2.6 million in checks as of June 16). H. Tafler, 11/3/06 Tr. at 19-21. In short, even under NPS' own calculations, NPS knew that more money needed to be paid to bring it current and keep it current, yet it chose not to make those payments.[14] N. Gunn, 9/20/06 at 247-255.

In any event, Procaps' relief that things were moving in the right direction on the evening of June 16 was short lived, as time went by and the $2.6 million in checks were not received in the mail. R. Molyneux, 3/24/06 Tr. at 23-24; H. Tafler, 11/3/06 Tr. at 13-18. Indeed, by June 23, Procaps became even more concerned when, not only had the $2.6 million not been received, but also NPS' regular weekly checks for $700,000 – due that day -- did not arrive, and no-one from NPS was responding to inquiries about their whereabouts. E. Truant, 9/6/06 Tr. at 269; 275-276; E. Truant, 9/7/06 Tr. at 12-14; R. Italia, 9/8/06 Tr. at 168-169; H. Tafler, 11/3/06 Tr. at 11-20. Then, on June 23, Richmond Italia had a conversation with Gino Postorivo in which he promised, *inter alia*, to wire the money the next day, June 24.[15] NPS-64; R. Molyneux, 9/5/06 Tr. at 83-85; E. Truant, 9/7/06 Tr. at 13-14; R. Italia, 9/7/06 Tr. at 223-231.

---

[14] In addition, under Procaps account reconciliation, the actual amount past due on June 16 was slightly higher, at $3,072,779.67, and continued to be somewhat higher than the NPS numbers throughout that period, even if one were to give credit to NPS for the $2.6 million payment on June 16. *See* PLP-810 and PLP-817; *compare with* PLP-809; H. Tafler, 11/3/06 Tr. at 196-198.

[15] Interestingly, on June 21, 2005, NPS filed the instant arbitration, initially to resolve alleged breaches by Procaps under the agreements, and sent the demand to Procaps along with a letter from Mr. Campo further detailing the alleged breaches. NPS-578; J. Campo, 9/28/06 Tr. at 70-74; J. Campo, 9/29/06 at 92-107. Procaps received the letter and demand on June 28, 2005.

On June 24, both Mr. Tafler and Mr. Truant exchanged emails with Mr. Gunn requesting that the wire transfer be completed and providing wire instructions. PLP-100; E. Truant, 9/6/06 Tr. at 126-127. H. Tafler, 11/3/06 Tr. at 182-187. Mr. Gunn refused to effectuate such transfer, however, unless Procaps agreed to use some very specific language in an email, which included allowing for a purported "applicable bank waiting period" after NPS cancelled the checks mailed on June 16. E. Truant, 9/6/06 Tr. at 276-280; H. Tafler, 11/3/06 Tr. at 183-185. When Procaps would not agree to this language, having no idea with this meant and being concerned about further delays (although they had no problem with a stop payment in principal), no wire was forthcoming. *Id.*, R. Molyneux, 9/5/06 Tr. at 163-164; E. Truant, 9/6/06 at 279-280. H. Tafler, 11/3/06 Tr. at 183-187.

By June 24, Procaps felt their backs were against the wall. NPS owed Procaps over $8 million, of which over $3.4 million was past due and more aging daily. R. Molyneux, 9/5/06 Tr. at 165-166; H. Tafler, 11/3/06 Tr. at 173-175. Although checks for $2.6 million were allegedly "in the mail," NPS was not taking any serious steps to get money to Procaps, had inexplicably allowed their account to become $700,000 more past due in one day by not sending their regular weekly checks, was being very cagey in responding to wire transfer requests and generally not being cooperative or demonstrating any serious interest in curing the default, bringing the account current and moving forward on reasonable business terms (*i.e.*, providing financial information and staying within the 45-day contract terms). R. Molyneux, 9/5/06 Tr. at 106; H. Tafler, 11/3/06 Tr. at 183-191. Indeed, by this time Procaps had serious doubts about whether the $2.6 million in checks could be cashed when received, and NPS' behavior was not reassuring them in any fashion. *Id.* Accordingly, on June 24, 2005, Procaps felt it was left without any alternative and issued notices of termination under both agreements. NPS-13; NPS-

