Diablo/Empire paint brand and ensure we have an equivalent for each DraXxus box of paint."
(PLP-676 at NPS-032857.)  And Mr. Campo noted that he thought the NPS sales staff was "anti
blue-arc [sic] and anti-anything other than DXS [DraXxus] Paintballs/QIP [other Procaps]
paintballs," and admonished the sales staff to "Sell Diablo-Diablo-Diablo-Diablo and also try to
sell some Blue Arc." PLP-676.  Thus, these comments demonstrate that NPS was intentionally
and deliberately moving away from Procaps and its products, which was, *inter alia*, a violation
of NPS' obligation to "vigorously, diligently and faithfully promote the sale of [DraXxus]
paintballs . . ." NPS-5, Section 11.05.

Third, the comments of Ms. Sosta in June, 2005, quoted above, made clear that
NPS deliberately and intentionally shifted its source of paintball supply in Europe from Procaps
to Hovid, and that this was not occurring merely by happenstance.  PLP-700.

## III.    ARGUMENT

### A.  Procaps Properly Terminated the Agreements on June 24, 2005

As discussed above, Procaps notified NPS on May 17, 2005 in formal breach
notices that it was in violation of the payment terms under both the paintball and goggles and
masks agreements, and provided NPS with thirty (30) days to cure the default, as required by the
contracts.  As has and will be demonstrated, NPS did not cure in thirty days, as it never became
current on even one day between May 17 and June 24, 2005, the date of termination, which was
more than thirty (30) days after not only the notices were sent out, but also after May 24, the day
NPS admits they were received.

Under Section 5.02 of the September 2004 Paintball Agreement, NPS was required to submit payment within 45-days of the shipment date:[23]

> *NPS shall be responsible to pay* [Procaps] for Products purchased hereunder, including those purchases of Products shipped outside of the North American Territory, *on or before Forty-Five (45) days* from the date the respective Products are shipped from [Procaps'] manufacturing facilities . . . .

NPS-3 (emphasis added). Similarly, the 2002 Goggles and Masks Agreement provides in Section 4.01 that:

> *NPS shall be responsible to pay* [Procaps] for Products hereunder *on or before Forty-Five (45) days* from the date the respective Products are shipped from [Procaps'] faciltity(ies).

NPS-5 (emphasis added). It is undisputed that, as of May 17, 2005, numerous invoices from Procaps to NPS were beyond the forty-five (45) day terms.

Accordingly, on May 17, 2005, Procaps sent NPS notice of the default under both agreements via registered mail to the appropriate NPS address, as required by the agreements. Specifically, Section 16.06 of the Paintball Agreement provided that "All notices, requests, orders, demands or other communications by the terms hereto required or permitted to be given by one party to the other shall be given in writing, and shall be sent by registered or certified mail, postage prepaid addressed to such other party or delivered to such other party as follows . . . ." NPS-3; *see also* Goggles Agreement, Section 13.06.

Procaps then waited more than thirty (30) days for NPS to cure, as required by the agreements, prior to terminating. Specifically, Section 8.03 of the Paintball Agreement provides that:

---

[23] Procaps invoiced NPS generally on the day the product was shipped, or mailed the invoice the day after. H. Tafler, 11/2/06 Tr. at 237-238.

> This Agreement may be terminated (i) by [Procaps] if NPS fails or otherwise defaults on making payments to [Procaps] as and when such payments become due and payable *and such default and/or failure continues for a period of thirty (30) days after notice*, and NPS, before the expiration of said thirty (30) day period is unable to cure; or NPS otherwise fails to provide [Procaps] with adequate assurances of performance.

NPS-3 (emphasis added). Section 8.02 of the Goggles Agreement contains virtually the identical provision. NPS-5. NPS concedes that it received the notices on May 24, 2005. Assuming that the time period for cure runs from the date notice is received, thirty (30) days from May 24 would be June 23. *See* N.J.S.A. § 12A:1-201(26) & (27). It is also undisputed that, even though Procaps personnel were under the impression that they could have terminated the agreements earlier, namely on June 16, thirty (30) days after the notices were sent, they did not actually terminate until June 24, one day after the June 23 date and thus thirty-one (31) days after the notices were received. Accordingly, just on this point alone, the timing of the termination was proper.

As has been set forth above, it is also undisputed that, by the June 24 termination date, Procaps had not only not received the $2.6 million in checks mailed on June 16, but also it had not received the regular weekly checks of $700,000 from NPS, such that NPS was, according to Procaps' records, past due by $3,476,089 on a total receivable of over $8 million. *See* PLP-817, 810; H. Tafler, 11/3/06 Tr. at 173-174. Importantly, as discussed above, on no day between May 17 and June 24 did NPS *ever* become current, either under Procaps' records or even under NPS' records, when taking into account payments actually received during that period and the actual dates of deposit of the payments, which were done by agreement of the parties. *See* PLP-810, PLP-809; H. Tafler, 11/3/06 Tr. at 40-45.

Thus, but for some red herrings that will be discussed below, there can be no dispute that, when properly accounting for payments, there is simply *no day* on which NPS

-33-

became current and thus cured the breach during the period between May 17 and June 24. Of course, NPS could cure under Sections 8.02 of the Paintball and 9.02 of the Goggles Agreement either by making payment *or* by providing adequate assurances of payment. However, as the record summarized above also demonstrated, at no point during that period did NPS give Procaps *any* assurances of payment, let alone adequate ones. [24] As discussed above, to the contrary of providing assurances, by the time June 24 was reached, NPS had done several things that gave Procaps great concern, including, but not limited to the following:

- refusing to work out a viable payment plan after months of follow up by Procaps;

- allegedly sending a large payment by registered mail, the first time such method was ever used, instead of by overnight mail or wire as previously;

- refusing to stop payment on the checks and wire money unless some non-standard language about "applicable bank waiting period" was used in the request;

- repeatedly promising but then failing to provide *any* information about NPS' financial condition and/or financing;

- NPS' CEO asking for 90-day terms in a conversation where he was asked to affirm that he would keep to the contractual 45-day terms;

- in the only limited conversation about NPS' finances between the CFO's, implying that NPS *could not* pay the amounts past due; and,

---

[24] As will be discussed below in Section III.C, the use of the legal concept "adequate assurances of performance" in this context in the agreements is odd, and not in keeping with its proper legal use. That being said, under the UCC, "Assurances are adequate where they 'would instill in a merchant a sense of reliance that the promised performance will be forthcoming when due.'" *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp.2d 324, 330 (D.N.J. 2002) (*quoting* N.J.S.A. 12A:2-609, comment 1).

- not sending the regular weekly checks on June 23 and providing absolutely no explanation for that failure, despite repeated requests.

For all these reasons, and more, NPS not only did not provide Procaps with adequate assurances of payment by June 24, but rather provided Procaps with extensive grounds for insecurity and concern. Accordingly, Procaps' termination of both agreements on June 24 was entirely proper, under Section 8.03 of the Paintball Agreement and Section 8.02 of the Goggles Agreement.

