## IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| NATIONAL PAINTBALL SUPPLY, INC.,      ) | |
| ) | |
| Claimant,      ) | AAA No. 50 181 T 00252 05 |
| ) | |
| v.      ) | |
| ) | |
| PROCAPS, L.P. (f/k/a PAINTBALL L.P.),      ) | |
| ) | |
| Respondent.      ) | |
| _____ ) | |

## NATIONAL PAINTBALL SUPPLY, INC.'S POST-HEARING REPLY BRIEF

**DUANE MORRIS LLP**
Patrick J. Loftus, Esquire
Robert E. Kelly, Esquire
Lawrence H. Pockers, Esquire
Michael S. Zullo, Esquire
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 979-1000

*Attorneys for Claimant*
*National Paintball Supply, Inc.*

# I.    *INTRODUCTION*

Procaps, L.P.'s ("Procaps") Post-Hearing Opening Brief ("Procaps' Opening Brief") is merely the latest example of the obfuscation that has characterized the actions of Procaps' and its majority shareholder, Imperial Capital Corporation ("ICC"), throughout this matter.  But in addition to echoing its mispresentations and inconsistent accounts of the facts and circumstances surrounding its obviously pretextual and improper termination of the supply contracts (the "Contracts") with National Paintball Supply, Inc. ("NPS"), Procaps' Opening Brief attempts to further obscure reality by disregarding the legal principles that govern the outcome of this matter.

This Reply Brief details just some of the numerous instances in which Procaps, in its Opening Brief, has mischaracterized the facts and/or ignored the law in an attempt to further portray itself as the "victim" of what the evidence establishes is Procaps' own improper termination of the Contracts. Fortunately, to reach its decision in this case, the Panel actually need do no more than consider the following simple analysis which demonstrates that NPS is entitled to an award in its favor as a matter of law – even were the Panel to accept Procaps' misguided position concerning what NPS' obligations were upon receiving Procaps' May 17th default notices.[1]

According to Procaps, its May 17th default notices obligated NPS to not only cure any overdue balance existing as of the date of the notices but to *further* ensure that NPS' account balance was also current as of the date of NPS' "cure" payment.  Assuming Procaps was correct about the amount owed and the nature and timing of NPS' obligations (which, as discussed below, it is not with respect to any of these issues), NPS was, as of June 16th, required to pay $3,072,779 in order to cure.

Procaps claims that NPS failed to pay the above amount by June 16th and, as a result, "failed to cure" the defaults.  However, Procaps admits that its calculation of NPS' overdue account balance on June 16th did not take into account the fact that Procaps was then in possession of uncashed NPS checks

---

[1]  As was the case in NPS' Opening Brief, all references to dates in this Brief are to dates in 2005 unless otherwise indicated.

totaling \$560,000 (which had been sent via overnight mail the night before) and the fact that NPS had sent additional checks totaling \$2,621,189.19 via registered mail on June 16th.

Procaps has not cited to, nor could it possibly cite to, *any* legal authority to support its contention that only amounts that Procaps had actually *deposited* as of June 16th should be credited as payments by NPS as of that day.  Indeed, New Jersey law – the law the parties agreed would govern any disputes between them – is very clear that Procaps' receipt of the checks totaling \$560,000 on June 16th and NPS' mailing of the checks totaling \$2,621,189.19 on June 16th constituted proper payment by NPS of the combined amount of these checks, \$3,181,189.19, *as of June 16th* at the latest.  Further, at a bare minimum, NPS' payments in this time frame provided Procaps with more than adequate assurances of NPS' performance – which under the applicable default and notice provisions of the Contracts also constituted a "cure."  Thus, even under Procaps' unsupportable interpretation of the nature and timing NPS' obligations upon receiving the May 17th default notices, NPS cured as a matter of law.

A review of the record in this matter clearly establishes that Procaps' contention that it terminated the Contracts because NPS did not pay a sufficient amount is an obvious fiction, invented by Procaps during the course of this litigation to mask the real reason why it terminated the Contracts.  The evidence is undisputed that Procaps did *not* terminate because of any conclusions it had reached regarding whether NPS paid the right amount – indeed, Procaps never once complained prior to this litigation that the amount NPS paid on June 16th was insufficient to cure the alleged defaults.  In fact, only on the last day of the hearings and in its post-hearing briefing has Procaps advanced the theory that the amount NPS paid on June 16th was "insufficient" to cure the default.

This 11th hour "insufficient payment" theory further underscores the fact that  Procaps' defense in this case has been a moving target and demonstrates the lengths to which Procaps has gone in attempting to obscure the issues in the hope of denying NPS the award it deserves.  The following chart illustrates Procaps' ever-changing positions on some of the key issues in this matter and what the evidence presented actually shows:

2

| | PROCAPS' POSITION IN PRE-HEARING BRIEF | PROCAPS' POSITION IN OPENING STATEMENT | PROCAPS' POSITION IN POST-HEARING BRIEF | WHAT THE ACTUAL EVIDENCE SHOWS |
|---|---|---|---|---|
| **ICC'S COMMUNI-CATIONS TO NPS IN PRE-ACQUISITION PERIOD REGARDING NPS' OVERDUE ACCOUNT BALANCE** | No pre-acquisition communications. Procaps asserted that it "began to assess the situation with NPS" only "*after* closing." Procaps' Pre-Hearing Brief at 4. | Procaps' counsel asserted that NPS was aware *prior to ICC's acquisition of Procaps* that, although Procaps had previously permitted NPS to carry an overdue balance, under the "new world order" *this would no longer be the case*. Tr. 3/20 at 63-64. | Procaps now takes the position that Molyneux advised Gino Postorivo prior to the acquisition that Procaps was merely "concerned" about NPS' overdue account balance, *i.e.*, no mention of a "new world order" in which an overdue balance would not be acceptable. Id. at 7. | Not a single document during the pre-acquisition period reflects that ICC or Procaps communicated to NPS any ultimatums or *even the slightest concern* about NPS' overdue balance on its roughly $35 million in purchases per year from Procaps. In fact, the uncontraverted evidence proved that ICC was essentially begging NPS to assign the Contracts. |
| **DATE BY WHICH NPS HAD TO "GET CURRENT" ACCORDING TO PROCAPS** | No reference to *any* communications between the parties regarding a date by which NPS was to bring its overdue account balance current. | Procaps' counsel asserted that the CFOs of NPS and Procaps were instructed to work on a payment plan whereby NPS' account would be brought current "by *around the mid-June time frame*." Tr. 3/20 at 66-68. | Procaps admits to having told NPS that NPS would have until *the end of the summer* within which to bring its account balance current, but Procaps maintains that it accelerated the time frame when it "discovered" in mid-May that NPS had an ownership interest in Blue Arc. Id. at 13. | The documents uniformly demonstrate, and Procaps' own witnesses repeatedly admitted, that what was discussed was a payment plan whereby NPS would bring its account current by the end of the summer, not by "the mid-June time frame." NPS was never advised that Procaps had decided to accelerate this time frame at any time prior to receiving the default notices. |
| **AMOUNT IN "DEFAULT" ON MAY 17TH** | $2,466,151.11. Procaps' Pre-Hearing Brief at 5. | $2,466,151.11 as of May 16th, according to the schedule that Procaps' counsel misrepresented as the analysis prepared by Procaps' expert and reflected in PLP-327. Tr. 3/20 at 68-70. | $3,041,083 according to post-litigation analysis prepared by Tafler (not by Epstein, as Procaps had previously stated). Ex. PLP-817. | $2,197,060, based on the analysis of NPS' expert witness, Steve Scherf, who unlike Procaps' expert, actually performed an invoice-by-invoice analysis as opposed to merely accepting the figures provided by the party on whose behalf he was testifying. Ex. PLP-817. |
| **WHAT CONSTITUTED PROCAPS' "REQUEST FOR ADEQUATE ASSURANCES" UNDER THE UCC** | Tafler's June 4th email to Norm Gunn. Procaps' Pre-Hearing Brief at 11. | Tafler's June 4th email to Norm Gunn. Tr. 3/20 at 87-90. | The May 17th default notices. Id. at 46. | Procaps never made a "request for adequate assurances" that would have come anywhere close to satisfying what is required under the UCC. |

| WHEN TERMINATION OCCURRED | "[B]y *mid-to-late July, 2005*." Procaps' Pre-Hearing Brief at 10. | "In *July at the very latest*." Tr. 3/20 at 87-90. | June 24th, but the termination was purportedly also based on NPS' failure to provide "adequate assurances" in response to Procaps' May 17th default notices. Id. at 46. | The date of termination was June 24th and the sole reason for termination was NPS' purported failure to cure the May 17th default notices. The May 17th default notices said nothing about any request for adequate assurances. |
|---|---|---|---|---|

