IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| NATIONAL PAINTBALL SUPPLY, INC., ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | AAA No. 50 T 181 25205 |
| ) | |
| PAINTBALL L.P., ) | |
| ) | |
| Respondent. ) | |

| | |
|---|---|
| PROCAPS L.P. f/k/a PAINTBALL L.P., ) | |
| ) | |
| Counterclaim-Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| NATIONAL PAINTBALL SUPPLY, INC., ) | |
| ) | |
| Counterclaim-Respondent. ) | |

**PROCAPS L.P.'S**
**POST-HEARING REPLY BRIEF**

Respondent and Counterclaimant Procaps L.P. ("Procaps"), by and through its

undersigned counsel, hereby submits this Post-Hearing Reply Brief.

**I.    INTRODUCTION**

The parties agree on the key question that the Panel must decide:  Was Procaps'

termination of its agreements with National Paintball Supply, Inc. ("NPS") on June 24, 2005

proper?  As Procaps demonstrated in its Opening Brief and as it will further show below,

Procaps properly terminated the agreements, the only sensible – albeit costly -- business decision

it could make under the circumstances.

Seeing the weakness in its position, however, NPS, as it did for sixteen (16) days

of hearings, would like to have this Panel ignore the propriety of the termination and focus on

Procaps' alleged "bad faith." Unfortunately for NPS, as Procaps explained in its Opening Brief and will further discuss below, none of the evidence adduced in the Hearings, either individually or collectively, proves "bad faith." Instead, NPS continuously acted in bad faith and undertook at least three concrete steps to distance itself from its obligations under the agreements. Accordingly, NPS – not Procaps -- has violated the implied covenants of good faith and fair dealing present in the parties' agreements. The Panel should hold NPS accountable.

Having dispensed with this colossal red herring, Procaps demonstrates below that none of the arguments NPS raises in its Opening Brief for why the termination was improper have merit. First, notwithstanding any of NPS' arguments to the contrary, Procaps was entitled to rely upon and implement the 45-day payment terms specifically set forth in the Agreements. Procaps did not waive the payment requirement by any purported course of performance. Further, if any waiver existed, Procaps retracted the waiver no later than April 12, such that Procaps issued entirely proper breach notices on May 17. Second, NPS did not cure the breach on any day between May 17 and June 24, including June 16, under any view of the facts. Third, at no time did NPS provide adequate assurances of performance under either the contracts or the UCC.[1] In short, Procaps properly terminated the parties agreements on June 24.

Accordingly, the Panel should award Procaps the full amount of the outstanding $5 million receivable owed by NPS, with interest, as well as the other damages that NPS' breach and the subsequent termination caused. In this regard, without its alleged bad faith claim, NPS

---

[1] Interestingly, having focused extensively at the hearings on the purported insufficiency of the breach notices, even NPS has now conceded, as it must, that the notices were legally proper, as it does not make any such argument in its Opening Brief. *See generally* NPS Opening Br.; *see also* Procaps Opening Br. at 37-39 (demonstrating legal sufficiency of breach notices). Instead, NPS now merely argues in the context of its bad faith claim that this was some extra step that Procaps should have taken purportedly to make things easier for NPS to cure. Of course, as was shown in Procaps' Opening Brief, there were sound reasons why Procaps could not take these additional steps and they would have not assisted NPS in curing. *Id.*

has asserted no defenses whatsoever to Procaps' damages claims either for the receivable, interest or other damages, and, thus, Procaps should be awarded the amounts it has sought in full. Procaps also is entitled to recover its costs incurred in this proceeding, including attorneys' fees, arbitrators' fees and other costs.

## II.    ARGUMENT

### A. NPS' Bad Faith Claim Fails as Both a Stand Alone Claim and as Evidence of Wrongful Termination

Like its presentation of evidence at the Hearings, NPS spends more than half its brief trying to cobble together its "bad faith" argument. In support of this argument, NPS rehashes numerous items covered at the Hearings, such as the infamous "Project Splat" memo, the offers ICC made to NPS, Craig Miller's emails and others instances it claims constitute "direct and overwhelming" evidence of Procaps' (and ICC's) bad faith. But unfortunately for NPS, no matter how much time it spends or number of pages it writes, it cannot take a series of innocent documents and instances and, by linking them together, prove "bad faith."

