## PRODUCT SUPPLY AGREEMENT

THIS PRODUCT SUPPLY AGREEMENT ("Agreement") is made and entered into as of the last date indicated below upon which a party hereto subscribed its execution (the "Agreement Date"), by and between **PROCAPS ENCAPSULATION, INC.**, with an address at 6000 Kieran, St. Laurent, PQ, H4S 2B5, Canada ("QIP") and **NATIONAL PAINTBALL SUPPLY, INC.**, with an address 570 Mantua Blvd., Sewell, New Jersey 08080 ("NPS").

### RECITALS

WHEREAS, the parties hereto entered into that certain Wholesale Product Supply and Distribution Transfer Agreement dated as of February 28, 2002 ("First Agreement"), and that certain Amendment of Contract Terms dated as of May 11, 2004 ("First Addendum");

WHEREAS, certain disputes and differences have arisen by and between the parties hereto under the above referenced First Agreement and the First Addendum; and

WHEREAS, the parties hereto have agreed to resolve all outstanding disputes and to terminate the First Agreement and the First Amendment and contemporaneously enter into this Agreement pursuant to which NPS shall purchase Products (as defined herein) from QIP and all expressly in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises that are hereby incorporated as a part of this Agreement and the covenants hereinafter set forth, the parties, for themselves and for and on behalf of their respective owners, partners, affiliates, agents and/or permitted assigns, hereto further agrees as follows:

1. **DEFINITIONS**

1.01 As used in this Agreement the following terms, whether singular or plural, shall have the following meanings:

(i) **Agreement Date**: as used hereunder shall mean the date this Agreement was executed by the parties hereto.

(ii) **Paintball(s)**: as used hereunder and above shall mean all kinds of soft gelatin capsules containing dye or other marking material to be fired from paintball markers and commonly referred to as "paintballs".

(iii) **Diablo Paintball(s)** as used hereunder shall refer to any and all Paintballs manufactured under NPS' exclusive Diablo™ trademark/trade dress and including, but not necessarily limited to, Formula 13™, Crucifire™, Hellion™, Nightmare™, Heat™, Dark Legion™ and Aurora™

(iv) **DXS Paintball(s)**: shall refer to any and all Paintballs manufactured by QIP under the DraXxus™ trademark/trade dress and including, but not necessarily limited to, HellFire™, Imperial™, Arctic Inferno™, Inferno™, Blaze™, Field Blaze™, Midnight™ and RecSport™.

(v) **QIP Paintball(s)**: shall refer to any Paintballs manufactured by QIP under trademarks/trade dress owned, adopted and used exclusively by QIP, not including any of the marks associated with any of the DXS Paintballs or OEM Paintballs.



EXHIBIT
NPS-3

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043112

(vi) **OEM Paintball(s):** shall refer to any Paintballs manufactured by QIP under trademarks/trade dress owned, adopted or used exclusively by a single, unaffiliated, independent bona fide third party purchaser/distributor other than NPS.

(vii) **NPS Paintball(s):** as used hereunder shall refer to any and all Paintballs manufactured under NPS' trademarks/trade dress, other than any marks associated with Diablo Paintballs, and which may include, Thirty Two Degrees™ and Empire™.

(viii) **Product(s):** as used hereunder shall collectively refer to any Paintballs manufactured by QIP and sold to NPS pursuant to this Agreement.

(ix) **Canadian Territory:** as used hereunder shall refer to the entirety of the Country of Canada.

(x) **US Territory:** as used hereunder shall refer to the continental United States of America.

(xi) **North American Territory:** as used hereunder shall refer collectively to the Canadian Territory and US Territory.

(xii) **European Territory:** shall refer the area comprising the entirety of England, Scotland, Wales, the Republic of Ireland, Northern Ireland, Portugal, Spain, France, Germany, Italy, Switzerland, Belgium, Luxemburg, Austria, Croatia, Serbia, Montenegro, Macedonia, Albania, Greece, Bulgaria, Bosnia, Herzegovina, Romania, Moldova, Hungary, Slovenia, the Czech Republic, Slovakia, The Netherlands, Poland, Belarus, Ukraine, Lithuania, Latvia, Estonia, Finland, Sweden, Norway, Denmark and Russia.

(xiii) **Territory:** shall refer to entire world including, but not limited to, the Canadian Territory, the North American Territory and the European Territory.

(xiv) **Conventional Market:** as used hereunder and above shall mean any wholesale and/or retail outlet located in the North American Territory where more than fifteen percent (15%) of the gross sales of said outlet are derived from Paintballs and paintball game related products and services; including, but not necessarily limited to, paintball game retail stores, paintball fields and game sites, paintball tournaments and special events.

