## 8.    TERM AND TERMINATION

8.01    This Agreement shall become effective on the Agreement Date and shall remain in full force and effect for a period of seven (7) years and shall thereafter be renewed automatically for another term of seven (7) years and thereafter shall be renewed automatically year to year unless terminated by either party upon written notice delivered at least six (6) months prior to the end of the initial term of this Agreement or any renewal term(s) thereof.

8.02    This Agreement shall immediately terminate if QIP or NPS becomes insolvent or bankrupt, or becomes subject to the provisions of the *Winding-Up Act (Canada)* or the *Bankruptcy and Insolvency Act (Canada)* or any other similar act of Canada or the United States of America or makes a proposal under any such act, or goes into liquidation, either voluntarily or under an order of a court of competent jurisdiction, or makes a general assignment for the benefit of its creditors generally or otherwise acknowledge its insolvency, or if a liquidator, a receiver or a trustee is appointed in bankruptcy or otherwise or an encumbrancer takes possession of the property of QIP or NPS.

8.03    This Agreement may be terminated (i) by QIP if NPS fails or otherwise defaults on making payments to QIP as and when such payments become due and payable and such default and/or failure continues for a period of thirty (30) days after notice, and NPS, before the expiration of said thirty (30) day period is unable to cure; or NPS otherwise fails to provide QIP with adequate assurances of performance, (ii) by either party if a representation made by the other party hereunder is false in some material respect, or (iii) by either party if the other party fails or refuses to take any action required to be taken thereby pursuant to the provisions contained herein and such default or failure continues for a period of thirty (30) days after notice.

8.04    In the event the Agreement is terminated or otherwise cancelled and said termination or cancellation is attributable to NPS' material breach or nonfeasance hereunder, NPS agrees, as liquidated damages therefor, the parties acknowledging that a measure of damages in the event of a breach or other default is difficult to ascertain, to continue purchasing Products, from QIP, in accordance with the following:

(i)    For six (6) full months from and after the date of termination, NPS shall purchase Products, comprised of DXS Paintballs and Diablo Paintballs/NPS Paintballs, in quantities equal to seventy-five percent (75%) of NPS' purchases realized over the six (6) month period preceding the date of termination or the pro rata Base Minimum/Adjusted Yearly Minimum (whichever is greater);

(ii)    Thereafter, for a second full six (6) month period, NPS shall purchase Products, comprised of fifty percent (50%) DXS Paintballs and fifty percent (50%) Diablo Paintballs/NPS Paintballs, in quantities equal to seventy-five percent of the quantities purchased in and over the preceding six month period;

(iii)    Thereafter, for a third and last six (6) month period, NPS shall purchase Diablo Paintballs/NPS Paintballs from QIP in quantities equal to seventy-five percent (75%) of the purchases realized in and over the second six (6) month period; and

(iv)    All purchases under Section 8.04 shall be upon all of the same licensure, ordering, warranty, packaging, payment and shipping terms as set forth hereunder and under the Agreement except NPS shall be responsible to pay QIP on or before Thirty (30) days from the date the respective Products are shipped from QIP's manufacturing

13

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043124

facility(ies).  Further, the quantities set forth this Section 8.04(i)-(iii) herein represent the maximum quantities that QIP may require NPS to purchase, however, QIP may, at QIP's discretion, opt to decrease the amount of Products to be made available to NPS upon thirty (30) days written notice.

    (v)    At the end of the eighteen (18) month period set forth above, QIP, at QIP's option, may purchase all remaining DXS Paintballs from NPS at NPS' cost in and for the same.

