# PARENTERANDOLPH
*The Power of Ideas*

FORENSIC & LITIGATION SERVICES

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| NATIONAL PAINTBALL SUPPLY, INC. | ) ) ) |
| Claimant, | ) ) |
| v. | ) No. 50 181 T 00252 05 |
| PAINTBALL, L.P. | ) ) ) |
| Respondent. | ) ) |

Expert Report
By
Glenn Newman and Stephen Scherf

July 14, 2006

**PARENTERANDOLPH**
*Accountants & Consultants*

*The Power of Ideas*

FORENSIC & LITIGATION SERVICES

CONFIDENTIAL
ATTORNEYS' EYES ONLY

NATIONAL PAINTBALL SUPPLY, INC.

v.

PAINTBALL, L.P.

At plaintiff's counsel's request, we performed various financial analyses in connection with Paintball, L.P.'s ("PLP") alleged breach of certain agreements with National Paintball Supply, Inc. ("NPS"). Our analyses relate to (1) whether NPS, if it had been requested to do so by PLP, could have provided adequate assurances that NPS could meet its payment obligations to PLP in May and June 2005; and (2) NPS' damages which result from PLP's termination of its agreements to supply products, including paintballs and goggle/mask systems, to NPS. This report is structured as follows:

I. Introduction
II. Basis for Analysis
III. Background
IV. Analysis
V. Conclusion
   Exhibits

CONFIDENTIAL
ATTORNEYS' EYES ONLY                                                              Page: 29

Consistent with Mr. Truant's assertion that it would take a few years for NPS to recover from its lack of a supply of V-Force goggles, we have calculated damages based on NPS securing a different supplier(s) and recovering from the lack of V-Force goggles as a mitigation component. Based on the current level of non V-Force sales, NPS' management believes that by the end of the Goggles Agreement's initial term, June 2009, they will have restored goggles sales to approximately 40 percent of historical levels. Our analysis incorporates mitigation of the V-Force component by assuming that during the future, sales of its goggle line will be restored ratably to 40 percent of prior sales levels.[71]

To quantify the damages associated with the decline in sales of goggles, we have utilized the company's gross profit margin to represent an aggregate estimate of the damages sustained by NPS due to PLP's termination of the Goggles Agreement. Following is a summary of NPS' gross profit margins:



Chart 4: NPS' Gross Profit Margins

---

[71] For calculation purposes, we have applied future mitigation of 20 percent, 30 percent, and 40 percent of prior sales levels.

CONFIDENTIAL  
ATTORNEYS' EYES ONLY

Page: 30

We have utilized a gross profit margin of 20 percent to determine NPS' incremental costs of goggles and other lost paintball related products during the affected periods. We believe this approach is conservative for the following reasons:

- NPS' profit margins have been consistently improving with the most recent year-end margins approaching 22 percent.
- Profit margins on paintballs historically have been significantly less than the overall company margins. Accordingly, items other than paintball items, including goggles, would expect to be higher (i.e., greater than 20 percent) than the overall company average.
- These other products are considered less of a commodity than paintballs.
- Testimony has been provided which established a range of an 18 to 25 percent markup on goggles and 20 to 25 percent on markers or guns.[72]

Based on our analysis, we have calculated NPS' losses associated with goggles as follows:

Table 14: Goggle Losses – U.S.[73]

| 09/01/05 through | Cumulative |
|---|---|
| 05/31/06 (historical) | $413,194 |
| 09/30/06 | 655,393 |
| 09/30/07 | 1,263,905 |
| 09/30/08 | 1,687,218 |
| 06/30/09 | 1,888,914 |

---

[72] Arbitration Transcript, March 20, 2006 – pg. 126, 128 - 129.  
[73] Net of discount rate.

