AMERICAN ARBITRATION ASSOCIATION

ARBITRATION NO. 50 181 T 00252 05

NATIONAL PAINTBALL            )
SUPPLY, INC.,
                              )
        Claimaint,
                              )
    - vs -
                              )
PROCAPS, L.P.
(f/k/a Paintball,             )
L.P., )
                              )
        Respondent.

- - - - - - - - - - - - - - - - -

        TRANSCRIPT OF ARBITRATION HEARING, taken by and before KRISTIN N. LAFTY, Registered Professional Reporter and Notary Public, at the Law Offices of PEPPER HAMILTON, 18th & Arch Streets, Philadelphia, Pennsylvania, on Thursday, September 28, 2006, commencing at 8:30 a.m.

        ERSA COURT REPORTERS

        30 South 17th Street

        United Plaza - Suite 1520

        Philadelphia, PA 19103

        (215) 564-1233

```
 1    A P P E A R A N C E S:
 2
 3    BEFORE:
 4            JOHN WILKINSON, ESQUIRE
              WILLIAM A. ZUCKER, ESQUIRE
 5            DAVID L. EVANS, ESQUIRE
 6
 7
 8            DUANE MORRIS
              BY:  ROBERT KELLY, ESQUIRE
 9            BY:  PATRICK LOFTUS, ESQUIRE
              BY:  LARRY POCKERS, ESQUIRE
10            30 South 17th Street, Suite 1200
              Philadelphia, Pennsylvania 19103
11            Counsel for the Claimant
12
13            PEPPER HAMILTON
              BY:  NICOLE GALLI, ESQUIRE
14            BY:  ANTHONY J. DESTRIBATS, ESQUIRE
              BY:  FRANCIS P. DEVINE, II, ESQUIRE
15            18th & Arch Streets
              Philadelphia, Pennsylvania 19103
16            Counsel for the Respondent
17
18
19    A L S O   P R E S E N T:
20    Margaret Riley
      Richmond Italia
21    Edward Truant
      Howard Tafler
22    Gino Postervivo
      Amy Flannery
23
24
```

```
 1                          I N D E X

 2    WITNESS                                              PAGE

 3

 4    JOHN CAMPO

 5    BY:  Mr. Kelly                                          4

 6    BY:  Ms. Galli                                        140

 7

 8

 9

10                         E X H I B I T S

11                                                 PAGE    PAGE
      NUMBER          DESCRIPTION              MARKED  ATTACHED

12

13

14                    NOT ATTACHED

15

16

17

18

19

20

21

22

23

24
```

```
 1   oh, Steve Baldwin, what a big mouth.  Steve
 2   Baldwin is the European agent.  I thought I'd
 3   get another two weeks out of you.
 4   Q.    Let's put that conversation in context,
 5   though.  When are you seeing -- you are seeing
 6   Richmond in person?
 7   A.    No.  This is a telephone call at my
 8   place.
 9   Q.    When does this conversation occur?
10   A.    First, maybe second week in July.
11   Probably 7th of July, 8th.
12   Q.    Was it before or after Procaps had
13   received the notice of arbitration?
14   A.    Actually, what it would have been was
15   before the 7/7 date, which when I supplemented
16   the demand for arbitration to include claims
17   for the unilateral termination.  So it was
18   before the 7th of 7.
19   Q.    In your discussion with Mr. Italia, did
20   he bring up your -- that your June 30th letter
21   -- in other words, did you get any --
22   A.    No.
23   Q.    Was it referenced that you got it wrong
24   in your June 30th letter?
```

1  A.   No.  I confronted him about it and
2  wanted to hear what he had to say about the
3  European pre-sales, if you will, with respect
4  to the product that was on the water.  And I
5  said, put this thing back on.  And the only
6  response I got -- and that conversation was
7  abruptly terminated.  Was I thought I'd have
8  you for another two weeks.  Steve Baldwin has
9  a big mouth.
10 Q.   What did you take that to mean?
11 A.   I took it to mean that Stephen wasn't
12 being as covert as Richmond would like.
13 Customers were coming back to me that Stephen
14 was making available and letting them know
15 that as soon as the ship pulled up to port,
16 he'd be deep in DRAXXUS.  And, you know, jig's
17 up.
18           (At this time, a short break
19      was taken.)
20 BY MR. KELLY:
21 Q.   Mr. Campo, there had been -- well, let
22 me just ask you to take a look at an exhibit.
23 It's NPS-1459.  Mr. Campo, can you identify
24 that document?

```
 1    A.    Yes.  This is a letter forwarded by
 2    NPS's counsel at the time, Drinker, Biddle &
 3    Wreath, to counsel for PLP at the time.
 4    Q.    And what was the purpose of this
 5    letter?
 6    A.    The purpose was to put them on notice
 7    that we were demanding that they perform in
 8    accordance with section 8.5 of the agreement
 9    and that -- in essence.
10    Q.    What were you -- okay.  What were you
11    asking for under that section?  What does that
12    section provide for?
13    A.    Section 8.05 of the agreement?
14    Q.    No.  Yeah.
15    A.    Section 8.05 of the agreement provides
16    in the event that the termination attributable
17    to their -- you know, to them that they were
18    held to perform for a period of time under the
19    contract.
20    Q.    And did they perform under the contract
21    pursuant to your demand?
22    A.    No.
23    Q.    Sir, I want to just go back for a
24    second to this PMI deal.  And there was some
```

1  testimony, questions asked of you about why
2  the PMI deal ultimately went through.
3           MR. ZUCKER:  Ultimately didn't
4     go through.
5  BY MR. KELLY:
6  Q.    Ultimately did not go through.  Sir, if
7  the contracts with Procaps were not
8  terminated, would you have closed that
9  transaction with PMI?
10 A.    Mostly likely, no.
11 Q.    What issues in your mind would have
12 kept that contract from closing?
13 A.    We had serious concerns about their
14 financial situation at the time upon our due
15 diligence.  And it's kind of born fruit and
16 proven correct.  But we wouldn't have gone
17 forward.  And as a matter of fact, the
18 agreement was terminated based upon our
19 financial due diligence.  Rather, the LOI was
20 terminated.  And we didn't proceed any further
21 based upon what we obtained in our financial
22 due diligence.
23 Q.    In the event that Procaps had
24 ultimately exercised its price protection

```
 1    option, to pull the price protection -- we've
 2    heard a lot of testimony on it.  That would
 3    have triggered the right of NPS to have the
 4    Diablo brands manufactured by someone else,
 5    correct?
 6    A.    Correct.
 7    Q.    Would you have elected that option,
 8    that counter-option for Diablo and moved it
 9    from Procaps?
10    A.    No, no.  There was no one to make that
11    product other than Procaps at the consistency
12    and with the quality necessary for that brand.
13    Q.    How about the volumes?
14    A.    Or at the volumes.  No, we wouldn't
15    have pulled the brand.
16              MR. KELLY:  Thank you, sir.
17    BY MS. GALLI:
18    Q.    Good afternoon.  Hi, Mr. Campo.
19    A.    Good afternoon.
20    Q.    You had mentioned that you joined NPS,
21    I think that was -- was that in 1999, was it?
22    A.    No.
23    Q.    2000?
24    A.    2000.
```