# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| KEE ACTION SPORTS HOLDINGS, INC. (f/k/a AJ Acquisition Holdings, Inc.), a Delaware Corporation, | ) ) ) ) |
| KEE ACTION SPORTS, LLC (f/k/a AJ Intermediate Holdings, LLC), a Delaware Limited Liability Company, | ) ) ) ) ) |
| KEE ACTION SPORTS I, LLC (f/k/a AJ Acquisition I, LLC), a Delaware Limited Liability Company, | ) ) ) ) ) |
| and | ) ) |
| KEE ACTION SPORTS I UK LIMITED (f/k/a AJ Acquisition I UK Limited), a Private Company Limited by Shares Registered in England and Wales | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| EUGENIO POSTORIVO, an individual residing at 329 Breakneck Road, Sewell, NJ 08080 | ) ) ) ) ) ) |
| PBS HOLDING GROUP, INC. (f/k/a National Paintball Supply, Inc.), a Delaware Corporation, | ) ) ) ) ) |
| PBS HOLDING GROUP X-TREMES, INC. (f/k/a Paintball 2 X-tremes, Inc.), A New Jersey Corporation, | ) ) ) ) |

Civil Action No.

**Trial By Jury of 12 Demanded**

**NON-ARBITRATION CASE**

| | |
|---|---|
| PBS HOLDING GROUP 1, LLC, | ) |
|    (f/k/a Empire Sports, LLC), | ) |
|       a Delaware Limited Liability | ) |
|       Company, | ) |
|    and | ) |
| | ) |
| KINGS VIEW ASSOCIATES LIMITED, | ) |
|       a Private Company With Shares | ) |
|       Registered in England and | ) |
|       Wales, | ) |
| | ) |
|       Defendants. | ) |

## COMPLAINT

Plaintiffs KEE Action Sports Holdings, Inc. (f/k/a AJ Acquisition Holdings, Inc.), KEE Action Sports, LLC (f/k/a AJ Intermediate Holdings, LLC), KEE Action Sports I, LLC (f/k/a AJ Acquisition I, LLC) and KEE Action Sports I UK Limited (f/k/a AJ Acquisition I UK Limited) (collectively, the "Plaintiffs" or "KEE Action Sports"), through their undersigned counsel, allege the following in support of their Complaint:

## PRELIMINARY STATEMENT

1. In November 2006, substantially all of the assets of National Paintball Supply, Inc. ("NPS," now known as PBS Holding Group, Inc.) and substantially all of the assets of an unrelated company called Pursuit Marketing, Inc. were combined to form one of the largest providers of paintball equipment and accessories in the paintball gaming industry. The combination was effected through contemporaneous, arms' length asset acquisition transactions funded with private equity capital and third party debt.

2. The claims in this Complaint concern one of these contemporaneous transactions (the "Transaction"): Plaintiffs' acquisition of substantially all of the assets of NPS, Paintball 2 X-tremes, Inc. (now known as PBS Holding Group X-tremes, Inc.), Empire Sports, LLC (now known as PBS Holding Group 1, LLC), and Kings View Associates Limited (the "NPS

businesses" or, together with Eugenio Postorivo ("Postorivo"), the "Sellers" or the "Defendants") under the terms of a definitive asset purchase agreement (as amended and together with its numerous ancillary agreements, exhibits and schedules, the "APA" or the "Agreement").[1]

3. The Transaction presented a significant upside for Postorivo – the founder, owner, President and CEO of the NPS businesses – in that NPS was, at the time of the Transaction, experiencing financial pressure and operating with a significant debt burden. As a result of its financial difficulties, NPS was in default on a loan facility it maintained with PNC Bank. The loan facility had approximately $19 million outstanding and was personally guaranteed by Postorivo. Had the Transaction not been consummated, and given the financial performance and future prospects of the NPS businesses at the time, PNC Bank reasonably could have called the loan extended to NPS and exercised its guarantee provided by Postorivo.

4. In addition to releasing Postorivo from approximately $19 million in personal guaranty obligations, the Transaction provided other significant financial benefits to Postorivo, including:

- approximately $10 million in gross proceeds in connection with the sale of the NPS Corporate Headquarters to Spirit Finance Corporation (which in turn leased the building to KEE Action Sports I, LLC). But for the Transaction, the sale to Spirit Finance Corporation would not have occurred, and the building would have been subject to foreclosure by PNC;

---

[1] All capitalized terms used herein have the meanings ascribed to them in the APA unless otherwise defined in this complaint.

