warranty made by any Seller or the Stockholder in this Agreement or in any Seller Transaction Document". (APA, Section 11.2).

33. APA Section 11.5 addresses indemnity claims other than Third Party Claims. Section 11.5 provides for an indemnity claim notice procedure, requires of both parties to a disputed claim that good faith efforts be made to resolve the claim, and failing this, that "the dispute shall be resolved by litigation in an appropriate court of competent jurisdiction."

**Sellers' Misrepresentations and Breaches of the APA**

    A.    **Misrepresentations Regarding Inventory.**

34. Within months of closing the Transaction, Plaintiffs began to discover pervasive, undisclosed inventory variances in violation of the Sellers' representations, warranties and covenants. In particular, inventory included in the Acquired Assets and recorded in the companies' records and Financial Statements was found to be obsolete, slow-moving or altogether unsaleable, defective, and in some instances, non-existent. In short, substantial quantities of inventory are not saleable in the ordinary course of business, and there are extensive quantities of inventory that were and are not "reasonable in the present circumstances."

35. Sellers, including members of the Knowledge Group and Postorivo, had actual knowledge of these inventory problems when the APA was executed on November 16, 2007. Among other things, the inventory was purchased by the Sellers, and in the Sellers' possession at all times relevant. The conditions giving rise to the variances are not latent, but rather are readily apparent and, in many cases, self-evident given the type of product involved. Additionally, the sheer volume of inventory affected is significant, representing nearly 70% of the total inventory and requiring an additional write-off representing nearly 40% of the total inventory value. The

inventory problems could not have been, and in fact were not, simply overlooked by the Sellers prior to the Closing Date.

36. The inventory valuation is ongoing, and more variances may be discovered in the future. To date, however, Plaintiffs' have identified valuation variances totaling approximately $8.7 million – $8.2 million of which relates to inventory in the U.S. and is an amount vastly greater than the applicable portion of the $2.5 million reserve in Schedule 3.12 of the APA for "slow moving and obsolete U.S. inventory," and $462,353 of which relates to UK-based inventory, and greatly exceeds the $150,000 reserve for excess and slow-moving inventory there.

37. Inventory valuation variances were described in the March 28, 2007 Indemnity Claims Notice. Quantitatively more variances have been discovered since, and presently include the following:

### 1. Excess and Obsolete Paintball Markers

38. The Acquired Assets were to include 12,449 units of NPS paintball markers represented by Sellers to have a book value of $1,425,558.

39. Contrary to Sellers' representations, warranties and covenants, these units are estimated to have an actual book value of $241,177 for a variety of reasons, including the fact that they are technically and functionally outdated, have high failure rates, or the units on hand greatly exceed market demand or capacity to consume. This, in turn, will cause Plaintiffs to incur significant liability with respect to repair, replacement and warranty claims.

### 2. Non-Existent Truck Inventory

40. The Acquired Assets were to include 49,941 units of various products located on a truck used to store and transport inventory to be sold at certain events, represented by Sellers to have a book value of $597,364.

41. Contrary to Sellers' representations, warranties and covenants, certain of this inventory does not exist. The estimated book value of the missing inventory is approximately $281,136.

### 3. Excess, Obsolete and Poor Quality U.S. Paint

42. The Acquired Assets were to include 57,010 units of paint located in the U.S., represented by Sellers to have a book value of $1,328,057.

43. Contrary to Sellers' representations, warranties and covenants, the estimated book value of this inventory is approximately $1,005,890.

### 4. Defective Product

44. The Acquired Assets were to include 24,170 units of halo loaders, paintballs, ICD Markers, NPS Bunkers, Bauer Compressors, Pin Valves, Universal Fill Adapters, and other miscellaneous items, represented by Sellers to have a book value of $525,183.

45. Contrary to Sellers' representations, warranties and covenants, the inventory is defective, cannot be sold, and therefore has no value.

### 5. Soft Goods

46. The Acquired Assets were to include 181,638 units of soft goods, including clothing, bags, harnesses, protective gear and lifestyle items, represented by Sellers to have a book value of $1,192,612.

47. Contrary to Sellers' representations, warranties and covenants, the actual value of these inventory items is approximately $366,453.