14; R. Molyneux, 9/5/06 Tr. at 157-178; E. Truant, 9/7/06 Tr. at 4-14; R. Italia, 9/8/06 Tr. at

199-200.  Procaps also ceased shipping product to NPS that day.[16]  PLP-813; H. Tafler, 11/3/06

Tr. at 23-29.

### E. Events after termination

Even after sending out the termination notices on Friday, June 24, Procaps

reached out to NPS and requested a meeting the following week, in order to see if they could get

any money from NPS and, assuming they did, to see if there could be some acceptable

arrangements made with NPS for Procaps to continue to supply them with product, provided

further payments were assured.  R. Molyneux, 3/24/06 Tr. at 175-178.  NPS agreed to meet and,

accordingly, on Monday, June 27, a team from Procaps, including Robert Molyneux, Edward

Truant, Richmond Italia, Craig Miller and their outside counsel, Max Gotlieb, flew to

Philadelphia to meet with NPS.  R. Molyneux, 3/24/06 Tr. at 179-185.  Shortly after arriving at

the meeting, however, Procaps learned that NPS was in negotiations with Procaps' arch

competitor, PMI, and the two were planning to merge very soon.  Indeed, the two principals of

PMI, Jeff Perlmutter and Dave Freeman, then joined the meeting to explain more of the details of

the deal.  R. Molyneux, 3/24/06 Tr. at 179-182; R. Molyneux, 9/5/06 Tr. at 107-109; C. Miller,

9/27/06 Tr. at 222-223.  At this point, the checks for $2.6 million had not arrived, Procaps was

unable to secure any funds from NPS that evening and, given the turn of events with PMI, the

Procaps folks left the meeting.  R. Molyneux, 3/24/06 Tr. at 185-186.  Thereafter, in one last

hope that they might be able to get some money from NPS, the Procaps folks requested another

meeting the next day.  R. Molyneux, 3/24/06 Tr. at 186.

---

[16] Notably, this was the first time Procaps stopped shipping product to NPS during this whole time period, as they did not want to disrupt NPS' operations.  R. Molyneux, 3/24/06 Tr. at 59-60; 80-81.

Accordingly, on Tuesday June 28, the Procaps, NPS and PMI folks again met, this time at NPS' facility in New Jersey. R. Molyneux, 3/24/06 Tr. at 186-187. R. Molyneux, 9/5/06 Tr. at 109-110. That morning, the checks for $2.6 million finally arrived at Procaps, and Richard Italia flew down with them so that certified funds could be obtained, which did occur that day. R. Molyneux, 3/24/06 Tr. at 73, 85; E. Truant, 9/4/06 Tr. at 281. In the meantime, the Procaps and NPS folks reached new terms under which the parties agreed to do business together going forward, specifically that NPS would resume paying Procaps on a weekly basis in the amount of $700,000 (consisting of five (5) checks each for $140,000, one to be deposited on each of five (5) consecutive business days), all of which would be credited towards the oldest receivables. R. Molyneux, 3/24/06 Tr. at 190-191. In return, Procaps would ship NPS only $500,000 of product each week (under the same exclusive, terms as before), so that, over a reasonable period of time, the remaining past due balance would be worked down and not continue to grow further. R. Molyneux, 3/24/06 Tr. at 192; R. Molyneux, 9/5/06 Tr. at 228-229; H. Tafler, 11/2/06 Tr. at 249-250; H. Tafler, 11/3/06 Tr. at 24-26, 188-189. As a result, on June 28, the Procaps team left New Jersey not only with a certified check for the $2.6 million, but also $700,000 in checks for the coming week.[17] R. Molyneux, 3/24/06 Tr. at 97; H. Tafler, 11/2/06 Tr. at 249-250. In addition, Procaps resumed shipments of product to NPS on June 28. R. Molyneux, 3/24/06 Tr. at 97; J. Postorivo, 3/22/06 Tr. at 80. PLP-813.