### B.  NPS' Arguments as to Why the Termination was not Proper are Without Merit

As discussed above, NPS has advanced at least four arguments as to why Procaps' termination of the agreements was not proper: (1) the parties' course of performance precluded Procaps from requiring NPS to pay within 45-days; (2) Procaps' breach notices were defective, because they failed to specify the amount owed and/or the specific invoices past due; (3) NPS came current on June 16, 2005, such that termination thereafter was improper; and (4) the termination was really a pretext to acquire NPS "on the cheap" or destroy it. As will be discussed below, each one of these arguments is without merit, as a matter of fact and law.

### 1.  Alleged Course of Performance in Excess of 45-Days Does Not Preclude Termination

NPS has contended that, because it was frequently past due on its account with Procaps before May 17, 2005, when the breach notices were sent, Procaps was precluded from holding NPS to the contractual forty-five (45) day requirements. Specifically, NPS has contended that the doctrine of "course of performance" has created a modification of the parties' agreements, such that the forty-five (45) day requirement was no longer applicable. This argument is incorrect as a matter of fact and law.

There can be no dispute that both agreements here require any changes to the terms of the agreements must be in writing. The Paintball Agreement provides in Section 16.02

that: "No modifications to the Agreement are possible without both parties' agreement in writing." NPS-3. The Goggles Agreement similarly provides in Section 13.02 that: "This Agreement . . . cannot be modified, altered, supplemented, terminated or amended except by a writing signed by an authorized representative of both parties." NPS-5. There can be no dispute here that there is no signed writing waiving the forty-five (45) day terms or providing NPS with extended terms. Accordingly, NPS is relying upon the doctrine that, even where, as here, a contract can only be modified or amended in writing, requirements in the contract can nonetheless be waived by course of performance.

The UCC provides: "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." 12A:2-208(3). However, it requires a clear waiver, which is not present here. *See Green Constr. Co. v. First Indemnity of Am. Ins. Co.*, 735 F. Supp. 1254, 1261-63 (D.N.J. 1990) (continuous failure to comply with the contract is not sufficient to establish waiver through course of performance where it is also established that the one party continuously warned the other that these failures were not acceptable and it had to comply with the contract terms, even though the transactions otherwise continued). Here, as has been demonstrated during the hearings and summarized above, even though NPS consistently exceeded the forty-five (45) day terms, Procaps also consistently asked NPS to get current. Thus, there is more than ample evidence to establish that there was no waiver due to course of performance.

Also, even if such waiver existed, under UCC law it can be retracted, which it clearly was done here: "A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view

of a material change of position in reliance on the waiver." N.J.S.A. § 12A:2-209(5). Here, it is undisputed that no later than April 12, 2005, Procaps notified NPS that it was no longer going to tolerate continued payments beyond forty-five (45) days, and that NPS needed to bring its account current and keep it current. Accordingly, even if there had been a waiver of the forty-five (45) day terms due to the parties' course of performance, it was clearly retracted over a month before the notices of breach were sent. Thus, the breach notices were entirely proper for this reason.

### 2. Breach Notices Were Legally Sufficient

NPS has contended that the May 17 breach notices were legally insufficient because they failed to specify the amount owed and/or the specific invoices past due. This argument is another red herring. The contracts are silent on the content of the notice, but UCC and other contract law provides some guidance on this issue. First, the New Jersey UCC provides that:

> A person "notifies" or "gives" notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not the other actually comes to know of it.

N.J.S.A. §12A:1-201(26). The key is "reasonably." This is reaffirmed by the UCC in the context of notices from a buyer to a seller, where the UCC provides that:

> The content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched. . . . The notification which save the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

N.J.S.A. §12A:2-607, comment 4; see also Duall Building Restoration v. 1143 E. Jersey Ave. Assocs., 279 N.J. Super. 346, 356 (App. Div. 1995). Thus, it appears that the extent of the notice required under the UCC is fairly minimal and merely must be reasonably sufficient to advise the

breaching party of the nature of their breach. *Id.*; N.J.S.A. §12A:1-201(26); *see also Ameritech Info. Sys., Inc. v. Bar Code Resources*, 331 F.3d 571, 574 (7th Cir. 2003) (notice which stated: "Please be advised, Ameritech considers BCR to be in default on this agreement due to failure to meet the provisioning schedule" was adequate).

Here, the notices were not bare bones. They did more than simply say, for example, that NPS was in breach of the agreements without specifying why. The notices clearly stated that the breach was due to NPS' failure to adhere to the payment terms in the agreements, provided enough information to enable NPS to determine how to cure the breach and advised NPS that it had thirty (30) days to cure. NPS-7; NPS-8. As explained at the hearings, Procaps could not reasonably have included the exact amount or invoices due on the day of cure, because it did not know what day NPS would choose to cure. H. Tafler, 11/2/06 Tr. at 280-283; H. Tafler, 11/3/06 Tr. at 133; E. Truant, 9/8/06 Tr. at 4-5; R. Italia, 9/7/06 Tr. at 214-215. Furthermore, such detail was unnecessary, as the notice accomplished its legal objective – it advised NPS of a problem in this area that needed to be addressed, which it then began to do, albeit ultimately insufficiently. Specifically, both before and after the notices were received, the parties were in extensive discussions about bringing the past due accounts receivable current, as well as working on reconciling the account.[25] NPS-389; NPS-405; PLP-328; PLP-448; PLP-157; PLP-429; PLP-423; PLP-528. Indeed, there is no doubt that NPS knew the basis of their breach. NPS was fully on notice as to what was required – bringing the account current and

---

[25] However, Mr. Gunn admitted that on no day during this time period did he ask Mr. Tafler or anyone else from Procaps or ICC specifically what Procaps wanted (by way of a precise number or otherwise) to cure the breach. As Mr. Tafler testified, that information could have been provided easily if anyone had asked. H. Tafler, 11/3/06 Tr. at 193-194.

keeping it current – and the only new factor introduced by the breach notices was that they now had a deadline by which to do it.

### 3.  NPS Did Not Become Current on June 16

NPS has contended that it became current on June 16, when it mailed out the $2.6 million in checks.  It bases this argument on two main points that –first, its payment mailed on June 16 should be deemed as received that day and, second, its payment of $2.6 million was sufficient to cure the past due amounts due that day.  Neither of these arguments have merit.

First, NPS argues that the $2.6 million payment should be credited as having been received on June 16, when it was mailed, even though the record is clear that the checks were not received until June 28, 2005, after the termination.  NPS basis its argument on the "mailbox" rule, which says that an action is complete upon mailing.  *See* NPS Pre-Hearing Br. at 11-12. There is no legitimate basis for applying the mailbox rule to this situation, however.  It cannot be disputed that the express language of the agreements do not provide for the method of payment. Instead, in support of its argument that registered mail was required, NPS has referred to Section 16.06 of the Paintball Agreement and 13.06 of the Goggles Agreement, which relate to the method for sending "notices . . . and other communications."  NPS-3; NPS-5.  Even if this provision could be interpreted as applying to payments, the parties' clear course of performance to the contrary would override this provision.  "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  N.J.S.A. §12A:1-205(1).  Here, the parties' clear and undisputed course of performance, which was never retracted, was that payments would be sent by overnight courier or wire.  It is also undisputed that the first and only time that NPS sent a payment by registered mail was on June 16.  Indeed, when NPS consulted with Mr. Molyneux at the last minute on

June 16, he advised them that sending payment by the usual method and/or wire would likely be preferred. Yet NPS unilaterally sent payment by registered mail. Accordingly, the mailbox rule does not apply here and NPS' payment should be deemed received on the day of actual receipt, June 28, 2005.