As illustrated in the chart above, Procaps has sought to avoid the consequences of its improper termination of the Contracts in a manner that, in the kindest terms, can be described only as desperate. In order to do so, Procaps not only had to create a fictional course of events in which it, and not NPS, was the victim but also conjure a parallel universe in which words and legal concepts have vastly different meanings than they have in the world of reality. The following chart details just some of these terms and concepts and the alternative (and absurd) meanings that Procaps attributes to each:

| TERM/ CONCEPT | PROCAPS' DEFINITION |
|---|---|
| Each and every statement in which the principals and agents of Procaps and ICC declare their strategy/desire to terminate the Contracts | No one from Procaps or ICC actually wanted to terminate the Contracts. Even if we said these things dozens of times and even invoked "the Force," we never meant it. |
| "End of the summer" (as used in connection with Procaps' demand that NPS bring all accounts current by the end of summer, 2005) | May 2005 |
| "Evidence" (as used to reference the facts and testimony in evidence in this matter) | This refers only to the self-serving testimony of Procaps' principals/agents on direct testimony. This also applies to the ridiculous denials by the same witnesses on cross-examination and when presented with reams of documents authored by those same persons which contradict their sworn testimony except that any references to said documents shall not be considered "evidence" and all such denials shall be deemed non-ridiculous. |
| "Failure to cure" (as used in the termination notices) | In the event that you actually did cure the only default expressly stated in the default notices, this may also "alternatively" mean that we can terminate based on your failure to answer a "request for adequate assurances" under the Uniform Commercial Code ("UCC") that we never made, or terminate based on anything that we discover after we have already terminated you. |

| "Notice of Default"<br><br>(as used in connection with Procaps' May 17th letters advising without any further detail that NPS was in default for "failure to pay amounts due and owing") | Even though we only stated that you were in default for failure to pay then-existing invoices aged more than 45 days, this applies to all future amounts due in excess of 45 days, in the event of which the Contracts are terminable immediately, at our discretion and without further notice or opportunity to cure. The preceding applies to the date on which you attempt to cure, so be careful when attempting to pay the money we claim to be so desperate to recover.<br><br>By the way, we also want to buy you on the cheap or strong-arm you into accepting a non-exclusive relationship (the proceeds of which would fund a Procaps-owned distribution network whose first order of business will be to steal all your customers and put you out of business) – but this has nothing to do with anything. |
|---|---|
| "Notice Provision"<br><br>(referring to the notice and default provisions of the Contracts) | One of a number of contractual terms that exist only for Procaps' benefit. For example, if Procaps sends notices of default by registered mail it is entirely proper. If NPS utilizes the same mode of transmission in making payments in an effort to cure the same defaults, it is improper and, moreover, suspicious regardless of what the postal receipts say or whether we do in fact receive the checks in envelopes bearing the same U.S. Postal confirmation numbers you provided the night you sent them.<br><br>The non-responsive waffling of one of our principals in response to a direct request to "tell us how you want us to send the money" shall not affect the above. It also doesn't matter if said principal promises to call you back later the same day with a more definitive answer but doesn't call back until it is too late. You have no right to rely on such representations because he is "at a very important dinner" and didn't even know his cell phone was on. |
| "Payment Date"<br><br>(as used in connection with Procaps' recognition of checks sent by NPS) | The date on which we unilaterally decide to credit you for payments regardless of whether we have already received them or whether you have advised us that you have mailed them and provided independent documentation verifying same. |
| "Request for Adequate Assurances under the UCC" | Prior to the filing of our Opening Brief, this means Tafler's June 4th email to Norm Gunn. However, once we realized that we terminated you less than 30 days after June 4th, this means the May 17th default notices. The fact that neither Tafler's email nor the default notices actually contained an actual request for such assurances under the UCC shall not be construed against us. |

Unfortunately for Procaps, neither the evidence presented at the hearings nor New Jersey law

supports Procaps' ever-changing rationalizations. Under New Jersey law:

- when a manufacturer enters into seven-year exclusive distribution contracts with its distributor that cannot be canceled save for exceptional circumstances, the manufacturer cannot invent a pretext to cancel the contracts and then cancel the contracts despite the fact that the distributor cures the bogus default;

- when a manufacturer has always given its distributor extended payment terms beyond those set forth in the parties' contracts, and the manufacturer induces the distributor to consent to the assignment of the contracts based on the promise that nothing will change, the

5

manufacturer is not permitted, immediately after receiving the distributor's consent to the assignment, to re-institute the payment terms the manufacturer has previously waived;

- when a manufacturer promises its distributor that the distributor will be given until the end of the summer to bring its account balance current, the manufacturer is not permitted to default the distributor before the summer even begins;

- a contract provision that gives the distributor 30 days within which to cure or provide adequate assurances of performance is enforceable, and the manufacturer is not permitted to terminate for failure to pay invoices without first having provided the distributor with the benefit of the 30-day "cure" period; and

- the determination of whether a party "cures" a default is *not* subjective, i.e., it is not for the manufacturer to say whether the distributor's checks that have already been sent to and/or received by the manufacturer "count" as payments based on whether the manufacturer has actually *deposited* those checks or based on the vagaries of the international mail system.

Having established that, even in the alternative universe Procaps has conjured, its termination of the Contracts was unlawful, it should come as no surprise that the actual facts and applicable law demand an award in NPS' favor.  In reality, NPS was obligated under the law only to pay the amount past due on the date of the notice, May 17th (as opposed to the date that actual payment was made). Further, under the Contracts, NPS was entitled to a full 30 days to make such payment.  Although Procaps urges the Panel to agree with it that, in order to "cure," NPS was required to pay amounts that were not even overdue on the date of the notices and to do so in less than 30 days, the fact remains that NPS paid an amount far in excess of that which it was required to pay under the law in order to cure any default covered by the May 17th notices and, further, made such payment well within the period provided for in the Contracts.   Therefore, this Panel should enter an award in NPS' favor for an amount in excess of $40 million – and such additional damages that the Panel deems appropriate – along with the costs and attorneys' fees NPS was forced to incur in order to attain the outcome to which NPS was entitled, but for Procaps' improper termination and other violations of the Contracts.

## II.    ARGUMENT

### A.    Procaps Improperly Terminated The Contracts (Counts I and II)

#### 1.    NPS Indisputably Cured The Defaults Even Under Procaps' Erroneous Interpretation Of NPS' Obligations Upon Receiving The Default Notices

In Procaps' ever-changing view of the obligations imposed on NPS by Procaps' May 17th default notices, NPS had 30 days from its receipt of the default notices to cure the defaults *and* NPS had to pay its account balance current as of the date NPS made payment.  As set forth in NPS' Opening Brief at pages 60-64, and as further set forth, <u>infra</u>, Section II.A.2.b., Procaps' view is simply incorrect as a matter of law, even if Procaps were entitled to rely on the 45-day payment terms written in the Contracts.[2]  However, what is most striking about the position Procaps advances in its post-hearing briefing is that even if Procaps were correct in its interpretation of NPS' obligations upon NPS' receipt of the May 17th default notices, NPS would have *still* cured the default as a matter of law.

There is no dispute that on June 16th, NPS sent Procaps checks totaling $2,621,189.19 via registered mail.  Significantly, at no time between June 16th, when John Campo emailed and faxed Procaps' principals two letters advising that NPS had sent Procaps checks totaling $2,621,189.19 via registered mail that day, and June 24th, when Procaps terminated the Contracts, did Procaps *ever* complain that $2,621,189.19 was an insufficient amount, in Procaps' view, to cure the defaults.  Nevertheless, in the post-litigation analysis performed by Procaps' CFO, Howard Tafler, and now in its Opening Brief, Procaps maintains that the checks totaling $2,621,189.19 that NPS sent Procaps via registered mail on June 16th were insufficient to cure the amount past due on June 16th.  P.O.B. at 17.[3]

Procaps states two bases for its assertion that $2,621,189.19 was insufficient to cure the amount past due on June 16th.  First, Procaps asserts that "there is no legitimate basis to apply the mailbox rule"

---

[2]  As set forth, <u>infra</u>, Section II.A.2.a., Procaps waived reliance on the 45-day payment terms in the Contracts through its continuous acceptance of payments from NPS beyond 45 days, and Procaps never retracted its waiver.

[3]  Citations to Procaps' Opening Brief are abbreviated "P.O.B."

to credit NPS as of June 16th, the date the checks were mailed, for its payment of $2,621,189.19.  P.O.B. at 39.  Second, Procaps asserts that the $2,621,189.19 was an insufficient amount to bring NPS' account balance current as of June 16th.  P.O.B. at 17-18, 40.  As set forth below, each of these assertions is incorrect as a matter of law, even if Procaps' erroneous interpretation of NPS' obligations upon receipt of the default notices were correct.

The "Mailbox Rule" unquestionably applies to NPS' payment of $2,621,189.19 on June 16th such that NPS must properly be credited with having paid that amount on June 16th.  See Okosa v. Hall, 718 A.2d 1223 (N.J. Sup. Ct. 1998) (discussed in NPS' Opening Brief at pages 68-69, holding that where, as here, a party had mailed payment prior to the deadline by certified mail, the payment was effective on the date it was mailed, even though the payment may not have been received or posted until after the deadline and, as such, the insurance company improperly terminated the insurance policy at issue).  Procaps cites _no_ legal authority in support of its assertion that "[t]here is no legitimate basis for applying the mailbox rule to this situation."  Rather, Procaps contends that the Mailbox Rule does not apply because the express language of the Contracts did not provide for payment by registered mail; the parties' course of performance was for NPS to pay by overnight mail and that course of performance "was never retracted"; and that Molyneux advised NPS that sending payment "by the usual method and/or wire would likely be preferred."  P.O.B. at 39-40.

As to these first two contentions, Procaps chooses to ignore the fact that NPS' payment of $2,621,189.19 on June 16th was _not_ a payment in the regular course of performance but, instead, was a payment made by NPS in specific response to the May 17th default notices _which were sent by Procaps to NPS via registered mail_.  Exs. NPS-9, NPS-10.  As such, the parties' course of performance regarding ordinary payments in the normal course of the parties' relationship simply has no relevance to the circumstances surrounding NPS' payment of $2,621,189.19 on June 16th.  As to the third contention referenced above, Procaps mischaracterizes Molyneux's testimony.  Molyneux did _not_ testify that he advised NPS on June 16th that payment "by the usual method and/or wire would likely be preferred," as

Procaps asserts in its Brief. Rather, Molyneux testified that he merely *asked* Gino Postorivo how NPS normally paid and that Molyneux would need to get back to Gino regarding how NPS' payment of $2,621,189.19 should be sent to Procaps. Tr. 3/24 at 73-75 (Molyneux). By the time that Molyneux got around to calling Gino back, NPS had already mailed out the payments via registered mail to ensure that the payment was made on the 16th. Tr. 3/22 at 97-101 (G. Postorivo), 9/28 at 42-44 (Campo).