In each instance, evidence adduced at the Hearings – notably ignored (or dismissed) by NPS in its brief – demonstrates that each of these items had a good faith explanation. *See* Exhibit A, chart setting forth each NPS allegation and the contrary evidence adduced at the Hearings. Further, as also explained in Procaps' Opening Brief, even when considered collectively, all of this evidence demonstrates nothing more than that (1) ICC and Procaps recognized Procaps' customer concentration issues, as any reasonable business person would; (2) starting at least in the due diligence phase and continuing until termination, ICC and Procaps considered and explored a number of legitimate business options for addressing Procaps' customer concentration issues, including acquiring NPS, acquiring other paintball businesses, related businesses in other industries and expanding product lines and market options

(such as the mass market) that were permitted under the parties' agreements, many of which they articulated to Procaps' lenders as early as the Confidential Information Memorandum (NPS-31);[2] (3) upon issuing the breach notices, ICC and Procaps began exploring options and how to proceed in a world without NPS, again a reasonable business response to a difficult situation; and (4) NPS completely frustrated some Procaps' employees, such as Craig Miller, who did not want to deal with them any longer, but the key decision makers *never* expressed – let alone gave into - - such frustrations because they recognized the tremendous downside risks to termination, which everyone now recognizes. (*See* Procaps Op. Br. at 41 discussing downside to termination.) Accordingly, despite its Herculean efforts, NPS cannot demonstrate bad faith on the part of ICC or Procaps, whether as an independent claim or as evidence that the termination was wrongful.

Indeed, to the contrary, the record clearly establishes that *NPS*, not Procaps, acted in bad faith. As discussed at length in Procaps' Opening Brief, NPS took at least three concrete steps to distance itself from Procaps, namely its business involvements with Blue Arc, Hovid and PMI. *See* Procaps Op. Br. at 24-31. While taken alone, some of these actions, such as acquiring Blue Arc, may not alone constitute a technical breach of the Agreements[3], collectively they clearly establish that it was *NPS* – not Procaps -- who violated the implied covenant of good faith and fair dealing in the agreements by acting in a fashion that would "have the effect of destroying or injuring the right of [Procaps] to receive the fruits of the contract." NPS Op. Br. at

---

[2] Indeed, as Robert Molyneux explained, one of the most significant ways that ICC addressed this issue right away was to restructure the ICC/Procaps transaction to take into account the concentration problems. R. Molyneux 9/5 Tr. at 61-66.

[3] Much time was spent in the Hearings on the issue of whether ICC and Procaps knew that NPS had an option and, later, that Gino Postorivo acquired an interest in Blue Arc. The most NPS could have arguably established, however (which Procaps disputes), was that ICC and Procaps knew about an option of some kind. Even NPS' own recitation of the evidence in its Opening Brief at 77-80, demonstrates that Procaps and ICC were completely unaware of NPS' *ownership* interest until May 13, which was a triggering factor for issuing the May 17 breach notices.

53 (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126-27 (N.J. 2001). Accordingly, the Panel should find in Procaps' favor on this basis alone.[4]

### B. NPS' Arguments as to Why the Termination was not Proper are Without Merit

Like NPS' bad faith claim, none of the arguments NPS raises in its Opening Brief for why Procaps' termination of the agreements was improper have merit. NPS' arguments divide into three categories. First, NPS claims that Procaps was not entitled to rely upon the 45-day terms of the Agreements due to a waiver caused by the parties' alleged course of performance. Further, NPS argues the alleged waiver could not be retracted or, if it could, it was not retracted in a timely fashion. As will be shown below, even if such waiver existed, it was clearly properly retracted no later than April 12, such that Procaps' May 17 breach notices were entirely proper. Second, NPS claims it cured possibly as early as June 10, through payments in the ordinary course, and certainly no later than June 16 by paying the amounts allegedly past due that day. Again, as will be shown below, NPS never cured its breach on any day between May 17 and June 24, under any view of the facts. Third, NPS claims that not only was it not required to provide adequate assurances of performance, it did so merely by making some payments to Procaps between May 17 and June 24. Of course, NPS disregards entirely its complete behavior during the period, which actually caused Procaps cause for greater rather than less concern than before. In short, Procaps' termination of the agreements on June 24 was entirely proper.