(xv) **Non-Conventional Market:** as used hereunder and above shall mean any retail outlet located in the North American Territory where less than fifteen percent (15%) of the gross sales of said outlet are derived from Paintball and paintball game related products and services.

(xvi) **Order(s):** as used hereunder shall mean a written purchase order for Products submitted by NPS to QIP.

2. **TERMINATION OF THE FIRST AGREEMENT AND THE FIRST ADDENDUM**[1]

2.01 Contemporaneously upon the execution of this Agreement the parties hereto terminate the First Agreement and the First Addendum and agree that neither party shall have any further liability under the First Agreement and the First Addendum, except for any liability or obligation accruing prior to the date of termination or any obligation or liability, which from the context of

---

[1] Terms defined in the various sections of the First Agreement and/or the First Addendum referenced in Section 2 of this Agreement shall have the same respective meanings as defined under the First Agreement and/or the First Addendum unless otherwise expressly set forth herein.

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043113

the First Agreement or the First Addendum is intended to survive termination and including any liability or obligation set forth in this Section 2 herein which the parties hereto expressly agree shall survive termination.

2.02   In respect to the First Agreement, the parties hereto expressly republish, reconfirm and agree that the following provisions shall be incorporated into this Agreement:

   (i)   In respect to all Paintballs (as defined in the First Agreement) manufactured by QIP and purchased by NPS prior to the date of this Agreement the parties hereto agree that the Product Warranty and Indemnification provisions set forth in Section 6 of the First Agreement shall remain operative.

   (ii)   In respect to the Transfer and Assignment of DDUSA (as defined under the First Agreement), the parties hereto agree that the provisions set forth in Sections 10, 11, 13, 14 and 16 of the First Agreement shall remain in full force and effect from and after the date of this Agreement.

2.03   In respect to the First Addendum, the parties hereto expressly republish, reconfirm and agree that the following provisions shall be incorporated into this Agreement:

   (i)   The entirety of Section 3(ii) of the First Addendum shall remain in full force and affect from and after the date of this Agreement, subject to the following understanding:

      (a)   Only after eighteen (18) full months from and after the date of this Agreement, QIP may sell QIP Paintballs and/or OEM Paintballs (both as defined under this Agreement) to customers in or for resale to the European Territory (as defined under this Agreement) in accordance with the terms of this Agreement.

   (ii)   The entirety of Section 6(i) of the First Addendum shall remain in full force and effect from and after the date of this Agreement.

   (iii)   In respect to the Transfer and Assignment of DDEURO (as defined under the First Addendum), the parties hereto agree that the entirety of the provisions set forth in Section 8 of the First Addendum shall remain in full force and effect from and after the date of this Agreement, subject to the following understanding:

      (a)   NPS shall be afforded a period not to exceed twenty-one (21) days from and after the date of this Agreement to bring the payments under Section 8(xvi)(b) of the First Addendum current.

3.   **EXCLUSIVE MANUFACTURE; EXCLUSIVE DISTRIBUTOR; PAINTBALL CLASSIFICATIONS; MINIMUM PURCHASES; SUPPLY; TERRITORY**

3.01   Subject to Section 15.02 herein, during the term of this Agreement and any renewal term(s) thereof, NPS shall purchase all of its requirements for Diablo Paintballs in the Territory from QIP and QIP shall be the exclusive manufacturer-supplier of Diablo Paintballs to NPS. NPS shall not authorize any other person or entity, unless necessitated in accordance with Section 3.01(i) and 3.01(ii) herein, to manufacture and/or supply Diablo Paintballs to NPS.

   (i)   As an exception to the foregoing, NPS may secure its requirements of "Diablo Dark Legion™" and/or "Diablo Aurora™", glow in the dark Paintballs and any Diablo

3

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043114

Paintballs intended for sale in and to the Non-Conventional Market independent of QIP provided QIP is given first right of refusal to match price and other terms NPS is able to secure in the marketplace.

(ii) In the event QIP cannot produce the requisite number, grade or type of Diablo Paintballs that NPS forecasts it will need under this Agreement, subject to Section 4.01 and Section 4.02 herein, NPS shall be entitled to consent to another party being granted a temporary, non-exclusive license to manufacture the Diablo Paintballs for sale to NPS; provided, however, that notwithstanding this provision, QIP shall, at all times, have the exclusive right to manufacture the Diablo Paintballs up to the maximum amount that QIP is capable of producing in any month, from time to time, during the term of such non-exclusive license pursuant to this Agreement, on a priority basis over any other temporary licensees.