8.05    In the event the Agreement is terminated or otherwise cancelled and said termination or cancellation is attributable to QIP's material breach or nonfeasance hereunder, QIP agrees, as liquidated damages therefor, the parties acknowledging that a measure of damages in the event of a breach or other default is difficult to ascertain, to pay unto NPS an amount equal to One Million Seven Hundred Thousand Dollars ($1,700,000.00), less the balance owed on the amount paid for DDEuro as identified in Section 2 herein, less Fifty Thousand Dollars ($50,000.00) for each month this Agreement was operative measured from the Agreement Date to the date of termination, and, at NPS' option, QIP shall continue to manufacture and sell Products to NPS in accordance with the following:

    (i)    For twelve (12) full months from and after the date of termination, NPS may purchase Products, comprised of DXS Paintballs and/or Diablo Paintballs/NPS Paintballs and in quantities as NPS shall determine up to an amount equal to one hundred percent (100%) of NPS' purchases realized over the Purchase Year preceding the date of termination.

    (ii)    All purchases under this Section 8.05 shall be upon all of the same licensure, ordering, warranty, pricing, packaging, payment and shipping terms set forth hereunder.

8.06    Except for warranty and/or indemnification claims under Section 2, Section 6 and Section 7 herein, and except for any and except for any claims that may arise from claims or actions from third party users of the Products, the remedies set forth in this Section 8 shall be the sole and exclusive remedy of QIP and/or NPS for breach by NPS and/or QIP under the Agreement.

## 9.    CONFIDENTIALITY AND NONDISCLOSURE

9.01    The parties hereto acknowledge that they may share certain proprietary, trade secret or confidential information (the "Confidential Information") in the course of their performance under this Agreement.  Confidential Information does not include, however, information which (a) is or becomes generally available to the public other than as a result of a disclosure by the receiving party, or (b) became available to the receiving party on a non-confidential basis from a person or entity, other than the disclosing party, who is not bound by a confidentiality agreement with the disclosing party or is not otherwise prohibited from transmitting the information to the receiving party.

9.02    The parties hereto agree that they shall not divulge to any third party any information about the other party discovered in the performance hereunder.

## 10.    REBATE, CREDITS AND DEBITS

10.01    If NPS, over any Purchase Year, purchases an amount of Paintballs equal to or exceeding Two Billion Five Hundred Million Paintballs at the prices set forth on Schedule A attached hereto (not including potential bargain or sales prices established from time to time), NPS, at the end of

14

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043125

the Purchase Year, and provided NPS is current as of the end of said Purchase Year, shall receive a credit equal to Fifty Cents ($0.50) per case of 2000 Paintballs purchased in and over said Purchase Year.

10.02  If NPS, over any Purchase Year, purchases an amount of Paintballs equal to or exceeding Three Billion Paintballs at the prices set forth on Schedule A attached hereto (not including potential bargain or sales prices established from time to time, including Sponsorship Paintball (defined under Section 11.03 herein)), NPS, at the end of the Purchase Year, and provided NPS is current as of the end of said Purchase Year, shall receive a credit equal to One Dollar ($1.00) per case of 2000 Paintballs purchased in and over said Purchase Year.

10.03  For the avoidance of doubt, the rebates available pursuant to Section 10.01 and Section 10.02 are not cumulative.

10.04  NPS' and QIP's accounting departments shall coordinate and determine a daily remittance scheme pursuant to which all accounts shall be brought current within forty-five (45) days from the Agreement Date.

11.    ADVERTISING AND PROMOTION

11.01  To promote DXS Paintballs throughout the Territory, the parties hereto acknowledge and agree that it is important to engage in advertising and promotional activities including, but not necessarily limited to, print media; tournament and event attendance; web sites and web links; direct mailings; flyers; catalogues; sales literature; and team and event sponsorships.

11.02  Annually, commencing January 1, 2005, the parties hereto, through their respective principals, shall establish an Annual Advertising and Promotional Plan (each a "Plan"). The development of such Plan shall involve industry research, planning, development of targeted advertising and promotional marketing strategies, and applied program activities, including but not limited to identifying the tournaments and events that NPS shall attend; the industry publications to be utilized and the amount of advertisements to appear in each; the team, tournaments and/or events to be sponsored and the terms and conditions for each; the direction and coordination of the various web sites; and the tone, tenor and direction of any advertisements to be run over each applicable calendar year.