*National Paintball Supply, Inc. v. Paintball, L.P.*

CONFIDENTIAL  
ATTORNEYS' EYES ONLY                                                    Page: 31

        d.      Losses from Lost Sales on Other Products

We understand that PLP's termination of the Agreements impacted not only paintball and goggles, but certain other products that NPS sells in addition to paintballs. Specifically, other NPS' products impacted by PLP's actions segregated by type, include:

- Accessories;
- Barrels;
- Markers/Guns; and
- Air Systems/Tanks; and
- Other.

We understand that many customers look to NPS for all of their paintball related products. As such, when purchasing paintballs, it is common for customers to purchase NPS' other products. NPS representatives have advised that the ability to supply quality paintballs to customers has been key to its historical success. Moreover, much of NPS' historical revenues for other products are dependent upon such ability. Gino Postorivo testified that a person needs five basic items to play paintball, including: goggles, paintballs, apparel, guns, and accessories.[74] Mr. Postorivo stated that among the five groups, paintballs were the most important to NPS' success because "without them you can't play."[75] Further, a PLP representative testified,

> We are a startup business. I mean – I mean, I will still – you go down and look at it. We don't have other products. We are starting to work on that. You need the paintballs. You have the goggles, but then you also have to have a variety of products to be a true distributor. That takes time. And, you know, some of them want to have certain volumes committed. We have to look at financing, see how we commit to that. You know, it need CO2 containers. That is tough to find because the other major player have arrangement, some of them exclusive. Paintball markers. That's all new for us.

---

[74] Arbitration Transcript, March 20, 2006 – pg. 103.  
[75] Arbitration Transcript, March 20, 2006 – pg. 104.

*National Paintball Supply, Inc. v. Paintball, L.P.*

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Page: 32

> So, it's fine to say, you know, we are in industry.... because we have paintballs and goggles. The guy that phones up wants clothing, a full outline of products. That is what I'm competing against. We don't have that.[76]

Consistent with our analysis of NPS' U.S. sales of paintballs and goggles, we noted a decline in NPS' revenue for other products subsequent to PLP's termination of the Agreements. Table 15 compares revenue in significantly affected product categories during the post termination period analyzed, September 1, 2005 through May 30, 2006, with the identical time period in the prior fiscal year, September 1, 2004 through May 31, 2005.

Table 15: Other than Paintball Revenues[77]

| Category | 09/01/04 to 05/31/05 | 09/01/05 to 05/31/06 | Reduction |
|---|---|---|---|
| Accessories | $5,702,409 | $3,403,825 | $2,298,584 |
| Barrels | 3,254,380 | 2,180,314 | 1,074,066 |
| Markers[78] | 11,357,237 | 7,692,571 | 3,664,666 |
| Air Systems | 7,378,905 | 5,581,221 | 1,797,684 |
| Total | $27,692,931 | $18,857,931 | $8,835,000 |

Table 15 indicates that overall sales in these categories were down by 32 percent. Consistent with our prior calculation regarding U.S. paintball sales, we have calculated NPS' losses for both the period that has elapsed, September 1, 2005 through May 31, 2006, and through the end of the paintball contract and discounted future revenues to account for risks. See Exhibit 4 for an analysis of NPS' losses for items other than paintballs and goggles.

---

[76] Arbitration Transcript, March 24, 2006 – pg. 202-203.
[77] NPS representatives have indicated these particular product categories have been impacted by PLP's actions.
[78] Decrease in sales of markers sold under the Tippman and BT trademarks have been excluded in the calculation of NPS' damages. Tippman ceased supplying NPS in October of 2005. NPS has introduced the BT brand of marker. NPS envisions the BT brand of marker will somewhat offset the markers traditionally sold under the Tippman name. Accordingly, the calculation measures the loss in sales of non-Tippman markers.