- 10% of the fully diluted common stock of KEE Action Sports Holdings, Inc. (which was believed to have significant future value) and the right to be assigned $5 million in junior preferred stock;

- employment as President of the entity that acquired substantially all of the assets of NPS under a five-year contract providing an annual salary of not less than $400,000, an opportunity to earn an annual incentive bonus equal to 125% of base salary and certain other benefits, and

- a non-revolving line of credit up to an aggregate principal amount of $500,000 (the entire amount of which was drawn in December 2006), the sole purpose of which was to fund NPS' prosecution of the Procaps Litigation. This benefited Postorivo because the Procaps Litigation remained a significant asset of NPS, of which Postorivo was and is the sole shareholder.

5. As the founder, owner, architect, President and CEO of the NPS businesses, Postorivo was a critical conduit of information regarding the assets acquired and the liabilities assumed and excluded under the APA. Postorivo, on behalf of himself and the other Sellers, made material representations and warranties in the APA, certified the accuracy of those representations and warranties in the Transaction documents, and agreed under the APA's "indemnity" provisions to be jointly and severally liable with the other Sellers for any breach of or inaccuracy in the Sellers' representations, warranties and covenants.

6. In the months following the closing of the Transaction, an alarming array of violations of the Sellers' representations, warranties and covenants came to light, giving rise to the issuance of a March 28, 2007 Indemnity Claims Notice and request for good faith negotiations in accordance with the APA. As alleged below, the violations involve, among other

things, intentional misrepresentations regarding (a) product inventories and (b) undisclosed liabilities, the latter including undisclosed purchase orders and costs relating to manufacturing operations abroad. The losses caused by these violations exceed and may be found to substantially exceed $11 million. In terms of consequential damages, the violations have exacted an enormous toll from the Plaintiffs' resources and personnel, they have undercut Plaintiffs' relationships with their lenders, requiring the infusion of additional equity capital, they have resulted in lost revenue and lost business opportunities, they have compromised relationships with critical vendors, they have required costly remedial measures, they have given rise to lost time value of revenues and diverted cash, and more.

7. Due to the violations and in particular the intentional nature of the violations, the relationship between Postorivo on the one hand and the Plaintiffs on the other has broken down, and efforts to resolve the violations amicably have failed. Accordingly, by this action, Plaintiffs seek to recover money damages under applicable provisions of the APA, equity and the common law as set forth below.

## THE PARTIES

### Plaintiffs

8. Plaintiff KEE Action Sports Holdings, Inc. is a Delaware corporation with a principal place of business at 570 Mantua Blvd., Sewell, New Jersey. KEE Action Sports Holdings, Inc. formerly was known as "AJ Acquisition Holdings, Inc.", which changed its name by Certificate of Amendment filed with the Delaware Secretary of State on February 2, 2007. A true and correct copy of the Certificate of Amendment is attached at Exhibit A.

9. Plaintiff KEE Action Sports, LLC is a Delaware limited liability company with a principal place of business at 570 Mantua Blvd., Sewell, New Jersey. KEE Action Sports, LLC

formerly was known as "AJ Intermediate Holdings, LLC", which changed its name by Certificate of Amendment filed with the Delaware Secretary of State on February 2, 2007. A true and correct copy of the Certificate of Amendment is attached at Exhibit B.

10. Plaintiff KEE Action Sports I, LLC is a Delaware limited liability company with a principal place of business at 570 Mantua Blvd., Sewell, New Jersey. KEE Action Sports I, LLC formerly was known as "AJ Acquisition I, LLC", which changed its name by Certificate of Amendment filed with the Delaware Secretary of State on February 2, 2007. A true and correct copy of the Certificate of Amendment is attached at Exhibit C.

11. Plaintiff KEE Action Sports I UK Limited is a private company limited by shares registered in England and Wales with a registered office at 24 Chiswell Street, London, UK EC1Y4YX. KEE Action Sports I UK Limited formerly was known as "AJ Acquisition I UK Limited", which changed its name by special resolution on February 26, 2007. A true and correct copy of the Certificate of Incorporation on Change of Name filed with the Registrar of Companies for England and Wales is attached at Exhibit D.