### 6. Miscellaneous and Other

48. The Acquired Assets were to include over 2.2 million units of inventory, including accessories (booklets, catalogs, game fields, safeties, sights, squeegies, tape and videos), air (adapters, bulk tanks, covers, cradles, expansion chambers, hoses, parts, regulators

and vertical), air systems (CO2 and high pressure), barrels (including kits and parts), goggles (including cleaners, lenses, masks, straps and visors), guns (including grips, parts and part kits), loaders (including agitating, force-fed and gravity types, in addition to body kits, parts, pods, and shells), and miscellaneous items (including banners, calendars, catalogs, counter mats, license covers, magazines, mousepads, posters, services, stickers and videos), having a combined book value of $5,651,294.

49.  Contrary to Sellers' representations, warranties and covenants, the estimated actual value of this inventory is approximately $1,949,384.

### 7.  BT Paintball Markers

50.  The Acquired Assets were to include more than 29,171 units of this brand of marker. The represented book value of this inventory was $1,876,706.

51.  While the BT-4 marker is a current product, there are about 2 years of inventory. Given that the marker is 18 months into the 36-month total average lifecycle of a marker, it will be impossible to sell this inventory without heavy discounts. Contrary to Sellers' representations, warranties and covenants, the actual value is approximately $1,242,697.

52.  The BT-16 marker was plagued with problems: mechanical issues, problems with customer service support and quality control problems. Consequently, this marker cannot be sold into the marketplace. In addition, there is no demand for this marker in the marketplace, even if it were not defective. Contrary to Sellers' representations, warranties and covenants, these markers are unsaleable and have no value, or if sold, the costs of customer support, warranties and repairs would exceed the proceeds received.

### 8. Icon X Markers

53. The Acquired Assets were to include approximately 42,000 units of this gun. The represented book value was $1,045,035.

54. Contrary to Sellers' representations, warranties and covenants, these markers are obsolete, and can only be sold at steep discounts to cost, if at all. The actual book value of this inventory is approximately $795,035.

### 9. BT Marker Barrels

55. The Acquired Assets were to include more than 40,087 units of these barrel upgrades to markers. The represented book value was $1,106,576.

56. The majority of these barrel upgrades are for markers manufactured by other companies that the Plaintiffs do not sell. In addition, the number of units on hand for this product represents approximately two years of inventory. Contrary to Sellers' representations, warranties and covenants, given the sheer volume of inventory, it will impossible to sell this product at anything but a substantial discount. The estimated book value of the inventory is approximately $606,576.

### 10. Excess, Obsolete and Poor Quality U.K. Paint

57. The Acquired Assets were to include 24,230 units of paintballs and paint in the companies' U.K. inventory, represented by Sellers to have a book value of $288,057.

58. This inventory had to be re-packaged for sale as non-branded "seconds" or "thirds" – generic brands of lesser value – because the paint either was old or simply of poor quality. In order to sell the paint, it must be priced below cost. Contrary to Sellers' representations, warranties and covenants, these units are estimated to have an actual book value of approximately $95,697.

### 11. U.K. Excess and Obsolete Inventory

59. The Acquired Assets were to include 75,372 units of inventory that have been selling below cost since November 17, 2006. This category includes, among others, old paint (apart from that identified in no. 1 above), air systems, barrels, stickers, apparel and miscellaneous items such as banners, lanyards, and mouse pads. The represented book value was $365,824.

60. Contrary to Sellers' representations, warranties and covenants, this inventory is obsolete and slow-moving; the actual book value is approximately $95,831.

### B. Undisclosed Liabilities.

61. To date, and contrary to Sellers' representations, warranties and covenants, Plaintiffs have discovered undisclosed liabilities totaling $1,580,425.

### 1. Undisclosed Purchase Orders

62. Plaintiffs discovered numerous purchase order liabilities that were not disclosed in the APA. They include the following:

- BT AK-47 Barrel Systems and Barrel Kits ranging from $21 to $26 per unit, totaling approximately $61,600;
- BT-4 Combat Rental Parts Kits costing $246 per unit, totaling approximately $39,360;
- BT-4 Combat markers costing $50 per unit, totaling approximately $725,000;
- 32 Degrees Icon-X markers costing $24 per unit, totaling approximately $432,000;
- Indian Creek Lasoya ProMaster markers costing $145 per unit, totaling approximately $105,560; and
- Indian Creek Promaster markers costing $110 per unit, totaling approximately $22,440.

63. Postorivo and therefore the other Sellers had actual knowledge of these undisclosed purchase orders. At a joint special meeting of the board of directors of AJ Acquisition Holdings, Inc. and AJ Acquisition Intermediate Holdings, LLC on January 24, 2007, for example, Postorivo admitted that he knew about "upwards of $1.0 million dollars of purchase orders for a significant supply of BT markers (among other products)" that was not disclosed as of the Closing Date.