On July 8, 2005, Mr. Tafler asked Mr. Gunn about the $700,000 checks that Procaps should be receiving for deposit the following week. H. Tafler, 11/3/06 Tr. at 26. Once again, Mr. Gunn raised issues about NPS' financial condition with Mr. Tafler, but said the

---

[17] Importantly, NPS never replaced the $700,000 in checks that were not received, as they should have been on June 23. Thus, NPS' account remained $700,000 more past due than it would have had such payments been received. PLP-815; H. Tafler, 9/2/06 Tr. at 242, 248-249; H. Tafler, 9/3/06 Tr. at 20.

checks would be sent out, although they could not be deposited until starting July 12, rather than

July 11 as previously agreed. H. Tafler, 11/3/06 Tr. at 26-27. Then, when the checks arrived on

July 11, they were for only $500,000, instead of the $700,000 agreed upon, and the instructions

accompanying the checks indicated that Procaps should not start depositing the checks until

July 13. *Id.*

In the meantime, on July 11, Procaps learned that NPS had amended its

arbitration demand on July 7 to include the instant wrongful termination claim under both

agreements. NPS-2229. H. Tafler, 11/3/06 Tr. at 218-219. Accordingly, Procaps decided to

terminate all further dealings with NPS, and permanently ceased shipments to NPS on July 12

(but for shipments to two tournaments sponsored by the parties later in July). H. Tafler, 11/3/06

Tr. at 28. PLP-813.

### F. ICC's efforts to acquire NPS

There is no dispute that ICC was interested in acquiring NPS, and made at least

two specific proposals to NPS in this regard. These discussions began in November, 2004, when

ICC was meeting with NPS in connection with its due diligence efforts on the Procaps deal.

PLP-804; PLP-789; E. Molyneux, 9/6/06 Tr. at 96-98; E. Truant, 9/6/06 Tr. at 179-181. The

record is also undisputed that ICC was interested in not only acquiring Procaps, but also other

businesses in the paintball (or related) industries, as part of its overall strategy for the growth of

the Procaps investment. E. Truant, 9/6/06 Tr. at 150-151, 179-180, 189; R. Molyneux, 9/5/06 Tr.

at 4, 8-14. NPS, of course, represented a particularly attractive acquisition candidate, because of

the nature of the supply/distribution relationship between NPS and Procaps, but as the ICC folks

have explained, this was by no means their only option. E. Truant, 9/6/06 Tr. at 299-301.

Nonetheless, it was worth exploring and the ICC management team owed it to their investors to

make some serious efforts to do so.

From ICC's perspective, all offers it made to NPS were always very preliminary, as NPS refused to share any significant financial or other information with ICC about its business because NPS' counsel, Mr. Campo, was dissatisfied with the NPS/ICC confidentiality agreement relating to the potential deal. R. Molyneux, 3/23/06 at 197-198; J. Campo, 9/28/06 Tr. at 281-286; E. Truant, 9/6/06 Tr. at 307-308. Nonetheless, the record is undisputed that on December 2, 2004, ICC's Steve Lister sent Gino Postorivo a proposal to buy all of NPS' business for $77.5 million. NPS-34; R. Molyneux, 9/5/06 Tr. at 44-46; E. Truant, 9/6/06 Tr. at 190-194, 235-238; J. Campo, 9/27/06 Tr. at 291-294; J. Campo, 9/29/06 Tr. at 56-61. This proposal was not accepted and, thereafter, the parties mutually agreed to cease discussions about a potential transaction until after the ICC/Procaps closing. R. Molyneux, 3/23/06 Tr. at 198-201.