More importantly, this issue is a red herring, for even if NPS should get credit for having made the $2.6 million on June 16, as discussed above, even NPS' own account reconciliation from June 16 demonstrates that this payment was not sufficient to bring the account current on that day or on any day between June 16 and June 24. *See* discussion *supra* at Section II.D; NPS-9; PLP-809. Quite simply, even giving NPS credit for the $2.6 million payment on June 16 does not mean they were current on June 16 – NPS was still $421,348.70 short even under their own records (more under Procaps' records, *see supra* and PLP-810, PLP-817), and the account continued to remain past due even thereafter.[26]

### 4. The Termination was for Valid Reasons and There is no Substantial Evidence Otherwise

The centerpiece of NPS' case is the argument that Procaps' termination of the agreements was pretextual, and that Procaps' true intention was either to buy NPS "on the cheap" or destroy it. Despite sixteen (16) days of hearings, NPS has adduced no credible evidence of such a plot. It is undisputed, as set forth above, that ICC and Procaps were interested in potentially acquiring NPS, as there would be many synergies inherent in such

---

[26] Notably, even if NPS did become current on June 16, termination on June 24 would still have been proper, because, as NPS' own records and submissions at the hearings demonstrate, under their analysis and arguments, NPS came current on June 16, but did not remain current, as required by the notice. By June 24, even NPS admits that its account was again past due at least $663,892. PLP-817; NPS-837; S. Scherf, 9/29/06 Tr. at 193-194. The evidence was clear at the hearing: Procaps was not trying to get NPS current on one day and then allow them to lapse into past due status again. That was neither the purpose nor the intent of the default notices, nor was that commercially reasonable. NPS needed to come current and stay current. It did neither, and thus termination was proper.

transaction, it would further one of ICC's long-term objectives to grow the business and it would be an easy fix for Procaps' customer concentration issues. It is also undisputed that ICC was, naturally, interested in purchasing NPS at a good price and not paying more than was necessary. But these facts alone, which are all the evidence NPS has of this supposed plot, do not demonstrate that the termination was for anything other than valid reasons.

Furthermore, the concept that Procaps (or ICC) would want to destroy NPS is illogical and contrary to the extensive evidence adduced at the hearings that Procaps has suffered greatly since terminating NPS, that Procaps terminated NPS only after extensive attempts to continue the relationship – even after termination – and that Procaps engaged in no real planning for a world without NPS. If Procaps were truly trying to destroy NPS and continue without it, it certainly would have done a much better job than it did of preparing for life afterwards.

Indeed, Mr. Molyneux explained that the very idea that Procaps would want to take actions immediately after the closing that would jeopardize NPS and the NPS/Procaps relationship is ludicrous. R. Molyneux, 3/24/06 Tr. at 140-141. As Mr. Molyneux explained and NPS knew, Procaps' new bank financing depended upon the existence of this agreement and the termination of the contract alone (putting aside the resulting financial devastation to the business) jeopardized the financing. In addition to significant financial impacts to Procaps (and ICC and its investors), the termination has put Procaps in a position where its bank can call the loan at any time, at the bank's discretion, which could endanger not only the financial health, but also the very existence, of the company. R. Molyneux, 9/24/06 Tr. at 140-41; R. Molyneux, 9/5/06 Tr. at 131-135; H. Tafler, 11/3/06 Tr. at 22-24. The concept that sophisticated business people such as those at ICC and Procaps would intentionally put themselves in this position is incredible, and NPS has adduced no evidence of this.

In addition, despite the attempts to portray NPS as unsophisticated in the ways of business, and thus easily intimidated by ICC and Procaps, the facts adduced at the hearings demonstrated the contrary. While NPS may have started from humble beginnings in the late 1980's, by late 2004, early 2005 it had grown into a sophisticated, world-wide multi-faceted company, with top flight advisors such as PNC and PriceWaterhouse Coopers and experienced employees such as Gino and Johnny Postorivo, Mr. Gunn and many others. Further, it was actively exploring various and complex transactions of its own, including with Blue Arc and PMI, the later being one of the largest players in the paintball market and NPS' (and Procaps') arch competitor.

Indeed, contrary to NPS' pretext theory, the evidence is extensive that Procaps terminated NPS for entirely proper and valid reasons. As explained in detail above, by March of 2005 both market conditions and conditions specific to both NPS and Procaps had changed. After a decade of double-digit growth, the United States market had slowed. While things were reported to be better in Europe, from Procaps' perspective, NPS was experiencing severe difficulties in Europe (although the evidence has demonstrated that these apparent difficulties may have been somewhat artificial since NPS was buying from Hovid instead of Procaps), its past due balances were aging while its overall purchases were not growing and it was beginning to make numerous other investments that required cash. Given all this, and Procaps' own position where it now was highly leveraged and needed to keep its accounts receivable more current and healthy to support the financing, as well as just out of good business practices, Procaps understandably was no longer willing to be lax with NPS and had to draw a firm line, which it did.

### C. Procaps Also Could be Considered to Have Terminated the Agreements on June 24 Under UCC Law for Failure to Provide Adequate Assurances of Performance

Separate and apart from any "adequate assurances" that NPS could have given to cure the breach of the agreements in this matter under the applicable contract provisions, Procaps demanded and did not receive adequate assurances of performance under UCC law in general. As alluded to above, under the UCC concept of adequate assurances, the demand for assurances is made *before* not *after* a breach has occurred.  In other words, unlike in the parties' agreements where the concept is that assurances can be given *after* the breach, under UCC law, if "reasonable grounds for insecurity arise," about a party's performance, the other party can ask for "adequate assurances" of that performance and, if such assurances are not received within thirty (30) days from such demand, can treat the contract as repudiated.  *See* N.J.S.A. §12A:2-609.  Furthermore, during the thirty (30) day period, the party demanding assurances is entitled to suspend its performance.  *Id.*

As the New Jersey UCC states:

A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.  *When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance* and until he receives such assurance may if commercially reasonable suspend any performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has that already receive the agreed return.

*After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.*

*Id.* (emphasis added).  Furthermore, what gives rise to reasonable grounds for insecurity has been explained as follows:

A party need not wait for an actual material breach to demand
assurances; it need only show that it reasonably believed that such
an event might be in the offing. *"Any facts which should indicate
to a reasonable merchant that the promised performance might not
be forthcoming when due should be considered reasonable
grounds for insecurity."*

*Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp.2d 324, 330 (D.N.J. 2002) (ultimately

*quoting* N.J.S.A. 12A:2-609, comment 1, other citations omitted) (emphasis added).  Similarly,

commercial standards govern the test for adequate assurances: "Assurances are adequate where

they 'would instill in a merchant a sense of reliance that the promised performance will be

forthcoming when due.'"  *Id.*  (*quoting* N.J.S.A. 12A:2-609, comment 1).

Here, as discussed above, the Procaps team had numerous reasons for their

concerns, at various points, about NPS' ability to pay the Procaps' bills going forward, especially

within the forty-five (45) day contract terms.  This included not only changing market conditions

but also new information that they were learning about NPS, such as NPS' other investments.