At a more fundamental level, Procaps' contention that Procaps was entitled to send NPS the May 17th default notices by registered mail in accordance with the notice provisions in the Contracts, but NPS was *not* permitted to send the checks totaling $2,621,189.19 to Procaps via registered mail in accordance with the same notice provisions in the Contracts, is simply absurd and typical of Procaps' arrogance in believing that each of the key provisions in the Contracts existed for Procaps' benefit only. There is simply no proper legal basis for Procaps' assertion that only Procaps, but not NPS, was entitled to invoke the notice provisions of the Contracts.[4] In any event, as the New Jersey Superior Court's opinion in Okosa makes clear, where, as here, the default notices were sent via registered mail, it is "universally held" that the party who has been defaulted was entitled to have sent its payment via registered mail, and that the payment is deemed effective on the date the payment was mailed. Okosa, 718 A.2d at 1223.

Apparently sensing that the absence of any legal authority dooms its argument that the Mailbox Rule somehow does not apply to "this situation," Procaps next argues that the $2,621,189.19 is actually a "red herring" because even if NPS were given credit for its payment of $2,621,189.19 on June 16th, this was an insufficient amount to bring NPS' account balance current as of June 16th. P.O.B. at 17-18, 40. According to Procaps, the amount that was actually overdue on June 16th was $3,042,537.89. P.O.B. at 17.

---

[4] Indeed, had NPS overnighted or wired the payment of $2,621,189.19 to Procaps on the 16th, there is little doubt (given Procaps' stated goal of terminating the Contracts) that Procaps would now be arguing that NPS failed to adhere to the notice provisions in the Contracts by not sending its payment via registered mail!

In the first instance, Procaps should not now be heard to make this argument when Procaps never once complained at any time prior to this litigation that NPS' payment on June 16th was insufficient to cure the default. Tr. 9/5 at 155-157 (Molyneux); Tr. 9/5 at 272-273 (Truant). Quite frankly, in light of the testimony of Procaps' own principals and the other evidence adduced during the hearings, this defense is almost laughable. The undisputed evidence establishes that on June 15th, Norm Gunn emailed Tafler a spreadsheet created by NPS reflecting what NPS believed it had to pay to bring its account balance current. Ex. NPS-55. On June 16th, Campo sent the checks totaling $2,621,189.19 by registered mail and also emailed and faxed the letters to Procaps containing NPS' reconciliation showing how NPS arrived at that $2,621,189.19 as the amount which NPS believed it had to pay to bring its account balance current through June 17th. Exs. NPS-9, NPS-10. Then, on June 17th, Gunn faxed Tafler the same reconciliation included with Campo's letters, which Tafler acknowledged receiving. Ex. NPS-2208. At none of these junctures did Procaps *ever* complain to NPS that the amount NPS had intended to pay and then actually paid was insufficient. In fact, the Panel will recall Molyneux's concession, in response to a question posed by Mr. Wilkinson, that the amount of NPS' payment was sufficient to cure. Tr. 3/24 at 105 (Molyneux). Truant likewise conceded that the checks totaling $2,621,189.19 "would have cured" if, according to Truant's uninformed testimony in light of the Mailbox Rule, those checks had been received by Procaps on June 16th. Tr. 9/6 at 275 (Truant). Under these circumstances, Procaps' post-litigation about-face regarding whether NPS' payment of $2,621,189.19 on June 16th was sufficient to cure the default should be ignored.

In any event, Procaps' post-litigation rationalization that the $2,621,189.19 paid by NPS on June 16th was an insufficient amount to bring NPS' account balance current as of June 16th is incorrect as a matter of law. The basis for Procaps' assertion is Procaps' contention that NPS was not entitled to credit for checks totaling $560,000 that NPS sent by overnight mail to Procaps on June 15th and which Procaps received *on June 16th*, but had yet to deposit. P.O.B. at 17-18. Stated otherwise, Procaps implicitly

admits that if this $560,000 were counted against NPS' overdue account balance as of June 16th, NPS would have *more than paid* the overdue amount according to Procaps' own post-litigation analysis.

Procaps' stated reason for not crediting NPS for its payment of this $560,000 is the parties' agreement that checks sent at the beginning of the week would be deposited on successive business days instead of on the day the checks were received. P.O.B. at 17-18. In other words, Procaps is now pointing to the agreed-upon modification of the payment term to justify a termination under that same payment term. Procaps' circular reasoning must be rejected. Moreover, the parties' agreement regarding when checks sent by NPS to Procaps would be *deposited* by Procaps has no bearing on the issue of whether NPS had "paid" the $560,000 as of the date the checks in that amount were sent by NPS and/or received by Procaps. As the New Jersey Superior Court's holding in Okosa makes clear, "payment" is *not* synonymous with "deposit." Okosa, 718 A.2d at 1224. As such, Procaps' contention that NPS had somehow not "paid" the $560,000 when Procaps actually had checks in that amount in hand is simply without merit. Moreover, if Procaps were really attaching any significance to the distinction between when payments by NPS were made and when Procaps deposited those payments, Procaps could have simply requested NPS' permission to deposit the $560,000 in checks on June 16th. That Procaps never made such a request is further evidence that Procaps' "theory" that NPS had not paid an amount sufficient to cure its overdue balance as of June 16th is just another in a long line of after-the-fact justifications Procaps has advanced throughout the course of this litigation in the hopes of avoiding responsibility for its pretextual and improper termination of the Contracts.

### 2. *Procaps' Termination Of The Contracts Was Also Improper Under The Correct Interpretation Of The Parties' Rights And Obligations Under New Jersey Law*

In reality, and as set forth at pages 56-60 of NPS' Opening Brief, New Jersey law is clear that, based on the parties' course of performance, Procaps waived the 45-day payment terms in the Contracts and, therefore, could not have properly defaulted NPS on May 17th on the basis of NPS' failure to pay Procaps for invoices that were more than 45 days past due. Accordingly, Procaps improperly terminated

the Contracts based on NPS' purported "failure to cure" the May 17th default notices because NPS could not have been in "default" on May 17th given the parties' course of performance.  Moreover, even if Procaps were entitled to rely on the 45-day payment terms in the Contracts, NPS' sole obligation under the plain language of the Contracts and under New Jersey law was to pay the invoices that were aged more than 45 days *as of May 17th*.  NPS unquestionably made payments to Procaps between May 17th and June 10th -- *prior to even sending* its payment of $2,621,189.19 to Procaps via registered mail – in excess of the amount of the invoices that were aged more than 45 days as of May 17th.

> ### a.    *Procaps Waived The 45-Day Payment Terms In The Contracts And, Therefore, Could Not Have Properly Defaulted NPS On That Basis On May 17th Or Terminated Based On A Purported Failure By NPS To Cure Procaps' Improper Default*

In its Opening Brief, Procaps asserts that it never waived the 45-day payment terms in the Contracts and that, even if it had waived the 45-day payment terms, Procaps retracted its waiver.  P.O.B. at 35-37.  Each of these assertions is incorrect.

With regard to the former assertion, Procaps argues first that because the Contracts contained provisions requiring that any changes to the Contracts be in writing, any changes to the 45-day payment terms provided for in the Contracts would have had to have been in writing.  P.O.B. at 35-36.  Procaps' argument is incorrect under New Jersey law.  Under the New Jersey UCC, a provision in a contract prohibiting waiver except by a signed writing has no effect.  See N.J. Stat. Ann. § 12A:2-209(4); see id., New Jersey Study Comment Four.  Thus, the provisions in the Contracts prohibiting modification except by written agreement, see Exs. NPS-3 at ¶ 16.02, NPS-5 at ¶ 13.02 , would not prevent a waiver by course of performance in this case.  See Cassidy, 944 F.2d at 1147, n.11 (contractual provision prohibiting waiver except by written agreement did not prevent waiver through course of performance pursuant to UCC § 2-208).

Next, Procaps cites Green Constr. Co. v. First Indemnity of Am. Ins. Co., 735 F. Supp. 1254 (D. N.J. 1990) in support of the proposition that a continuous failure to comply with the terms of a

contract does not establish a waiver through course of performance where one party continuously warned the other party that its failure to comply with the contract terms was unacceptable. According to Procaps, it "consistently asked NPS to get current" and, therefore, there was no waiver. P.O.B. at 36. Procaps' argument is without merit. First, it is simply not true that Procaps "consistently asked NPS to get current." To the contrary, the evidence demonstrates that as of February 25, 2005, when NPS consented to the assignment of the Contracts, ICC specifically acknowledged NPS' good standing under the Contracts, notwithstanding the fact that the overdue receivable at the time exceeded $2 million. Exs. NPS-2219, NPS-2220, PLP-327. Furthermore, the evidence is undisputed that when Procaps first approached NPS in April 2005 regarding the status of NPS' account balance, and continuing into May 2005, Procaps' representatives communicated that NPS would have until *the end of the summer* to bring NPS' account balance current. Tr. 11/3 at 93 (Tafler); Tr. 3/23 at 229-231 (Molyneux); Ex. NPS-47 (Truant May 11th email indicating that Tafler was to follow-up with Gunn to discuss payment plan to bring NPS' account balance current *by the end of the summer*). At no time did Procaps ever advise NPS that its failure to "get current" in April or May 2005 was unacceptable.