---

[4] To the extent that any party is entitled to purse this legal theory at this stage, as it was not explicitly pled by either NPS or Procaps, Procaps respectfully requests that the Panel deems its pleadings amended as well to include this claim, for the reasons articulated in NPS' brief, which equally apply to Procaps. *See* NPS Op. Br. at 54.

1. **Procaps Could Rely Upon the 45-Day Requirement in the Agreements, Notwithstanding Any Course of Performance**

a. **The 45-day Terms Were Not Waived by Course of Performance**

In its Opening Brief, NPS first argues that Procaps waived the right rely upon to the 45-day terms in the agreements because of the parties' alleged course of performance. In this regard, NPS claims that "at all relevant times NPS *was permitted* to pay beyond the terms" and further that Procaps "never advised NPS that this was unacceptable or put NPS in breach." (NPS Op. Br. at 29 (emphasis added).) NPS further states that "NPS consistently made and Procaps consistently accepted payment beyond 45 days." (NPS Op. Br. at 56.) As explained in Procaps' Opening Brief, while it is true that NPS was consistently late in paying, Procaps did not accept these late payments without protest. (Procaps Op. Br. at 6-7, 36.) Indeed, NPS statement that Procaps never advised that this practice "put NPS in breach" is flatly wrong. The evidence at the hearings demonstrate that Procaps advised NPS that this practice was a breach of the contract on at least two occasions historically, in July of 2004 and again in September of 2004. PLP-668; PLP-570. Accordingly, Procaps did not waive these terms as a matter of law. *See Green Constr. Co. v. First Indemnity of Am. Ins. Co.*, 735 F. Supp. 1254, 1261-63 (D.N.J. 1990) (continuous failure to comply with the contract is not sufficient to establish waiver through course of performance where it is also established that the one party continuously warned the other that these failures were not acceptable and it had to comply with the contract terms, even though the transactions otherwise continued).

b. **Even if There Was a Waiver, It Could be Retracted**

In addition to claiming that Procaps waived the contracted 45-day payment terms, NPS also argues that Procaps could not have retracted the waiver because NPS allegedly "materially altered its position" in a manner that would prevent such retraction. (NPS Op. Br. at

58-59.) Once again NPS' argument fails. The UCC provides that a waiver cannot be retracted when such "retraction would be unjust in view of a material change of position in reliance on the waiver." N.J.S.A. § 12A:2-209(5). In this case, NPS claims that its agreement to the assignment of the contracts to the new Procaps entity constituted a "material change of position" that prevented retraction. This argument fails for several reasons. First, the plain language of the statute states that the change in position has to be in reliance on the *waiver* – *i.e.*, on the fact that NPS would not be held to 45-day terms. Here, NPS admits that it agreed to the assignments because ICC allegedly represented that "nothing would change" after the closing. Even if such representations were made,[5] the reliance was on these representations, not on the alleged waiver itself. Second, there is no evidence that these representations had anything to do with the alleged waiver (indeed, when questioned, Gino Postorivo admitted that he did not recall raising the term issue with ICC (G. Postorivo 3/21 Tr. at 204-205)), or that, if it was included, that ICC was representing that the alleged waiver would continue without change after the closing. Most importantly, under UCC law, at the time of closing, even NPS would have to concede that the old Procaps entities could have retracted the alleged waiver, so if such representation was made by ICC, it is entirely consistent that it included the right to retract the waiver and require NPS to adhere to the stated terms of the agreements. Indeed, in this regard, it is notable that the assignment documents specifically required NPS to affirm its obligation to adhere to the contract terms. NPS-2218 – NPS-2226.

Further, the UCC provides that there are three factors to be considered in assessing whether an assignment constitutes a "material change." See 12A:2-210(2). These are

---

[5] As discussed in Exhibit A, Procaps has submitted evidence contradicting these representations. *See* Exhibit A at item 3 and cites therein.

whether: (1) any of NPS' duties changed; (2) the burden or risk imposed on NPS would increase after the assignment; or (3) NPS' chance of obtaining return performance would be impaired. Since Procaps could have retracted any waiver of the parties' alleged course of performance before the assignment, the fact that the new entity could also do so thus did not constitute a material change. Accordingly, under these circumstances, agreeing to the assignment of the contracts was not, by itself, a material change of NPS' position – it was in exactly the same position as if the old Procaps had still held the contracts – the waiver could be retracted at any time.