(iii) If any Diablo Paintballs are manufactured by an entity other than QIP pursuant to Sections 3.01(i) and 3.01(ii) above, NPS covenants to ensure that either a different country of origin is set forth on each Diablo Paintball package to differentiate it from QIP manufactured Diablo Paintballs and/or, if NPS is securing the Diablo Paintballs from another Canadian manufacturer, to expressly set forth the name of the other manufacturer. Nothing hereunder shall be read to limit or obviate anything set forth in Section 4.06 herein.

3.02 During the term of this Agreement and any renewal term(s) thereof, NPS shall purchase all of its requirements for DXS Paintballs in/for the Territory from QIP and QIP shall be the exclusive manufacturer-supplier of DXS Paintballs to NPS. During the term of this Agreement and any renewal term(s) thereof and subject to the terms, conditions and limitations herein, QIP appoints NPS to serve as the exclusive distributor for DXS Paintballs in and throughout the Territory and NPS accepts such appointment. Further, except as provided in Section 3.02(i) herein, QIP shall not appoint other distributors for DXS Paintballs in the Territory and/or sell its DXS Paintballs through independent sales representatives and/or by direct sales in the Territory at retail (including the Non-Conventional Market), wholesale or otherwise.

(i) As an exception to the foregoing, QIP may continue to sell its DXS Paintballs to its Canadian distributor for a period not to exceed six (6) full months from and after the Agreement Date or on or before the "Skydome 2005 Canadian Paintball Tournament (whichever shall occur first) for resale in and throughout the Canadian Territory. After the aforementioned period, QIP covenants that it's Canadian distributor shall cease selling any DXS Paintballs in and throughout the Canadian Territory.

3.03 Subject to the terms, conditions and limitations set forth herein, QIP may manufacture and sell each brand of OEM Paintballs to single, unaffiliated bona fide independent third party purchaser. Nothing herein shall be interpreted to limit the number of different customers that QIP may provide different brands of OEM Paintballs to in the general course of business. QIP shall not actively participate in the promotion or advancement of any OEM Paintball and at all times the prices QIP charges purchasers of OEM Paintballs, including rebates and sponsorships, shall be proportionally in accordance with the initial prices set forth on Schedule A, setting forth the prices for DXS Paintballs, Diablo Paintballs and OEM Paintballs.

(i) The parties acknowledge that the prices QIP shall sell the various OEM Paintballs to third parties are predicated on the purchase volumes of said third party purchases. NPS shall be entitled to secure an unaffiliated third party reasonably acceptable to QIP in order to audit and confirm that the prices QIP's customers are

*G-P-*
*87*

4

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043115

purchasing OEM Paintballs for are in accordance with Schedule A and section 3.03 herein above.

3.04  Subject to the terms, conditions and limitations set forth herein, QIP may manufacture, market, promote and sell QIP Paintballs to NPS and third parties. For the first thirty-six (36) full months from and after the Agreement Date, NPS shall have the right to purchase any and all QIP Paintballs manufactured by or for QIP on a non-exclusive basis from QIP. After thirty-six (36) full months from and after the Agreement Date, and subject to the terms, conditions and limitations set forth herein, QIP shall have the discretion as to whether or not it wishes to sell any new QIP Paintball introduced from and after thirty-six (36) full months from and after the Agreement Date to NPS.

(i)  Subject to Section 15.02 herein, the parties acknowledge that the prices at which QIP shall sell the various QIP Paintballs to third parties are predicated on the purchase volumes of said third party purchases as set forth in Schedule A attached hereto and/or pursuant to the following provisions.

(ii)  During the term of this Agreement or any renewal term(s) thereof, NPS would at all times be afforded the "Best Price" for and/or on QIP Paintballs NPS is to purchase hereunder, which shall be equal to the lowest price QIP charges any other purchaser of QIP Paintballs purchased at the volume breaks set forth on Schedule A attached hereto. Without limiting the foregoing, during the term of this Agreement and any renewal term(s) thereof, subject to Section 15.02 herein, the "Best Price" for QIP Paintballs shall, at a minimum, always be QIP's "thirty truck price" established from time to time and, at a minimum, two dollars ($2.00) higher per case of 2000 rounds compared to any corresponding DXS Paintball or Diablo Paintball with the same characteristics.

(iii)  QIP may establish wholesale and retail MAP type prices for QIP Paintballs and NPS will strictly adhere to the same. QIP shall be entitled to secure an unaffiliated third party reasonably acceptable to NPS in order to audit and confirm that the prices to NPS' customers are maintained in accordance with said MAP prices.