        (i)     Any and all DXS Paintball advertisements and promotional materials shall be subject to the written consent of the other party prior to the publication and or dissemination of the same.

11.03  During each calendar year during the term of this Agreement and any renewal term(s) thereto, QIP shall provide Ten Million Hellfire™ or Inferno™ branded DXS Paintballs (the "Sponsorship Paintballs") for sponsorship of professional and/or top ranked teams, which shall be allocated as follows:

        (i)     NPS, pursuant to the Plan referenced in Section 11.02 hereinabove, shall allocate six million (6,000,000) of the Sponsorship Paintballs to teams of NPS' choosing; and

        (ii)    QIP, pursuant to the Plan referenced in Section 11.02 hereinabove, shall allocate four million (4,000,000) of the Sponsorship Paintballs to teams of QIP's choosing.

15

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043126

SEP-20-2004  15:50          PAINTBALL                                                                P.19

11.04  Further, for distribution by NPS to Novice/Rookie/Amateur teams, NPS shall be entitled purchase up to five full truckloads of Inferno™ branded DXS Paintballs for twenty-four dollars ($24.00) per case of two thousand (2000) Paintballs.

11.05  From and after the Agreement Date, unless otherwise set forth herein, NPS covenants to vigorously, diligently and faithfully promote the sale of DXS Paintballs in and throughout the Territory.

11.06  As the basis of any Plan hereinafter to be established, the parties, at a minimum, shall be strictly responsible to perform in accordance with the following:

(i)    From and after the Agreement Date, NPS shall be the only party to represent, promote or display DXS Paintballs at tournaments and/or events;

(ii)   NPS shall alter its New Jersey based show trailer as soon as possible (including all awnings, tents and accoutrements thereto) and design its European show trailer, when one is acquired, in accordance with the floor plan and elevation attached ay Exhibit B hereto;

(iii)  NPS shall be responsible, except as set forth in Section 11.06(xi) herein below, to provide all labor and personnel to staff each tournament and event in order to promote and display the DXS Paintballs and in order to support and distribute DXS Paintballs to sponsored teams and event promoters;

(iv)   NPS shall provide "links" from its various web site(s), including www.nationalpaintballsupply.com, www.diablodirect.com, www.diablopaintball.com to QIP's web sites including www.draxxus.com and www.vforcepaintball.com;

(v)    QIP shall provide "links" from its various web site(s), including www.draxxus.com and www.vforcepaintball.com to NPS' web sites including www.nationalpaintballsupply.com, www.diablodirect.com; and www.diablopaintball.com.

(vi)   NPS shall ensure that information specific to DXS Paintballs is included in each mailing(s) of NPS' *Paintball Observer*;

(vii)  NPS shall ensure that information specific to DXS Paintballs are included in every wholesale catalogue printed by NPS;

(viii) Owing to NPS' exclusive interest in and to DXS Paintballs, QIP agrees that promotional materials in and for the same shall not be commingled or associated in any way with the advertising and/or promotion of any QIP Paintballs and/or OEM Paintballs;

(ix)   Nothing hereunder shall be construed to limit or prevent QIP from entering into any unilateral team sponsorships not included in the Plan for DXS Paintball, provided NPS, nonetheless, shall distribute and/or release any DXS Paintballs directly to the team and provided QIP reimburses NPS for the same;

(x)    Nothing hereunder shall be construed to limit or prevent QIP from advertising or representing it's QIP Paintballs at events and/or tournaments;

16

SEP 20 2000 7:59PM    HP LASERJET 3200

P.17

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043127

(xi)    At agreed upon tournaments and events set forth in the Plan, it being understood that each PSP and NPPL tournament shall be included in any said Plan, QIP shall provide a paint truck with all associated Sponsorship Paintballs and a designated individual to work with NPS in distributing the same to teams and/or event promoters;

(xii)   QIP covenants to provide NPS with DXS Paintball-specific promotional and informational materials for each tournament or event, including items such as banners, stickers, etc and as specified from time to time in the Plan.