*National Paintball Supply, Inc. v. Paintball, L.P.*

Based on the documentation provided to date, we were unable to analyze the post-termination sales of PLP and the effect the termination had on PLP. Based on our analysis, we have estimated NPS' losses associated with U.S. sales for items other than paintballs as follows:

Table 16: Other Products Losses - U.S.

| 09/01/05 through | Cumulative |
|---|---|
| 05/31/06 (historical) | $1,325,250 |
| 09/30/06 | 2,008,264 |
| 09/30/07 | 3,798,910 |
| 09/30/08 | 5,231,427 |
| 09/30/09 | 6,369,014 |
| 09/30/10 | 7,274,870 |
| 09/19/11 | 7,989,974 |

  e.  Other Damages

NPS has suffered additional economic losses due to PLP's actions associated with its failure to honor certain exclusivity and best pricing terms included in the Agreements.

With respect to exclusivity, the Agreements provided that NPS was the exclusive distributor in the following instances:

- NPS was the exclusive wholesale and retail distributor for all paintballs manufactured by PLP to customers in or for resale to the European territory for the 18-month period from September 2004 through March 2006.[79]

- NPS was the exclusive worldwide distributor for DXS paintballs[80] and QIP was not permitted to appoint other distributors and or sell DXS paintballs through

CONFIDENTIAL
ATTORNEYS' EYES ONLY
Page: 34

independent sales representatives and/or by direct sales at retail, wholesale or otherwise.

- On a worldwide basis, NPS purchased all of its Diablo Paintballs from PLP, the exclusive supplier.[81]

- On a worldwide basis, NPS purchased all of its DXS Paintballs from PLP, the exclusive supplier. The only exception being that PLP was able to sell DXS Paintballs for the six-month period from September 2004 through March 2005.[82]

- NPS was the exclusive worldwide distributor of certain PLP goggles and related products.

Due to PLP's alleged breach of the exclusivity provisions of the Agreements, NPS lost sales. PLP, in turn, was able to benefit from its distribution of paintballs and goggles into certain markets which it was precluded from selling into under the Agreements.

Based on the documentation provided to date, we are currently unable to calculate damages associated with the breach of exclusivity in the aforementioned markets. Accordingly, we expect to update our analysis of exclusivity damages when sufficient documentation becomes available.

---

[79] Arbitration Exhibit NPS-3.
[80] Arbitration Exhibit NPS-3.
[81] Arbitration Exhibit NPS-3.
[82] Arbitration Exhibit NPS-3.

*National Paintball Supply, Inc. v. Paintball, L.P.*

CONFIDENTIAL
ATTORNEYS' EYES ONLY                                                                 Page: 37

## IV   CONCLUSION

Based on the foregoing analysis, we have concluded within a reasonable degree of professional certainty that NPS was capable of providing adequate assurance to PLP concerning NPS' payment obligations. In addition, we have made numerous calculations with respect to NPS' losses associated with PLP's actions, exclusive of prejudgment interest, for the duration of the Agreements, summarized as follows:

Table 18: Total Damages ($000s) for the Duration of the Agreements

| Damage Classification | Through 5/31/06 | 9/30/06 | 9/30/07 | 09/30/08 | 9/30/09 | 09/30/10 | 09/30/11 | Total |
|---|---|---|---|---|---|---|---|---|
| Paint | $2,497 | 1,000 | 2,641 | 2,113 | 1,678 | 1,336 | 1,057 | $12,322 |
| Goggles | 413 | 242 | 609 | 423 | 202 | | | 1,889 |
| Other Sales | 1,325 | 683 | 1,791 | 1,433 | 1,138 | 905 | 715 | 7,990 |
| Total Losses | $4,235 | $1,925 | 5,041 | 3,969 | 3,018 | 2,241 | 1,772 | $22,201 |

As previously indicated, we are awaiting documentation concerning alternative calculations with respect to losses computed in connection with the UCC and with respect to breaches by PLP for exclusivity and best pricing. We will update our analysis as information and documentation becomes available.

PARENTE RANDOLPH, LLC

*[signature]*

Glenn S. Newman

*[signature]*

Stephen J. Scherf