**Defendants**

12. Defendant Postorivo is an individual residing at 329 Breakneck Road, Sewell, New Jersey. At all times relevant, Postorivo was President and CEO and the sole stockholder or member of the various NPS businesses, which include a Delaware corporation and a Delaware limited liability company. As a result of the Transaction, Postorivo became President of a Delaware limited liability company (KEE Action Sports, LLC), a director of a Delaware Corporation (KEE Action Sports Holdings, Inc.), a director of a Delaware limited liability corporation (KEE Action Sports, LLC), and a substantial shareholder in a Delaware corporation

(KEE Action Sports Holdings, Inc.). Postorivo is sued in his individual capacity and in his capacity as President and CEO of the NPS businesses.

13. Defendant NPS, now known as PBS Holding Group, Inc., is a Delaware corporation.

14. Defendant PBS Holding Group X-tremes, Inc., formerly known as Paintball 2 X-tremes, Inc., is a New Jersey corporation. Upon information and belief, PBS Holding Group X-tremes, Inc. maintains a principal place of business at 329 Breakneck Road, Sewell, New Jersey. PBS Holding Group X-tremes, Inc. is a party to the APA, is in contract privity with Delaware entities, has sold substantially all of its assets to Delaware entities, and by virtue of its contractual relation and sale of assets to Delaware entities, has caused economic injury in Delaware. Additionally, PBS Holding Group X-tremes, Inc. is part of a group of affiliated companies which include Delaware business entities.

15. Defendant PBS Holding Group 1, LLC, formerly known as Empire Sports, LLC, is a Delaware limited liability company.

16. Kings View Associates Limited is a private company limited by shares registered in England and Wales. Kings View Associates Limited is a party to the APA, is in contract privity with Delaware entities, has sold substantially all of its assets to Delaware entities, and by virtue of its contractual relation and sale of assets to Delaware entities, has caused economic injury in Delaware. Additionally, Kings View Associates Limited is part of a group of affiliated companies which include Delaware business entities.

## **FACTUAL ALLEGATIONS**

**Background**

17. Paintball gaming began in the early 1980s and since has grown into a significant segment of the "action sports" industry.

18. While there is a virtually limitless variety of paintball games, most involve a field of play (ranging from natural woods to an open stadium), an objective (such as "capture the flag"), and the elimination of opponents by "marking" them with biodegradable, non-toxic paint capsules fired from a paintball "gun" or "marker."

19. Growth in the paintball industry over the first two decades was exponential. According to a report published by American Sports Data, Inc., close to 6 million people played paintball at least once in 1999, spending over $260,000,000 in gaming fees alone in the process. Also by the turn of the century there were in the U.S. sixteen major paintball publications, over a thousand paintball stores, approximately 950 paintball fields, almost 2,000 paintball websites, approximately 5,500 paintball teams, and domestic paintball marker sales averaging roughly 67,000 per month.

20. Some years into the new millennium, however, the paintball industry experienced a downturn as the market reached a state of maturity and its growth rate slowed. The slowdown created an over-supply of inventory in the industry and pricing pressure ensued. Companies such as NPS experienced a material decline in the profitability of their businesses, which had previously experienced strong, growing profits. During this downturn, the NPS businesses had a substantial debt burden and experienced significant financial pressure. In fact, NPS was in breach of its financial covenants under term and line of credit notes (totaling approximately $19 million) in favor of PNC Bank as of the quarters ending September 30, 2005, December 31, 2005

and March 31, 2006. While those breaches had been waived and interim amendments made to the original covenants, there was no assurance that PNC would extend the waiver and amendments beyond the quarter ending September 30, 2006. Postorivo had personally guaranteed the PNC notes, which were secured in part by real estate owned by Postorivo.

21. Thus, by mid-summer 2006, Postorivo and the NPS businesses faced the unsettling prospect of insolvency or, alternatively, finding a suitable buyer.

**The Transaction**

22. In a joint press release dated November 17, 2006, NPS and a competitor called Pursuit Marketing, Inc. announced that they were effectively combining substantially all of their respective business assets to form what is believed to be one of the world's largest paintball product and equipment supply companies. The combination was to be achieved by two independent, contemporaneous transactions, whereby substantially all of the assets of each entity would be purchased by a consortium of acquisition subsidiaries. The transactions were funded with private equity capital and third party debt.

23. The Transaction between the Plaintiffs and the Sellers that is the subject of this lawsuit was and is governed by the terms of the APA, a true and correct copy of which is being filed separately due to its size, and subject to appropriate measures to protect potentially confidential proprietary information. The APA is incorporated herein as if a part of this Complaint.