### 2. Other Undisclosed Liabilities

64. In addition, Plaintiffs have discovered approximately $194,465 of items and costs relating to undisclosed tooling expenses that were authorized by Sellers to be spent in Taiwan in order to be ready to manufacture a product known as the P2 electronic marker. As set forth in the Indemnity Claims Notice, these expenses include an import tax for the Korea Goggle Strap, the Triangle Ear Piece Clip Mold, the import tax for the Yellow Plug for Barrel, the Camo Screen Mould, the ICD Marker Spare Parts, the Old P2 Marker Mould, the BT-4 Rip Clip Mould, and the New Halo B (NF Floader) Mould.

65. The Sellers had actual knowledge of the foregoing undisclosed liabilities.

## Consequential Damages Resulting from Sellers' Misrepresentations and Breaches of the APA

66. APA Section 11.2 expressly provides for consequential damages arising from an identifiable exposure.

67. Consequential damages resulting from Seller's misrepresentations and breaches of the APA have been incurred and likely will continue to be incurred. To date, and conservatively viewed, Plaintiffs believe that consequential damages exceed $5 million, and may in the course of events substantially exceed $5 million. Consequential damages to date include:

-22-

a) costs in manpower expended in investigating and recording inventory problems, assessing alternatives for the inventory, developing a multi-faceted strategy to mitigate the inventory problems, repairing certain inventory (including re-packaging) to make it saleable and otherwise dealing with the inventory problems described above;

b) cost of parts necessary to repair certain unsaleable inventory;

c) lost opportunity costs in the form of diverted manpower, cash and assets that otherwise could have been expended on profitable corporate activities;

d) the loss of revenues from the sale of certain inventory has deprived the Plaintiffs of the use of those revenues, has required infusion of cash by shareholders and has increased the Plaintiffs' debt and interest burden;

e) delays in the sale of certain inventory caused by Sellers' breaches have resulted in loss of the time value of revenues generated and to be generated by such sales;

f) the loss of revenue from the sale of inventory has caused and continues to cause the Plaintiffs to bear an increased level of debt and a higher level of interest expense;

g) loss of standard margins on the inventory had it been "saleable in the ordinary course of business";

h) customer and brand damage due to the unavailability of salable product, and the damage caused to certain brands due to the defective nature of certain elements of the inventory;

i) impaired relationships with the Plaintiffs' vendors;

j) employee costs to provide customer service, warranties and parts for product sold prior to the post-closing determination regarding the problems with certain products: and

   k)  losses not yet incurred or not yet known, but which may be incurred or discovered in the future.

**<u>Indemnity Claims Notice Under Provisions of APA</u>**

  68. On March 28, 2007, a formal Indemnity Claims Notice was served upon Sellers in accordance with the Notice provisions in Section 12.6 of the APA. A true and correct copy of the Indemnity Claims Notice is attached at Exhibit F and is incorporated herein.

  69. The Indemnity Claims Notice specifically described the numerous violations, demanded monetary relief, and reserved the right to seek additional damages, including consequential damages.

  70. By letter dated April 10, 2007 from Sellers' counsel, Plaintiffs were advised that Sellers disputed the factual allegations in the Indemnity Claims Notice and disclaimed any liability under the indemnity provisions of APA Section 11.2. The letter also indicated that Sellers were willing to discuss a possible amicable resolution to the Indemnity Claims Notice and all disputes arising from the Transaction.

**<u>Good Faith Efforts to Negotiate Resolution</u>**

  71. The March 28, 2007 Indemnity Claims Notice was accompanied by a request for a meeting to discuss the misrepresentations and breaches described in the Notice.

  72. Almost two weeks elapsed before plaintiffs received Sellers' April 10 response, which did not firmly commit to a meeting or a meeting date but rather simply indicated that Sellers disputed the indemnity claims, and that Sellers would be willing to discuss an amicable resolution. The April 10 response recommended a meeting venue in Cherry Hill, New Jersey.

  73. Numerous follow-up attempts to schedule a meeting or conference call were made by Plaintiffs' counsel after receiving the April 10 response. Those communications in some

instances went unanswered for days on end. In other instances, the communications were met with "responses" that did not commit to a meeting time and venue.