At the April 12, 2005, meeting, discussed above, discussions about ICC and/or Procaps acquiring NPS again resumed. R. Italia, 9/8/06 Tr. at 66-67. A meeting for further such discussions was proposed for April 18, 2005, but this never occurred. R. Molyneux, 3/23/06 at 256-262; E. Truant, 9/6/06 Tr. at 226-227; J. Campo, 9/29/06 Tr. at 51-56; NPS-41; PLP-793; PLP-322. From Procaps and ICC's perspective, however, NPS, particularly Gino Postorivo, seemed very amenable to discussing a potential transaction. R. Molyneux, 3/23/06 Tr. at 256-258. Indeed, contrary to statements from Mr. Campo, there was no hint that NPS felt threatened or intimidated in any way by ICC or Procaps. After some discussions between Gino Postorivo and Richmond Italia in late April or early May, Richmond reported to ICC on the potential terms of a deal that he had put together with Mr. Postorivo. NPS-46; E. Truant, 9/6/06 Tr. at 240-241. Accordingly, on May 5, 2005, Mr. Lister sent Mr. Postorivo a new proposal reflecting the terms discussed with Richmond Italia, this time for acquiring only a portion of the NPS business, for $45 million. NPS-46; R. Molyneux, 3/24/06 Tr. at 31-32; R. Molyneux, 9/5/06 Tr. at 84-86;

E. Truant, 9/6/06 Tr. at 240-241, 312-313. NPS did not accept this proposal. J. Campo, 9/27/06

Tr. at 309-310, 319-320; J. Campo, 9/29/06 Tr. at 57-59. Thereafter, some discussions

continued, but never again rising to the level of an email proposal from ICC, let alone anything

more firm.

Interestingly, the record evidence also established that NPS knew it was not the

only company that ICC and/or Procaps were talking to during that period. Indeed, NPS admitted

to being aware of potential discussions by ICC and/or Procaps with a number of other players in

the paintball industry. J. Campo, 9/29/06 Tr. at 50. Thus, NPS knew it was not being singled

out in any way as a potential deal target. In addition, as will be discussed below, throughout this

period, NPS was deep in sophisticated negotiations with PMI – its own arch rival (in addition to

being the arch rival of Procaps) and a major industry player – over a potential transaction, such

that NPS' claims of feeling intimated or threatened by ICC and Procaps ring false.

### G. NPS' efforts to establish alternative sources of supply to Procaps

In contrast to Procaps, there is abundant evidence in the record that NPS took

extensive steps during the 2004-2005 time period to establish sources of supply other than

Procaps, including from Blue Arc, Hovid and PMI, as detailed below. There is also evidence

from several senior NPS mangers that this was the purpose and intent of these actions.

### 1. NPS' dealings with Blue Arc

On March 7, 2004, NPS entered into a supply agreement with Blue Arc

Manufacturing Corporation, a manufacturer of low-end paintballs (the hottest growing area of

the market according to NPS' Johnny Postorivo). J. Postorivo, 3/22/06 Tr. at 151-152. At the

same time, NPS also entered into an option agreement with Blue Arc and an agreement to begin

to loan Blue Arc certain funds to assist its operations. G. Postorivo, 3/21/06 Tr. at 28-29;

N. Gunn, 9/26/06 Tr. at 119-124; 278-280; N. Gunn, 9/27/06 Tr. at 5-6; J. Campo, 9/28/06 Tr. at

238-244.  Thereafter, Blue Arc began to supply NPS with paintballs and NPS began to make a series of loans to Blue Arc.  J. Postorivo, 9/25/06 Tr. at 158-159; N. Gunn, 9/26/06 Tr. at 119-124; 278-280; J. Campo, 9/28/06 Tr. at 238-244.  Interestingly, in addition, the record evidence demonstrates that between May 2004 and October 2004 NPS also became involved in the day-to-day management of Blue Arc's operations.  R. Italia, 9/8/06 Tr. at 154.  Procaps was never made aware of these facts, except that Procaps did learn independently that Blue Arc was supplying NPS with some paintballs.  R. Italia, 9/8/06 Tr. at 154; J. Campo, 9/28/06 Tr. at 251.  Procaps was not aware of the details of the supply arrangement, nor was it aware of the option or loan agreements, or that NPS was exercising, at a minimum, influence over the day-to-day affairs of Blue Arc.  J. Campo, 9/28/06 Tr. at 251.