Accordingly, orally on April 12 and on numerous occasions thereafter both orally and in writing,

Procaps requested that NPS provide a specific payment plan to bring the account current and

keep it current, as well as provide information about NPS' financial condition and new financing.

Indeed, NPS' lack of responsiveness in working out a payment plan and failure to provide

financial information once requested gave Procaps' further cause for concern.

Procaps' concern is corroborated by NPS' financial condition as assessed at the

closest time period to when performance was to have occurred.  As Procaps' expert, Dr. Roy

Epstein explained, looking at NPS' cash position and borrowings would have raised significant

concerns to a reasonable business person about NPS' prospective ability to bring the Procaps'

account current and keep it current.  The NPS limited cash on hand, the near violation of bank

covenants related to the line of credit, and the looming increase in new overdue amounts all

pointed to heightened risk that NPS would be unlikely to have sufficient liquidity satisfy the obligations due to Procaps in a timely manner. Dr. Epstein further testified that the trends in the paintball industry by June 30 revealed deteriorating business generally, and with NPS in particular. PLP-453; PLP-454; PLP-814; R. Epstein, 11/2/06 Tr. 23-29. This risk is also evident in the analysis by NPS' expert, Stephen Scherf, once the undisputed errors in his ratio analysis are corrected. PLP-808; R. Epstein, 11/2/06 Tr. at 28-49.

In any event, it is undisputed that NPS provided Procaps with *no* assurances of future performance, let alone adequate ones. At no time did NPS provide Procaps with a payment plan showing that they would become current on any day in 2005. H. Tafler, 11/2/06 Tr. at 278. Furthermore, at no time did NPS provide Procaps with any information about their financial condition or their new financing, nor did the promised calls or meetings with NPS' bankers ever occur. H. Tafler, 11/3/06 Tr. at 7-8, 57; N. Gunn, 9/26/06 Tr. at 145-146. To the contrary, as discussed above, on June 14, the one occasion when Mr. Tafler discussed NPS' financial situation briefly with Mr. Gunn, he was left with the distinct impression that NPS was having financial difficulties. PLP-187; H. Tafler, 11/3/06 Tr. at 5-13.

NPS' likely sole defense to this argument will be that it was not properly asked for adequate assurances, as, *inter alia*, the May 17 breach notices did not explicitly mention it. Thus, NPS will likely argue, failure to provide adequate assurances could not have been a basis for termination on June 24. As a matter of law, however, NPS is incorrect. As explained in the *Koch* case, demands for adequate assurances under UCC law need not be very formal and what constitutes a sufficient demand for assurances depends upon the circumstances of a particular case. *Koch*, 205 F. Supp.2d at 332 (citations omitted). Indeed, the *Koch* case cites with approval a line of case in which "[u]nder certain circumstances, a demand for payment of earlier accounts

-45-

due may be construed as a demand for adequate assurances under the Code." *Id.* (*citing with approval Smyers v. Quartz Works Corp.*, 880 F. Supp. 1425, 1433 (D. Kan. 1995)). As the *Smyers* court observed, courts "construe the writing requirement liberally." *Smyers*, 880 F. Supp. at 1433.

Under the circumstances here, it is more than appropriate to view the May 17 breach notices as encompassing a demand for adequate assurances. NPS was clearly on notice from the April 12 meeting and the various conversations and emails subsequent to that that it needed not only to bring the account current, but also to provide Procaps with the necessary information to assure it that NPS could and would keep the account current. There are various forms those assurances could have taken (*e.g.*, providing a payment plan and financial information, etc.), but it is undisputed that, by June 24, NPS had done *none* of it and, instead, by its actions, like in cases such as *Smyers*, had given Procaps even more cause for concern. Accordingly, Procaps was entirely within its rights to terminate NPS on June 24 for failure to provide adequate assurances of future performance, as well as for not bringing the account current by that date.

### D.  Procaps is Entitled to Collect its Outstanding Receivable, Plus Interest

There is no dispute that NPS owes Procaps in the vicinity of $5 million for product purchased and received, but for which it never paid. According to Procaps records, the amount is $5,016,386. PLP-817; H. Tafler, 11/3/06 Tr. at 59. According to NPS records, the amount is $4,910,681. PLP-817; NPS-2232; *see also* S. Scherf 9/29/06 Tr. at 194-96. Accordingly, Procaps respectfully requests entry of judgment in its favor in the amount of $5,016,386 for this receivable.

In addition, Procaps should be entitled to an award of prejudgment interest on this amount since the time of breach. Under New Jersey law, courts have discretion to award

prejudgment interest on contract claims in accordance with equitable principles. *See, e.g.*, *Benevenga v. DiGregorio*, 737 A.2d 696, 700 (N.J. Super. Ct. App. Div. 1999); *see also Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1070 (N.J. 1988) ("It is settled that prejudgment interest may be awarded on contract claims."); *DialAmerica Marketing, Inc. v. Keyspan Energy Corp.*, 865 A.2d 728, 732 (N.J. Super Ct. App. Div. 2005) (prejudgment interest awarded on claim for breach of a services contract).

The equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it is entitled, but which has been retained by another. *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 851 (N.J. 1999) (citation omitted). As the New Jersey Supreme Court explained:

> [P]rejudgment interest has been regarded by our courts as compensatory – to indemnify the plaintiff for the loss of what the monies due him would presumably have earned if payment had not been refused. . . . The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.

*Rova Farms Resort, Inc. v. Investors Ins. Co.*, 323 A.2d 495, 512 (N.J. 1974).

Here, the equities strongly support Procaps' claim for prejudgment interest on the amount of the receivable (and also on its lost profits claim, to be discussed below). With regard to the account receivable, there has been no genuine dispute that the amount is due, but rather NPS has merely refused to pay in the hopes that it will be able to succeed on its wrongful termination claim. In essence, Procaps has advanced NPS a $5 million loan since June, 2005; it is not reasonable to expect that loan to be interest-free. Indeed, every invoice Procaps sent to NPS advised NPS that late payments would be subject to the payment of interest, at a rate of 18%. PLP-790; R. Italia, 9/8/06 Tr. at 24; H. Tafler, 11/2/06 Tr. at 238-239. Procaps also

-47-

reminded NPS of this in its May 17 breach notices.  NPS-7; NPS-8.  Thus, under all these
circumstances an award of prejudgment interest is appropriate.

        In contract actions, "[p]ursuant to New Jersey, the rate at which prejudgment
interest is calculated is within the discretion of the court." *DialAmerica*, 865 A.2d at 733.  In
*DialAmerica*, the court held that the statutory rate for prejudgment interest in tort actions
provides an appropriate beginning benchmark, but that, in appropriate circumstances, a court can
vary from those rates.[27]  *Id.* at 733-34.  Indeed, in *DialAmerica*, one party argued for the use of
the prime rate, but the court chose not to use that rate in that case because the circumstances did
not warrant it.  *Id.* at 730-34.  Among other things, in that case, the plaintiff could not have
expected a profit on its contract and the defendant was legally required to participate in the
agreement in the first place.  *Id.*  Thus, *DialAmerica* is clearly distinguishable from this case.