Moreover, the <u>Green</u> case is inapposite. <u>Green</u> involved a sub-contractor who agreed to deliver 1,000 tons per week of crushed stone to a contractor. 735 F. Supp. at 1256. When the sub-contractor failed to make any deliveries, the contractor repeatedly warned the sub-contractor that the sub-contractor's non-performance was unacceptable, and the contractor eventually terminated when the sub-contractor failed to perform. 735 F. Supp. at 1257. In rejecting the defendant's argument that the contractor's and sub-contractor's "course of performance" had amounted to a waiver of the delivery terms, the Court found that the defendant, other than an affidavit stating that the sub-contractor and contractor had orally agreed to a change in the contract terms, had produced "no . . . evidence of the parties' course of performance which would even colorably indicate that [the contractor] waived the . . . delivery and quantity provisions of the contract." <u>Id</u>. at 1262. In other words, the Court found that *there was no course of performance* that would have constituted a waiver of the delivery and quantity

13

provisions of the contract. Here, by contrast, the evidence indisputably established a three-year course

of performance, dating from the start of the parties' relationship in 2002, in which NPS made payments,

and Procaps accepted those payments, beyond the 45-day payment terms in the contract in force at the

time. Tr. 11/3 at 81-82 (Tafler).

Whereas the Green case does not provide any support for Procaps' argument based on the

evidence in this case, the Third Circuit's decision in Cassidy Podell Lynch, Inc. v. Snyder General

Corp., 944 F.2d 1131 (3d Cir. 1991), applying New Jersey law, is directly on point. See NPS' Opening

Brief at pp. 56-58 and at n. 25 (discussing facts and holding in Cassidy). Here, as in Cassidy, the

manufacturer's (Procaps') acquiescence in permitting NPS to pay beyond the payment terms set forth in

the contract in effect at the time amounted to a waiver of the payment terms.

Procaps argues, in the alternative, that even had there been a waiver of the 45-day payment

terms, Procaps retracted that waiver when "no later than April 12, 2005, Procaps notified NPS that it

was no longer going to tolerate continued payments beyond forty-five (45) days, and that NPS needed to

bring its account current and keep it current." P.O.B. at 37. Once again, Procaps' argument ignores

both the facts and the law. First, New Jersey law is clear that a party may not retract its waiver where

"the retraction would be unjust in view of a material change of position in reliance on the waiver." N.J.

Stat. Ann. § 12A:2-209(5). Here, it would have been manifestly unjust for Procaps to retract its waiver

of the 45-day payment terms in the Contracts. ICC was well aware prior to the closing that historically

Procaps had extended payment terms beyond 45 days to its largest customers, including NPS. Ex. NPS-

35 at ICC00003791 (E&Y Financial Due Diligence Report, indicating average terms of 78 days for

largest customers); Tr. 3/22 at 226 (Molyneux) (testifying that he understood this report meant that

"Procaps' relationship with National was such that payment terms were extended," beyond 45-days and

"extended even further" during the peak season). Yet, prior to persuading NPS to consent to the

assignment of the Contracts, ICC *never* informed NPS that it would, thereafter, insist on NPS' adherence

to the 45-day payment terms. On the contrary, ICC's representatives told NPS that, following the

assignment, nothing would change  Tr. 3/21 at 64-68 (G. Postorivo).  The consent documents NPS signed confirmed NPS' good standing under the Contracts.  Exs. NPS-2219, NPS-2220.  In reasonable reliance on these representations, NPS "materially altered its position" by consenting to the assignment of the Contracts.  As Gino Postorivo testified, he would not have consented to the assignment had he known that ICC planned to terminate the Contracts a little more than three months after the assignment, based on a failure to abide by the 45-day payment terms written in the Contracts.  Tr. 3/21 at 97.

Second, Procaps conveniently omits the fact that in *all* of the discussions between Procaps' and NPS' principals commencing with the April 12th dinner in Philadelphia and continuing up through the May 17th default notices, Procaps communicated that NPS would have *until the end of the summer* to get NPS' account balance current under any payment plan.  Tr. 3/23 at 230-31 (Molyneux); Tr. 11/3 at 93 (Tafler); Ex. NPS-47 (May 11th email from Truant advising that Tafler was to follow-up with Gunn to work on payment plan for NPS to get current "by the end of the summer"); Tr. 11/3 at 93-94 (Tafler) (admitting he thereafter followed-up with Gunn to discuss payment schedule where NPS would bring its account balance current *by the end of the summer*).  Further, according to *all* witnesses, the April 12th dinner was a "celebration" dinner and there was no evidence adduced that Procaps even advised NPS at that dinner that it "was no longer going to tolerate" payments beyond 45 days.  Accordingly, it is simply not true that Procaps retracted its waiver prior to its issuance of the May 17th default notices.

The very earliest that Procaps could be said to have retracted its waiver was on May 24th, the day that NPS received the default notices.  Tr. 3/21 at 71-73 (G. Postorivo).  Assuming the receipt of those default notices constituted adequate notice that Procaps would no longer honor the parties' course of performance, the Third Circuit's opinion in <u>Cassidy</u> makes clear that the retraction of the waiver could have only applied to *future* invoices, not invoices which had *previously* issued.  <u>Cassidy</u>, 944 F.2d at 1147 ("although Snyder could have retracted its waiver with respect to future shipments, it could *not* demand compliance with respect to past shipments") (emphasis added).  Thus, under New Jersey law, Procaps could have only *properly* insisted on compliance with the 45-day payment terms on *July 8th* –

45 days from May 24th, when any invoices that were issued on May 24th would have become due. Here, Procaps defaulted NPS on *May 17th*, but only based on a payment term that Procaps had waived through its three-year course of performance, and without having previously retracted that waiver.

> **b.** **Even If Procaps Had Not Waived The 45-Day Payment Terms In The Contracts, NPS Unquestionably Cured Under The Correct Interpretation Of Its Obligations Upon Receiving The Default Notices**

Procaps' "insufficient payment" theory rests entirely on the premise that Procaps' May 17th default notices somehow obligated NPS to pay its account balance *current* as of the date that NPS made its "cure" payment. However, this premise is flawed because, as set forth below, the default notices did not advise that NPS was obligated to pay its account balance *current* as of the date that NPS made its "cure" payment, nor could they have based on the plain language of the Contracts and New Jersey law.

Procaps contends that the May 17th default notices "provided enough information to enable NPS to determine how to cure the breach," i.e., that NPS was "fully on notice" that it was obligated to pay its account balance *current* as of the date that NPS made its "cure" payment and thereafter keep the account balance current. P.O.B. at 37-38. Of course, there is no dispute that the default notices simply did not state that NPS was obligated to pay its account balance *current* as of the date that NPS made its "cure" payment and thereafter keep the account balance current (assuming that such a default notice would even be permissible under New Jersey law). Exs. NPS-7, NPS-8. Rather, the default notices merely stated that NPS was in default "for failure to pay amounts due and owing to Procaps within the time period during which such payment is to be made, and for which you have thirty (30) days from the date hereof to cure such default." Id.

Apparently recognizing that its default notices failed to accomplish the purpose that Procaps had allegedly intended, Procaps asserts, citing to the UCC's definition of "notice," that its default notices were adequate because "the extent of the notice required under the UCC is fairly minimal." P.O.B. at 37. However, Procaps has confused two separate and distinct concepts. Section 1-201(26) of the UCC, which Procaps cites, sets forth the requirement of "reasonableness" with regard to the *mode of*

*transmission* of the notice.  In other words, this section merely provides that if the notifying party takes reasonable steps to get the message to the other party, that is enough, regardless of whether the other party actually receives the notification.  The relevant definition for purposes of this case, however, is contained in section 1-201(25) of the UCC, which provides that "a person has 'notice' of a fact when: (a) The person has actual knowledge of it; or (b) The person has received a notice or notification of it; or (c) From all the facts and circumstances known to the person at the time in question the person has reason to know that it exists."  N.J. Stat. Ann. § 12A:1-201(25).  Here, there is simply no indication from the text of the letters that the May 17th default notices were intended to create an obligation for NPS to pay its account balance *current* as of the date that NPS made its "cure" payment and to thereafter keep it current.  Therefore, NPS was not on "notice" that it was expected to pay its account balance current as of the date of its cure payment.

In any event, Procaps *could not have properly* issued default notices declaring a "default" based on NPS' failure to pay *future* overdue invoices.  NPS was not – nor could it be – in "default" on May 17th with respect to invoices that had *yet to become* "due and payable."

According to the post-litigation rationalization performed by Tafler and incorporated in Exhibit PLP-817, and for the moment accepting Procaps' calculation regarding the amount "overdue" just for purposes of this argument, the amount "overdue" and therefore in "default" as of May 17th was $3,041,083.  The Contracts unambiguously provided that Procaps could only terminate if the "default" at issue "continue[d] for a period of thirty (30) days after notice, and NPS, before the expiration of said thirty (30) day period" was "unable to cure" *or* "otherwise fail[ed] to provide [Procaps] with adequate assurances of performance."  Exs. NPS-3 at ¶ 8.03, NPS-5 at ¶ 8.02.  NPS' obligation, therefore, was to, within 30 days from the date NPS *received* the default notices, pay Procaps $3,041,083 *or* provide Procaps with adequate assurances that it could perform under the Contracts – *it plainly did not have to do both*.

17

That NPS had the option to either cure or provide adequate assurances is entirely academic because the evidence demonstrates that between May 17th and June 10th, NPS mailed checks and/or made wire payments to Procaps totaling $3,050,014.35.  Exs. NPS-2233, NPS-2239.  Applying these payments by NPS against the oldest outstanding invoices – the ones that made up the amount in "default" as of May 17th – based on the parties' usual practice, NPS unquestionably cured the defaults noticed on May 17th because, by June 10th, it had paid an amount greater than the amount in default ($3,050,014.35 in payments versus $3,041,083 in default according to Tafler's post-litigation analysis).  The approximately $3.05 million in payments made by NPS between May 17th and June 10th does not even take into account NPS' payment of $700,000 on June 15th *or* its payment of more than $2.6 million on June 16th.