Consequently, even if a waiver of the 45-day terms existed, it could be retracted even by the new Procaps after the acquisition.

### c. Any Waiver Was Retracted by April 12 and the Retraction Applies to All Unpaid Invoices as of That Date

NPS claims that, even if a retraction were proper under the circumstances here, it would have to be made by "formal written notice," and, further, that it could only apply to future invoices. No such requirements appear in the UCC or the case law that NPS cites.

First, NPS complains that "Procaps *never* delivered formal written notice to NPS" of the purported retraction. (NPS Op. Br. at 59 (emphasis original).) The law does not require such notice. The statute itself provides that the retraction needs to be by "reasonable notification." N.J.S.A. § 12A:2-209(5). Here, there is no dispute that Procaps informed Gino Postorivo, NPS' CEO, in person on April 12, 2005, that the NPS account had to be brought current and kept current, and that NPS would have until the end of the summer to do this provided they worked out a payment plan and provided certain financial information. R. Molyneux 3/23 Tr. at 233; R. Molyneux 3/24 Tr. at 166; R. Molyneux, 9/5 Tr. at 72-74; N. Gunn 9/26 Tr. at 31-35, 196-201. Of course, when NPS failed to meet the conditions for having until

the end of the summer, on May 17, Procaps did issue formal notices of breach under the agreements. That notice gave NPS an additional thirty (30) days as required under the contracts to cure.

Second, NPS contends that *Cassidy* established a blanket rule that a retraction can only apply to invoices issued after the retraction. (NPS Op. Br. at 58-60, *citing, inter alia, Cassidy Podell Lynch, Inc. v. Synder General Corp.*, 944 F.2d 1131, 1147 (3d Cir. 1991).) However, there is no such blanket rule under either the UCC itself or as applied in the *Cassidy* case or otherwise. As *Cassidy* explains, whether a retraction applies to pending and/or future invoices depends upon what would be reasonable and just in the particular circumstances. *Cassidy*, 944 F.2d at 1147. Indeed, while the court in *Cassidy* held that in that case, generally Snyder could not hold Cassidy to compliance for all past shipments, it also held that Snyder could have done so for certain past shipments: "Snyder, however, could have retracted its waiver, thus *entitling Snyder to demand payment for past shipments before the expiration of ninety days*" (*i.e.*, the period within which Cassidy had been paying, even though the contract provided only 30 days). *Id.* (*emphasis added*). Thus, as both cases cited by NPS demonstrate, one must look at the particular circumstances to determine what would be reasonable and appropriate. *Id.*; *see also Double-E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 298 (3d Cir. 1973).

Here, it would be reasonable for the retraction to be effective as of April 12 for all outstanding and future invoices because, *inter alia*, Procaps did not demand immediate compliance with the 45-day terms but rather gave NPS substantial additional time to bring itself into compliance. Indeed, had NPS provided a payment schedule and financial information, both reasonable commercial demands, it could have had until the "end of the summer" – *i.e.* at least

four or five months – to get current and keep current.  Over thirty days later, when NPS did not

provide this information and appeared to be making no progress in that direction, Procaps still

did not immediately cut NPS off, but continued to ship product to NPS and gave NPS an

additional thirty (30) days, as required by the contracts, in which to bring its account current.

Thus, under these circumstances, where NPS had over sixty (60) days from the date of retraction

to bring its account current, it is entirely reasonable for a retraction of a waiver to apply to all

past due invoices, regardless of when issued.[6]

### 2.  NPS Did Not Become Current on June 16 or Any Other Day

NPS also argues that termination was improper because it claims it became

current possibly as early as June 10, but definitely no later than June 16.  Once again both these

arguments fail.

NPS tries to claim it became current on June 10 because it paid off the amounts

past due on May 17 by that date, because its payments in the ordinary course in that period

exceeded the amount past due on May 17.  (NPS Op. Br. at 65.)  Of course, NPS can only make

this argument by "putting the rabbit in the hat," and assuming its default was a failure to pay

specific overdue invoices.  In fact, the May 17 notices, together with the parties' discussions

before and after May 17, made clear that the issue was NPS' overall payment practices and the

need to bring all of NPS' outstanding debt within the 45-day terms and keep current.  Indeed, if

NPS is right, the only way Procaps could have accomplished this objective would have been to

---

[6]Notably, as discussed below in Section II.B.3, *infra* and in the cited sections of Procaps' Opening Brief, even if the May 17 notice were somehow defective because, at that point, Procaps was unable to demand compliance with the 45-day terms, it is still effective as a demand for adequate assurances of future payment – and especially future *timely* payment.  Since such assurances were not given, Procaps termination was sound on that basis as well.

start issuing notices on May 17 and keep issuing daily notices *ad infinitum*. This is not legally and commercially reasonable.