(iv)  NPS shall be entitled to secure an unaffiliated third party reasonably acceptable to QIP in order to audit and confirm that the prices QIP's customers are purchasing QIP Paintballs for are in accordance with Schedule A and this Section 3.04 herein.

3.05  On a wholly discretionary, *ad hoc* basis, the parties may agree that QIP may manufacture and sell NPS Paintballs to NPS for the prices and terms established for corresponding DXS Paintballs and Diablo Paintballs.

3.06  NPS shall, at a minimum, for every successive period of twelve (12) full months following the Agreement Date ("Purchase Year") during the term of this Agreement and any renewal term(s) thereof, purchase ONE BILLION SEVEN HUNDRED MILLION (1,700,000,000) Paintballs comprised of the DXS Paintballs and/or Diablo Paintballs from QIP ("Base Minimums").

3.07  NPS shall Order, pursuant to Section 4.01 herein, at all times during the term of this Agreement and any renewal term(s) thereof, a minimum of ONE HUNDRED MILLION (100,000,000) Paintballs per month, except for the months of February and August where NPS may purchase a minimum of SEVENTY FIVE MILLION (75,000,000) Paintballs ("Monthly Base Minimums") comprised of DXS Paintballs and/or Diablo Paintballs/NPS Paintballs.

G.P.-
5

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043116

3.08   Over the first five (5) purchase years following the first two (2) Purchase Years, the parties hereto agree that NPS shall increase its purchases of DXS Paintballs and/or Diablo Paintballs/NPS Paintballs by ten percent (10%) each Purchase Year during these first five (5) Purchase Years following the first two (2) Purchase Years (the "Adjusted Yearly Minimums"). Increases in the Adjusted Yearly Minimums for any given Purchase Year shall be adjusted downward if through statistical industry data, it can be sufficiently demonstrated that the "paintball industry" during the relevant Purchase Year decreased by at least ten percent (10%). The Adjusted Yearly Minimums shall not be increased if it can be sufficiently demonstrated that the "paintball industry" during the relevant Purchase Year did not change by at least ten percent (10%). The Adjusted Yearly Minimums shall be ascertained independent of the amount of DXS Paintballs and/or Diablo Paintballs/NPS Paintballs actually sold and/or purchased by the parties hereto during any given Purchase Year.

3.09   The parties hereto acknowledge that if NPS is compelled to secure Diablo Paintballs pursuant to the provisions of Section 3.01(i) and 3.01(ii) that the Base Minimums, Monthly Base Minimums and/or Adjusted Yearly Minimums shall be decreased by the amount of Diablo Paintballs purchased pursuant to said provisions.

3.10   Over every Purchase Year during the term of this Agreement and any renewal term(s) thereof, NPS shall purchase a minimum of NINE HUNDRED MILLION (900,000,000) DXS Paintballs (excluding Blitz™ and RecSport™), FIVE HUNDRED MILLION (500,000,000) Diablo Paintballs/NPS Paintballs and THREE HUNDRED MILLION (300,000,000) RecSport™, Competitive Edge™ and Blitz™ Paintballs.

3.11   Over every Purchase Year during the term of this Agreement and any renewal term(s) thereof, NPS shall purchase DXS and Diablo Paintballs/NPS Paintballs from QIP in reasonable accordance with the Monthly Blend, as more fully set forth on Schedule A attached hereto.

4.   **FORECASTING; MANUFACTURE; ORDERS; PACKAGING**

4.01   NPS will Order Products from QIP by endeavoring to maintain QIP with a forty-five (45) day rolling forecast and a twenty-one (21) day rolling Order procedure. NPS and QIP agree to design a mutually agreeable system and documentation for the contemplated forecast/Order procedure.

4.02   Subject to the provisions of Section 4.01 above, NPS must give forty-five (45) days written notice to QIP that NPS will require QIP to significantly increase QIP's production of the Products to a specific number of units specifying the specific colors, packing type and other production attributes for the specific Order covered by the notice.

4.03   NPS shall purchase Products pursuant to an Order. The Order shall set forth the description of the Product(s) being purchased, date and time of delivery, associated color(s), quantity(ies) and relevant shipping information.

4.04   Subject to the provisions of Section 4.01 and Section 4.02 above, QIP shall use its best efforts to ship, subject to Section 5.07, the Products to NPS, or NPS' designee, in accordance with the terms of each Order, provided it is reasonable under the circumstances.

4.05   Over the general course of business, NPS shall have the first priority to any available production and NPS' Orders shall be satisfied before any OEM Paintball and/or QIP Paintball orders.