(xiii)  All teams sponsored under any Plan hereunder to be provided with DXS Paintballs shall execute contracts with NPS that will provide, at a minimum, the following:

    (a)  All members of the team shall:

        (1)  During all paintball tournaments and paintball events of any kind, display the DRAXXUS logo;

        (2)  Visibly portray the DRAXXUS logo at all photo shoots;

        (3)  Take all team pictures with the DRAXXUS banner;

        (4)  Always wear the jersey while playing that displays the DRAXXUS logo, and for "high profile team" identified pursuant to the Plan, to wear a jersey that displays the DRAXXUS logo on all four sides of the jersey where it is understood that the front and back DRAXXUS logos must measure at least 5" X  3" and the logos on the sleeves and/or arms must measure at least 3" X 2";

        (5)  Always conduct themselves in a proper and sportsmanlike manner, and take no action which will bring the DRAXXUS name into disrepute; and

        (6)  Always exclusively use DRAXXUS Paintballs, in both practice and play, with no exceptions, unless written permission is first obtained from the sponsor, or when Non-Sponsors field or tournament paint is mandated by the event promoter, or if paint manufactured by QIP is totally unavailable at an event.

## 12.   REPRESENTATIONS AND WARRANTIES

12.01   QIP represents and warrants that:

(i) QIP shall not, either directly or indirectly, cause to be done, any willful act or thing to the prejudice of the trade or business of NPS and will, whenever required by NPS, its executors, administrators, or assigns, render every assistance and give all necessary evidence for the purpose of recovering or otherwise enforcing or furthering the intention(s) contemplated hereunder;

17

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043128

(ii) The consummation of this Agreement does not violate any agreement or restriction to which QIP is subject; and

(iii) QIP has taken all steps and obtained all authorizations necessary to consummate the transaction(s) contemplated hereunder and this Agreement represents the legal, valid, binding obligation of QIP and may be enforceable against QIP in accordance with its terms;

12.02   NPS represents and warrants to QIP that:

(i) The consummation of this Agreement does not violate any agreements or restriction to which NPS is subject;

(ii) NPS has taken all steps and obtained all authorizations necessary to consummate the transaction(s) contemplated hereunder and this Agreement represents the legal, valid, binding obligation of NPS and may be enforceable against NPS in accordance with its terms; and

(iii) NPS shall not, either directly or indirectly, cause to be done, any willful act or thing to the prejudice of the trade or business of QIP and will, whenever required by QIP, its executors, administrators, or assigns, render every assistance and give all necessary evidence for the purpose of recovering or otherwise enforcing or furthering the intention(s) contemplated hereunder;

## 13.   TAXES & DUTIES

13.01   QIP and NPS shall pay when due all federal, state, city and local income taxes, unemployment taxes, and social security taxes applicable to their respective business operations and/or the transaction(s) contemplated hereunder, and the other party shall have no liability therefor.

13.02   NPS shall be responsible for all import duties associated with the shipment of the Products in and throughout the Territory by QIP.

## 14.   INDEPENDENT CONTRACTOR

14.01   QIP and NPS expressly acknowledge and agree that the other party is an independent contractor, and that except as otherwise stated herein neither party shall have any right to control or direct the manner in which the other party performs its obligations and duties hereunder. Neither party shall have the right or authority to create any obligation, liability or contract of any kind on behalf of the other party. This Agreement shall not be construed to create an employment relationship or partnership, limited partnership, joint venture, association, agency or other similar business enterprise, organization or relationship between QIP and NPS.