24. The price paid for the NPS businesses' assets took many forms. The principal consideration paid by the Plaintiffs in the Transaction included (a) the assumption of certain liabilities (the "Assumed Liabilities"), (b) specified payments to Sellers' creditors in an aggregate amount not to exceed $19,000,000, (c) the issuance of Junior Preferred Stock with an

aggregate liquidation preference of $5,000,000 in KEE Action Sports Holdings, Inc., and (d) the issuance of restricted shares equal to 10% of the fully diluted common stock of KEE Action Sports Holdings, Inc.

25. As described in paragraphs 3 and 4 above, the benefits of the Transaction to Postorivo were substantial.

**Pertinent Provisions Of The APA**

    **A.**    **Acquired Assets**

26. Under the APA, except as specifically excluded, Plaintiffs acquired all of the assets of the NPS businesses associated with the paintball business, including but not limited to the following assets:

    a)    Real property, including the assumption of various leases in the U.S. and the U.K. (APA, Section 1.1(a) and Schedule 3.11);

    b)    Inventory held at any location controlled by any of the Defendants, including supplies, raw materials, work-in-progress and finished goods (*Id.* at Section 1.1(b));

    c)    All items and expenses prepaid by any Defendant (other than prepaid taxes and prepayments of Excluded Assets) (*Id.* at Section 1.1(c));

    d)    All tangible personal property of any kind and description owned, leased or licensed by any Defendant used or held for use in connection with the Business, including trucks, machinery, equipment, furniture, fixtures, computers, office materials and supplies (*Id.* at Section 1.1(d) and Schedule 3.10(b));

    e)    All Defendants' rights under all contracts, leases, licenses, purchase orders, indentures, agreements and commitments (*Id.* at Section 1.1(e) and Schedule 3.17);

 f) All files, records, books of account, invoices, supplier lists and other records of any Defendant relating to the Business (*Id.* at Section 1.1(g));

 g) All rights, claims, credits or causes of action relating to the Business against third parties including Affiliates of the Sellers, except as relative to Taxes paid or attributable to a taxable period ending on or before the Closing Date (*Id.* at Section 1.1(i));

 h) All purchase orders outstanding on the Closing Date from customers of any Defendant for the purchase of products or services from the Business (*Id.* at Section 1.1(m));

 i) All notes, receivables, accounts receivable and other receivables of each Defendant of any kind (*Id.* at Section 1.1(o) and Schedule 3.30);

 j) All security deposits; all of each Defendant's goodwill and going concern value of the Business; all government permits, licenses and authorizations held by each Defendant in connection with the Business; all insurance claims arising from or relating to Acquired Assets or Assumed Liabilities; all guarantees, warranties, indemnities, and similar rights of each Defendant with respect to the Business or any Acquired Assets; and all cash, cash equivalent and short-term investments of each Defendant Company held in connection with the Business on the Closing Date, to the extent it is in excess of the Excluded Amount (*Id.* at Sections 1.1(h), (j)-(l), (n),(p)); and

 k) Any cash, cash equivalents, refunds or other proceeds received before or after Closing by any Defendant in connection with or indirectly related to the cancellation, surrender or termination of any Defendant insurance policy. (First Amendment to Asset Purchase Agreement, Section 2(c)).

### B. Assumed Liabilities

27. Under the APA, the Plaintiffs did not assume all liabilities of the NPS businesses, but rather assumed only certain specified liabilities. These Assumed Liabilities are described in Section 1.3 of the APA and in Schedule 1.3(a), and included the following:

    a) all liabilities and obligations arising or accruing on or after the Closing Date under the express terms of the Assumed Contracts and Purchase Orders, but not for any breach or default occurring on or prior to the Closing Date;

    b) certain trade payables, liabilities and other obligations of Schedule 1.3(a) but not for more than the respective amounts set forth to the description of each on that Schedule;

    c) certain trade payables from the date of the APA through the Closing Date to the extent they occurred in the ordinary course of the Business consistent with the Defendants' past practices as disclosed in writing;

    d) Pre-closing Tax liabilities, including Transfer Taxes and Taxes based on net income or attributable to sale or use taxes, but not in more than the respective estimated amounts set forth on Schedule 1.3(a);

    e) third-party claims for personal injuries or product damage made after the Closing Date caused by a product manufactured, distributed or sold by any Defendant before the Closing Date; and

    f) product recall obligations to the extent resulting from one or more Post-Closing Occurrences, as that term is defined in the APA.