74. The Sellers have engaged in evasive tactics; consequently, to date, Plaintiffs' good faith efforts to amicably resolve the disputed claims have been unsuccessful.

75. The Sellers have thwarted every attempt to convene a meeting or a call to conduct discussions regarding a possible resolution of the disputed indemnity claims.

**COUNT I:    CLAIM FOR CONTRACTUAL INDEMNIFICATION AGAINST ALL DEFENDANTS**

76. Plaintiffs incorporate by reference herein the allegations in paragraphs 1-73 as if fully set forth.

77. For the reasons and in the manner alleged above, the Defendants have breached each of the following representations and warranties contained in the APA:

    a)    Section 3.5(a), in that the books and records of the Sellers were incomplete, and did not accurately reflect all transactions involving the NPS businesses;

    b)    Section 3.5(b), in that the books of account and related records of each Seller failed to reflect accurately and in detail the Acquired Assets and Assumed Liabilities, and were not maintained in accordance with sound accounting practices, including the maintenance of internal controls;

    c)    Section 3.6 and Schedule 3.17, in that the Sellers' liabilities and obligations were misrepresented and otherwise not fully disclosed;

    d)    Section 3.7 and Schedule 3.17, in that there were, in fact, events, occurrences and developments not identified on Schedule 3.17 which, individually or in the aggregate, had or could have a Seller Material Adverse Effect as that term is defined in the APA;

   e) Section 3.12 and Schedule 3.12, in that a substantial portion of the of the finished goods Inventory, as that term is defined in the APA, were not in good, merchantable, and usable condition, or salable in the ordinary course of business; the raw materials and work-in-progress Inventory of each Seller could not reasonably be expected to be consumed in the ordinary course of business; and there was obsolete, slow-moving inventory not identified in Schedule 3.12 and Inventory quantities that were not reasonable in the present circumstances of the Business;

   f) Section 3.17 and Schedules 3.1 and 3.17, in that Schedule 3.1 failed to identify all Contracts with any customer or supplier involving payments in excess of $10,000 per year or $20,000 over the life of the Contract and other Contracts material to the Business or the termination of which has had or could have a Seller Material Adverse Effect, and Schedule 3.17 failed to identify all contracts and instruments under which any Seller was in default in any material respect;

   g) Section 3.23, in that Article 3 and the schedules referenced in Article 3 contained untrue statements of fact and omitted material facts necessary to make the statements contained in the APA not misleading;

   h) Section 3.27, in that Sellers failed to provide complete and accurate schedules; and

   i) Section 3.28, in that Sellers failed to make due and diligent inquiry into the matters to which the representations and warranties relate.

  78. As set forth above, Plaintiffs have been damaged by these breaches, have incurred and likely will incur in the future consequential damages as a result of these breaches, and are

entitled to indemnification under Article 11 of the APA, including Sections 11.2, 11.4, 11.5, and 11.6.

79. Plaintiffs have complied with the indemnification provisions of the APA, including those contained in Section 11.5.

80. The claims set forth above have been disputed, and remain disputed despite Plaintiffs' good faith efforts to resolve them amicably.

81. Because Sellers had actual knowledge of the breaches alleged above before the representations and warranties were made, and because some or all of the breaches of representations and warranties also constitute breaches of Postorivo's covenants under the APA, the damages limitations in APA Section 11.7 are inapplicable.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against the Defendants, jointly and severally, and award them actual and consequential damages, punitive damages, attorneys fees and litigation costs, and such other relief that this Court deems appropriate.

### COUNT II:    BREACH OF CONTRACT AGAINST ALL DEFENDANTS

82. Plaintiffs incorporate by reference herein the allegations in paragraphs 1-79 as if fully set forth.

83. The APA is a lawful and enforceable contract.

84. The indemnity obligations set forth in Article 11 likewise are lawful and enforceable.

85. Defendants, through counsel, have disputed their indemnity obligations under the APA in connection with claims where they have no reasonable, good faith basis to dispute the factual bases for those claims or their indemnity obligations with respect to those claims.

86. In fact, as to some of the claims made herein, Postorivo already has admitted the facts upon which they are based.

87. Defendants' refusal to honor their indemnity obligations constitutes a breach of the APA.

88. In view of the fact that Postorivo already has acknowledged responsibility for at least some of the inventory variances discovered after the Closing Date, Defendants' refusal to honor their indemnity obligations constitutes bad faith.