Importantly, a reading of the plain language of the operative NPS/Procaps agreements during this period demonstrates that NPS' actions were a violation of those agreements.  Specifically, pursuant to Section 12.02 of the February 2002 Agreement, NPS agreed that neither it nor "its partners, affiliates, directors agents and/or assigns," would "*engage in the business directly or indirectly of manufacturing Paintballs* or otherwise compete with [Procaps] in the Territory *nor aid or assist anyone else in that business* in the Territory."  NPS-1, 2002 Paintball Agreement at NPS-043263 (emphasis added).  This provision survived with the amendment of this agreement in May, 2004, which provided that Section 12.02 "shall be supplemented to include the European Territory in addition to Territory."  NPS-2; PLP-69. While Procaps is not seeking redress for these violations in this arbitration,[18] this fact does, at the very least, illustrate the nature of NPS' behavior during this time period.

---

[18] Indeed, under the various assignment agreements, these claims are the claims of the prior Procaps entity, Procaps Encapsulation, which is not a party to this arbitration.

### 2. NPS' dealings with Hovid

As noted above, by March, 2005, Procaps had become concerned about NPS' European operations in two ways. First, the European operations had a large, growing past due receivable, which NPS repeatedly indicated was a struggle to pay down further, supposedly due to getting the European operations up and running. H. Tafler, 11/2/06 Tr. at 259-262. Second, Procaps had discovered that its sales volumes in Europe had declined significantly as compared to the prior year when the business was under Procaps' ownership, even though reports coming in for Europe were that the market was doing well overall. H. Tafler, 11/2/06 Tr. at 262-264.

The evidence adduced at the hearings has demonstrated that there was at least one simple, yet significant, contributing factor causing both phenomena, which Procaps suspected but as to which it did not get confirmation until late June 2005, just before terminating the agreements: "Most of [NPS] UK sales are Hovid, there is virtually no Procaps product sold in the UK now." PLP-544; R. Italia 9/8/06 Tr. at 198-200. NPS' documents confirmed that NPS was buying considerable product from Hovid, a paintball manufacturer in Europe, and shifting its purchases away from Procaps:

> *We are attempting to slow down the orders from Procaps,*
> especially as *we are also ordering paint* locally (Ireland) *from*
> *Hovid,* as per the deal we are working on with Campo.

PLP-700 (June 7, 2005 email from NPS' European manager Jackie Sosta to Kim Postorivo) (emphasis added). In addition, because NPS Europe was required to keep (and presumably was keeping) its accounts current with Hovid (and other suppliers), it was slower in paying Procaps than it otherwise could and should have been:

> It has been quite a challenge in the past year to pay Procaps, let
> alone pay back NPS – I'm committed right now to pay $170k per
> week to Procaps *and I also have to keep current with Hovid, Smart*
> *Parts, Luxfor and all the other vendors out there* as well as try to
> find money to send to NPS.

PLP-316 (June 16, 2005 email from Kim Postorivo to Avery Amaya) (emphasis added).  In short, regardless of other factors, the record is clear that at least one significant reason why Procaps was suffering as a result of NPS' European operations was because NPS was deliberately and intentionally shifting its supply sourcing away from Procaps, to Hovid.