        In terms of equities, this case is much more similar to *Musto v. Vidas*, 754 A.2d
586, 598 (N.J. Super. Ct. App. Div. 2000), a non-contract action nonetheless cited with approval
in *DialAmerica*.  In *Musto*, the trial court used the prime rate under the conceptual framework of
the "borrowing model" (*i.e.*, the debtor has borrowed the creditor's money during the damages

---

[27] New Jersey Court Rule 4:42-11.  Rule 4:42-11(b) provides that, for tort actions, "prejudgment interest
shall be calculated in the same amount and manner provided for by paragraph (a) of this rule."  Rule 4:42-11(a)
provides:

        (ii) For judgments not exceeding the monetary limit of the Special Civil
Part at the time of entry, regardless of the court in which the action was filed:
commencing January 2, 1986 and for each calendar year thereafter, the annual
rate of interest shall equal the average rate of return, to the nearest whole or one-
half percent, for the corresponding preceding fiscal year terminating on June 30,
of the State of New Jersey Cash Management Fund (State accounts) as reported
by the Division of Investment in the Department of the Treasury.

        (iii) For judgments exceeding the monetary limit of the Special Civil
Part at the time of entry:  in the manner provided for in subparagraph (a)(ii) of
this Rule until September 1, 1996;  thereafter, at the rate provided in
subparagraph (a)(ii) plus 2% per annum.

The New Jersey Cash Management Fund rates would be 1% for 2005, 2% for 2006 and 4% for 2007.

period and therefore the debtor owes the creditor interest on that money). *Id.* at 597-98. Using a

"borrowing model" framework, Procaps' expert, Dr. Epstein determined that the appropriate

interest rate in this case, looking at NPS' borrowing history, was the prime rate *minus* 0.75%.

*See* Epstein July R. at ¶ 5. Using that rate, Procaps is entitled to interest in the amount of

$381,468 on the overdue receivable through September 30, 2006.[28] PLP-808 at 17. Interest

should continue to accrue until the date Procaps actually receives the amount owed, and Procaps

reserves its right to supplement its interest figure to the extent interest is awarded.

### E. Procaps is Entitled to Lost Profit Damages, with Interest

#### 1. Entitlement to and Calculation of Lost Profit Damages

Procaps is entitled to recover lost profits under the UCC, which provides that:

(1) Subject to subsection (2) and to the provisions of this Chapter
with respect to proof of market price (12A:2-723), the measure of
damages for non-acceptance or repudiation by the buyer is the
difference between the market price at the time and place for
tender and the unpaid contract price together with any incidental
damages provided in this Chapter (12A:2-710), but less expenses
saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is
inadequate to put the seller in as good a position as performance
would have done then *the measure of damages is the profit
(including reasonable overhead) which the seller would have made
from full performance by the buyer, together with any incidental
damages provided in this Chapter (12A:2-710), due allowance for
costs reasonably incurred and due credit for payments or proceeds
of resale.*

---

[28] Using the 18% invoice rate, Procaps would be entitled to interest in the amount of $1,071,262. PLP-808
at 18.

N.J. S.A. 12A:2-708 (emphasis added). Here, subsection (2) applies, because, among other things, there is no set contract price,[29] such that the formula for damages in subsection (1) would be inadequate. In addition, the damages formula in subsection (1) is also inadequate for other reasons, such as to the extent that there was no market for certain of its products, it could not make mitigating sales.

Lost profit damages equal lost revenue less the expenses associated with generating the lost revenue. PLP-453; R. Epstein, 11/2/06 Tr. at 67-84. In calculating Procaps' lost profits, Dr. Epstein considered each product category separately: (1) Diablo/NPS branded paintballs; (2) whitebox paintballs; (3) DraXxus paintballs; and (4) goggles and masks. He then conducted his analysis in four steps. PLP-453.

First, Dr. Epstein calculated the revenue that Procaps lost for each of the aforementioned products from the date of the termination of the Agreements (*i.e.*, June 24, 2005) until the end of 2005. The lost revenue for the NPS branded paintballs (*i.e.*, Diablo, 32 Degrees, and Empire) totaled $3,170,422. Epstein July R. at ¶ 33. The lost sales of DraXxus paintballs from the date of termination through the end of 2005 amounted to $2,516,224 in lost revenue. *Id.* at ¶ 41. Notably, Dr. Epstein did not assess damages for lost sales of whitebox, because the pre-termination sales of whitebox exceeded the contract minimums under paragraph 3.10 of the Paintball Agreement. *Id.* at ¶ 35. Finally, the lost revenue associated with goggles and masks for the time in question totaled $731,630. *Id.* at ¶ 45.

---

[29] Pursuant to Section 5 of the Paintball Agreement and Section 4 of the Goggles Agreement, although certain prices were provided for in the agreements as a starting place, those prices could be renegotiated between the parties as needed, depending upon, *inter alia*, market conditions.

Second, Dr. Epstein assessed the future lost profits for the paintball products from 2006 until the Paintball Agreement expired by its terms in September 20, 2011.[30]  With regard to the NPS branded paintballs, Dr. Epstein applied several conservative assumptions: (a) the future sales would remain at the minimum required by the Paintball Agreement (*i.e.*, 500 million balls per year through 2011) and (b) the average price for the NPS branded paintballs would remain at $11.58 per thousand – the same price they sold for in 2005. *Id.* at ¶ 34.  As a result, Dr. Epstein concluded that the future lost sales for NPS branded paintballs under the contract minimums would be $5,790,000 per year. *Id.*

Likewise, Dr. Epstein applied the same conservative assumptions to the calculation of lost profits for whitebox paintballs (*i.e.*, RecSport, Competitive Edge and Blitz). His report noted that lost profits for whitebox were based on the assumption that future sales would remain at the Paintball Agreement minimum of 300 million balls per year and that the 2005 average price for such balls – $9.41/thousand balls – would apply to all succeeding years until the terms of the Paintball Agreement expired. *Id.* at ¶ 36.  Applying the average price for whiteballs to the contract minimums from 2006 through 2011 equals annual lost revenue in the amount of $2,823,000. *Id.*[31]

Procaps is only seeking limited damages for its future lost profits associated with its DraXxus brand of paintball.  Dr. Epstein concluded that Procaps is only entitled to lost profits

---

[30] Dr. Epstein did not assess lost profit damages for goggles or mask products after 2005.  Accordingly, Procaps is *not* seeking lost profit damages from 2006 through the expiration of the Goggles Agreement in 2009.  *See* Epstein July R. at ¶ 46.

[31] Dr. Epstein explained why mitigation does not apply to the lost branded NPS and whitebox sales. Procaps is no longer able to sell branded NPS paintballs.  Next, the contractual minimum for whitebox is lost business because those sales would be in addition to whitebox sales Procaps is able to make irrespective of the Paintball Agreement.  Moreover, Dr. Epstein testified that the declining trend of DraXxus actual sales post-termination refutes the conjecture of a DraXxus increase as mitigating the loss of the branded NPS product.  PLP-454; PL-814; R. Epstein, 11/2/06 Tr. at 67-86.

for lost revenue in 2005, discussed above, and 2006. *See id.* at ¶ 42. In his Supplemental Report, Dr. Epstein calculated that figure for 2006 as $835,924. PLP-814; Epstein Oct. R. at ¶ 4.