### 3.  None Of The Other Issues Raised By Procaps Have Any Bearing On The Analysis Of Whether The Termination Was Improper

The May 17th default notices were based on NPS' alleged "failure to pay amounts due and owing."  Exs. NPS-7, NPS-8.  The sole basis for Procaps' June 24th termination of the Contracts was NPS' claimed failure to cure the May 17th default notices.  Exs. NPS-13, NPS-14.  Yet, in its Opening Brief, Procaps has focused on two issues that admittedly had nothing whatsoever to do with the actual reason for the termination of the Contracts.  More specifically, the "red herrings" Procaps has focused on in its Opening Brief are:  (1) NPS' alleged failure to provide "adequate assurances" under the UCC, despite the fact that Procaps never made a request for adequate assurances under the UCC; and (2) NPS' purported efforts to establish alternative sources of supply to Procaps.

### a.  Procaps Never Made A Proper Request For Adequate Assurances And, In Any Event, The Termination Was Not Based On A Failure By NPS To Provide Adequate Assurances

After having maintained throughout the course of this arbitration, including throughout the hearings, that a June 4th email from Tafler to Gunn constituted Procaps' earliest demand for "adequate assurances" under the UCC, Procaps has in its Opening Brief changed its story and, instead, Procaps

18

now claims, for the very first time, that the May 17th default notices were actually Procaps' request for adequate assurances under the UCC.  P.O.B. at 46.  As a result, Procaps now asserts, Procaps "also could be considered to have terminated the [Contracts] on June 24 under UCC law for failure to provide adequate assurances of performance."  P.O.B. at 43, Heading "C".

Even if Procaps' new and contradictory position on the request for adequate assurances were entitled to any weight, Procaps' argument would still fail as a matter of law.  First, Procaps acts as if the reason for the termination of the Contracts is some illusory concept that Procaps can help define, after the fact, through the arguments it makes in its briefing.  In reality, Procaps' own June 24th termination notices very plainly stated the actual reason why the Contracts were terminated (not the one invented by Procaps after the fact).  The termination notices provided that the Contracts were being terminated for failure to cure the defaults noticed in Procaps' May 17th default notices.  Exs. NPS-13, NPS-14.  All of Procaps' witnesses conceded this point at the hearings.  The termination notices did not reference any failure to provide "adequate assurances of performance" under the UCC because no request for adequate assurances under the UCC had ever been made (hence Procaps' shifting story).

Moreover, the May 17th default notices – like the June 4th Tafler email which Procaps initially maintained was its request for adequate assurances under the UCC – do not even approach what is required under the UCC in order to properly make a request for adequate assurances.  See NPS' Opening Brief at pp. 72-77.  The May 17th default notices did not refer, cite to or otherwise call attention to the UCC.  Not a single witness on Procaps' side testified that the May 17th default notices were intended to be a request for adequate assurances under the UCC.  Moreover, there was no indication that Procaps was going to suspend performance until NPS responded.  See Cumberland County Improvement Authority v. GSP Recycling Co., Inc., 818 A.2d 431, 440 (N.J. Super. 2003) (holding that New Jersey UCC requires that demand "clearly convey the insecure party's intent to *suspend performance* in the absence of adequate assurances").  Accordingly, even if Procaps *had* intended to terminate on the basis of a failure by NPS to provide adequate assurances (which it did not), the May 17th default notices

would not have come anywhere close to satisfying the requirements of a proper demand for adequate assurances pursuant to section 2-609 of the UCC.

### b.    NPS Was Permitted Under The Paintball Contract To Source Paintballs From Other Manufacturers

Procaps focuses a full seven pages of its Opening Brief on NPS' efforts to establish alternative sources of supply to Procaps. P.O.B. at 24-31. Once again, Procaps has sought to divert the Panel's attention from the actual issues in this case. There is no dispute that NPS was expressly permitted under the Paintball Contract to source paintballs from other suppliers. Ex. NPS-3 at ¶¶ 3.01, 3.02 (providing that Procaps was to be exclusive manufacturer for Diablo and DraXxus paintballs only); Tr. 9/27 at 130-32 (Miller). Moreover, there is no dispute that Gino Postorivo was expressly permitted under the Paintball Contract to own an interest in a paintball manufacturing plant. Ex. NPS-3 at ¶ 15.02; Tr. 3/24 at 46-47 (Molyneux) ("My understanding is [Gino] could own a paint plant"); Tr. 9/27 at 130-131 (Miller); Tr. 9/6 at 243-245 (Truant); Ex. NPS-51 (Miller email acknowledging NPS was permitted to acquire ownership interest in Blue Arc). Accordingly, this section of Procaps' Opening Brief has no relevance to any of the claims in this case, and Procaps' attempt to suggest that NPS was a "bad actor" for exercising the contractual right that it had negotiated is absurd.

However, as with all of the other sections of Procaps' Opening Brief, the section in which Procaps addresses NPS' efforts to establish alternative sources of supply is riddled with factual errors that NPS is compelled to address:

- The suggestion that NPS somehow violated the February 2002 Agreement – which Procaps admits is not even relevant in the first place because Procaps is not seeking redress for these "violations" – by sourcing paintballs and by loaning money to Blue Arc is false. Procaps omits the fact that there was an exception to the contractual provision Procaps cites which permitted NPS to source paintballs for the Non-Conventional Market from other manufacturers should Procaps have been unable to meet demand (which Procaps was). Ex. NPS-1 at ¶¶ 12.02, 3.06(ii). Greg Vance, one of the three individuals who owned the pre-acquisition Procaps entity, admitted that he consented to NPS sourcing paintballs from other manufacturers pursuant to this exception. Dep. Tr. Vance at 97-100.

20

- Procaps cites the Confidential Financing Information Memorandum ("CIM") that NPS and PMI submitted to potential lenders, ex. PLP-384, for the proposition that the document indicated that NPS' plan was to only purchase 600 million paintballs per year from Procaps after the merger, well below the 1.7 billion minimum.  P.O.B. at 28. Procaps has its math wrong.  The CIM indicated that the combined NPS-PMI entity would have production capacity of almost 5 billion paintballs, but that the combined entity expected to sell between 6-7 billion paintballs per year and *the excess would be supplied by Procaps under the existing Paintball Contract*.  Ex. PLP-384.  Accordingly, at a minimum, the CIM indicates an intention to continue purchasing between 1-2 billion paintballs from Procaps.  Moreover, NPS' witnesses confirmed that even had NPS acquired PMI, NPS would have ensured that NPS continued to satisfy its obligations under the Contracts.  Tr. 3/23 at 190-92 (J. Postorivo); 9/26 at 106-108 (Gunn).

- Procaps cites the testimony of Gary Martz, a former Credit Manager of PNC who was assigned to work on the NPS/PMI transaction, for the proposition that NPS planned to purchase less than its minimums from Procaps after the acquisition of PMI.  P.O.B. at 28-30.  However, Procaps conveniently omits the fact that Martz also testified to his clear recollection that Procaps was going to continue to be the exclusive manufacturer of Diablo *and* DraXxus paintballs for NPS, which necessarily would have entailed NPS meeting its contractual minimums at the very least.  Dep. Tr. Martz at 33.  Thus, at best, Martz has given conflicting testimony regarding the plan subsequent to an acquisition that never took place.

### 4.  *Procaps' Continuing Bad Faith Efforts To Contrive Excuses To Mask The Real Reason Why It Defaulted NPS And Terminated The Contracts*

As set forth at pages 25-51 of NPS' Opening Brief, Procaps' and ICC's own documents demonstrate very plainly that Procaps' termination of the Contracts was the preordained result once NPS refused to sell its business to Procaps/ICC.  As also set forth in NPS' Opening Brief, New Jersey law mandates that Procaps be found to have improperly terminated the Contracts based on its (and ICC's) bad faith and unfair dealing, *even if* Procaps had abided by the express termination provisions of the Contracts.  Id. at 53-56; see also Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 589 (N.J. 1997).

Apparently recognizing that its bad faith conduct dooms its defense to NPS' improper termination claims, Procaps has engaged in creative writing in its Opening Brief, imagining a story line in which Procaps (not NPS) is the unwitting victim; NPS (not Procaps) is the villain; and NPS (not Procaps) has exhibited "ill-grace" in suggesting otherwise.  As with most creative writing, however,

Procaps latest iteration of why it did what it did bears little resemblance to the actual facts.[5]  Procaps'

fictional recounting of the "evidence" goes something like this:  Procaps, concerned about various

aspects of the paintball market and NPS' business, approached NPS in mid-April 2005 requesting that

NPS come up with a payment plan where NPS would bring its account balance current by the end of the

summer and requesting that NPS provide financial information.  P.O.B. at 8-13.  But, according to

Procaps, when NPS had not proffered a payment plan or provided financial information by early May,

and Procaps thereafter "discovered" that NPS had an ownership interest in the Blue Arc paintball

manufacturing plant, Procaps had "grave concerns" and could no longer wait until the end of the

summer for NPS to get current.   As a result, Procaps maintains, it issued the default notices "in an

attempt to prod NPS into responding."  P.O.B. at 3.  But, according to Procaps, NPS thereafter "strung

Procaps along for several more weeks with repeated empty promises, finally sending an inadequate

amount to Procaps by registered mail, the slowest fashion possible and a method never before used by

the parties."  P.O.B. at 3-4.  All the while, NPS was secretly "setting itself up to be able to significantly

decrease, if not ultimately eliminate, its dependence on Procaps for paintballs" while Procaps and ICC,

on the other hand, did not have any ulterior motives.  Id. at 3-4.  In fact, Procaps asserts, the "concept

that Procaps (or ICC) would want to destroy NPS is illogical."  Id. at 41.  Faced with an "uncooperative

business partner" who may be "setting them up," Procaps did what any reasonable business person

would do "to save its business" – it terminated the Contracts.  Id. at 4.