Instead, NPS has relied and continues to rely upon its sending of $2.6 million in checks by registered mail on June 16, combined with the four checks totaling $560,000 that NPS sent to Procaps on June 15, which were received on June 16, but which, by agreement and practice of the parties could not be and were not cashed until June 17, 20, 21 and 22. (NPS Op. Br. at 65-70; *see also* Procaps Op. Br. at 17-18 and record cites therein.) NPS claims that both the $2.6 million and $560,000 payments should be deemed to have been made on June 16. As to the $2.6 million in payments, Procaps has already addressed that fully in its Opening Brief at pages 39-40 and demonstrated that the mailbox rule in *Okosa* does not apply and the payment should be deemed made when received -- on June 28.

The analysis is similar with respect to the $560,000 in checks received on June 16 but not cashed until after. The parties' clear course of performance, which should control when "payment" was deemed made, demonstrated that all the checks (totaling $700,000 received on June 16) *could not* be cashed on the date received but only on one (for $140,000) on the day received and the rest (totaling the $560,000) on succeeding days. Indeed, evidence adduced at the hearings demonstrated that, on the few occasions that Procaps departed from the parties' practice and deposited more than one check (but never all) because of some legitimate reason such as weather or holidays, NPS vehemently protested and demanded that such action never occur again. N. Gunn 9/26 Tr. at 159-161; H. Talfer 11/2 Tr. at 245-246. Further, the record evidence also demonstrates that Procaps consistently recorded the payments as being made when the checks were deposited and, in addition, that NPS was aware of this (and never complained about it). PLP-815; N. Gunn 9/26 Tr. at 163-165. Accordingly, like with the $2.6 million in

payment, the mailbox rule does not apply because the parties' clear course of performance for handling these ordinary payments governs.

Thus, using either NPS' own account reconciliation for June 16 or Procaps' (*see* Procaps Op. Br. at 40), NPS did not become current on June 16, let alone any other day between May 17 and June 24 and the termination was entirely proper.

### 3. NPS Did Not Provide Adequate Assurances of Performance

NPS tries to defend against its failure to provide adequate assurances of performance in two ways. First, it argues that its payments of $6.5 million to Procaps between May 17 and June 16 (including of course the $2.6 million in checks mailed, but not received until June 28) constituted adequate assurances. (NPS Op. Br. at 71.) This is NPS' *only* stated factual basis for claiming it provided adequate assurances. Alone, this is insufficient because at the same time that these payments were made, NPS continued to purchase product from Procaps and NPS' balances continued to increase. *See* PLP-810, PLP-812, PLP-813; H. Tafler 11/2/06 Tr. at 286-289; H. Tafler 11/3/06 Tr. at 28-31. Importantly, NPS also ignores the extensive evidence that NPS' actions in the months preceding the termination, rather than providing assurances, had given Procaps great concern about its ability to perform. (*See* Procaps Op. Br. at 34-35, 43-46.)

Second, NPS also argues, as expected, that it did not have to provide adequate assurances under the UCC, and that, even if it could be required to provide adequate assurances under the UCC, it did not have to do so here because such assurances were not properly demanded. As explained at length in Procaps' Opening Brief, NPS was required to provide adequate assurances under the UCC regardless of whether it was also required by the parties' agreements and, further, that the May 17 breach notices constituted a proper demand for adequate assurances. (Procaps Op. Br. at 43-46.)

-12-

In summary, Procaps would have been entirely proper in terminating the agreements on June 24 for failure to provide adequate assurances of future performance, let alone for NPS' failure to bring the account current by that date.