6

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043117

4.06    The prices QIP charges NPS for the Products set forth in Section 5 herein shall include packaging. The packaging characteristics of the various Products to be sold hereunder are more fully set forth on Schedule A hereto.

    (i)    DXS Paintballs and Diablo Paintballs shall be packaged and labeled in a manner that inures to the benefit of NPS. No trademark or logo that NPS does not hold an exclusive interest in shall appear on any DXS Paintball or Diablo Paintball package, and NPS' name, address and designated website shall be independently set forth on all DXS Paintballs and Diablo Paintball packages.

    (ii)   QIP Paintballs shall be packaged and labeled under exclusive trade names and logos according to QIP's sole discretion and may be changed from time to time at the discretion of QIP.

    (iii)  Diablo Paintball and NPS Paintballs, if applicable, shall be packaged by QIP based upon, and in accordance with, schematics and under exclusive trade names and logos provided by NPS, which may be changed by NPS from time to time on reasonable notice to QIP and in a manner that provides QIP and NPS with the opportunity to extinguish or otherwise use inventories of printed boxes.

    (iv)   QIP shall ensure that logos and manufacture's indicia set forth on QIP Paintballs are different from any logos, names and/or addresses to appear on any DXS Paintballs.

5.    **PRICING TERMS**

5.01    NPS shall pay QIP the base prices specified in Schedule A attached hereto. The prices QIP charges NPS for the Products set forth in Schedule A herein shall include, subject to Section 4.06, packaging and shipping, FOB NPS, or NPS' designee, pursuant to Section 5.07 herein.

5.02    NPS shall be responsible to pay QIP for Products purchased hereunder, including those purchases of Products shipped outside of the North American Territory, on or before Forty-Five (45) days from the date the respective Products are shipped from QIP's manufacturing facilities, or otherwise upon such other terms and conditions to be negotiated by and between the parties hereto from time to time and incorporated thereafter into Orders on an *ad hoc* basis.

5.03    During the term of this Agreement and any renewal term(s) thereof, QIP shall maintain its pricing to allow NPS to remain competitive in its Paintball marketplace by periodically calibrating said base prices against those prices charged by other manufacturers in the Paintball Industry including, but not limited to, R.P.S., Zap, Nelson and other manufacturers.

5.04    NPS shall market and resell the various grades of Products contemplated hereunder in a manner and for prices commensurate with the industry generally and, specifically, in regard to QIP Paintballs in a manner that comports with Section 3.05(i) herein, and, in regard to DXS Paintballs, in a manner that does not independently, from a wholesale market perspective, drive or otherwise establish the "lowest price".

5.05    Without limiting anything set forth in Section 5 herein, QIP may, however, increase the base prices set forth on Schedule A attached hereto as such increases may be necessitated by increases in QIP's raw material, production including packaging costs, labor costs and justified by market conditions, on providing NPS with forty-five (45) days prior written notice of such price increase.

*G.P.*
*7*

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043118

5.06   The prices that QIP charges NPS for DXS Paintballs, NPS Paintballs and Diablo Paintballs shall not exceed the lowest price QIP charges to any other customer, including Non-Conventional Market customers, purchasing like products.

5.07   The Products shall be shipped FOB NPS or FOB NPS' designee; provided, however, a minimum of Seven (7) full skids of Paintballs comprise each said shipment for shipments made within the North American Territory and said shipment is otherwise in close proximity and/or on route (i.e. within 100 miles from facility/route or otherwise by agreement) to one of NPS' bona fide distribution centers, and Twenty-Four (24) full skids of Paintballs for all other shipments worldwide, subject to the following:

    (i)   In the event an amount of Paintballs less than Seven (7) full skids (on route) is requested or otherwise required by NPS to be shipped within the North American Territory, NPS shall pay QIP 1/10 of one cent per Paintball in and comprising the shipment in consideration for QIP shipping the same. In no event shall QIP be responsible to ship an amount of Paintballs less than two (2) full skids.

    (ii)   NPS shall be responsible for all shipping charges associated with shipping the Products outside of the North American Territory and QIP shall, at NPS' discretion, charge NPS for the shipping pursuant to an invoice or ship the Products to NPS, as NPS directs, in the North American Territory for NPS' coordinate.

5.09   Risk of Loss on and for all Products purchased pursuant to and under this Agreement shall pass to NPS upon NPS' or NPS' designee's receipt of said Products.