## 15.   MISCELLANEOUS PROVISIONS

15.01   DraXxus™ branded apparel. From and after the Agreement Date, QIP shall sell down its remaining inventory of DraXxus™ branded apparel. Thereafter, during the term of this Agreement and any renewal term(s) thereof, NPS shall, pursuant to the Plan (as defined pursuant to Section 11.02 herein), be exclusively responsible for manufacturing all DraXxus™ branded apparel, pursuant to the Plan and in furtherance of NPS' promotional and advertising efforts hereunder. It is expected

18

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043129

that the DraXxus™ branded apparel line may be comprised of pants, jerseys, t-shirts, hats and other promotional items.

15.02   In the event NPS or any of its principals, partners and/or affiliates, purchases or otherwise succeeds to an ownership interest in any Paintball manufacturing concern, other than a nominal interest in a stock corporation, QIP may, provided NPS is not purchasing Products in excess of Three Billion (3,000,000,000) Paintballs per Purchase Year plus ten percent (10%) per Purchase Year measured from the Agreement Date, upon thirty (30) days written notice, opt to be released from its obligation to charge more for OEM Paintballs and QIP Paintballs pursuant to the Provisions of Section 3.03, Section 3.04 and Schedule A attached hereto. In the event QIP should opt to release itself from its obligation to charge more for QIP Paintballs and/or QIP Paintballs pursuant to this provision, QIP shall no longer have the exclusive right to manufacture NPS' Diablo Paintballs, and thereafter Diablo Paintballs shall be considered NPS Paintballs for the purposes of this Agreement. Further, in the event QIP should opt to be released from its obligation to charge more for QIP Paintballs and OEM Paintballs, NPS, nonetheless, shall at all times have the right to purchase Products, including DXS Paintballs, QIP Paintballs and NPS Paintballs from QIP at or equal to NPS' established prices for similar products and/or the lowest price QIP charges any other customer buying similar quantities of products and on similar terms and conditions, whichever is lower. Lastly, in the event QIP should opt to be released from its obligation to charge more for QIP Paintballs and OEM Paintballs, the Monthly Minimums, Base Minimums and Adjusted Yearly Minimums set forth hereunder shall be adjusted downward to reflect the removal of the Diablo Paintballs in accordance with this provision.

15.03   At NPS' option and in quantities as NPS shall determine, for the first three full months from and after the Agreement Date, QIP shall provide NPS with up to ten (10) trucks (120 skids) of "white box" Paintballs per month for a price of Eighteen Dollars and Sixty-Six Cents ($18.66) per case of 2000 Paintballs. For the avoidance of doubt, these "white box" Paintballs shall not be included in the Monthly Minimums, Base Minimums and Adjusted Yearly Minimums set forth hereunder.

15.04  Mass Market.

    (i)      NPS covenants not to sell DXS Paintballs to the Mass Market for twelve (12) months after the Agreement Date, defined hereunder as Non-Conventional Market retailers such as Wal-Mart, K-Mart, Dick's Sporting Goods, Canadian Tire, Galyans, Cabellas, Sports Authority, Dunham's, and other retail outlets of the same ilk.

    (ii)     The parties hereto agree, without limiting Section 5.06 herein, that QIP's obligation to charge more for OEM Paintballs and QIP pursuant to Section 3.03 and Section 3.04 herein shall not apply to Mass Market retail outlets as defined herein.

16.    OTHER PROVISIONS

16.01   If QIP or NPS is prevented from meeting its commitments under the terms hereof by reason of acts of God, war(s), terrorism, government regulations, strikes, riots, civil commotion or sabotage, lack of supplies or any other similar cause beyond its reasonable control, the party in default shall be under no liability to the other to the extent of the default caused thereby so long as such impediment shall continue, and any defaults directly resulting there from shall not be deemed breaches of the warranties contained therein.