-12-

C.  **Representations and Warranties.**

28.  In the APA, Postorivo, on behalf of himself and the other Sellers, made representations and warranties regarding the Acquired Assets and Assumed Liabilities. These representations and warranties included, among others, the following:

    a)  "The Financial Statements have been prepared from the books and records of the Sellers, which books and records *are complete* and *accurately reflect all transactions involving the Business.*" (APA, Section 3.5(a), emphasis added);

    b)  "The books of account and related records of each Seller *reflect accurately and in detail the Acquired Assets and Assumed Liabilities.*" (*Id.* at Section 3.5(b), emphasis added);

    c)  *"No Seller has any liabilities or obligations (whether pursuant to Contracts or otherwise) of any kind whatsoever . . . except: (a) those reflected or reserved against on the 2005 Balance Sheets; (b) those not required under GAAP to be reflected or reserved against in the 2005 Balance Sheets that are expressly quantified and set forth in the Assumed Contracts (other than for breach or nonperformance); and (c) those of the same nature as those set forth on the 2005 Balance Sheets that have arisen in the ordinary course of business of such Seller thereafter (the "<u>Post-Balance Sheet Liabilities</u>"). All Post-Balance Sheet Liabilities are consistent in amount and character with past practice and experience. No Post-Balance Sheet Liability has had or could have a Seller Material Adverse Effect. No Post-Balance Sheet Liability is a result of a breach of contract or warranty, a tort or infringement, or violation of any property rights. No stockholder has any liabilities or obligations of any kind whatsoever arising out of or relating to the Business other than liabilities of the Sellers*

*guaranteed by such Stockholder pursuant to guarantees set forth on Schedule 3.17.*" (*Id.* at Section 3.6 ("No Undisclosed Liabilities"), emphasis added);

  d) "Since September 30, 2005, the business has been conducted in the ordinary course consistent with past practice as disclosed by Sellers in writing to the Buyer Parent (including with respect to the collection of receivables, payment of payables and other liabilities) ... and, *except as set forth on Schedule 3.7, there has not occurred with respect to the Business: (a) any event, occurrence, or development which, individually or in the aggregate, has, had or could have a Seller Material Adverse Effect ...*" (*Id.* at Section 3.7, emphasis added);

  e) "[A]*ll of the finished goods Inventory is in good, merchantable, and usable condition and is salable in the ordinary course of business*. All of the raw materials and work-in-progress Inventory of each Seller can reasonably be expected to be consumed in the ordinary course of business. Except as set forth in Schedule 3.12, none of the Inventory is obsolete, slow-moving...[and] *[t]he quantities of Inventory are ... reasonable in the present circumstances of the Business.*" (*Id.* at Section 3.12 ("Inventory"), emphasis added);

  f) "*Schedule 3.17 contains a complete and accurate list of all Contracts* of the types described below to which each Seller is currently a party or otherwise bound: (a) Contracts with any customer or supplier ... involving payments in excess of $10,000 per year or $20,000 over the life of the Contract ... (n) any other Contract, whether or not made in the ordinary course of business, which is material to the Business or the termination of which has had or could have a Seller Material Adverse Effect. ... Except as set forth on Schedule 3.17 no Seller....is...in default in any material respect under any Contract or instrument required to be set forth in the Schedules to this Agreement ..." (*Id.* at Section 3.17, emphasis added); and

    g)  *"No representation, warranty or statement of any Seller or the Stockholder contained in this Article 3, in any of the Schedules referred to in this Article 3 … contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading."* (*Id.* at Section 3.23, emphasis added).

  29. Postorivo and each of the Sellers executed Closing Certificates that certified the accuracy of the representations and warranties as of the Closing Date. True and correct copies of these Closing Certificates are attached as Exhibit E.

  30. The Closing Certificates are deemed part of the APA. (APA, Section 7.5).

  31. The Closing Certificates specifically certify that the "representations and warranties contained in Article 3 of the [APA] are individually and collectively, true and correct in *all respects* (in the case of any representation or warranty containing any materiality qualification) *or true and correct in all material aspects* (in the case of any representation or warranty without any materiality qualification) as of the date hereof" (emphasis added).

## The APA's Indemnity Provisions

  32. The APA contains mutual indemnity obligations that survive the Closing Date. Among other things, these obligations require that the Sellers "jointly and severally indemnify, defend, save and hold" the Plaintiffs harmless "from and against all demands, claims, allegations, assertions, actions or causes of action, assessments, losses, damages … deficiencies, liabilities, costs, expenses and taxes … asserted against, imposed upon, resulting to, required to be paid by or incurred by any Buyer Indemnitee, directly or indirectly, in connection with or arising out of (a) any Excluded Liability, (b) any breach or inaccuracy of any representation or