89. As set forth above, Plaintiffs have been damaged by these breaches, and have incurred and likely will incur in the future consequential damages as a result of these breaches.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against the Defendants, jointly and severally, and award them declaratory, actual and consequential damages, punitive damages, attorneys fees and litigation costs, and such other relief that this Court deems appropriate.

## COUNT III: INTENTIONAL MISREPRESENTATION AGAINST DEFENDANT POSTORIVO

90. Plaintiffs incorporate by reference herein the allegations in paragraphs 1-86 as if fully set forth.

91. As alleged above, Postorivo had actual knowledge of the misrepresentations and omissions contained in the APA (including the due diligence documentation) at the time those misrepresentations and omissions were made and/or communicated to Plaintiffs.

92. Postorivo made or permitted the misrepresentations and omissions to be made to induce Plaintiffs to enter the APA and consummate the Transaction.

93. Plaintiffs reasonably relied on those misrepresentations in entering the APA and consummating the Transaction, and in any event need not prove reliance under Section 11.1 of the APA as a precondition to recovery.

94. As set forth above, Plaintiffs have been damaged by these misrepresentations and omissions, and has incurred and likely will incur in the future consequential damages as a result of these misrepresentations and omissions.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Postorivo, and award them actual and consequential damages, punitive damages, attorneys fees and litigation costs, and such other relief that this Court deems appropriate.

### COUNT IV: UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

95. Plaintiffs incorporate by reference herein the allegations in paragraphs 1-91 as if fully set forth.

96. The Transaction was supported by consideration, which consideration was based in part on the parties' mutual understanding of the benefits they stood to realize.

97. The Transaction consideration was based on the Acquired Assets and Acquired Liabilities described in the APA and the due diligence documentation provided by Defendants.

98. As alleged above, due to Defendants' misrepresentations and omissions, the intrinsic value of the Acquired Assets has proven to be less than represented by Defendants in material respects, and the Acquired Liabilities have proven to be materially higher than represented by Defendants.

99. Plaintiffs have performed their obligations under the APA in all material respects.

100. Due to Defendants' misrepresentations and omissions, the Plaintiffs have not received in the Transaction the value for which they bargained and upon which the aggregate

Transaction Price was based. Correspondingly, Defendants have been inequitably and unjustly enriched in the Transaction by Plaintiffs' overpayment.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against the Defendants, jointly and severally, and award them actual and consequential damages, attorney fees and litigation costs, and such other relief that this Court deems appropriate.

Dated: May 4, 2007    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

By: _/s/ R. Montgomery Donaldson_
R. Montgomery Donaldson (Del. Bar No. 4367)
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Telephone: (302) 504-7840
Facsimile: (302) 504-7820
E-Mail: rdonaldson@mmwr.com
*Attorney for Plaintiffs*

Of Counsel:

Richard L. Scheff, Esquire
Jodi Bromberg, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

Louis A. Petroni, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
LibertyView
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002-5074

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| KEE ACTION SPORTS HOLDINGS, INC. )<br>  (f/k/a AJ Acquisition Holdings, Inc.), )<br>         a Delaware Corporation, )<br> )<br>KEE ACTION SPORTS LLC )<br>  (f/k/a AJ Intermediate Holdings LLC), )<br>         a Delaware Limited Liability )<br>         Company, )<br> )<br>KEE ACTION SPORTS I LLC )<br>  (f/k/a AJ Acquisition I LLC), )<br>         a Delaware Limited Liability )<br>         Company, )<br> )<br>                and )<br> )<br>KEE ACTION SPORTS I UK LIMITED )<br>  (f/k/a AJ Acquisition I UK Limited), )<br>         a Private Company Limited )<br>         by Shares Registered in England )<br>         and Wales )<br> )<br>                Plaintiffs, )<br> )<br>     v. )<br> )<br>EUGENIO POSTORIVO, )<br>         an individual residing at )<br>         329 Breakneck Road, )<br>         Sewell, NJ 08080 )<br> )<br> )<br>PBS HOLDING GROUP, INC. )<br>  (f/k/a National Paintball Supply, Inc.), )<br>         a Delaware Corporation, )<br> )<br> )<br>PBS HOLDING GROUP X-TREMES, INC. )<br>  (f/k/a Paintball 2 X-tremes, Inc.), )<br>         A New Jersey Corporation, )<br> )<br> | Civil Action No.<br><br>**Trial By Jury of 12 Demanded**<br><br>**NON-ARBITRATION CASE** |