### 3.  NPS dealings with PMI

The evidence has demonstrated that NPS' discussions with PMI regarding a potential transaction commenced in late 2004, and by January 22, 2005, the two parties had entered into a formal letter of intent for a potential merger.  PLP-342; J. Perlmutter Dep. 8/28/06 Tr. at 155-156; J. Campo, 9/28/06 Tr. at 307-308. J. Campo, 9/29/06 Tr. at 21.  As the evidence demonstrated, the parties then engaged in on-again, off-again discussions between late January and early April 2005, but by April 18, 2005 the discussions resumed with vigor and continued seemingly unbroken at least until sometime in July 2005.[19]  PLP-353; N. Gunn, 9/26/06 Tr. at 309-311; J. Campo, 9/28/06 Tr. at 308-312; J. Perlmutter Dep. 8/28/06 at 164.

While NPS has claimed that there was going to be no impact to Procaps should the deal go forward and, further, that NPS fully intended to continue to meet its minimums under the agreements, the documentary and other evidence submitted to PNC Bank and also from PWC, one of the deal advisors, is to the contrary, as is the testimony from former PNC Bank employee Gary Martz, the only disinterested witness to testify on this issue.

First, the Confidential Financing Information Memorandum that NPS and PMI submitted to potential lenders, including PNC (on May 19, 2005), stated, under the category "Strong Internal Growth Opportunities," that:

---

[19] Interestingly, the discussions were clearly off for a brief period in early April when NPS met with the folks from Procaps and ICC on April 12, which could explain NPS' apparent interest at that time in a potential deal, and then the dwindling of that interest over the next several weeks as the NPS/PMI deal gained momentum. *See* Chronology, Exhibit A.

The acquisition of the RPS paintball operations in 2003 allowed PMI to control the production and, therefore, the ultimate sale of the paintballs through its distribution channels. The Combined Company will enjoy production capacity of almost 3.5 billion paintballs at the RPS facility in Florida. Additionally, the Combined Company intends to exercise an option to acquire the remaining interests in another paintball manufacturing facility in Florida [Blue Arc] that is located less than two miles from the RPS facility. The acquisition will provide the Combined Company with additional capacity of almost 1.5 billion paintballs. Senior Management estimates that it will sell 6-7 billion paintballs in its first full year after the merger. *The excess paintballs that the Combined Company will not have the capacity to manufacture will be purchased primarily from ProCaps*, a paintball manufacturer located in Montreal, under an existing supply agreement with NPS. *The Combined Company will realize the manufacturing profit on the 1.5 billion paintballs that it does not manufacture currently.*

PLP-384 at PNC 2203 (emphasis added); *see also* PLP-356, PLP-398. NPS purchased about

2.1 billion paintballs from Procaps in 2004. J. Postorivo, 9/25/06 Tr. at 5-6. Under the

September, 2004 paintball agreement, NPS was required to purchase a minimum of 1.7 billion

paintballs from Procaps. NPS-3 (Section 3.06); J. Postorivo, 9/25/06 Tr. at 100-101.

Mathematically, if NPS were to move 1.5 billion into its own production and purchase only the

excess from Procaps, that would be only 600 million, far less than the 1.7 billion required.

Similarly, a member of the PWC team summarized their understanding of the

planned transaction, and noted that the projected paintball sales for the combined company for

2006 were only 5.1 billion, with the combined company being able to produce about 4 billion of

the needed balls, requiring an outside source of supply of only 1 billion. PLP-366.

As explained by several witnesses, including Gary Martz, a former Credit

Manager of PNC who was assigned to work on the NPS/PMI transaction, PNC worked closely

with NPS and PMI in trying to develop the financing for the potential transaction. G. Martz Dep.

11/1/06 Tr. at 9-12. This included reviewing various materials submitted by the parties,

including the financing memorandum quoted above, and also attending a presentation with

management team members at NPS' facility in New Jersey on May 26, 2005. G. Martz Dep.