Third, in accordance with the lost profits formula – lost revenue *minus* expenses – Dr. Epstein focused next on determining the profit that Procaps could expect to generate on the revenues that he had calculated. To that end, Dr. Epstein assessed Procaps' expenses associated with producing paintballs, goggles and masks and concluded that Procaps' rate of profit on its paintball revenue was 32.17%, while its profit rate for goggles and masks was 37.76%. Epstein July R. ¶ 49. Dr. Epstein then multiplied the lost profits figures for the paintballs, goggles and masks by their respective rate of profit, yielding the total lost profits owed to Procaps. *See id.*

Finally, in calculating each of the lost profit figures noted above, Dr. Epstein discounted the future lost revenue to the present value. He applied a discount rate of 15%, which represented Procaps' weighted average cost of capital ("WACC"), which he explained was an appropriate rate. *See* Epstein July R. at ¶ 37; PLP-808; R. Epstein, 11/2/06 Tr. at 78-84.

In addition, Dr. Epstein also determined that, since the termination of the agreements, Procaps has incurred expenses associated with starting a distribution network to replace the NPS network that Procaps previously utilized. Epstein July R. ¶ 50. Dr. Epstein calculated the present value of these damages as $276,620 and included it as part of Procaps' total lost profit damages. *Id.* at ¶¶ 51-52.

Applying the above factors, Procaps' lost profit damages are conservatively estimated to equal $12,488,758 for the various items discussed, with the addition of $268,931 from the shortfall in 2006 DraXxus paintball sales. *Id.* at 52; PLP-808; PLP-814.

### 2. Procaps is Also Entitled to Prejudgment Interest on its Lost Profits Claims

Under the law discussed in Section III.D, Procaps is also entitled to prejudgment interest on its claim for lost profits. In addition to the equitable factors discussed above, there is no dispute that Procaps was in a position to earn a substantial amount of revenue over the life of the agreements but for NPS' breach. As such, Procaps has been deprived of these earnings and profits. Accordingly, under the case law cited above, an award of prejudgment interest is appropriate. As of September 30, 2006, Dr. Epstein calculated that the interest due on Procaps' lost profits of $12,488,758 (*i.e.,* its lost profits through June 24, 2005), again using an accrued prejudgment interest rate of prime minus 0.75%, is $1,088,999. PLP-814; Epstein October R. at ¶ 6; PLP-808.[32] In addition, given the timing, Dr. Epstein did not believe interest was appropriate on the lost profits damages for the shortfall in 2006 DraXxus sales. *Id.* Accordingly, adding the $12,488,758 in lost profits damages as of June 24, 2005, plus interest of $1,088,999, and $268,931 from shortfall in 2006 DraXxus sales, brings Procaps total lost profits damages claimed to $13,846,688. *Id.*

### 3. The Liquidated Damages Provision in the Paintball Agreement is Unenforceable against Procaps

Section 8.04 of the Paintball Agreement provides for liquidated damages in the event the Agreement is breached by NPS. The provision calls for continued paintball purchases by NPS that decline by 25% over three (3) consecutive six (6) month periods. New Jersey courts, however, have closely scrutinized contract provisions that provide for specific performance and have declined to award "liquidated damages" that do not reasonably

---

[32] Once again, interest should continue to accrue until the date Procaps actually receives the amount owed, and Procaps reserves its right to supplement its interest figure to the extent interest is awarded.

compensate the aggrieved party. *River Road Assocs. v. Chesapeake Display & Packaging Co.*, 104 F. Supp. 2d 418, 425 (D.N.J. 2000); *see also Wasserman's Inc. v. Township of Middletown*, 645 A.2d 100, 109 (N.J. 1994) ("liquidated damages are enforceable only if 'the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach.'") (citation omitted). Accordingly, a two prong test is applied:

> An agreement, made in advance of breach, fixing the damages therefore, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

*Metlife Capital Fin. Corp. v. Washington Ave. Assocs. L.P.*, 732 A.2d. 493, 499 (N.J. 1999).

Here, the liquidated damages clause at issue fails both prongs. Requiring NPS to purchase paintballs from Procaps on a declining basis for only 18 months is in no way a reasonable forecast of "just compensation" for the harm that NPS' breach caused to Procaps, particularly where the breach was a failure to pay Procaps in a timely fashion. Furthermore, as illustrated in Dr. Epstein's reports, the actual damages caused to Procaps by NPS' breach are not difficult to ascertain. Therefore, under current New Jersey law, the liquidated damages provision in the Paintball Agreement should not be enforced against Procaps.[33]

### F. NPS' Damages Claims are Duplicative and Unjustifiably Inflated

Procaps respectfully submits that NPS' claims of wrongful termination are entirely unfounded, and thus it should not be entitled to any damages whatsoever. If the Panel were to rule otherwise, however, Procaps submits that NPS' damages claims are flawed and

---

[33] It might be reasonable, however, to construe this provision as an expression of the parties' intent to limit the scope of the lost profits damages that might be recoverable to the economic equivalent of this provision. With this in mind, Dr. Epstein was asked to and did calculate what the economic equivalent of this provision would be. PLP-814; Epstein Oct R. at ¶¶ 7-8. Dr. Epstein concludes that, utilizing that method, Procaps' damages due to the breach would be lost profits in the amount of $6,590,426.

grossly exaggerated, for the following reasons.[34]  In addition, as a threshold matter, Procaps

moves to exclude the testimony of NPS' damages expert, Glenn Newman, in its entirety for a

number of reasons, as discussed below.

### 1.  Mr. Newman's Testimony Should be Excluded

As developed at the hearing, in the matter, *Capital Funding, VI, LP v. Chase*

*Manhattan Bank USA, N.A.*, Civ. A. No. 01-6093 (E.D. Pa. Oct. 18, 2004), the United States

District Court for the Eastern District of Pennsylvania excluded Mr. Newman's testimony on

grounds equally applicable to the situation here:

> As the Third Circuit makes clear, "if the flaw (in methodology) is
> large enough that the expert lacks the 'good grounds' for his or her
> conclusions," the court must act as a gatekeeper and preclude the
> evidence. *The flaws in Mr. Newman's methodology are*
> *significant, and his proposed testimony is not well-grounded.  He*
> *made no effort to independently verify the accuracy of the data*
> *underlying his opinions.  They are based on the unjustified*
> *assumptions and unreliable information provided to Mr. Newman*
> *by Mr. Carabello, who has a significant financial interest in this*
> *litigation.  See JMJ Enters. v. Via Veneto Italian Ice, Inc.*, Civ.A.
> No. 97-CV-0652, 1998 WL 176888, at *7-*9 (E.D. Pa. April 15,
> 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999) (noting that an expert's
> reliance on his client's tax return and his failure to perform an
> independent analysis is a methodological flaw).  Accordingly, his
> testimony is not admissible.

*Id.* (PLP-785) at 14 (emphasis added).[35]  Similarly, here, Mr. Newman "made no effort to

independently verify the accuracy of the data underlying his opinions" in a number of ways, as

shown on cross-examination.  G. Newman 9/25/06 Tr. at 334-337, 339.  For example, he

---

[34] In this brief, Procaps submits its arguments responding to the arguments it best anticipates NPS will make on its claims both for liability and damages; however, NPS has other liability and damages claims that have been alluded to from time to time but Procaps is uncertain whether NPS is continuing to pursue them.  Accordingly, Procaps reserves its right to respond to any such arguments in its reply brief.