As set forth below, the fictional story line Procaps has contrived is a lie.  However, before

examining the evidence demonstrating that each aspect of this fictional story line is false, it is necessary

to examine the sources for the story Procaps has told in its Opening Brief.  Where Procaps has cited to

---

[5]  As set forth, supra, Section I., Procaps' latest iteration of the facts is significantly different than what its positions on several key issues were prior to the arbitration and even in its Opening Statements.  The fact that Procaps' story has been such a moving target is reason, in and of itself, for the Panel to discount Procaps' latest attempt to justify its plainly pretextual and improper termination of the Contracts.

the record in telling its story, it has cited almost exclusively to the self-serving testimony of its own

witnesses.  As such, it is useful to "consider the source."  The evidence demonstrates that each of

Procaps' principals who testified in this matter simply were not credible.  The following are only a few

of the examples in which Procaps' witnesses gave simply *in*credible testimony on some of the key points

in the case:

- **Molyneux** testified that Procaps' had no "Plan B" for what it would do in the event the Contracts were terminated, Tr. 3/24 at 50 (Molyneux), despite the overwhelming evidence, set forth in Procaps' and ICC's own documents, that ICC intended all along to engineer the termination of the Contracts if NPS refused to sell, ex. NPS-32, and that Procaps was actively taking steps during the cure period to establish a competing distribution network, Exs. NPS-1567 (Procaps' plan to hire "temp" to enter NPS' customers into Procaps' mailing list), NPS-1552 (Miller-Migos email re Migos' efforts to gauge interest of European sub-distributors in once again doing business with Procaps once contracts were terminated); NPS-1489 (Littlejohn email detailing plan, worked out during June 16th meeting, for Procaps' new distribution network once Contracts were terminated);

- **Truant**, after admitting on the first day of his testimony that had the checks totaling $2,621,189.19 which NPS sent to Procaps via registered mail on June 16th been received by Procaps on June 16th, the $2,621,189.19  "would have cured" the defaults noticed in Procaps' May 17th default notices, Tr. 9/6 at 275 (Truant), apparently had a change of heart that evening, because the very next day he testified that had Procaps received the $2,621,189.19 on June 16th, that still would have left NPS approximately $600,000 short, Tr. 9/7 at 33-35;

- **Richmond Italia** testified that even though Procaps' sales increased from 2001 to 2004 by a factor of 3-5 times, and even though Procaps' DraXxus brand only came into existence as part of the first contract between NPS and Procaps and thereafter NPS maintained the exclusive distribution rights for the brand, NPS had "no role" in building the DraXxus brand, Tr. 9/7 at 94-98 (Richmond Italia);

- **Miller** testified that Procaps did not wish to sell its products on a non-exclusive basis (which it could only do if the Contracts were terminated), despite the numerous documents written by Miller in which he indicated that doing business on a non-exclusive basis with NPS was what Procaps "always wanted," Tr. 9/27 at 117; and

- **Tafler** testified that no one at Procaps wanted to see the Contracts terminated, Tr. 11/2 at 307, 11/3 at 23, 59 (Tafler), despite the fact that every single executive of Procaps wrote emails articulating reasons why Procaps should terminate the Contracts that had nothing to do with NPS' account balance.

In any event, Procaps' latest story should also be discounted because it is contradicted by the

actual evidence.  First, the notion that Procaps approached NPS in mid-April to discuss a payment plan

because Procaps had somehow grown "concerned" about the state of NPS' finances and/or the state of

the paintball industry, P.O.B. at 8-10, is belied by the evidence.  Procaps ignores the fact that, just a

month earlier, on February 25, 2005, ICC specifically acknowledged NPS' good standing under the

Contracts when NPS consented to the assignment of the Contracts.  Exs. NPS-2219, NPS-2220.  As ICC

well understood prior to its acquisition of Procaps, NPS always ran an overdue account balance with

Procaps when measured against the 45-day payment terms embodied in the Contracts and in the

agreements that preceded the Contracts.  Tr. 11/3 at 81 (Tafler).  The notion that the overdue account

balance had somehow grown appreciably worse in the period between ICC's acquisition of Procaps on

March 7th and the date the notices of default were issued on May 17th is belied by Procaps' own

documents, which show that NPS' overdue account balance had only increased by approximately

$200,000 between mid-March and mid-May, a negligible amount.  Ex. PLP-327.  Moreover, if Procaps

were truly concerned about a change in the paintball industry which began in the Fall of 2004, there

would have been plenty of time for ICC to have insisted that NPS promise, as part of NPS' consent to

the assignment of the Contracts, that NPS would get its account balance current within a reasonable time

after the assignment.  ICC never did this.

Procaps' claim that it was NPS' failure to provide a payment plan by early May and Procaps'

"discovery" that NPS had an ownership interest in Blue Arc in mid-May that caused Procaps "to no

longer be willing to wait until the end of the summer for NPS to get current," P.O.B. at 12-13, is also

belied by the evidence.  The evidence is clear that Procaps and ICC knew of NPS' ownership interest in

Blue Arc by no later than November 2004.  See NPS' Opening Brief at 77-80.  In addition, the notion

that ICC – a veteran of acquisitions just like the acquisition of Procaps, and a company that prided itself

on conducting thorough due diligence – would have somehow "overlooked" running a UCC search on

Procaps' largest customer during the due diligence period is simply unbelievable.

The actual evidence also refutes Procaps' contention that NPS  "strung Procaps along for several

. . . weeks" after Procaps' issuance of the May 17th notices of default.  In the first instance, NPS did not

even receive the default notices until May 24th because Procaps did not bother to fax or email copies of the letters to NPS.  Thus, for at least one of the "several weeks" that Procaps references, NPS did not even know it had been defaulted!  Moreover, NPS indisputably had 30 days from its receipt of the default notices within which to cure or provide Procaps with adequate assurances of performance.  Exs. NPS-3 at ¶ 8.03, NPS-5 at ¶ 8.02.

Procaps' contention that NPS sent "an inadequate amount" to Procaps "by registered mail, the slowest fashion possible and a method never before used by the parties,"  P.O.B. at 3-4, is equally absurd.  As set forth supra, Section II.A.1., the amount NPS sent by registered mail would have been sufficient to cure the defaults (not to mention provide adequate assurances of performance) even if Procaps' tortured interpretation of NPS' obligations upon receiving the default notices were correct, and NPS properly used the same mode of transmission in making the payment it believed it needed to make to cure the defaults as that used by Procaps in sending its default notices.

Procaps' contention that NPS was secretly "setting itself up to be able to significantly decrease, if not ultimately eliminate, its dependence on Procaps for paintballs" while Procaps and ICC, on the other hand, did not have any ulterior motives, P.O.B. at 3-4, is as gross a distortion of the record as any made by Procaps in its entire Opening Brief.  If NPS were secretly plotting to eliminate Procaps from the equation, then it logically follows that upon receiving Procaps' default notices, NPS should have rejoiced.  After all, the default notices would have given NPS the excuse it was supposedly looking for to get out of the Contracts.  Procaps appears to have ignored the fact *NPS did not treat the default notices this way but, instead, paid Procaps more than $6.5 million within 30 days of Procaps' issuance of the default notices, including a lump sum payment of more than $2.6 million on June 16th*!

By contrast, Procaps' claim that the evidence demonstrates that neither Procaps nor ICC had any ulterior motives in terminating the Contracts, P.O.B. at 3-4, demonstrates the extent to which Procaps truly has no understanding of the difference between actual evidence and the fictional course of events it has mapped out in its Opening Brief.  Incredibly, Procaps *does not even acknowledge* the reams of its

own documents, introduced into evidence during the course of the hearings and detailed at pages 25-51 of NPS' Opening Brief, which demonstrate that ICC's plan all along was to either acquire NPS or engineer the termination of the Contracts, and that ICC followed through on this plan once NPS refused to sell at less than fair market value.[6]

Finally, Procaps' contention that, faced with an "uncooperative business partner" who may be "setting them up," Procaps did what any reasonable business person would do "to save its business," i.e., it terminated the Contracts, Id. at 4, is also simply absurd.  Assuming for the moment that Procaps found itself "backed against a wall," if Procaps truly did not want to see the Contracts terminated – as Tafler maintains was the position of everyone in Procaps' management – it would have surely rescinded its termination when Procaps received the checks for more than $2.6 million (and another $700,000) on June 28th.  Instead, Procaps has concocted a story about how NPS – after going to the trouble of sending a lump sum payment of more than $2.6 million; after allowing Procaps' management to leave New Jersey with certified funds in that amount on June 28th; and after handing Procaps another set of checks for $700,000 – "agreed" that the Contracts were terminated and that the parties would do business under new terms.  P.O.B. at 21.  Suffice it to say, no such "agreement" ever took place and, in any event, the provisions in the Contracts prohibiting modification except by written agreement would have prevented such an oral modification. Exs. NPS-3 at ¶ 16.02, NPS-5 at ¶ 13.02.

In sum, the actual evidence – not Procaps' fictionalized version of events – demonstrates that the default notices were merely an extension of the "solution" mapped out by ICC in its Project SPLAT! Status Report from November 2004 to "change the agreement to either (i) more closely align the two

---

[6] In this regard, Procaps' claim that it would not have made sense for it to have taken any actions to eliminate NPS as a distributor immediately after the closing, Id. at 41, misses the point.  The evidence demonstrates that ICC and Procaps did not want to eliminate NPS as a distributor but, rather, wished to terminate the Contracts so that Procaps could do business with NPS on a non-exclusive basis until Procaps built up its own competitive distribution network.  Ex. NPS-32 (Project SPLAT! Memorandum declaring Contracts to be "untenable" and setting forth plan to either acquire NPS or go into direct competition); see also Exs. NPS-60, NPS-490 (Miller emails advocating termination of the Contracts so that Procaps could do business with NPS on a non-exclusive basis, as Procaps had "always wanted").

companies or (ii) go into direct competition with National." Ex. NPS-32. Having failed to acquire NPS, ICC naturally proceeded to Plan B and engineered, albeit without cause, the termination of the Contracts so that Procaps could then directly compete with NPS.