### C.  Procaps is Entitled to Collect its Outstanding Receivable, Plus Interest

NPS does not dispute that, as a matter of fact, NPS owes Procaps $5 million for product it purchased and received, but for which it never paid.  (*See generally* NPS Op. Br.) NPS' only defense is that NPS should be excused from its clear obligation to pay Procaps under the doctrine of unclean hands.  (NPS Op. Br. at 92-93.)  Of course, as discussed above in Section II.A, *supra*, this argument fails as a matter of fact because the evidence does not support a finding of bad faith or unclean hands; however, it also fails as a matter of law.  As even cases cited by NPS demonstrate, the doctrine of unclean hands does not apply to claims, like this, seeking legal remedies, but only to claims seeking injunctions or other equitable relief.  *See, e.g., Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 401 F. Supp. 2d 383, 386 (D.N.J. 2005) (applied doctrine to deny equitable relief); *see also Miller v. Beneficial Management Corp.*, 855 F. Supp. 691, 716 n.28 (D.N.J. 1984) ("equitable defenses, such as the unclean hands defense, are generally not applicable to bar claims seeking legal remedies").

With respect to Procaps' request for an award of prejudgment interest on the $5 million receivable since the time of breach, NPS does not contest that Procaps ordinarily should be entitled to prejudgment interest on such claim, but rather argues that Procaps' alleged bad faith should preclude its recovery of interest.  (NPS Op. Br. at 93.)  Once again, as NPS' bad faith claim fails, there should be no barrier to awarding Procaps interest on its claim.

### D.  Procaps is Entitled to Lost Profit Damages, with Interest

Like NPS' attack on Procaps' claim for the outstanding receivable, plus interest, NPS mounts no substantive defense against Procaps' claim for lost profit damages as a result of

-13-

the termination, either in whole or in part. (NPS Op. Br. at 94.) Instead, NPS' sole defense is, again, its bad faith and wrongful termination claims. Since these fail, Procaps should be awarded the full amount of its lost profits claim, plus interest, namely $13,846,588.

## E. Procaps is Entitled to Recover its Attorneys' Fees and Other Costs

As NPS has explained in its Opening Brief, the prevailing party in this matter may be awarded its costs, including reasonable attorneys' fees, arbitrators' fees and other costs of arbitration under both the agreements themselves and the AAA rules. (*See* NPS Op. Br. at 91-92.) Here, as Procaps' termination of the agreements was entirely proper and NPS' bad faith is manifest, Procaps should be awarded its costs. Attached as Exhibit B is a summary of its costs incurred through December 31, 2006, totaling $2,151,004.46.[7] Procaps reserves the right to supplement this summary and figure at the time of an award.

## F. NPS' Best Price Claim Fails

In its opening brief, NPS articulates for the first time its claim that Procaps violated the "best price" provisions of the Paintball Agreement, specifically Sections 3.03 and 3.04. (NPS-3.) As discussed below, Procaps did not violate these provisions.

NPS contends that Procaps violated the best price provisions of the Paintball Agreement in two ways. First, NPS alleges that Procaps charged third-parties less than it should have for QIP ("X-Ball") paintballs by "pretending" that X-Ball Gold, Silver and Bronze paintballs corresponded to a lower pricing structure in Schedule A to the Paintball Agreement than how they should have been classified. (NPS Op. Br. at 81-82.) This allegation is without merit. Schedule A to the Paintball Agreement provides that QIP paintballs with a two-tone shell,

---

[7] Should the Panel like to receive any additional detail or support for these costs, Procaps would be happy to provide it.

metallic ingredient and medium fill are the equivalent of the "Mid Level" paintballs sold

exclusively to NPS.  NPS-3 at Sched. A.  On direct examination, Craig Miller, Procaps' Vice

President of Sales, testified that, although X-Ball Bronze is a metallic two-toned ball, (Miller

9/27 Tr. at 76), "X-Ball Bronze is a...Midnight [or Low Level] equivalent" because "X-Ball

Bronze [paintballs] are made from recycled ribbon, [ribbon that has] already been used."  Miller

9/27 Tr. at 104-106.  Mr. Miller further explained that in manufacturing X-Ball Bronze

paintballs, Procaps does not "add any metallic content into the product, but the ribbon contains it.

[X-Ball Bronze] has sort of a metallic look, *but it is not an ingredient.  It is not a cost factor.*"

Miller 9/27 Tr. at 106(emphasis added).  Thus, although X-Ball Bronze paintballs may have a

metallic appearance (which is NPS' sole basis for is allegation that it was misclassified), metal is

not added to nor is it figured into the manufacturing cost for these paintballs.  As such, NPS'

claim that Procaps was "pretending" that X-Ball Gold, Silver and Bronze paintballs

corresponded to a lower pricing structure in Schedule A of the Paintball Agreement is clearly

unsubstantiated.[8]

Second, NPS contends that Procaps made "no effort whatsoever to charge third

parties for X-Ball or private label paintballs" in accordance with the pricing structure in Schedule

A of the Paintball Agreement.  (NPS Op. Br. at 83.)  Once again, NPS' position is erroneous and

unsupported by the evidence.