6.   **PRODUCT WARRANTY & INDEMNIFICATION**

6.01   QIP warrants that all Paintballs manufactured and supplied to NPS under this Agreement, except those grades of Paintballs designated as "White Box" (including, but not necessarily limited to Blitz™ and Comp Edge™), shall be free from defects in materials and workmanship. QIP will replace any lot of Paintballs, or that amount or portion of a lot either still in NPS inventory and subsequently returned to or replaced by NPS that do not conform to the foregoing warranty provided NPS notifies QIP in writing of such non-conformity immediately upon discovery through inspection or upon notice by one or more of NPS' customers having received such non-conforming Paintballs. NPS shall endeavor to, but shall not be strictly responsible to, inspect each lot of Products as the same arrives at NPS' respective warehouse facilities in order to prevent or minimize the instances where a specific lot or portion thereof will have been resold prior to the discovery of defective or non-conforming Paintballs. The preceding warranty is understood by the parties hereto to apply to all or substantially all of a lot of Paintballs and is not intended to apply to instances where the majority of a lot cannot be accounted for and/or established certain to have been defective or otherwise at variance to the foregoing warranty. Further, the warranty contemplated hereunder, exclusive of the 36 pallets provided for in Section 6.01(i) herein, shall not apply to physical damage to the Product packaging caused by handling and shipping after completed manufacture.

    (i)   Without limiting the foregoing and without having to account for the entirety or substantially the entirety of a given lot, NPS shall be entitled to return, as of right, 36 pallets of miscellaneous Product(s) each Purchase Year during the term of this Agreement, and any renewal term(s) thereof, for replacement.

8

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043119

6.02  Without limiting the foregoing, acceptance of Paintballs, including the Products by NPS shall be subject to inspection and approval by NPS with respect to whether each lot of Products is not defective.

6.03  Except for any liability that may arise from claims or actions from third party users of the Products, in no event shall QIP or NPS be liable to the other party for (a) any delay in the delivery of Products to NPS or by NPS to a third party, or (b) any special, indirect, consequential or incidental damages whatsoever.

6.04  Notwithstanding the fact that NPS covenants at all times, during the term of this Agreement and any renewal term(s) thereof, to maintain on an occurrence basis, at NPS' expense, standard comprehensive general liability insurance coverage for property damage and personal injury from a qualified insurance carrier, as to all sales of Products by QIP to NPS, QIP shall maintain general liability insurance with coverage in the amount of Three Million Dollars ($3,000,000.00), or in amounts as the parties may mutually agree, and QIP hereby agrees to indemnify and hold harmless NPS as specified below:

(i)  QIP hereby agrees to indemnify and hold harmless NPS from and against all claims, suits, actions, proceedings, judgments, deficiencies, liabilities, costs and expenses (including reasonable attorney's fees) as and when incurred in connection with or arising out of the sale or distribution of the Products by NPS; provided however, that no right of indemnification by QIP, pursuant to the provisions contained herein, or otherwise, shall be available to NPS unless the Products which are the subject matter of any such claims, suits, actions, proceedings, judgments, deficiencies, liabilities, costs and expenses (including reasonable attorney's fees) have not been altered or in any way changed by NPS.

(ii)  No right to indemnification under this section 6.04 shall be available to NPS hereto unless it shall have given QIP prompt notice ("Claim Notice"), pursuant to the provisions of this Section 6.04(ii), describing in reasonable detail the facts giving rise to the claim for indemnification after receipt of such knowledge of the facts upon which the claim is based. Upon receipt by QIP of a Claim Notice from NPS with respect to any claim of a third-party, QIP may assume the defense thereof with counsel reasonably satisfactory to NPS and NPS shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony and attend all such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith. NPS shall have the right to employ its own counsel in any such case, but the fee and expenses of such counsel shall be at the expense of NPS unless QIP shall not have promptly employed counsel reasonably satisfactory to NPS to take charge of the defense of such action, in which case such fees and expenses shall be borne by QIP, and QIP shall not have the right to direct the defense of any such action on behalf of NPS. NPS shall give notice, pursuant to Section 16.06 hereof, to QIP of any proposed settlement of any claim, which settlement QIP may reject in its reasonable judgment within 10 days of receipt of such notice. QIP shall have the right, in its sole discretion, to settle any claim for monetary damages for which indemnification has been sought and is available hereunder.