16.02   This Agreement, including the attached referenced Schedule A, represents and contains the entire agreement of the parties relating to the subject matter hereof and sets forth all the

19

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043130

promises, covenants, agreements, conditions and understandings between the parties hereto with respect to the supply of Paintballs by QIP to NPS and the termination of the First Agreement and the First Addendum, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions pertaining thereto, express or implied, oral or written, and cannot be modified, altered, supplemented, terminated or amended except by a writing signed by an authorized representative of both parties. Any and all capitalized words or phrases appearing in and throughout this Agreement, if applicable, shall be construed in accordance with those definitions appearing herein. Further, No modifications to the Agreement are possible without both parties' agreement in writing. All Orders shall be subject to, and shall be deemed to incorporate, the provisions of this Agreement. Any term in any Order inconsistent with this Agreement shall be of no force or effect unless the parties expressly acknowledge and agree to such inconsistency in writing.

16.03  Neither NPS or QIP shall assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party.

16.04  This Agreement and the respective rights and obligations under it shall be binding on QIP and NPS and their respective successors and permitted assigns.

16.05  This Agreement shall be construed and the legal obligations between the parties hereunder shall be determined according to the substantive laws of the State of New Jersey.

16.06  All notices, requests, orders, demands, or other communications by the terms hereto required or permitted to be given by one party to the other shall be given in writing, and shall be sent by registered or certified mail, postage prepaid addressed to such other party or delivered to such other party as follows:

If to QIP:        Procaps Encapsulation, Inc.
                  6000 Kieran
                  St. Laurent, PQ
                  H4S 2B5
                  Attention: Richard Italia

If to NPS:        National Paintball Supply, Inc.
                  570 Mantua Boulevard
                  Sewell, New Jersey 08080
                  Attention: Eugenio Postorivo

or at such other address as the parties may from time to time designate pursuant to the provisions of this Section 16.06.

16.07  Each of the parties hereto hereby covenants and agrees that it shall hereafter execute and deliver any and all further instruments, documents and agreements and do such other and further acts and things as may be required or useful to carry out the interests and purposes of this Agreement and to assure to each of the parties hereto the benefits contemplated by this Agreement.

16.08  This Agreement may be executed by means of facsimile signatures and in one or more counterpart, each of which, when so executed, will be deemed an original, and such counterparts together shall constitute one and the same instrument.

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043131

16.09   Any disputes arising out of or pertaining to this Agreement which the parties are unable to resolve by bona fide negotiations at an executive level, shall be resolved by binding arbitration on the basis that the arbitration shall be submitted for arbitration to the American Arbitration Association on demand of either party to such dispute. Such arbitration shall be conducted in New York, New York. Except as otherwise provided in this Agreement, such dispute shall be heard by a panel of three arbitrators in accordance with the then current rules of the American Arbitration Association. The arbitrators shall have the right to award and include in their award any relief that they deem proper in the circumstances, including without limitation, money damages (with interest on unpaid amounts from the due date), specific performance, injunctive relief and attorney's fees and costs. The award and decision of the arbitrators shall be conclusive and binding upon the parties and judgement upon the award may be entered into any court of competent jurisdiction. This agreement to arbitrate shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. The arbitration shall be conducted informally with a view to the issue being resolved expeditiously and quickly. The arbitrators, as part of their decision, shall be entitled to determine which of the parties shall be liable for their costs or the ratio in terms of which the parties are to share their costs, failing which, their costs shall be borne equally between the parties.

16.10   All dollar amounts referred to in this Agreement or any Exhibit or Schedule hereto refer to U.S. dollars.

16.11   No waiver by any party of any condition, or of the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any other condition or of the breach of any other term, covenant, representation or warranty set forth in this Agreement.

16.12   The captions and headings of the various sections and subsections of this Agreement are for convenience only and shall neither constitute a part of this Agreement nor control nor affect the meaning or construction of this Agreement.

16.13   If any provisions of this Agreement shall be or shall become illegal or unenforceable in whole or in part, for any reason whatsoever, the remaining provisions shall nevertheless be deemed valid, binding and subsisting.