11/1/06 Tr. at 11-12. Mr. Martz memorialized his notes of that meeting on the Powerpoint

presentation handed out by the parties. PLP-397; G. Martz Dep. 11/1/06 Tr. 27-29. Among his

notes included a discussion of the projected paintball cost savings due to the parties' plans to

move some of the manufacturing in-house and the specific numbers the parties planned to

manufacture versus purchase. PLP-397 at PNC1343; G. Martz Dep. 11/1/06 Tr. 27-29.

Mr. Martz later set forth PNC's understanding of these plans in narrative form, as obtained from

the meeting and documents submitted, as follows:

> Paintball Manufacturing Cost Savings: PMI has its own in-house
> paint factory located in St. Petersburg, Florida. NPS currently
> buys paint to sell under its brand names from several sources,
> including a competitor (Pro Caps) and from a company, Blue Arc,
> partially owned by Gino Postorivo. Since its production is in-
> house, PMI's cost per case of paint is $6.00 less than NPS's. NPS
> sells approximately 1.1 [million] cases of paint per year[20] PLP-
> 397; G. Martz Dep. 11/1/06 Tr. 27-29 and the plan is to move
> [500,000] cases of production of the lower-end paint branded sold
> by NPS to the PMI facility. This results in savings of [$3 million.]
> *The remaining [600,000] cases of paint will continue to be
> purchased from outside sources based on capacity and quality-
> consistency concerns.*[21]

PLP-480 at PNC 3191; G. Martz Dep. 11/1/06 Tr. 16-21, 23-25; *see also* PLP-175; PLP-467 at

PNC-2080 & 2081. Of course, 600,000 cases of paint are only 1.2 billion paintballs, again less

than the 1.7 billion minimum in the contract (let alone the 2.1-2.2 billion purchased that year).

Notably, Mr. Martz testified that this plan was the *only* plan presented to PNC and, moreover,

that paintball cost savings was presented as a significant factor in the companies' stated

---

[20] It has been established that there are 2,000 paintballs in a case, which means that 1.1 million cases is 2.2 billion paintballs. G. Postorivo 3/20/06 Tr. at 109-110.

[21] Mr. Martz explained that it was his convention to use "MM" to signify millions and "M" to signify thousands. G. Martz Dep. 11/1/06 Tr. 18-21.

motivation to combine. G. Martz Dep. 11/1/06 Tr. at 24-25. Indeed, Mr. Martz observed that the paintball cost savings was the single largest projected cost savings the companies expected to achieve. G. Martz Dep. 11/1/06 Tr. 18-21.

The evidence is clear. As NPS explained to its bank, it was *not* planning to continue to purchase even its minimums from Procaps and was, instead, planning to purchase substantially less, regardless of its contractual obligations or the impact on Procaps.[22]

### 4. NPS' express intention to decrease dependence on Procaps

NPS' documents revealed at least three instances in which senior NPS management members expressed the specific desire to move away from dependence upon Procaps, notwithstanding the parties' agreements.

First, on July 15, 2004, during the middle of the difficulties, discussed above, which almost resulted in the breaking apart of the NPS-Procaps relationship in the summer of 2004, Gino Postorivo and Mr. Gunn discussed the need to extend the Procaps agreement for at least six more months, if possible, rather than split up at that time "since we will be able to build our brands (Diablo, 32 Degrees, Empire) in the US & UK and start building the new 'Pebbles' (AKA for BAM [Blue Arc Manufacturing]) brand." PLP-588. Notably, Mr. Gunn emphasized that, by doing this, "the harder the impact to them," meaning Procaps. *Id.*

Second, on May 10, 2005, both Mr. Gunn and Mr. Campo stressed to other senior NPS managers the importance of moving away from promoting Procaps' paintball products and, instead, begin to more heavily promote both NPS' own brands, such as Diablo, and brands obtained from Blue Arc. As Mr. Gunn put it, a certain recent event "reinforces our need to push

---

[22] Indeed, it is likely that NPS thus would run afoul of its obligation to "vigorously, diligently and faithfully promote the sale of [Draxxus] paintballs . . ." NPS-5, Section 11.05.