[35] This decision was affirmed by the Third Circuit, although not specifically with regard to the exclusion of Mr. Newman's testimony.  *Capital Funding, VI, LP v. Chase Manhattan Bank NA*, No. 04-4355, 191 Fed. Appx. 92 (3d. Cir. July 11, 2006).

adopted, without testing, NPS' assumption that its sales would suffer a 40% decline out through

2011. He also assumed, again without independent analysis, that sales of paintball products

other than goggles would be adversely affected by an inability to sell certain brands of paintballs.

In addition, he assumed, at NPS' request, (even in the face of evidence in his own report to the

contrary) that market prices of paintballs would be significantly higher than any price NPS ever

paid – *i.e.*, at the retail not the wholesale level. These are only some of the many examples

which pervade Mr. Newman's analysis. Accordingly, like in the *Capital Funding* case,

Mr. Neman's testimony is fatally flawed and should be excluded.

### 2. NPS' Claims Three Categories of Damages, Which are Duplicative

It appears that NPS is claiming three categories of damages, parts of which are

duplicative: (1) lost profits; (2) cover/market; and (3) Section 8.05 damages.

First, with respect to lost profits and market damages, it would be duplicative, at

least in this case, to allow NPS to recover such damages. The goal of the UCC is to put the

plaintiff in the financial position that would have resulted absent any breach, not to confer a

windfall. In the current case, permitting market damages and lost profits damages, as calculated

by Mr. Newman would provide for double recovery which is contrary to the intent of the statute.

*See M.K. Metals, Inc. v. Container Recovery Corp.*, 645 F.2d 583, 591 n. 4 (8th Cir. 1981).

Mr. Newman has used the contract price between Procaps and NPS to calculate lost profits. In

doing so, he has effectively included the market damages calculation within his lost profits

model, resulting in double counting of damages. In *M.K. Metals,* the plaintiff's expert

constructed his lost profits model in the exact same fashion, and the Eighth Circuit refused to

permit recovery of both market and lost profit damages. The Eight Circuit stated:

> While it may be preferable to treat the difference between contract
> and market price as a separate item of damages, appellant's
> evidence lumped that amount into its calculations of "lost profits."

> The district court was understandably worried that to allow
> damages on both of appellant's theories [market and lost profits]
> would amount to double recovery.

*Id.* at 590-91.[36] Thus, here, as in *M.K. Metals,* duplicate recovery of lost profits and market

damages should not be allowed.

Second, NPS' damages claim under Section 8.05 is duplicative of *both* its lost

profits claim and its market/cover claims.  Like Section 8.04 for Procaps, Section 8.05 is a

liquidated damages provision.  If enforceable, it is inherently, by its nature, a substitute for any

other types of damages.  *See* Section III.E.3, *supra.*[37]

### 3.  NPS' Claim for Lost Profits Damages is Greatly Overstated and Unreliable

NPS has claimed damages for lost profits on its sales of paintballs, goggles/masks

and other paintball related products and attributes these estimated loses entirely to Procaps.  In

addition, NPS asserts a claim for "price" or, more precisely, margin erosion.  These claims are

conceptually flawed and empirically unsupportable.

---

[36] The Eighth Circuit cited the following example provided in J. White, R. Summers, Uniform Commercial Code Sec. 10-4, 394-95, n.91 (2d ed. 1980):  "In granting a buyer lost profits because he is unable to resell a product, a court must be careful not to overcompensate him.  Assume for example, that a buyer sues wholesaler for nondelivery of a shipment of fiberglass skiis [sic] under section 2-713.  He might ask for the market contract differential (assume it is $10,000-$8,000) plus consequential damages which are lost resale profits.  If he could resell the shipment of skiis [sic] at $15,000 but he cannot cover, his lost profits will be $7,000 ($15,000-$8,000).  Should a court allow a recovery of $9,000 (the market-contract differential plus lost profits)?  First, 2-715(2)(a) requires cover if it is at all reasonable, and that principle would eliminate lost profits in most cases.  Secondly, in the unusual case where cover is impossible the court should award only $7,000 since that amount will put the wholesaler in the same position he would have been in if the manufacturer had sent the skiis [sic].  If the court gives the buyer the market-contract differential of $2,000 under 2-713, then the 'loss resulting' from the wholesalers inability to resell under 2-715(2)(a) is only $5,000."  *M.K. Metals,* 645 F.2d at 591 n. 4.

[37] Indeed, for a number of reasons, this provision is likely enforceable as to NPS even though section 8.04 is unenforceable as to Procaps.  The analysis of whether a liquidated damages provision is enforceable depends upon the particular provision and the circumstances at issue.  *See* Section III.E.3, *supra.*

### a. NPS' Paintball Lost Profits Claims are Overstated

First, Mr. Newman fails to consider the overall decline in the paintball industry

that has occurred starting at least in 2005.[38] *See* Epstein August R. at ¶ 9.  Specifically,

Mr. Newman fails to account for the paintball industry-wide slowdown in estimating its lost

paintball sales over the life of the Paintball Agreement. *Id.*. at ¶ 10.  As illustrated by

Dr. Epstein, it is clearly evident that the paintball industry experienced an overall sales decline

beginning in 2005.  *Id.* at ¶ 9.  That decline continues today.  Mr. Newman, however, fails to

account for the industry softness and, inexplicably, attributes all of its decreased paintball sales

directly and solely to Procaps.  Furthermore, Mr. Newman simply assumed on instructions from

NPS, that NPS' sales will remain fixed at 40% below the pre-termination level for the next five

years, until contract expiration in 2011.  Mr. Newman also provides no support or evidence of

any kind for the arbitrary assumption that NPS, which has grown rapidly throughout its history,

will now have zero success in growing sales for the indefinite future.[39] *Id.*  Accordingly, NPS'

claim for lost profits stemming from paintball sales is necessarily overstated and speculative.

### b. NPS' Claim for Lost Goggle/Mask Profits is Flawed

Mr. Newman's estimated lost profits analysis for sales of goggles/masks has the

same flaw as its paintball sales analysis by ignoring the general industry slowdown in 2005.  *Id.*

at ¶ 20.  These sales would have decreased irrespective of the dispute with Procaps.  *Id.*

---

[38] Mr. Newman asserted that his discount rate takes 2005 business conditions into account, but this is not credible. He testified that he was not competent to determine the discount rate. Accordingly, his discount rate was calculated by Mr. Scherf, but that calculation does not make ANY reference to conditions in the paintball industry. Newman/Scherf July R. at 25. Moreover, the discount rate Mr. Newman used remains at a constant rate for the entire period through 2011, such that there is nothing that reflects conditions specific to 2005-2006.

[39] Indeed, the fallacy of this assumption is underscored by a significant factual development since the close of the hearings. On November 17, 2006, NPS and PMI announced that they were merging. *See* Exhibit B (NPS/PMI press release). It is likely that a merger of NPS with its own and Procaps' arch rival – a major paintball distributor and manufacturer – will significantly enhance their ability to recover and mitigate their damages between now and 2011.