### B.    Procaps Breached The Best Pricing Provision Of The Paintball Contract (Count III)

In its Opening Brief, Procaps has not addressed the undisputed evidence, set forth in detail at pages 81-86 of NPS' Opening Brief, demonstrating Procaps' wholesale breaches of the "best pricing" provisions of the Paintball Contract. Ex. NPS-3 at ¶¶ 3.03, 3.04. That Procaps has chosen to ignore this evidence is not surprising, as it is consistent with Procaps' strategy, manifest throughout its Opening Brief, of ignoring the evidence and, instead, focusing on a fictional recounting of the "facts" as Procaps wishes them to be. In any event, the testimony of Craig Miller, and Procaps' own invoices and sales reports establish beyond question that Procaps violated these provisions of the Paintball Contract.

### C.    NPS' Damages

#### 1.    NPS Is Entitled To Recover Between $37.6-$40.9 Million In Damages As A Result Of Procaps' Improper Termination Of The Contracts

Procaps makes several arguments in response to NPS' damages claims for Procaps' improper termination of the Contracts. Each of Procaps' arguments is without merit.

First, there is no basis to exclude Glenn Newman's testimony. Procaps' claim that Newman "made no effort to independently verify the accuracy of the data underlying his opinions" is simply not true and is particularly hypocritical in light of the admission by Procaps' expert, Roy Epstein, that in reaching his opinion regarding NPS' ability to pay on June 30th (the date he chose for his "hypothetical conversation" between NPS and Procaps), Epstein did no independent analysis of what NPS' overdue account balance was, opting instead to rely on Procaps for that information. Tr. 11/2 at 85-87 (Epstein). In any event, by not filing a motion *in limine* to exclude Newman's testimony and by not objecting when Epstein's testimony was introduced, Procaps has waived any post-hearing objections that Newman's testimony should be excluded. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 518 (3d Cir. 1997).

Next, Procaps asserts that NPS' claims for lost profits and for market damages are duplicative. While Procaps cites one Circuit Court decision from the Eighth Circuit and the commentary of one UCC commentator, Procaps omits the fact that there is a decided split in authority over the appropriate measure of damages pursuant to section 2-713 of the UCC.  Indeed, in a number of cases and law review articles, courts and commentators have held market damages to be appropriate even where those damages would create a "windfall" recovery for the aggrieved buyer, i.e., even where the aggrieved buyer would be placed in a *better* position than he would have been in had the seller performed.  See, e.g., Apex Oil Co. v. Vanguard Oil & Service Co., Inc., 760 F.2d 417 (2d Cir. 1985); G.A. Thompson & Co. v. Wendell J. Miller, 457 F. Supp. 996 (S.D.N.Y. 1978); KGM Harvesting Co. v. Fresh Network, 42 Cal. Rptr.2d 286 (Cal. Ct. App. 1995); Tongish v. Thomas, 840 P.2d 471 (Kan. 1992); Fertico Belgium v. Phosphate Chem. Export, 510 N.E.2d 334 (N.Y. 1987); David Simon and Gerald A. Novack, Limiting the Buyer's Market Damages to Lost Profits:  A Challenge to the Enforceability of Market Contracts, 92 Harv. L. Rev. 1395 (1979); Schneider, UCC Section 2-713:  A Defense of Buyers' Expectancy Damages, 22 Cal. Western L. Rev. 233 (1986).  Even White and Summers, whose treatise Procaps cites in its Opening Brief, acknowledge that the damages remedy set forth in section 2-713 of the UCC "need bear no close relation to the plaintiff's actual loss."  1 White & Summers, Uniform Commercial Code 307 (4th ed. 1995).

"A cardinal rule of statutory construction [is] that full effect should be given, if possible, to every word of a statute. [A court] cannot assume that the Legislature used meaningless language." Gabin v. Skyline Cabana Club, 258 A.2d 6, 9 (N.J. 1969).  Here, the applicable statute provides that the aggrieved buyer can recover market damages, consisting of the difference between the market price and the contract price, "*together with* any incidental or consequential damages." N.J. Stat. Ann. §§ 12A:2-713 (emphasis added).  It simply cannot be assumed – as Procaps implicitly argues by virtue of its claim that awarding both types of damages would be "duplicative" – that the New Jersey legislature "used meaningless language" when it legislated that an aggrieved buyer may recover market damages *and* any

28

incidental or consequential damages.  Accordingly, under the plain language of the statute, NPS is entitled to recover its market damages in the amount of $14,801,953, <u>see</u> ex. NPS-839 at p. 20, *and* its lost profits in the amount of $22.2 million-$25.5 million, depending on whether Newman's or Epstein's discount rate is applied, <u>see</u> exs. NPS-837 at p. 37 and NPS-839 at p. 13.

Next, Procaps argues that NPS' damages claim under Section 8.05 of the Paintball Contract is duplicative of both NPS' lost profits claim and its market/cover claims.  Procaps' argument can be easily disposed of, as NPS did not put on evidence at the hearing, and is not seeking, damages under Section 8.05 of the Paintball Contract.  However, one aspect of Procaps' argument must be addressed.  Section 8.05 purports to be a liquidated damages provision applicable to NPS' damages in the event of a termination caused by Procaps' material breach.  A corollary provision purportedly applicable to Procaps' damages in the event of a termination caused by NPS' material breach appears in Section 8.04 of the Paintball Contract.  Each of the provisions contemplated a remedy that primarily consisted of continued sales/purchases between the parties for a period of time after termination.  <u>Id</u>.  This, of course, never occurred.  Although the provisions are essentially the same in concept, Procaps asserts that the provision that purportedly applies to Procaps (section 8.04) is unenforceable, P.O.B. at 53-54, whereas Procaps half-heartedly asserts (in footnote 37 of its Opening Brief) that the provision that purportedly applies to NPS (section 8.05) "is likely enforceable"!  P.O.B. at 57, n. 37.  Procaps' contention that the provision that would limit its damages is unenforceable, but the nearly identical provision that would limit NPS' damages is "likely enforceable," is yet another example where Procaps has acted as if the provisions of the Contracts work only to its advantage and NPS' detriment.  In reality, the liquidated damages provision that purports to limit NPS' damages is unenforceable because NPS never received the benefit of the specific performance called for in the provision, despite NPS' demand that Procaps continue to supply NPS pursuant to this provision and because the provision did not reasonably forecast NPS' damages.  Ex. NPS-1459; Tr. 9/28 at 138 (Campo) (explaining that even though NPS made demand for specific performance, Procaps did not comply); <u>see also</u> <u>River Rd. Assocs. v. Chesapeake</u>

Display & Packaging Co., 104 F. Supp. 2d 418, 425 (D. N.J. 2000) (noting that liquidated damages provisions "which seek to secure performance, as opposed to merely provide just compensation for non-performance, are *unenforceable*) (emphasis added).

Procaps next argues that NPS' lost profits claim is overstated. Again, Procaps' contention is without merit. First, contrary to Procaps' assertion, Newman's calculations did factor in the overall decline in the paintball industry. Procaps argues that this decline began in the Fall of 2004. P.O.B. at 8-9. Newman's damages analysis was based on a "but for" analysis of what NPS' sales had been in the nine-month period preceding the termination versus what those sales were in the nine-month period following the termination. Tr. 9/25 at 191-92 (Newman); Ex. NPS-837. Thus, in calculating NPS' "pre-termination" sales, Newman's analysis necessarily already took into account any effect of the market downturn because Newman analyzed the nine month period beginning in September 2004 as his baseline.

Second, contrary to Procaps' assertions, NPS' claim for lost profits on secondary products is well-grounded and entirely appropriate. Once again, Procaps has ignored the testimony of its own witnesses who admitted that paintballs – not markers, goggles, etc. – are the primary driver of sales of other paintball products. Dep. Tr. Vance at 60-61 (agreeing that once customer bought skid of paintballs, the "logistics" were "really good" for shipping other paintball-related products at minimal cost); Tr. 3/24 at 202-03 (Molyneux) (testifying that a distributor "need[s] the paintballs"). Procaps would have the Panel believe that it was merely a "coincidence" that NPS' dramatic decrease in sales of products other than paintballs and goggles coincided with the termination of the Contracts. This is absurd. Furthermore, Newman did consider the effect of the loss of Tippmann markers by excluding those losses from his damages calculation. Ex. NPS-837 at 32, n. 78.

Next, Procaps attacks NPS' claim for profit margin erosion. Again, Procaps' argument is without merit. Procaps cites Epstein's testimony for the proposition that "the only sensible interpretation of [NPS'] data is a shift in the product mix after termination towards less expensive

30

paintballs, which have a somewhat lower profit margin per case." P.O.B. at 60. However, Procaps and

Epstein have ignored the evidence once again. As Johnny Postorivo testified, NPS priced its paintballs

so that, no matter the grade, NPS made $4.50-$5.00 per case. Tr. 9/25 at 57-58 (J. Postorivo). Thus,

NPS' profit margin was actually *higher* the lower the cost of the paintball, thus negating Procaps' and

Epstein's theory.

Finally, Procaps attacks NPS' market damages claim as being "entirely unfounded." Procaps

incorrectly asserts that two of Newman's assumptions are flawed. First, Procaps asserts that the

appropriate time to measure market price is at the "time and place of delivery," not the time of the

breach, and, in support of this contention, Procaps cites two New Jersey cases, one from 1952 and the

other from 1939. P.O.B. at 60. Procaps has apparently overlooked the fact that each of these cases was

decided prior to the enactment of Section 2-713 of the New Jersey UCC in 1961, which specifies that

the time for measuring market price is "the time when the buyer learned of the breach." N.J. Stat. Ann.