Pursuant to Sections 3.03 and 3.04 of the Paintball Agreement, Procaps was

permitted to sell X-Ball (QIP) and private label (OEM) paintballs to third-parties.  The prices for

these paintballs were "predicated on the purchase volumes of said third-party purchasers as set

---

[8] Importantly, X-Balls sold to NPS were classified in the same manner, so even if the balls were misclassified, NPS cannot complain because it received the full benefit of that misclassification.

forth in Schedule A attached hereto…" NPS-3 at 3.03(i) and 3.04(ii). The volume cut-offs for prices of X-Ball paintballs were 30 trucks, 12 trucks, 84 skids and *ad hoc* prices for volumes under 84 skids. NPS-3 at Sched A. The volume cut-offs for prices of private label paintballs were 30 trucks, 12 trucks and 84 skids. *Id.* To determine which pricing a customer would receive for X-Ball and private label paintballs, Procaps had to forecast the future purchase volumes of these respective paintballs for each third-party customer for a one-year period. *Id.* at Sched. A.[9]

NPS contends that the third-party pricing for X-Ball and private label paintballs depended on the volume amount each third-party customer bought on an "annualized basis," starting September 20, 2004 when the Paintball Agreement was executed. (NPS Op. Br. at 83-84.) Using this method, and inexplicably looking at dollar figures rather than actual purchase volumes (which were provided in discovery to NPS but not utilized by NPS at the Hearings), NPS contends that because certain third-party purchasers were allegedly not on track for meeting the volume targets, Procaps did not meet its obligations under the best price provisions to NPS.

NPS fails to take into account a number of key factors, however, and thus its argument must fail. First, NPS contends that the year to be utilized to determine if a third-party was entitled to the price it received was *NPS'* Purchase Year, as defined by the contract: *i.e.*, "successive period of twelve (12) full months following the Agreement Date ('Purchase Year')" as defined throughout Section 3 of the Agreement. (*See* NPS-3 at 3.06, 3.08, 3.10 and 3.11.) There is no basis for assuming that, however, and it is far more likely that the appropriate year

---

[9] The parties are in agreement that the third-parties' volumes must be forecasted and calculated on an annual basis, rather than on a purchase-by-purchase basis. Furthermore, Mr. Miller testified that Procaps used its "very best efforts" to forecast the purchasing volumes for each third-party purchaser. Miller 9/27 Tr. at 95.

would be the *third-parties'* purchase year. Alternatively, the year could even be a calendar year. The agreement is silent and NPS has submitted no evidence as to the proper year.

Second, even assuming NPS is correct and the Purchase Year should be used, there were at least three (3) months remaining in the purchase year after the termination date and there is no basis for presuming that annualizing a third-parties' purchases is an appropriate forecasting measure. Once again, NPS has submitted no evidence to support its position that an "annualized" basis is a proper measure. Furthermore, even if it would be proper to "annualize" a third-parties' purchases, this calculation should have been performed on the basis of the appropriate purchase year, *i.e.*, the third-parties' purchase year.

Third, NPS inexplicably ignores third-parties' purchases of generic paintballs, which would be permissible under the agreement and count towards the requisite volumes.

Fourth, NPS ignores the fact that several of the entities it identifies are related parties (*e.g.*, X-Ball Direct, Generation E and Cousins), and thus their purchase volumes must be considered collectively.

Fifth, NPS ignores entirely the fact that X-Ball sales to these third-parties were abruptly cut-off – after agreements had been reached with the third-parties on forecasting and pricing – in order to accommodate NPS' desire to be the sole purchaser of X-Ball, even though it was not contractually entitled to do so. R. Italia 9/8 Tr. at 44-45. Under these circumstances, it is entirely inappropriate to enforce any volume requirements on sales to third-parties. Were it not for the fact that their sales were cut-off because of NPS, it is entirely possible they would have purchased more than they did during the period at issue, within the forecast.