7.  **LICENSES**

7.01  Upon the Agreement date and during the term of this Agreement, QIP hereby grants, and NPS hereby accepts, an exclusive, worldwide, royalty-free license to use those QIP exclusive trademarks and proprietary names, which may be supplemented by QIP from time to time, including but not necessarily limited to Hellfire™, Imperial™, Inferno™, Arctic Inferno™, Midnight™, Field

9

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043120

Blaze™, Blaze, RecSport™ and DraXxus™ (collectively "DXS Marks") for the sale and promotion of DXS Paintballs in the Territory and in accordance with the terms of this Agreement. The QIP Marks may be supplemented from time to time, and notification of such additions shall be supplied to NPS for written agreement that such additions are included within the definition of DXS Marks for the purpose of this Agreement. Further, upon the Agreement date and during the term of this Agreement, QIP hereby grants, and NPS hereby accepts, a non-exclusive, worldwide, royalty-free license to use those QIP exclusive trademarks and proprietary names, which may be changed and supplemented by QIP from time to time, including but not necessarily limited to "XBALL Paintballs" (collectively "QIP PB Marks") for the sale and promotion of QIP Paintballs in the Territory and in accordance with the terms of this Agreement. The QIP PB Marks may be changed and supplemented from time to time, and notification of such changes and/or additions shall be supplied to NPS for written agreement that such additions are included within the definition of QIP PB Marks for the purpose of this Agreement. Hereinafter, the DXS Marks and the QIP PB Marks shall collectively be referred to as the "QIP Marks".

(i) Ownership Of Mark. NPS acknowledges that QIP is the owner of the QIP Marks. NPS agrees that it shall do nothing inconsistent with such ownership and that use of the QIP Marks by NPS should inure to the benefit of and be on behalf of QIP. NPS further agrees that (i) nothing in this Agreement shall give NPS any right, title or interest in the QIP Marks, other than the right to use the QIP Marks solely in accordance with this Agreement; and (ii) it shall at no time question or contest the title of QIP to the QIP Marks, or the validity of the QIP Marks.

(ii) Quality Standards. NPS agrees that it will sell, distribute and market the QIP Marked Paintballs in accordance with this Agreement. QIP shall have the right from time to time to require that NPS submit samples of NPS' use of the QIP Marks to QIP for inspection and approval. NPS agrees to use its best reasonable efforts to ensure that the quality of NPS' use of the QIP Marks is commensurate with the goodwill and reputation associated with the QIP Marks. NPS shall comply, at all times and at its own expense, with all laws, rules and regulations affecting or relating to this Agreement or pertaining to its sale, distribution and marketing of Paintballs bearing the QIP Marks and shall obtain all governmental approvals required by such laws, rules and regulations.

(iii) Form Of Use. NPS shall use the QIP Marks only in a form and manner and with appropriate legends, such as "™" or "®" as may be prescribed, such prescription to be reasonable, or approved, such approval not to be unreasonably withheld, from time to time by QIP. NPS shall supply QIP, upon request, with specimens of the use of the QIP Marks, as in advertising and promotional materials, or associated with the QIP Marked Paintballs for inspection.

(iv) Intellectual Property Warranty and Indemnification.

(a) To the knowledge of QIP, QIP hereby represents and warrants that the QIP Marks do not infringe upon, violate or constitute the unauthorized use of the intellectual property rights of any third party. There is no pending or, to the knowledge of QIP, threatened (in writing or otherwise) claim before any court, agency, arbitral tribunal, or registration authority in any jurisdiction (i) involving any of the QIP Marks owned or used by QIP with respect to DXS Paintballs and/or QIP Paintballs, (ii) alleging that the QIP Marks do or will infringe upon, violate or constitute the unauthorized use of the intellectual property rights of any third party or (iii) challenging the ownership, use, validity, enforceability or

10

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043121

registrability of any QIP Marks by QIP. There are no settlements, forebearances to sue, consents, judgments, or orders or similar obligations (other than license agreements in the ordinary course of business) which (a) restrict the rights of QIP to use any material QIP Marks, or (c) permit third parties and/or NPS to use any QIP Marks owned by QIP with respect to DXS Paintballs and QIP Paintballs pursuant to this Agreement.

(b)     In no event will NPS or agents and/or affiliates be liable for any lost revenue, profit, or for special, indirect, consequential, incidental or punitive damages, however caused regardless of the theory of liability, arising out of or related to the use of any of the QIP Marks, even if NPS has been advised of the possibility of such damages. QIP agrees to hold NPS harmless and to indemnify NPS against any charges of infringement.

(c)     QIP shall, at its own expense, defend, indemnify and hold harmless NPS, its affiliates, and each of their respective directors, officers, experts, contractors, representatives and employees against all losses, injuries, damage, liabilities, expenses, costs, fees (including reasonable attorney's fees), judgments or orders in favor of third parties or claims, demands, allegations, actions, or rights of action of third parties arising from any use of the QIP Marks.

(v) Term & Termination. This trademark license shall terminate upon the termination or sooner cancellation of this Agreement and the termination or sooner cancellation of this Agreement shall not affect any obligation or liability accruing prior to the date of termination or any obligation or liability, which from the context of this Agreement is intended to survive termination.