16.14   Each party acknowledges that it has participated in the negotiation and drafting of this Agreement, and further agrees that this Agreement shall be construed without regard to the identity of those who drafted the various provisions, that each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting of them, and that any rule of construction that a document is to be construed against, interpreted less favorably toward, or applied to the disadvantage of any party hereto by reason of such person having or being deemed to have structured, dictated, or drafted such provision shall not apply to this Agreement.

**IN WITNESS WHEREOF** the parties hereunto have executed this Agreement as of the 20 day of _September_ 2004.

(signatures on next page)

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043132

SEP-20-2004  15:53      PAINTBALL                                      P.25

SIGNED, SEALED & DELIVERED          PROCAPS ENCAPSULATION, INC.
IN THE PRESENCE OF                  )
                                    )
                                    ) Per:
                                    )

                                    NATIONAL PAINTBALL SUPPLY, INC.
                                    )
                                    )
                                    ) Per:
                                    )

6.P.

22

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043133

NPS-043134
CONFIDENTIAL--ATTORNEYS' EYES ONLY

SEP 20 2000 8:02PM    HP LASERJET 3200

| EXHIBIT A | Type of Paint | Purch. Blend | NPS Cost | QIP Paintballs Cost | | | | OEM Paintballs Cost | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 30 Trucks | 12 Trucks | 84 Skids | Aid Hoc | 30 Trucks | 12 Trucks | 84 Skids |
| | Tournament / Bulls | 1% | | $32.00 | $32.00 | $34.00 | $36.00 | $31.00 | $32.50 | $33.00 |
| | High Level / Inferno | 4% | $35.00 | $30.00 | $30.00 | $72.00 | $34.00 | $29.00 | $29.00 | $31.00 |
| | Crossfire | | $35.00 | | | | | | | |
| | Mid Level / Blaze | 30% | $30.00 | $28.00 | $28.00 | $30.00 | $32.00 | $27.00 | $28.00 | $29.00 |
| | Field Blaze | | $30.00 | | | | | | | |
| | Formula 13 | | $28.00 | | | | | | | |
| | Low Level / Blueprint X | 20% | $24.00 | $26.00 | $28.00 | $28.00 | $30.00 | $25.00 | $29.00 | $27.00 |
| | Nightmare | | $34.00 | | | | | | | |
| | Entry Level / Rec Sport | 30% | $22.00 | $24.00 | $24.00 | $26.00 | $28.00 | $24.00 | $24.00 | $25.00 |
| | Heat | | $12.00 | | | | | | | |
| | Generic / BRZ | 10% | $18.00 | $22.00 | $22.00 | $24.00 | $26.00 | | | |

CONFIDENTIAL--ATTORNEYS' EYES ONLY
NPS-043135

SEP 20 2000 8:02PM    HP LASERJET 3200

P.25



| BOX | BAG | SHELL_TONE | METALLIC | PAINT (may incur surcharge) | FILL |
|---|---|---|---|---|---|
| Full Color Box | Full Color | 1 or 2 Tone | Metallic | Possible* | Strong |
| Full Color Box | Full Color | 2 Tone | | Yes | Strong |
| Full Color Box | Full Color | 2 Tone | | Yes | Strong |
| Full Color Box | Full Color | 1 & 2 Tone | Metallics & Non-Met. | Possible* | Medium |
| | Full Color | 1 & 2 Tone | Non-Met. | Possible* | Medium |
| | Full Color | 1 & 2 Tone | Metallics & Non-Met. | | Medium |
| Full Color Box | Full Color | 1 & 2 Tone | Non-met. | Possible* | Light |
| | Full Color | 1 & 2 Tone | Non-met. | Possible* | Light |
| One Color Printing | | | | | |
| White or Brown Plain Box | Full Color | 1 Tone | Non-met. | No Print | unspecified |
| White or Brown Plain Box | Full Color | 1 Tone | Non-met. | No Print | unspecified |
| | unspecified | unspecified | unspecified | unspecified | unspecified |
| | unspecified | unspecified | unspecified | unspecified | unspecified |

PAINTBALL

P.27