Likewise, Mr. Newman offers no support for his assumption that goggle/mask sales will remain depressed by 40% throughout the remaining term of the agreement. *Id.* at ¶ 21.  Consequently, NPS' claims for lost profits stemming from goggle/mask sales are also unfounded and overestimated.

### c.  NPS' Claim for Lost Profits for Products Other than Paintballs and Goggles/Masks Has no Basis

Among other things, Mr. Newman failed to consider in his analysis that NPS continues to distribute Diablo and other paintballs of all grades. *Id.*  In addition, Dr  Epstein presented evidence that many customers continued to buy other products from NPS even when they purchased no paintballs.  PLP-808; R. Epstein, 11/2/06 Tr. at 64-66.  Moreover, Mr. Newman again failed to consider the overall industry-wide decline that began in 2005 as a factor leading to declining sales of other products.  PLP-454; Epstein Aug. R. at ¶ 23. Mr. Newman merely asserts without evidence that NPS' customers stopped buying other paintball related products due to its termination of the agreements with Procaps. *Id.* at ¶ 24. Furthermore, Mr. Newman improperly ignores NPS' loss of Tippman, manufacturer of one of the most popular line of markers, as a supplier and whether the loss of this supplier contributes to its overall decreased sales estimates. *Id.* at ¶ 25.  The Tippman marker line accounted for over $12 million in NPS sales.  Mr. Newman's failure to consider the impact of this loss greatly inflates NPS's alleged damages against Procaps. *Id.*

### d.  NPS' Claim for "Price" or Margin Erosion Has No Basis

NPS' claim for "price" or, more properly named, "margin" erosion on its paintball sales is entirely unfounded.  As Dr. Epstein explained, in order to have a margin (profit) erosion claim, either the selling price would have had to decrease materially or the input costs would have to increase materially.  PLP-454; Epstein Aug. R. at ¶¶ 13-19; R. Epstein, 11/2/06 Tr. at 50-

54. There is simply no evidence that either of these two factors took place. *Id.* Instead, as

Dr. Epstein explained, NPS' apparent "margin" erosion claim is really just a function of how the

data was analyzed and presented, namely in average or aggregate form. Mr. Newman combined

all grades of paintballs in an average, thereby failing to consider the effects caused by changing

product mix. *Id.* In fact, as Dr. Epstein explained, the NPS data relied upon by Mr. Newman

showed virtually unchanged selling prices and unchanged paintball acquisition costs. PLP-454;

R. Epstein, 11/2/06 Tr. at 51-67. Dr. Epstein testified that the only sensible interpretation of the

data is a shift in the product mix after termination towards less expensive paintballs, which have

a somewhat lower profit margin per case. *Id.* But there is no effect on the margin of any

particular grade of paintball. *Id.* Accordingly, the price erosion margin claim is entirely

unfounded.

### 4. NPS' Market Damages Claim is Entirely Unfounded

Mr. Newman makes two assumptions in his market damages analysis that are

fundamentally flawed. First, Mr. Newman assumes that the appropriate time to measure market

price is the time of breach. That is incorrect as a matter of New Jersey law. Under the market

theory of damages, the proper measure is the difference between the contract price and the

market price at the time and place of delivery. *See Agabati Bros. v. Catana*, 18 N.J. Super 45,

48, 86 A.2d 592, 593 (1952) ("The measure of damages was the difference between the contract

price . . . And the market value *at the time and place set for delivery*") (emphasis added); *see*

*also Marcus & Co., Inc. v. K.L.G. Baking Co., Inc.*, 122 N.J.L. 202, 211, 3 A.2d 627, 632 (N.J.

1939) (". . . where there is an available market for the goods in question, the measure of

damages, in the absence of special circumstances showing proximate damages of a greater

amount, is the difference between the contract price and the market or current price of the goods

*at the time or times when they ought to have been delivered.*") (emphasis added). Accordingly,

to the extent that Mr. Newman is relying upon prices in the market only on or about June 24, 2005, as opposed to later periods in time, his analysis is incorrect and unsupportable.

Second, as was demonstrated at the hearing even through the testimony NPS' own Chief Operating Officer, Johnny Postorivo, all of the so-called "market prices" that Mr. Newman used were prices for paintball cases on the *retail* market, not on the wholesale market where NPS actually purchased paintballs. J. Postorivo 9/25/06 Tr. at 154-158. As a matter of law, in this case, it is not proper to use retail prices. N.J.S.A. § 12A:2-713, comment 3, provides that the market price is generally properly measured "in the same branch of trade." As such, Mr. Newman's use of the retail market price in his market damages calculation is inappropriate in the current case, as there is insufficient evidence that NPS could not have obtain replacement product at the wholesale market level. The proper inquiry is whether NPS, if it had chosen to cover, would have purchased replacement product from other manufacturers or from retailers. *See Roth Steel Products v. Toledo Steel Tube Co.*, 705, F.2d 134, 157 (6th Cir. 1983) (*citing Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1092 (Ct. Cl. 1975) (use of resale market to measure market price under U.C.C. Sec. 2-713 is inappropriate when no evidence was produced indicating that the plaintiff would have resorted to the resale market to cover)).

Importantly, NPS adduced no evidence that the so-called "market prices" that Mr. Newman used for paintballs or goggles would apply to a customer purchasing at the wholesale level. To the contrary, the August Newman report demonstrated that NPS made cover purchases at virtually unchanged prices for each type of paintball and goggle. NPS-766; NPS-839. Moreover, at least until July 12, Procaps had offered to continue to supply NPS with all of its paintballs and goggle needs at unchanged wholesale prices, provided NPS continued to pay, but NPS did not do so. H. Tafler, 11/3/06 at 155-156. Thus, the only credible evidence in the

record of market price is that NPS *would* have been able to purchase at comparable wholesale prices, as opposed to having to pay retail prices.

### 5.  NPS' Section 8.05 Damages Claim is Overstated

In addition to being duplicative of other damages, NPS' Section 8.05 damages claim is also greatly overstated.  Epstein Aug. R. at ¶¶ 29-33.  Most notably, Mr. Newman ignores mitigation entirely, and assumes that NPS would have purchased all million cases available pursuant to Section 8.05.  This is not credible, when Mr. Newman also reports (annualized) NPS' purchases of approximately 654,000 cases after June 2005.  *Id.* at ¶ 30.  There is no basis for assuming NPS would purchase over 1.6 million cases (an increase of more than 60%) in a declining market.

## IV.    CONCLUSION

For the reasons set forth herein, Procaps respectfully requests that the Panel find in its favor and against NPS on all claims, declare that the Paintball and Goggles Agreements were properly terminated and award Procaps: (1) $5,016,386 for the overdue receivable, plus interest in the amount of $381,468, for a total of $5,397,855; and (2) lost profit damages in the amount of $13,846,688, including interest, for a total damages award of $19,244,543, together with all costs incurred in this arbitration, including arbitrators' fees and all other costs of arbitration.

Respectfully submitted,

Francis P. Devine, III, Esquire
Nicole D. Galli, Esquire
Anthony Destribats, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Respondent and Counterclaim-Claimant, Procaps L.P.

Dated: December 15, 2006