§§ 12A:2-713. In other words, Procaps has cited to law that has been superseded by the UCC.

Second, Procaps attacks the evidence of market prices that Newman relied on in making his

calculations. The gist of Procaps' argument is that the evidence of market prices presented by NPS

reflected retail, as opposed to wholesale, prices, and that therefore the market damages calculations done

by Newman were skewed. Ironically, in Roth Steel Products v. Toledo Steel Tube Co., 705 F.2d 134

(6th Cir. 1983), the case that Procaps cites in its Opening Brief in support of its assertion that Newman's

reliance on retail prices was inappropriate, the Court specifically found that the lower court's acceptance

of evidence of market price in a different branch of the trade *was appropriate*. Roth Steel involved the

breach of a contract to provide steel. Id. at 138-39. At trial, each party put on evidence regarding the

market in which the plaintiff would have covered. Id. at 157, n. 53. The plaintiff asserted that

"warehouse" prices were appropriate for measuring its market damages under section 2-713 of the UCC.

Id. The defendant maintained that "mill" prices – which were substantially lower than "warehouse"

prices – were appropriate because warehouses were not in the same branch of trade as the defendant, a

mill.  Id.  In finding that the District Court had properly concluded that use of "warehouse" prices was

appropriate for measuring the plaintiff's market damages under section 2-713 of the UCC, the Court

stated as follows:

> We believe that the district court properly used the warehouse price in computing the
> plaintiffs' damages pursuant to U.C.C. Sec. 2-713. Normally, the market price to be used
> in computing damages under U.C.C. Sec. 2-713 is the price prevailing in the market "in
> which the buyer would have obtained cover had he sought relief." Consequently, the
> proper inquiry is whether the plaintiffs, if they had chosen to cover, would have
> purchased rolled steel from a warehouse or from a mill. In this regard, *the district court
> found that the plaintiffs could not have obtained steel from other mills to replace the
> tonnage that Sharon failed to deliver; consequently, the plaintiffs would have been forced
> to cover by purchasing rolled steel from warehouses at premium prices. The findings are
> fully supported by the evidence and, thus, are not clearly erroneous*. We hold that the
> district court did not err in measuring damages; *if the plaintiffs had chosen to cover, they
> would have been forced to purchase the steel from warehouses. Thus, the district court
> properly used the warehouse price to measure the plaintiffs' damages*.

Id. at 156-57 (emphasis added) (citations omitted).

Here, as in Roth Steel, the buyer (in this case, NPS) had no plausible alternative sources once the

breaching party (in this case, Procaps) breached the Contracts.  Tr. 9/25 at 177-78 (J. Postorivo).  As a

result, for most of the various grades of paintballs that Procaps had been manufacturing for NPS, NPS

would have had to have paid a premium for those replacement paintballs.  Tr. 9/25 at 177-78 (J.

Postorivo) (**Q:** If NPS had to go out and get 100 million rounds of comparable paintball comparable

[sic] to the DraXxus Hell Fire paintball, what would you have done on that day [June 24, 2005]?  **A:** I

don't think any one supplier would have been able to supply me 100 million on that given day.  I

probably would have had to go to five or six companies, and I would have been at the mercy of what

they wanted to charge me.  **Q:** You would have paid a higher price?  **A:** Yes.).

Moreover, unlike in Roth Steel, here Procaps put on *no evidence* of any alternative market price

on the "manufacturer" level.  As such, the only evidence of market price is the evidence presented by

NPS and relied on by Newman.  Since Procaps does not challenge the market prices in the retail market

which were relied on by Newman (Procaps only challenges whether the retail market was the

appropriate market within which to measure market damages), the Panel must accept this evidence, and Newman's market damages calculation based on that evidence is entirely appropriate. See 1 White & Summers, Uniform Commercial Code 316 (4th ed. 1995) ("The Code directs the courts to accept *virtually any evidence—even evidence of marginal relevance*" with respect to market prices under section 2-713 of the UCC) (emphasis added).

Accordingly, NPS is entitled to the full amount of the damages calculated by Newman resulting from Procaps' improper termination of the Contracts: $22.2 million-$25.5 million in lost profits, depending on whether a 25% or 15% discount rate is applied, see exs. NPS-837 at p. 37, NPS-839 at p. 13, and cover and market damages in the amounts of $653,021 and $14,801,953, respectively. Ex. NPS-839 at p. 20. Therefore, the total amount of NPS' damages (cover/market plus lost profits) is $37,655,974, applying the 25% discount rate utilized in Newman's report, or $40,955,974, applying the 15% discount rate utilized in Epstein's report in the context of his calculation of Procaps' alleged damages. Id.[7]

### 2.    *NPS Is Entitled To Recover Its Attorneys' Fees And Costs*

As set forth in NPS' Opening Brief, Article 31 of the ICDR International Dispute Resolution Procedures provides that the tribunal may apportion costs among the parties and that such costs may include "the reasonable costs for legal representation of a successful party." The parties also agreed in the Contracts that the arbitrators "shall have the right to award and include in their award any relief that they deem proper in the circumstances, including without limitation . . . attorney's fees and costs." Exs. NPS-3 at ¶ 16.09, NPS-5 at ¶ 13.09.

As set forth in NPS' Opening Brief, Procaps unquestionably engaged in bad faith in terminating the Contracts, and Procaps alone is responsible for the fact that it left NPS with no choice but to pursue

---

[7] NPS is also entitled to damages in the amount of $2.2-$2.4 million for Procaps' violations of the best pricing provisions of the Paintball Contract. See NPS' Opening Brief at pp. 88-91. As set forth above, Procaps did not challenge in its Opening Brief the evidence introduced by NPS establishing that Procaps violated the best pricing provisions of the Paintball Contract. Nor did Procaps make any arguments in its Opening Brief concerning NPS' damages on account of these violations.

litigation to remedy Procaps' unilateral and patently improper termination of the Contracts.  See NPS' Opening Brief at pp. 25-51; see also Ex. NPS-65 (Lister email to Molyneux and Truant on June 27th stating: "I think it is in the interests of all that this thing does not spiral into litigation, etc. *But I know we are prepared to go down that path if necessary*") (emphasis added).  NPS should not have to pay the price – in the form of its own attorneys' fees and costs – just to achieve what it was entitled to as a matter of law had Procaps not improperly terminated the Contracts.  The Panel should exercise its discretion and award attorneys' fees and costs to NPS in this matter.  Contemporaneously herewith, NPS is providing a detailed summary of its attorneys' fees and costs in this matter.

### D.    In Contrast, Procaps Is Not Entitled To Damages On Its Counterclaims

As set forth at pages 92-93 of NPS' Opening Brief, Procaps has forfeited, through its "unclean hands," any right it may have had to collect on its Counterclaim for non-payment by NPS.  Moreover, even assuming that Procaps' hands were "clean" and that Procaps were entitled to recover for product shipped to, but not paid for by, NPS, Procaps would only be entitled to recover an amount that is substantially less than the amount to which Procaps claims it is entitled.  First, as set forth in the expert report submitted by Glenn Newman and Steve Scherf, Procaps' calculation of the amount of the unpaid receivable does not take into account credits due to NPS which, when added back in, reduce Procaps' claim by more than $200,000.  Ex. NPS-839 at 8-11.  In addition, Procaps ignores the fact that, immediately after terminating the Contracts, Procaps took actions which had the effect of significantly devaluing the inventory that NPS had purchased from Procaps.  Tr. 3/23 at 116-18 (J. Postorivo). Although it is not possible to precisely quantify the effect of Procaps' actions, the record is clear that NPS was essentially left with a worthless amount of inventory that it had to either sell at a loss or discard.  Id.  Accordingly, even if Procaps were entitled to recover for product shipped to, but not paid for by, NPS, the amount of Procaps' recovery would be substantially less than the more than $5 million Procaps claims.  In all events, New Jersey law is clear that Procaps would not be entitled to collect pre-judgment interest under the circumstances presented in this case because of its bad faith conduct.  See

Bak-A-Lum Corporation of America v. Alcoa Building Products, Inc., 351 A.2d 349, 353 (N.J. 1976) (concluding that prejudgment interest should not have been awarded to defendant on its counterclaim because "[i]nterest does not run on liquidated claims as a matter of course, but 'in accordance with principles of equity'" and that where defendant had improperly terminated exclusive distribution contract, "the equities preclude allowance of interest to the defendant.").

Procaps is apparently abandoning its other counterclaims in this matter, having not briefed these claims in its Opening Brief.  However, to the extent that these claims are still "in play," Procaps is not entitled to damages on account of any of the counterclaims it asserts at paragraphs 27-34 of Procaps' Response to Demands and Counterclaim ("Procaps' Response") because Procaps either did not present any evidence to support its claims, or because the evidence presented contradicts Procaps' claims.  See NPS' Opening Brief at pp. 94-95.

## III.     CONCLUSION

For the reasons set forth herein, NPS has proven it claims for breach of contract relating to Procaps' improper termination of the Contracts and Procaps' violations of NPS' best pricing protection in the Paintball Contract.  NPS has also demonstrated that it is entitled to damages in the amount of between $39.8 million and $43.3 million, as well as an award of attorneys' fees and costs in the amount of $3,351,284.24.  By contrast, Procaps is not entitled to prevail on any of its counterclaims and is entitled to no damages.

Respectfully submitted,

_____/S/_____
Patrick J. Loftus, Esq.
Robert E. Kelly, Esq.
Lawrence H. Pockers, Esq.
Michael A. Zullo, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 979-1000

35