Finally, and perhaps most importantly, NPS *did receive the best price*. There is *no* third-party who paid a lower price than NPS and NPS has not established the contrary. Accordingly, for all these reasons NPS' best price claims must fail.

### G. NPS' Other Damages Are Otherwise Overstated and Flawed and Should be Limited by the Paintball Agreement Liquidated Damages Provision

Of course, Procaps respectfully submits that NPS' claims of bad faith and wrongful termination are entirely unfounded, and thus NPS should not be entitled to any damages whatsoever. If the Panel were to rule otherwise, however, as explained in Procaps' Opening Brief, NPS' damages claims are overstated and otherwise flawed, for a number of reasons.[10] (Procaps Op. Br. at 54-62.)

As also noted in Procaps' Opening Brief at page 57, however, NPS' damages with respect to the Paintball Agreement should be limited by the liquidated damages provision in Section 8.05 of that agreement. NPS-3 at 8.05. As discussed in Procaps' Opening Brief, under New Jersey law, whether a liquidated damages provision is enforceable must be determined on a case-by-case basis, looking at both the particular provision at issue and the circumstances at the time of breach. (Procaps Op. Br. at 53-54 *citing cases*.) Unlike Secton 8.04, which applies to Procaps, the liquidated damages provision that applies to NPS (Section 8.05) does not merely require specific performance, which would be generally frowned upon, but also payment of a dollar amount. Specifically, Section 8.05 provides that, in the event NPS can demonstrate that Procaps breached the agreement, NPS would be entitled to purchase product from Procaps for a one year period. In addition, NPS would be entitled to a payment of $1.7 million less $50,000

---

[10] NPS' only argument in support of its damages claims is that its expert, Mr. Newman, utilized the same general methodology as Procaps' expert, Dr. Epstein. Even if that were true, which Procaps disputes, as explained in Procaps' Opening Brief, Mr. Newman's application of that methodology was critically flawed and thus his testimony should be excluded or, at the very least, NPS' damages claims significantly reduced to account for these flaws. Procaps Op. Br. at 54-62.

for each month the contract was in existence.  In contrast, Section 8.04 provides that, in the event Procaps can demonstrate that NPS breached the agreement, Procaps would be entitled to require NPS to purchase product from Procaps (in declining amounts) for an 18-month period.  Thus, while both provisions provide for specific performance, the NPS provision contains a cash payment, while the Procaps provision does not.  This factor alone leans towards enforcement of the NPS provision and not the Procaps provision.

Second, while specific performance will not be required under New Jersey law, *River Road Assocs. v. Chesapeake Display & Packaging Co.*, 104 F. Supp.2d 418, 425 (D.N.J. 2000) ("provisions which seek to secure performance, as opposed to merely provide just compensation for non-performance, are unenforceable") (*citing Waserman's Inc. v. Township of Middletown,* 645 A.2d 100, 108-109) (N.J. 1994)), it is reasonable to apply the economic equivalent of such clause as a limitation on damages.  For example, NPS' damages claims for "convoyed sales" or profit erosion are clearly outside the scope of the kinds of damages contemplated by Section 8.05 (let alone otherwise flawed), and should be excluded on this basis alone.  Thus, this provision should be used, at a minimum, as a limitation on the kind and amount of damages that NPS is able to recover, should it prevail.[11]

---

[11] Of course, as discussed in Procaps' Opening Brief, NPS' analysis of the economic equivalent of this provision – which is the appropriate limitation – is flawed and must be recalculated.  (Procaps Op. Br. at 62.)

## III.    CONCLUSION

For the reasons set forth herein, Procaps respectfully requests that the Panel find in its favor and against NPS on all claims, declare that the Paintball and Goggles Agreements were properly terminated and award Procaps: (1) $5,016,386 for the overdue receivable, plus interest in the amount of $381,468, for a total of $5,397,855; and (2) lost profit damages in the amount of $13,846,688, including interest, for a total damages award of $19,244,543, together with all costs incurred in this arbitration, including attorneys' fees, arbitrators' fees and all other costs of arbitration, totaling $2,151,004.46 as of December 31, 2006.

Respectfully submitted,

Francis P. Devine, III, Esquire
Nicole D. Galli, Esquire
Anthony Destribats, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Respondent and
Counterclaimant, Procaps L.P.

Dated: January 19, 2007