7.02    Upon the Agreement date and during the term of this Agreement, NPS hereby grants, and QIP hereby accepts a non-exclusive, nontransferable, royalty-free license to use those NPS exclusive trademarks and proprietary names, which may be changed and supplemented by NPS from time to time, including but not necessarily limited to Diablo™, Crucifire™, Hellion™ Formula 13™, Blitz™, Heat™ and Nightmare™ (collectively "NPS Marks") for the manufacture and sale of Paintballs exclusively to NPS and in accordance with the terms of this Agreement. The NPS Marks may be modified or supplemented from time to time, and notification of such modifications or additions shall be supplied to QIP for written agreement that such modifications or additions are included within the definition of NPS Marks for the purposes of this Agreement.

(i) Ownership Of Mark. QIP acknowledges that NPS is the owner of the NPS Marks. QIP agrees that it shall do nothing inconsistent with such ownership and that use of the NPS Marks by QIP should inure to the benefit of and be on behalf of NPS. QIP further agrees that (i) nothing in this Agreement shall give QIP any right, title or interest in the NPS Marks, other than the right to use the NPS Marks solely in accordance with this Agreement; and (ii) it shall at no time question or contest the title of NPS to the NPS Marks, or the validity of the NPS Marks.

(ii) Quality Standards. QIP agrees that it will manufacture and sell to NPS the NPS Marked Paintballs in accordance with this Agreement. QIP further agrees that the quality of the NPS Marked Paintballs will be of a quality commensurate with industry standards for each respective Grade of Paintball. QIP agrees to use its best reasonable efforts to ensure that the quality of the NPS Marked Paintballs is commensurate with the goodwill and reputation associated with the NPS Marks. NPS shall have the right to require from

11

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043122

time to time that QIP submit samples of the NPS Marked Paintballs for inspection. QIP shall comply, at all times and at its own expense, with all laws, rules and regulations affecting or relating to this Agreement or pertaining to its sale, distribution and marketing of Paintballs bearing the NPS Marks and shall obtain all governmental approvals required by such laws, rules and regulations.

(iii) Form Of Use. QIP shall use the NPS Marks only in a form and manner and with appropriate legends, such as "TM" or "®" as may be prescribed, such prescription to be reasonable, or approved, such approval not to be unreasonably withheld, from time to time by NPS. QIP shall supply NPS, upon request, with specimens of the use of the NPS Marks associated with the NPS Marked Paintballs for inspection.

(iv) Intellectual Property Warranty and Indemnification.

(a) To the knowledge of NPS, NPS hereby represents and warrants that the NPS Marks do not infringe upon, violate or constitute the unauthorized use of the intellectual property rights of any third party. There is no pending or, to the knowledge of NPS, threatened (in writing or otherwise) claim before any court, agency, arbitral tribunal, or registration authority in any jurisdiction (i) involving any of the NPS Marks owned or used by NPS with respect to Diablo Paintballs and/or NPS Paintballs (if applicable), (ii) alleging that the NPS Marks do or will infringe upon, violate or constitute the unauthorized use of the intellectual property rights of any third party or (iii) challenging the ownership, use, validity, enforceability or registrability of any NPS Marks by NPS. There are no settlements, forebearances to sue, consents, judgments, or orders or similar obligations (other than license agreements in the ordinary course of business) which (a) restrict the rights of NPS to use any material NPS Marks, or (c) permit third parties and/or QIP to use any NPS Marks owned by NPS with respect to Diablo Paintballs and/or NPS Paintballs (if applicable) pursuant to this Agreement.

(b) In no event will QIP or agents and/or affiliates be liable for any lost revenue, profit, or for special, indirect, consequential, incidental or punitive damages, however caused regardless of the theory of liability, arising out of or related to the use of any of the NPS Marks, even if NPS has been advised of the possibility of such damages. NPS agrees to hold QIP harmless and to indemnify QIP against any charges of infringement.

(c) NPS shall, at its own expense, defend, indemnify and hold harmless QIP, its affiliates, and each of their respective directors, officers, experts, contractors, representatives and employees against all losses, injuries, damage, liabilities, expenses, costs, fees (including reasonable attorney's fees), judgments or orders in favor of third parties or claims, demands, allegations, actions, or rights of action of third parties arising from any use of the NPS Marks.

(v) Term & Termination. This trademark license shall terminate upon the termination or sooner cancellation of this Agreement and the termination or sooner cancellation of this Agreement shall not affect any obligation or liability accruing prior to the date of termination or any obligation or liability, which from the context of this Agreement is intended to survive termination.

12

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043123